NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE MERCEDES-BENZ EMISSIONS LITIGATION | Civil Action No.: 16-881 (JLL)(JAD) |
| | **OPINION** |

**LINARES**, Chief District Judge.

This matter comes before the Court by way of Defendants Mercedes-Benz USA, LLC's and Daimler AG's motion to dismiss the Fourth Consolidated and Amended Class Action Complaint ("FAC"), (ECF No. 117), as well as Defendant Robert Bosch LLC's motion to dismiss the FAC, (ECF No. 118). Plaintiffs have opposed these motions (ECF Nos. 126–27), and Defendants have replied thereto, (ECF Nos. 131–32). The Court decides this matter without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, Defendants' motions are granted in part and denied in part.

## I. BACKGROUND[1]

### A. Facts

This is a putative class action involving allegations that Defendants Mercedes-Benz USA, LLC and Daimler AG (collectively, "Mercedes"), together with Bosch GmbH and Bosch LLC (collectively, "Bosch") have unlawfully mislead consumers into purchasing certain "BlueTEC

---

[1] The facts as stated herein are taken as alleged in the FAC, (ECF No. 107).

diesel" vehicles (the "Polluting Vehicles") by misrepresenting the environmental impact of these vehicles during on-road driving. (FAC ¶ 10–20).[2]

According to Plaintiffs, "Mercedes' advertisements, promotional campaigns, and public statements represented that the Polluting Vehicles had high fuel economy, low emissions, reduced NOx by 90%, had lower emissions than comparable diesel vehicles, and had lower emissions than other comparable vehicles." (FAC ¶ 323). However, Mercedes, with help of Bosch, installed an electronic control unit in the Polluting Vehicles known as the EDC17. (FAC ¶ 358). The EDC17 allegedly functions as a defeat device, meaning it turned off or limited emissions reductions during real-world driving conditions. (FAC ¶¶ 16–17, 21). This defeat device was "only discoverable when conducting over-the-road testing that is not part of the certification protocol." (FAC ¶ 252). The Polluting Vehicles also allegedly failed to perform up to their touted environmental standards in other situations, such as when ambient temperatures drop below 50°F/10°C—a defect Mercedes has acknowledged. (FAC ¶ 135).

Plaintiffs contend that Mercedes never disclosed the existence of the defeat device, nor the fact that the BlueTEC engines emit emissions substantially higher than those of gasoline vehicles, and thus, "defrauded its customers by omission, and engaged in fraud and unfair and deceptive conduct under federal and state law." (FAC ¶¶ 19, 313). Had Plaintiffs known of the emissions issues associated with the Polluting Vehicles, they would not have purchased those vehicles, or they would have paid substantially less for them. (FAC ¶ 317). As to Bosch, the FAC sets forth that Mercedes and Bosch entered into a scheme to evade U.S. emissions requirements and to deceive "the public into believing the Polluting Vehicles were 'clean diesels,'" in order to "bolster

---

[2] The Polluting Vehicles consist of the following Mercedes models powered by BlueTEC diesel engines: ML 320, ML 350, GL 320, E320, S350, R320, E Class, GL Class, ML Class, R Class, S Class, GLK Class, GLE Class, and Sprinter. (FAC ¶ 18).

revenue, augment profits and increase Mercedes' share of the diesel vehicle market." (FAC ¶¶ 17, 356).

Plaintiffs, on behalf of a national class and state subclasses, now assert claims for violation of the RICO Act, as well as violations of state consumer protection statutes, and fraudulent concealment. (FAC ¶¶ 342–1752).

## B. Procedural History

Plaintiffs initiated this action on February 18, 2016. (ECF No. 1). On May 6, 2016, Plaintiffs filed the Consolidated and Amended Class Action Complaint ("CAC"). (ECF No. 17). Mercedes moved to dismiss the CAC on July 8, 2016. (ECF No. 38). This Court granted that motion on December 6, 2016. (ECF Nos. 58–59). The Court found that Plaintiffs failed to establish Article III standing because the CAC did not allege that their injury was fairly traceable to Mercedes' conduct. (ECF No. 58 at 11–14). In particular, the Court found that "Plaintiffs have not alleged that they actually viewed any category of advertisements . . . that contained the alleged misrepresentations." (ECF No. 58 at 14). Accordingly, the Court dismissed the CAC without prejudice. (ECF Nos. 58–59). Plaintiffs then filed a third consolidated and amended class action complaint on March 3, 2017, (ECF No. 81), and finally, they filed the operative FAC on September 25, 2017 adding Bosch as a defendant and the accompanying RICO allegations. Mercedes and Bosch now move separately to dismiss the FAC arguing that Plaintiffs lack Article III standing, that Plaintiffs' state-law claims are preempted by the Clean Air Act or, alternatively, fail to state a claim, and finally that Plaintiffs fail to state a RICO claim.

## II.   LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(1): Standing

Defendants seek to dismiss Plaintiffs' Complaint for lack of standing.  "Rule 12(b)(1) governs motions to dismiss for lack of standing, as standing is a jurisdictional matter." *N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 371 n.3 (3d Cir. 2015).

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "It is axiomatic that, in addition to those requirements imposed by statute, plaintiffs must also satisfy Article III of the Constitution . . . ." *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 455 (3d Cir. 2003).  The requirements of Article III standing are as follows:

> (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) (quoting *United States v. Hays*, 515 U.S. 737, 742–43 (1995)); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (reiterating the same factors and articulating the second factor as "fairly traceable to the challenged conduct of the defendant").

On a motion to dismiss for lack of standing, the plaintiff "'bears the burden of establishing' the elements of standing, and 'each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *FOCUS v. Allegheny Cty. Ct. Com. Pl.*, 75 F.3d 834, 838 (3d Cir. 1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

"For the purpose of determining standing, [the court] must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the complaining party." *Storino*, 322 F.3d at 296 (citing *Warth*, 422 U.S. at 501).

## B. Federal Rule of Civil Procedure 12(b)(6)

To withstand a motion to dismiss for failure to state a claim, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

To determine the sufficiency of a complaint under Twombly and Iqbal in the Third Circuit, the Court must take three steps. "First, it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.' Second, it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, '[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

# III. ANALYSIS

## A. Article III Standing

As mentioned briefly above, this Court had previously dismissed Plaintiffs' CAC for lack of standing. In its prior Opinion, this Court found that while the Plaintiffs had set forth allegations "sufficient to support [their] claims that the [Polluting Vehicles] do not live up to Defendants' representations," Plaintiffs nevertheless failed to establish Article III standing because it was not clear that the injury was "fairly traceable" to Defendants' conduct. (ECF No. 58 at 8, 14). This was because "no Plaintiff ha[d] alleged that he or she relied upon any of the cited advertisements in deciding to lease or purchase one of Defendants' vehicles." (ECF No. 58 at 13–14). Both Mercedes and Bosch now argue that Plaintiffs lack Article III standing. (ECF Nos. 117-1 at 19–25; 118-1 at 19–27). Mercedes and Bosch both claim that Plaintiffs failed to address the traceability deficiencies raised in the Court's prior Opinion. (ECF Nos. 117-1 at 19–23; 118-1 at 25–27). Mercedes also argues that Plaintiffs allegations contain three theories of injury that are foreclosed as a matter of law: allegations regarding public environmental and health harms, violations of environmental regulations, and allegations of future harm, and that Plaintiffs have nevertheless abandoned these theories as a basis for standing. (ECF No. 117-1 at 24). Mercedes argues that Plaintiffs' benefit of the bargain theory is unsupported by allegations in the FAC. (ECF No. 117-1 at 24). Bosch similarly claims that Plaintiffs have abandoned all theories of injury except for a benefit-of-the-bargain injury, but that the "benefit of the bargain, upon which Plaintiffs base their claim for overpayment, cannot serve as the basis for an Article III injury in the absence of a contract or any 'bargain' between [Bosch] and Plaintiffs." (ECF No. 118-1 at 20–21). The Court will address these arguments in turn.

1. Injury-in-Fact

Plaintiffs have established an injury in fact that can serve as the basis for Article III standing. In its prior Opinion, this Court found that "Plaintiffs have plausibly pled that the products received did not live up to the claims made by Defendants," and that "benefit of the bargain damages are recoverable for overpayment and recoverable to confer standing." (ECF No. 58 at 6, 8). In challenging Plaintiffs' benefit of the bargain theory of injury in fact, both Mercedes and Bosch argue that Plaintiffs have not shown that the Polluting Vehicles "failed to work for [their] intended purpose or [are] worth objectively less than what one could reasonably expect." (ECF No. 117-1 at 24 (quoting *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010)); ECF No. 118-1 at 21). However, accepting Plaintiffs' allegations as true, they paid a higher price for the BlueTEC clean diesel engines, which, in reality, polluted at levels far higher than would be expected. (FAC ¶¶ 317, 323). "In other words, they paid for a product which did not operate in the way they believed it did." *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1052 (E.D. Mich. 2018). Claims of overpayment for a misrepresented product are "classic form[s] of injury in fact," that "[are] concrete and particularized." *In re Gerber Probiotic Sales Practice Litig.*, No. 12-835, 2013 WL 4517994, at *5 (D.N.J. Aug. 23, 2013).

Defendants' reliance on cases like *Koronthaly* and *Estrada v. Johnson & Johnson*, No. 16-7492, 2017 WL 2999026 (D.N.J. July 14, 2017), is misplaced, as those cases are distinguishable. In fact, *Estrada* explains why the facts before Judge Wolfson in that case and before the Third Circuit in *Koronthaly* are different from those present here. Judge Wolfson wrote that:

> [w]hile Plaintiff places reliance on several cases recognizing standing on a benefit-of-the-bargain theory of economic harm, those cases are distinguishable from the present matter[, because] . . . in each of those cases, the courts found that the plaintiffs did not receive the benefit of their bargain because either: (i) the plaintiffs received a defective product; or (ii) the plaintiffs pled facts sufficient for the court to conclude that they would not have purchased the product at issue but for a

specific misrepresentation by the defendants; *i.e.*, that the plaintiff was induced into purchasing the product by a specific misrepresentation.

*Estrada*, 2017 WL 2999026, at *9. In both *Koronthaly* and *Estrada*, the plaintiffs pled injury-in-fact based on economic harm from an alleged physical injury that came from an undisclosed risk from using a cosmetic product. 374 F. App'x at 259; 2017 WL 2999026, at *9. However, these are cases where "the plaintiffs suffered no ill effects." *In re Gerber*, 2013 WL 4517994, at *5. That is not the case here, as Plaintiffs have pled facts asserting that they fall into either of the two categories recognizing standing on a benefit of the bargain theory as outlined in *Estrada*.

In addition, Bosch argues that Plaintiffs have not established an injury-in-fact in their claims against it, because "[Bosch] was not a party to any of Plaintiffs' vehicle-purchase contracts, and no named Plaintiff makes any allegation that they had any relationship with [Bosch]." (ECF No. 118-1 at 21). Bosch's reliance on the absence of privity of contract is not relevant in this context. In the cases Bosch cites in support of this proposition—*Koronthaly*, *Bowman v. RAM Med., Inc.*, No. 10-cv-4403, 2012 WL 1964452 (D.N.J. May 31, 2012), and *Young v. Johnson & Johnson*, No. 11-4580, 2012 WL 1372286 (D.N.J. Apr. 19, 2012)—the lack of the contract alone was not the only reason the plaintiffs failed to establish injury-in-fact. In each case, it was the lack of privity of contract in addition to a failure to allege facts demonstrating that the product failed to work as intended or was worth less than what a reasonable consumer would expect. *Koronthaly*, 374 F. App'x at 259; *Bowman*, 2012 WL 1964452, at *3; *Young*, 2012 WL 1372286, at *4. Judge Chen explained in *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices and Products Liability Litigation ("FCA")*:

> [T]he courts in *L'Oreal* and *Johnson & Johnson* never held that a plaintiff must have a contractual relationship with a defendant in order to assert a cognizable overpayment injury. Instead, those courts simply noted that the plaintiffs there had invoked a benefit-of-the-bargain theory of injury, but could not maintain such a theory because they had not entered into contracts with the defendants. Here,

8

Plaintiffs do not allege that they entered into contracts with the Bosch Defendants, which were then breached. Rather, Plaintiffs assert that the Bosch Defendants played a role in designing, implementing, and concealing software that was used in the Class Vehicles to cheat emissions tests. . . . The benefit-of-the-bargain contract analysis in *L'Oreal* and *Johnson & Johnson* is therefore inapplicable.

295 F. Supp. 3d 927, 953 (N.D. Cal. 2018). [3]

### 2. Fairly Traceable

Defendants' traceability arguments also fail. While this Court is very cognizant of its previous Opinion dismissing the CAC on traceability grounds, it now finds that the FAC addresses these concerns, in light of Plaintiffs amendments and a spate of recent decisions in other districts addressing Article III standing in very similar cases which support a finding that Plaintiffs have established Article III standing. Mercedes and Bosch attack the traceability query from different angles, so the Court will address their arguments separately.

#### i. *Mercedes*

Mercedes argues that "fifty-four out of the sixty named plaintiffs in the FAC [] still fail to allege facts sufficient to support Article III standing," despite the Court's prior Opinion holding that those same Plaintiffs did not establish reliance on the cited advertisements in their decision to purchase or lease a Polluting Vehicle. (ECF No. 117-1 at 19–20). Mercedes claims that twenty-four of those plaintiffs reallege the same boilerplate, generalized assertions of deception and reliance that the Court previously rejected. (ECF No. 117-1 at 20–21). Another seventeen Plaintiffs point to advertising from non-party dealerships, while seven Plaintiffs do not allege that the advertisements they saw "contained the alleged misrepresentations." (ECF No. 117-1 at 21–

---

[3] Bosch also argues that the R320 and GLE types of the Polluting Vehicles should excluded from the claims because, "Plaintiffs have no standing to pursue claims based on Affected Vehicles that they did not purchase or lease." (ECF No. 118-1 at 13–14). This argument is premature at the motion to dismiss stage. *Luppino v. Mercedes-Benz USA, LLC*, No. 09-5582, 2013 WL 6047556, at *6 (D.N.J. Nov. 12, 2013) (finding that "dismissal of Plaintiffs' claims related to vehicle/wheel/tire combinations Plaintiffs did not purchase would be premature" at the motion to dismiss stage).

22). Finally, six more Plaintiffs do not allege that they viewed or relied on Mercedes' ads before buying or leasing their vehicle. (ECF No. 117-1 at 23).

Plaintiffs argue that they have cured these defects by retooling their complaint and "focusing on Mercedes' omissions and referencing the 'clean diesel' marketing campaign to demonstrate that those omissions were plausibly material to the targeted consumers." (ECF No. 126 at 28). The Court agrees. Plaintiffs have, for example, alleged that "Mercedes marketed the BlueTEC-equipped vehicles as environmentally friendly and fuel efficient," that this advertising "[was] widely disseminated throughout the United States," and that Mercedes "h[eld] itself out as a protector of the environment." (FAC ¶¶ 321–22, 324). At the same time, Plaintiffs allege that "Mercedes intentionally shut[] down or severely limit[ed] the emissions control system when the BlueTEC vehicles are on the road," and that Mercedes "intentionally concealed" and hid this fact "from the consuming public at the same time that" it "touted the vehicles as 'clean,' earth friendly, and complaint with all the relevant emissions standards." (FAC ¶ 16).

Similar allegations have been found by other courts addressing defeat device-based diesel emissions scandals across the country. In *Counts v. General Motors*, the plaintiffs also asserted an overpayment theory. 237 F. Supp. 3d 572, 582 (E.D. Mich. 2017). The Court explained as follows:

> GM promised a clean diesel engine—including 'at least 90% less nitrogen oxide and particulate emissions'—but actually delivered a vehicle that turns off its emissions reduction system when in use. GM charged more for the diesel Chevrolet Cruze model than a comparable gasoline model and Plaintiffs chose the diesel model based at least in part on its 'clean diesel' features. Accordingly, Plaintiffs allege that GM's misrepresentations resulted in their overpaying for a vehicle because the vehicle did not work in the way GM promised it would.

*Id.* The *Counts* Court found that:

> [t]his alleged disparity between what the Cruze was represented to be and what it actually is . . . is sufficient to constitute an injury in fact. Even if the Plaintiffs did

not specifically rely on the 'clean diesel' advertising in choosing to buy the Cruze, they paid a price, determined the market, which relied upon GM's representation that the vehicle included a fully functional 'clean diesel' system. . . . Plaintiff's overpayment can thus be traced directly to GM's alleged actions.

*Id.* at 586.

In *In re Duramax Diesel Litigation*, the plaintiffs alleged that GM "represented the Duramax [diesel] engine as providing both low emissions and high performance." 298 F. Supp. 3d 1037, 1046 (E.D. Mich. 2018). However, the *Duramax* plaintiffs alleged that the high power and efficiency of the Duramax engine was obtained only by reducing emissions controls with the aid of a defeat device. *Id.* at 1047. The *Duramax* plaintiffs alleged that had they known "of the higher emissions at the time they purchased or leased their Polluting Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did." *Id.* at 1050. The *Duramax* Court found that the injury was "traceable to GM's actions: GM developed the Duramax engine (including the alleged defeat devices), marketed its diesel vehicles as environmentally friendly, and set the MSRP for its diesel vehicles." *Id.* at 1052.

Lastly, in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, the Court analyzed whether inflated financing and leasing fees paid by former lessees of the class vehicles were fairly traceable to the conduct of Volkswagen. --- F. Supp. 3d. ---, 2018 WL 4777134, at *9 (N.D. Cal. Oct. 3, 2018). The plaintiffs in that case alleged that they paid a premium for Volkswagen's TDI "clean diesel" vehicles, which Volkswagen marketed as "being low-emission, environmentally friendly, fuel efficient, and high performing," while concealing "the fact that VW had installed software in these cars that caused their emission controls to perform one way during emissions testing, and another (less effective) way during normal driving conditions. *Id.* at *1. The Court found that the increased fees were fairly traceable

to Volkswagen's conduct, because the "'clean diesel' premium plausibly increased the price of the financed vehicles, which in turn would have led directly to higher financing fees." *Id.* at *9.

The allegations in the three cases finding Article III standing above are sufficiently similar to those before this Court to support a finding that the alleged injury in fact was fairly traceable to Mercedes' conduct. As to Mercedes' argument that fifty-four of the sixty named plaintiffs fail to establish Article III standing, this argument fails for the same reasons elaborated above. The "boilerplate" allegations that Mercedes' claims are insufficient are quite the opposite. That language is as follows:

> Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes disclosed this design, and the fact that the ML 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

(FAC ¶ 27). The FAC sets out these same allegations for each named Plaintiff. (FAC ¶¶ 27–87). These allegations mirror those in *Counts*, *Duramax*, and *Volkswagen*, in addition to the other portions of the FAC already outlined above. As such, the Court rejects Mercedes' arguments regarding the deficiencies of the named plaintiffs' claims as to Article III standing.

ii. *Bosch*

Bosch argues that Plaintiffs' allegations are based on its alleged misconduct with Volkswagen and Fiat-Chrysler, and Bosch's conduct with respect to other auto-makers "cannot serve to establish a causal relationship to Plaintiffs' alleged injuries concerning Mercedes vehicles." (ECF No. 118-1 at 25). Even if those allegations could establish a causal relationship, Bosch argues, Plaintiffs have failed to identify any advertisements, representations, or omissions by Bosch itself, and thus Plaintiffs' injuries are not fairly traceable to Bosch. (ECF No. 118-1 at 26).

Plaintiffs argue that they have adequately alleged that their injuries are fairly traceable to Bosch's conduct for the same reasons that the injuries are fairly traceable to Mercedes' conduct. (ECF No. 127 at 16). This Court agrees. The FAC is littered with allegations detailing Bosch's active participation in the alleged scheme to market the BlueTEC line of vehicles as "clean diesels" when Bosch knew they were not. For example, Plaintiffs allege that without Bosch's "knowing and active cooperation, Mercedes would not have been able to carry out the 'Clean Diesel' scheme outlined in this complaint," and that Bosch "participated not just in the development of the defeat device, but in the scheme to prevent U.S. regulators from uncovering the device's true functionality." (FAC ¶¶ 20, 106). Bosch also allegedly "marketed 'Clean Diesel' in the United States and lobbied U.S. regulators to approve 'Clean Diesel.'" (FAC ¶ 106).

In *FCA*, the Northern District of California dealt with facts nearly identical to the case before this court. There, the plaintiffs alleged that they paid more for the EcoDiesel feature, which the defendant falsely advertised as delivering more power, performance, fuel economy, and environmental friendliness than comparable gasoline vehicles. 295 F. Supp. 3d at 946. Bosch argued similarly that the plaintiffs had "not identified any statement that [Bosch] made to [the plaintiffs] that could support a purportedly inflated price for the Class Vehicles," and that because Bosch was not a party to the contract with Plaintiffs, it could not have deprived them of their benefit of the bargain. *Id.* at 951. There, as here, the plaintiffs alleged that Bosch "participated in a scheme and conspiracy with [the auto manufacturers] to develop, implement, and conceal software used in the Class Vehicles to cheat emissions tests." *Id.* The *FCA* Court found that the hidden software in the EDC17 rendered the affected vehicles defective, and thus less valuable, and that because Bosch "had a hand in developing and implementing this software, their conduct plausibly caused Plaintiffs' economic loss." *Id.* The *FCA* Court continued: "to the extent [Bosch] knowingly concealed the software installed in the Class Vehicles from regulators and consumers, Plaintiffs' economic injuries are also fairly traceable to that conduct," because the *FCA* plaintiffs, like the Plaintiffs here, alleged that the would not have bought or leased the Polluting Vehicles, or would have paid less to do so had the defeat device been disclosed. *Id.* at 952. Thus, the *FCA* court determined that the plaintiffs did not "need to identify a statement on which they relied that was made by [Bosch] to plausibly trace their economic injuries to these entities." *Id.*

The *Duramax* Court reached the same conclusion when facing Bosch's arguments regarding traceability. There, the Plaintiffs alleged that Bosch participated in the scheme to develop the defeat device and prevent U.S. regulators from discovering it, in addition to lobbying U.S. regulators to approve "clean diesel." 298 F. Supp. 3d at 1053. Faced with these allegations,

Bosch argued that, because it did not manufacture the Duramax engine or market the affected vehicles, "any overpayment by Plaintiffs [was] attributable solely to GM's actions." *Id.* The *Duramax* Court reasoned that though "the exact nature of [Bosch's] marketing is unclear, it is plausible that Bosch's efforts contributed to the market demand for 'clean diesel' vehicles, generally, in the United States," and that the premiums Plaintiffs paid for those vehicles "were a natural consequence of that market demand." *Id.* "In other words, Plaintiffs overpaid for their vehicles *because* Bosch worked closely with GM to install working defeat devices in the Duramax vehicles." *Id.* Thus, the *Duramax* Plaintiffs adequately alleged that their injury was fairly traceable to Bosch's conduct. *Id.* at 1054. Both *FCA* and *Duramax* lay out factually analogous precedent for finding that Plaintiffs have established Article III standing as to their claims against Bosch, and this Court will apply that precedent here in finding the same.

## B. Rico Claims

Plaintiffs have also alleged a RICO claim against defendants. They state:

> For many years now, the RICO Defendants have aggressively sought to increase the sales of Polluting Vehicles in an effort to bolster revenue, augment profits and increase Mercedes' share of the diesel vehicle market. Finding it impossible to achieve their goals lawfully, however, the RICO Defendants resorted instead to orchestrating a fraudulent scheme and conspiracy. In particular, the RICO Defendants, along with other entities and individuals, created and/or participated in the affairs of an illegal enterprise ("Emissions Fraud Enterprise") whose direct purpose was to deceive the regulators and the public into believing the Polluting Vehicles were "clean diesels." As explained in greater detail below, the RICO Defendants' acts in furtherance of the Emissions Fraud Enterprise violate § 1962(c) and (d).

(FAC ¶ 336).

The Racketeer Influenced and Corrupt Organizations Act "makes it unlawful 'for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of

such enterprise's affairs through a pattern of racketeering activity.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (quoting 18 U.S.C. § 1962(c)). Section 1962(d) expands liability under the statute by making it "unlawful for any person to conspire to violate [18 U.S.C. § 1962(c)]". 18 U.S.C. § 1962(d). "The RICO statute provides for civil damages for 'any person injured in his business or property by reason of a violation of [§ 1962].'" *Amos v. Franklin Fin. Servs. Corp.*, 509 F. App'x 165, 167 (3d Cir. 2013) (quoting *Tabas v. Tabas*, 47 F.3d 1280, 1289 (3d Cir. 1995)). A violation of the statute requires:

> (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The plaintiff must, of course, allege each of these elements to state a claim. Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of § 1962, nor is the mere commission of the predicate offenses. In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.

*Id.* (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

Defendants argue that Plaintiffs have failed to allege a RICO injury, RICO causation, and a RICO enterprise, and that they have otherwise failed to allege a pattern of racketeering with particularity. (ECF Nos. 117-1 at 25–39; 118-1 at 27–55).

1. RICO Injury

The injury to business or property element of a RICO claim requires "proof of a concrete financial loss and not mere injury to a valuable intangible property interest." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (quoting *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994)). A complaint therefore must contain allegations "of actual monetary loss, i.e., an out-of-pocket loss" to adequately plead the injury element. *Id.* Physical or emotional harm to a person is insufficient to show that a person was injured in his business or property under the act. *Magnum v. Archdiocese of Phila.*, 253 F. App'x 224, 227 (3d Cir. 2007). "Similarly, losses which flow from personal injuries are not [damage to] property under RICO." *Id.* (quotations omitted).

Defendants argue that Plaintiffs alleged injuries—diminished value and overpayment—are not cognizable under RICO. Diminished value is not a proper RICO injury, according to Defendants, because Plaintiffs have not alleged facts showing that the vehicles have a lower resale value, and RICO injury cannot be based on possible future events or factual speculation. (ECF Nos. 117-1 at 26; 118-1 at 31–32). Defendants are correct that RICO does not recognize injuries conditioned on future events or injuries that are impermissibly speculative. *Maio*, 221 F.3d at 495.

In fact, Plaintiffs fail to address Defendants' contentions that their diminished value claims are not sufficient for RICO purposes. "Where an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue." *Markert v. PNC Fin. Servs. Grp.*, 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011). Thus, to the extent Plaintiffs' RICO claims are based on their diminished value theory of injury,[4] Plaintiffs do not have RICO standing. *See Duramax*, 298 F. Supp. 3d at 1071 (finding that the plaintiffs' diminished value damages—based on a nearly identical paragraph to paragraph 332 of the FAC—"are contingent on future, uncertain developments," and that those "injuries may never occur," "are . . . currently unmeasurable," and "cannot give rise to RICO standing").

Plaintiffs' overpayment theory does not suffer from the same fatal flaws. As described above, Plaintiffs allege that had Defendants disclosed the existence of the defeat device and the true emissions performance of the Polluting Vehicles, they would not have purchased those vehicles or would have paid substantially less for them. Defendants argue that Plaintiffs'

---

[4] Plaintiffs diminished value theory is articulated as follows: "Moreover, when and if Mercedes recalls the Polluting Vehicles and degrades the BlueTEC Clean Diesel engine performance and fuel efficiency in order to make the Polluting Vehicles compliant with EPA standards, Plaintiffs and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased. Moreover, Polluting Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their cars' engines." (FAC ¶ 332).

overpayment allegations fail to establish RICO standing because "loss of value" or "benefit of the bargain" damages are typically not available in RICO suits, and because "absent the sale of [a Polluting] Vehicle at a loss, Plaintiffs' overpayment theory is a claim for a speculative, intangible property interest rather than a concrete financial loss." (ECF Nos. 117-1 at 27; 118-1 at 29). The existing diesel emissions litigation decisions squarely reject these arguments and distinguish the cases relied upon by Mercedes and Bosch. *Volkswagen*, 2018 WL 4777134, at *13–15, *FCA*, 295 F. Supp. 3d at 959–61; *Duramax*, 298 F. Supp. 3d at 1068–73. The Court agrees with those decisions.

Defendants rely heavily on *In re Bridgestone/Firestone, Inc. Tires Products Liabilities Litigation*, 155 F. Supp. 2d 1069 (S.D. Ind. 2001), *In re General Motors LLC Ignition Switch Litigation*, Nos. 14-md-2543, 14-mc-2543, 2016 WL 3920353 (S.D.N.Y. July 15, 2016), and *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), in support of their claim that overpayment allegations are insufficient to create RICO standing.

The *Bridgestone* plaintiffs asserted a RICO claim against Bridgestone/Firestone on the grounds that there was an alleged defect in certain tires that created a dangerous likelihood of tread separation. 155 F. Supp. 2d at 1077. The plaintiffs based their RICO injury on their need to "bear the financial loss associated with the cost of replacing the Tires and/or the diminished value of their vehicles equipped with the Tires now that the truth regarding their safety and lack of roadworthiness is known." *Id.* at 1089. Plaintiffs also based RICO injury on the fact that, had they known of the defect, they would not have bought, or would have paid substantially less for the defective tires or the vehicles equipped with them. *Id.* The Court determined that these injuries were too speculative to sustain a RICO injury as "[t]he actual failure of the Tires . . . is a contingency upon which Plaintiffs' economic damages are dependent." *Id.* at 1092.

In *Ignition Switch*, the plaintiffs' RICO claim was premised on GM's manufacture of vehicles with a defective ignition switch. 2016 WL 3920353, at *1. The plaintiffs' theory of injury was that they would not have purchased those cars, or paid less for them, had they known of the defective ignition switch. *Id.* at *7. The Court held that this theory did not create RICO standing, because "'loss of value' or 'benefit of the bargain' damages 'are generally unavailable in RICO suits' and 'plainly' unavailable where (similar to the case here) a RICO claim 'sound[s] in fraud in the inducement.'" *Id.* at *16 (quoting *McLaughlin*, 522 F.3d at 228–29).

Finally, *McLaughlin* concerned a class action based on allegations that the defendants—tobacco companies—fraudulently marketed light cigarettes as healthier alternatives to "full-flavored" cigarettes. 522 F.3d at 220. The plaintiffs' theory of injury in this case was again based on a benefit of the bargain argument: the plaintiffs created a "loss of value" model which measured "the difference between the price plaintiffs paid for light cigarettes as represented by defendants and the (presumably lower) price they would have paid (but for defendants' misrepresentation) had they known the truth." *Id.* at 228. The Second Circuit held that these expectation-based damages did not suffice to create a RICO injury, because "Defendants' misrepresentation could in no way have reduced the value of the cigarettes that plaintiffs actually purchased, they simply could have induced plaintiffs to buy Lights instead of full-flavored cigarettes." *Id.* at 229. Additionally, the plaintiffs' theory required the Second Circuit to "conceptualize the impossible—a healthy cigarette—and then to imagine what a consumer might have paid for such a thing." *Id.* at 229.

There are critical differences between the theory of injury set forth here by Plaintiffs and the RICO injuries alleged in the three aforementioned cases. First, Plaintiffs allege that they overpaid for the Polluting vehicles *at the time of purchase*. FAC ¶ 400. All three courts to have

dealt with the question of RICO injury in the context of a defeat device-based diesel emissions litigation have concluded that the fact that the injury occurred at the time of purchase constitutes a RICO injury. In *Duramax*, the Court wrote that such an injury, "clearly suffices to create RICO standing," as the plaintiffs had identified "a specific payment attributable directly to the vehicle component at issue which they opted to purchase on the basis of fraudulent conduct." 298 F. Supp. 3d at 1071–72. In *FCA*, the Court similarly found that "Plaintiffs' allegations of overpayment easily clear[ed] the threshold" for establishing a concrete RICO injury where "Plaintiffs . . . identified a particular, reasonably narrow range by which they allegedly overpaid for the Class Vehicles." 295 F. Supp. 3d at 962.

While Defendants argue that *Duramax* and *FCA* are distinguishable because they allege an overpayment of a specific amount, (ECF Nos. 134–35, 143–44), that is not the hill upon which RICO injury dies. In *Volkswagen*, Plaintiffs adequately alleged a RICO injury where they contended that "they each paid a premium for something that they did not receive—a vehicle with low emissions." 2018 WL 4777134, at *14. This injury was sufficiently concrete and tangible, despite the fact that these plaintiffs did not identify the specific amount of damage. *Id.* In fact, the *FCA* Court acknowledged the same. 295 F. Supp. 3d at 962 (noting that the threshold for RICO injury does not require a particular dollar amount); *see also In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 804 F.3d 633, 639–640 (3d Cir. 2015) (finding plaintiffs adequately alleged RICO injury based on allegations that they overpaid—absent a specific dollar amount—for a drug due to the inflationary effect that a drug manufacturer's illegal or deceptive marketing practices had on the drug); *In re Aetna UCR Litig.*, MDL No. 2020, Civ. No. 07-3541, 2015 WL 3970168, at *10 (D.N.J. June 30, 2015) (finding plaintiffs adequately alleged RICO injury where plaintiffs claimed they suffered "out-of-pocket losses in the form of higher co-payments" and "overpaid for

their health insurance plans"). What is important, and what is alleged here, is that the overpayment occurred at the time of purchase, rather than being "contingent on a future occurrence or on the vagaries of the free market." *Duramax*, 298 F. Supp. 3d at 1072.

Additionally, "courts have recognized expectation damages under RICO . . . where an agreement between the parties provided for a certain performance guarantee that the defendant had no intention of keeping." *Ignition Switch*, 2016 WL 3920353, at *17 (collecting cases). Here, as in *Volkswagen*, *FCA*, and *Duramax*, Plaintiffs allege that Defendants participated in a scheme to place a defeat device in the Polluting Vehicles, rendering them defective from the moment they were manufactured. Because Defendants allegedly knew of—and orchestrated the creation of—that defect, they had no intention of delivering vehicles with heightened fuel efficiency and environmental friendliness. *See Duramax*, 298 F. Supp. 3d at 1072 ("But, here, GM allegedly sold Duramax vehicles, for a premium, which did not perform as a reasonable consumer would expect. In other words, Defendants had no intention of delivering the emissions performance which consumers expected.").

Finally, to the extent there remains a question whether Plaintiffs' overpayment theory constitutes an injury to business or property for the purposes of RICO, Supreme Court precedent indicates that it does. *Reiter v. Sonotone Corporation* is an antitrust case in which the Supreme Court interpreted Section 4 of the Clayton Act, which allows any person injured "in his business or property" by the violation of an antitrust law to sue under that statute. 442 U.S. 330, 337 (1979) (quoting 15 U.S.C. § 15). The Supreme Court concluded that when "a consumer . . . acquir[es] goods or services for personal use, [she] is injured in 'property' when the price of those goods or services is artificially inflated by reason of the anticompetitive conduct complained of." *Id.* at 339. The Third Circuit has referenced the Supreme Court's rationale in *Reiter* when analyzing a RICO

claim as support for the conclusion that monetary loss suffices to constitute a RICO injury. *Maio*, 221 F.3d at 483–84 (3d Cir. 2000). Thus, *Reiter* would indicate that Plaintiffs' allegations that they overpaid for the Polluting Vehicles as a result of Defendants' deceptive conduct constitute injuries to property. *See Volkswagen*, 2018 WL 4777134, at *14 (interpreting *Reiter* the same way); *FCA*, 295 F. Supp. 3d at 959 (same); *Duramax*, 298 F. Supp. 3d at 1067–68, 1072–73 (same).

### 2. RICO Causation

A civil RICO plaintiff is required "to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but the proximate cause as well.'" *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 563 U.S. 258, 268 (2010)). The "central question" is "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Mercedes argues that Plaintiffs' "entire theory of RICO conduct relies on the claim that" the defendants perpetrated a fraud against United States government regulators, and thus Plaintiffs have failed to allege that they were injured by the enterprise's conduct. (ECF No. 117-1 at 28). Even if Plaintiffs do allege that they were directly deceived by the enterprise, Mercedes argues that Plaintiffs' RICO allegations should be dismissed because they "are based on the same generalized advertising scheme that the Court previously found insufficient to satisfy the 'fairly traceable' requirement of Article III standing." (ECF No. 117-1 at 29). Bosch separately argues that Plaintiffs have not established either proximate or "but for" cause, because they have failed "to allege (1) reliance upon any actionable misstatement or omission, or (2) a direct relationship between Bosch LLC's purported conduct and their alleged injuries." (ECF No. 118-1 at 33).

i. *Mercedes*

Mercedes makes the argument that Plaintiffs fail to establish RICO causation for the same reasons that they failed to establish traceability for the purposes of Article III standing. (ECF No. 117-1 at 29). As this Court has already determined that Plaintiffs have adequately alleged that Plaintiffs' injuries were fairly traceable to Mercedes' conduct, it need to not rehash that analysis here, as Mercedes has not set forth any new arguments to the contrary.

Alternatively, Mercedes argues that, because Plaintiffs' RICO claim centers around a fraud-on-the-regulators theory, Plaintiffs have failed to meet RICO's proximate cause requirement. (ECF No. 117-1 at 30). The reasoning goes: because the purpose of the alleged enterprise was to deceive regulators (rather than promulgate advertisements), Plaintiffs' overpayment as a result of the advertisements touting the emissions bona fides of the Polluting Vehicles is in no way connected to the fraud on the regulators. (ECF No. 117-1 at 30–31).

Mercedes relies on *Anza* as support for its claim that Plaintiffs' RICO allegations do not satisfy the proximate cause requirement. In *Anza*, the plaintiff sued its primary competitor under the RICO statute, alleging that the competitor reduced its prices without harming its bottom line by "failing to charge the requisite New York sales tax to cash-paying customers." 547 U.S. at 453–54. The Supreme Court found that this theory of injury did not satisfy RICO's proximate cause requirement, because "[i]t was the State that was being defrauded and the State that lost tax revenue as a result." *Id.* at 458. The Court also observed that the cause of Plaintiff's injury—lower prices—was "entirely distinct" from the alleged RICO violation—the defrauding of the state—and that the plaintiff's lost sales could have resulted from any number of alternative factors. *Id.* at 458–59.

The facts in *Anza* are distinct from what Plaintiff's allege here. Plaintiff's specifically allege that Mercedes defrauded its customers when it failed to disclose the existence of the defeat device, and that this deception caused Plaintiffs' injuries. (FAC ¶¶ 313–15). Furthermore, while Plaintiffs allege that Defendants deceived regulators, those regulators are not alleged to have been harmed by that deception like the State of New York was in *Anza*. *FCA*, 295 F. Supp. 3d at 966. Plaintiffs argue that the deception of the regulators inevitably led to their injuries, because "but for [that] deception about compliance, it would not have been able to sell the Polluting Vehicles." (ECF No. 126 at 36–37). These allegations are sufficient to establish RICO causation. *FCA*, 295 F. Supp. 3d at 967 ("By deceiving regulators, Defendants were able to sell Class Vehicles that emitted NOx at levels up to 20 times legal limits and that contained one or more defeat devices . . . , [which] plausibly caused Plaintiffs to overpay for the defective Class Vehicles by an amount directly attributable to the alleged wrongful conduct of the Defendants."); *see also Volkswagen*, 2018 WL 4777134, at *15 ("[T]he regulators were more like gatekeepers than victims of the fraud: they did not lose money from the fraud like consumers did. Also, Plaintiffs base their RICO claims at least in part on allegations that VW (on behalf of the enterprise) directly deceived consumers into believing that the class vehicles were 'clean' and 'environmentally friendly,' when they were not. To prevail on this theory, Plaintiffs would not even need to prove that VW first defrauded EPA and CARB; they would only need to demonstrate that VW defrauded *them* about certain vehicle attributes.") (citations omitted).

    ii.   *Bosch*

Bosch first argues that the misstatements Plaintiffs allegedly relied on are either non-actionable puffery, assert compliance with U.S. emissions standards, or made by Mercedes,

breaking "any causative link to Bosch."[5]  (ECF No. 118-1 at 33–34).  Secondly, Bosch argues that

Plaintiffs fail to establish "any direct relationship between [Bosch's] alleged conduct and their

alleged injuries."  (ECF No. 118-1 at 35).  These arguments have all been rejected in *Duramax*,

*FCA*, and *Volkswagen*, and this Court agrees with those prior decisions.

In *Duramax*, Bosch argued that "to the extent Plaintiffs claim that their injury resulted from

their reliance on purportedly false ads by GM, that itself breaks any causal link to the Bosch

Defendants."  298 F. Supp. 3d at 1075.  The *Duramax* Court deemed that argument "clearly

inconsistent" with Supreme Court precedent, pointing to the Supreme Court's decision in *Bridge*

*v. Phoenix Bond & Indemnification Co.*, 553 U.S. 639 (2008).  *Id.*  *Duramax* explained that *Bridge*

held that reliance is not a requirement of a RICO cause of action and explicitly rejected the notion

that "a plaintiff who brings [a RICO claim predicated on mail fraud] must show that it relied on

the defendant's misrepresentations in order to establish the requisite element of causation."  *Id.* at

1076 (quoting *Bridge*, 553 U.S. at 653).  In fact, *Bridge* stands for the proposition that a plaintiff

has identified a "a sufficiently direct relationship between the defendant's wrongful conduct and

the plaintiff's injury" where "[i]t was a foreseeable and natural consequence of [the defendant's]

scheme."  *Bridge*, 553 U.S. at 657–58.  The *Duramax* Court, applying this standard, then found

that the plaintiffs' allegations established but-for and proximate cause.  298 F. Supp. 3d at 1076–

77 ("According to Plaintiffs, Bosch 'exerts near-total control" over the customization of EDC17,

eliminating the possibility that GM programmed the functionality which enables use of defeat

devices without Bosch's knowledge.").

---

[5] The actionability of the misstatements as puffery are addressed *infra* Section III.B.3.iv.  To the extent Bosch claims
that Plaintiffs are trying to enforce compliance with emissions standards, that argument is addressed by Parts III.B.2.i
and III.C.

Here, Plaintiffs make nearly identical allegations: "All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch GmbH exerts near-total control. In fact, the software is typically locked to prevent customers, like Mercedes, from making significant changes on their own. Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end." (FAC ¶ 270). Thus, Plaintiffs have established a sufficiently direct relationship between Bosch and the alleged RICO injury for purposes of RICO causation. *See Volkswagen*, 2018 WL 4777134, at *15–17 (rejecting Bosch's argument that the actions of the car manufacture break the causal link in the chain, and thus, that there is not a sufficiently direct relationship between Bosch and the plaintiff's RICO injury); *FCA*, 295 F. Supp. 3d at 967– 68 (same).

### 3. The Merits of the RICO Claim

#### i. *Impermissible Group Pleading*

Bosch contends that Plaintiffs "make impermissible group pleadings against 'RICO Defendants' and varying definitions of 'Bosch.'" (ECF No. 118-1 at 38). Bosch argues that this "blurs the conduct of the various defendants and does not put each defendant on notice of its precise conduct," and thus fails to satisfy the pleading requirements of Rule 9(b). (ECF No. 118-1 at 38–39). Rule 9(b) requires that Plaintiffs "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004)). However, Rule 9(b) does not require that that a plaintiff plead with specificity "which fraudulent acts were caused or performed by which individual defendants." *In re Midlantic Corp. S'holder Litig.*, 758 F. Supp. 226, 233 (D.N.J. 1990).

Bosch made similar, unsuccessful arguments in both *FCA* and *Duramax*. *See FCA*, 295 F. Supp. 3d at 976–77 (rejecting Bosch's arguments that the plaintiffs "improperly 'lumped' the Bosch entities together" for the purposes of Rule 9(b), because the structure of the Bosch entities was such that there were employees "at both entities [who] work together on certain projects, including the EDC17 project."); *Duramax*, 298 F. Supp. 3d at 1056 ("Given Plaintiffs' allegation that Bosch employees and constituent entities often blur the legal boundaries between Bosch subsidiaries, the allegations against the Bosch Defendants are sufficiently specific."). Here, Plaintiffs plead allegations similar to those that were found sufficient in *FCA* and *Duramax*: Bosch GmbH and Bosch LLC "operate under the umbrella of the Bosch Group," individuals from both Bosch GmbH and Bosch LLC worked in divisions relevant to the creation and design of the EDC17, and Bosch itself does not distinguish between its own legal entities when describing its business. (FAC ¶¶ 109, 111–12). The FAC sufficiently puts Bosch on notice of the claims made against it.

ii. *RICO Enterprise*

To allege an association-in-fact enterprise, which Plaintiffs purport to do here, they must plead a "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *In re Ins. Brokerage*, 618 F.3d at 366 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). Defendants argue that Plaintiffs have not alleged a sufficient purpose or relationship between Defendants to constitute an association-in-fact enterprise. (ECF Nos. 117-1 at 31–35; 118-1 at 40–43).

An association-in-fact enterprise "need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent from the group's pattern of racketeering activity." *In re Aetna UCR Litig.*, 2015 WL 3970168, at *27 (quoting *In re Ins.*

*Brokerage*, 618 F.3d at 368). Plaintiffs allege that the purpose of Defendants' enterprise was to "deceive the regulators and the public into believing the Polluting Vehicles were 'clean diesels.'" (FAC ¶ 356). Defendants worked together to design, manufacture, distribute, test, and sell the Polluting Vehicles, while implanting the EDC17, falsifying emissions tests, and distributing deceptive marketing materials. (FAC ¶¶ 360–67). Plaintiffs allege that Defendants profited from this enterprise due to the increased number of vehicles sold as a result of the fraudulently obtained Certificates of Compliance ("COCs") and Executive Orders ("EOs"), as well as through misleading advertising. (FAC ¶ 367). These allegations sufficiently allege a purpose of the enterprise. *See In re Ins. Brokerage Antitrust Litig. ("In re Ins. Brokerage II")*, MDL No. 1663, No. 04-5184, 2017 WL 3642003, at *10 (D.N.J. Aug. 23, 2017) (finding that plaintiffs properly pleaded a purpose for the enterprise where they alleged that certain agreements existed "to facilitate the sale of insurance, in particular, the sale of insurance at supra-competitive rates to compensate both brokers and syndicates above what a competitive market would dictate"); *In re Aetna UCR Litig.*, 2015 WL 3970168, at *27 (finding that plaintiffs properly alleged a purpose for the enterprise where the plaintiffs alleged a dual purpose: "(1) 'to create a mechanism through which Aetna, UHG and the Insurer Conspirators could under-reimburse subscribers . . . for Nonpar services through use of flawed and invalid data' and (2) to increase insurer profits by deceptively underpaying ONET benefits to their policy holders") (citation omitted); *see also Duramax*, 298 F. Supp. 3d at 1066, 1078–79 (finding a properly plead common purpose based on nearly identical allegations to those in this case, including that the purpose of the enterprise was "to deceive the regulators and the public into believing the Polluting Vehicles were 'clean' and 'environmentally friendly,'" and that GM and Bosch "associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Polluting Vehicles through fraudulent COCs .

. . and EOs . . . , false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities").

With respect to the relationships of those associated with the enterprise, Mercedes argues that Plaintiff's FAC is deficient in that nearly all of the allegations "address Bosch's relationships with *other* vehicle manufacturers, namely Volkswagen and FCA." (ECF No. 117-1 at 32). Bosch, meanwhile, contends that Plaintiffs have done no more than "list the purported RICO participants," and have provided no allegations "'plausibly implying the existence of an enterprise' separate from the legal entities." (ECF No. 118-1 at 42 (citations omitted)). Both Defendants allege that Plaintiffs plead nothing more than an ordinary business relationship. (ECF No. 117-1 at 34–35; ECF No. 118-1 at 42–43).

It is true that ordinary business relationships are not sufficient to impose RICO liability. *Duramax*, 298 F. Supp. 3d at 1080 (describing a "widespread consensus" to this effect). However, both *Duramax* and *FCA* addressed similar arguments and concluded that similar pleadings sufficiently alleged the existence of the kind of relationships necessary to establish an association-in-fact. The *Duramax* Court rejected GM and Bosch's argument that "any alleged relationship between them [was] simply a routine business relationship." 298 F. Supp. 3d at 1079. There, the plaintiffs alleged that defendants "associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Polluting Vehicles through fraudulent COCs and EOs, false emissions tests, and deceptive and misleading marketing and materials, and deriving profits and revenues from those activities." *Id.* at 1080. The Court held that such allegations established a business relationship that was "far from 'routine,'" and was instead a course of conduct that was "inherently deceptive[, because] Bosch and GM collaborated to create

an engine which performed one way when being tested for emissions and another way when in normal use." *Id.*

The Court in *FCA* came to the same conclusion. *FCA* reasoned that the EDC17 "had only a deceitful purpose—to cheat emissions tests," and that the plaintiffs' "allegations plausibly support[ed] that each Defendant participated in developing or implementing the [defeat devices]." 295 F. Supp. 3d at 981. The FCA court came to this conclusion based on allegations that set forth "that the Bosch Defendants' software documentation describes parameters and functions that correlate with many of the hidden [defeat devices]," and that "the FCA Defendants initiated and oversaw development of the EcoDiesel engine and activated the [defeat devices] in the Class Vehicles." 295 F. Supp. 3d at 981–82. Such allegations went "beyond connecting Defendants to each other by way of normal commercial dealings." *Id.* at 982. Plaintiffs here have laid out many of the same allegations in the FAC, alleging, for example, that Bosch "continuously cooperated with Mercedes to ensure that the EDC Unit 17 was fully integrated into the Polluting Vehicles," and that it concealed "the defeat devices on U.S. documentation and in communications with U.S. regulators." (FAC ¶ 374). The EDC17 was "customized . . . for installation in the Polluting Vehicles with unique software code to detect when it was undergoing emissions testing." (FAC ¶ 360). Such allegations are sufficient to show a relationship between Defendants beyond a normal business relationship.

### iii. *Directing the Conduct of the RICO Enterprise*

As part of their RICO claim, Plaintiffs must also allege that Defendants "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). "The word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase

'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Id.* at 179. Defendants again argue that Plaintiffs have failed to assert anything more than legal conclusions as to their participation in the enterprise, and that any facts alleged show merely an ordinary business relationship. (ECF No. 117-1 at 35–37; ECF No. 118-1 at 43–47).

On top of Plaintiffs' allegations mentioned *supra* in Section III.B.3.ii, Plaintiffs have sufficiently alleged the participation of Mercedes and Bosch in the enterprise. They set forth that the EDC17 contains a "unique set of specifications and software code" made for the Polluting vehicles, that the implementation of those EDC17s into the Polluting Vehicles required Mercedes and Bosch to collaborate closely, and that Defendants knowingly and actively intended the EDC17 to function as a defeat device to evade United States emissions requirements. (FAC ¶¶ 13, 104, 108, 268, 270, 360, 374). Plaintiffs then allege that Defendants concealed the existence of the defeat device and lied to U.S. regulators. (FAC ¶¶ 125, 273–74, 374). Very similar allegations based on very similar facts have been found to satisfy this pleading element of a RICO claim in other diesel emissions litigations. *See FCA*, 295 F. Supp. 3d at 983 (finding that the plaintiffs adequately alleged participation in the enterprise where the FCA Defendants "conspired to install and conceal emission control software in the EcoDiesel® engines to illegally circumvent stringent U.S. emission standards" and oversaw the development of those engines, while Bosch's argument "that they were simply performing services for the enterprise," was "not sustainable at the pleading stage" "given the level of control they are alleged to have maintained over the emissions software in the Class Vehicles"); *Duramax*, 298 F. Supp. 3d at 1086–87 (holding that Bosch's argument that it simply "worked together with GM to design and implement software and . . . participated in promoting clean diesel technology generally" was a similarly faulty "repackaging of [its]

previous argument that . . . the relationship between the Defendants was merely a routine business relationship," where the plaintiffs alleged "that Bosch was an integral part of the operation of the enterprise because Bosch 'locked out' EDC17 . . . [and] worked closely with its customers to customize EDC17," which performed "an inherently deceptive function," and thus Bosch's responsibility for programming the operation of the EDC17 was at the "heart of the fraudulent enterprise").

iv. *Pattern of Racketeering Activity*

A pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "These predicate acts of racketeering may include, *inter alia*, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343." *In re Ins. Brokerage*, 618 F.3d at 363 (quoting *Lum*, 361 F.3d at 223. Here, Plaintiffs allege precisely these two predicate acts. In order to plead mail or wire fraud, Plaintiffs must describe "(1) the existence of a scheme to defraud; (2) the use of the mails [or wires] . . . in furtherance of the fraudulent scheme; and (3) culpable participation by the defendant, that is, participation by the defendant with specific intent to defraud." *United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005). These allegations must satisfy the pleading standards of Federal Rule of Civil Procedure 9(b). *In re Ins. Brokerage II*, 2017 WL 3642003, at *6.

Mercedes argues that Plaintiffs have failed to plead a pattern of racketeering activity for two reasons: First, they have failed to satisfy Rule 9(b), because they "allege only nondescript acts by unidentified parties at unspecified times, and second, Plaintiffs "have not pled any facts demonstrating how the applications [for certification to the EPA] further the purposes of the

alleged" enterprise. (ECF No. 117-1 at 38–39). Bosch additionally argues that Plaintiffs have failed to plead a claim of mail or wire fraud against it with the particularity required by Rule 9(b), as they have failed to allege a scheme to defraud, any participation by Bosch in that scheme, facts showing that Bosch should be held vicariously liable for Mercedes' alleged acts of mail and wire fraud, or a specific intent to defraud. (ECF No. 118-1 at 49–55).

Plaintiffs have sufficiently plead a pattern of racketeering activity with respect to Defendants. First, the allegations discussed at length in Parts III.B.3.ii and iii clearly allege the existence of scheme to defraud. Importantly, as noted in this Opinion's standing analysis, Plaintiffs pin Defendants' alleged liability on omissions rather than affirmative misrepresentations. Reliance on omissions on their own is sufficient to plead the predicate acts of mail and wire fraud. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) ("Under the mail fraud statute, a scheme or artifice to defraud 'need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension . . . [and] [t]he scheme need not involve affirmative misrepresentation.") (quoting *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978); *Livingston v. Shore Slurry Seal, Inc.*, 98 F. Supp. 2d 594, 597 (D.N.J. 2000) (quoting the same language from *Kehr Packages*). As laid out in *Duramax*:

> allegations of omissions—as opposed to affirmative misrepresentations—will inevitably be less specific. Misrepresentations occur at a definite point in time, but omissions occur over periods of time. And, because misrepresentations involve action while omissions involve inaction, plaintiffs are less likely to uncover discrete evidence of omissions. It must be remembered that the essential purpose of Rule 9(b) is to provide the defendants with adequate notice of the allegations so that they can defend against the claims.

298 F. Supp. 3d at 1083 (citations omitted); *see also Christidis v. First Pa. Mortg. Tr.*, 717 F.2d 96, 99–100 (3d Cir. 1983) ("In applying the first sentence of Rule 9(b) courts must be sensitive to

the fact that its application, prior to discovery, may permit sophisticated defrauders to successfully conceal the details of their fraud. Moreover, in applying the rule, focusing exclusively on its 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'") (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 407 (1969)). As such, "plaintiffs pleading a fraud by omission claim are not required to plead fraud as precisely as they would for a false representation claim." *Feldman v. Mercedes Benz USA*, No. 11-984, 2012 WL 6596830, at *10 (D.N.J. Dec. 18, 2012).

To adequately plead the use of the mails and wires in furtherance of the scheme, Plaintiffs need not allege that each Defendant personally mailed or wired the allegedly fraudulent communications, only that the mailing or wiring of that communication was foreseeable to Defendants. *United States v. Tiller*, 302 F.3d 98, 101 (3d Cir. 2002). Furthermore, "the gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contain[s] no false information.'" *Bridge*, 553 U.S. at 647 (quoting *Schmuck v. United States*, 489 U.S. 705, 712, 715 (1989)). Plaintiffs allege several uses of the mails and wires in furtherance of the scheme, such as numerous, specific applications for certification of various Polluting Vehicles to the EPA, (FAC ¶ 384), as well as advertisements touting the low emissions and environmental friendliness of the BlueTEC engine, (*see, e.g.*, FAC ¶¶ 32, 33, 36, 321, 323, 325).

These allegations are sufficient to establish the use of the mails and wires in furtherance of the scheme. The applications submitted to the EPA

> affirmed that the vehicles complied with emission standards. Without those mailings and electronic communications, [Mercedes] would have been unable to sell the vehicles. The applications and resulting certificates also increased the likelihood that consumers would perceive the [BlueTEC] vehicles as emitting pollution at a low level. And although Bosch may not have directly used the mail

or wire to further the fraudulent scheme, [Mercedes'] uses of the mail and wire were inevitable and thus reasonably foreseeable.

*Duramax*, 298 F. Supp. 3d at 1084;[6] *see also FCA*, 295 F. Supp. 3d at 979 (applying the same standard to similar facts and coming to the same conclusion). As to the advertisements identified by Plaintiffs, if they

> were relying on these advertisements as the basis for [their] claim of fraud, then Defendants' arguments regarding puffery and duty to disclose would become relevant. However, these representations do not constitute the fraudulent scheme; they merely further it. The level of emissions produced by a diesel engine was a material consideration for consumers purchasing a vehicle. [Mercedes'] extensive advertising which emphasized the low emissions and environmentally-friendly nature of its "clean diesel" engine underscores its understanding of that fact. Thus, regardless of whether these advertisements would be actionable on their own, they were material to the scheme.

*Duramax*, 298 F. Supp. 3d at 1084.

Finally, with respect to Defendants' culpable participation in the scheme, Plaintiffs need only allege intent generally. Fed. R. Civ. P. 9(b); *In re Ins. Brokerage II*, 2017 WL 3642003, at *9. Defendants' intent to defraud can be inferred from the scheme alone. *United States v. Chartock*, 283 F. App'x 948, 954–55 (3d Cir. 2008); *United States v. Pearlstein*, 576 F.2d 531, 541 (3d Cir. 1978); *see also FCA*, 295 F. Supp. 3d at 977 ("Because the AECDs themselves plausibly have a deceitful purpose, allegations supporting that each Defendant knew about yet concealed the AECDs also support a plausible claim that each Defendant intended to defraud."); *Duramax*, 298 F. Supp. 3d at 1083 ("[I]ntent can be inferred from the nature of the alleged conduct. The way in which EDC17 interacted with the Duramax engine is inherently deceptive. The alleged purpose

---

[6] *Duramax* also explicitly rejects "Bosch's repeated argument that Plaintiffs must specifically allege that *Bosch* used the mail or wire to defraud," as "simply, wrong," and notes that even though the plaintiffs had not "specifically alleged the date of the applications or the specific identity of the employee who prepared them," the plaintiffs had "alleged enough detail to put Defendants on notice of the alleged predicate acts." *Id.*

of the device is to provide the perception of reduced emissions while avoiding the reality of reduced emissions. Defendants cannot reasonably argue that the deceptive nature of EDC17 was unanticipated or unintended, and even if they do, that argument could be resolved only by a jury."); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, MDL No. 2672, 2017 WL 4890594, at *15 (N.D. Cal. Oct. 30, 2017) ("Bosch's intent to defraud reasonably [could] be inferred from the scheme itself," as no party had "sought to justify, or explain a lawful purpose for, software that effectively turns a vehicle's emission systems on or off depending on whether the vehicle is undergoing emissions testing or being operated under normal driving conditions."). Thus, Plaintiffs have adequately alleged Defendants' intent to defraud and have adequately established a pattern of racketeering activity based on the predicate acts of mail and wire fraud.

    v. *RICO Conspiracy*

Bosch argues that Plaintiffs failed to adequately plead a RICO conspiracy because they failed to plead a substantive RICO violation. As Plaintiffs have adequately plead their substantive RICO claim and that Bosch had knowledge of the racketeering activity, they have adequately plead a RICO conspiracy.

## C. Preemption

Defendants contend that Plaintiffs' state-law claims are preempted by the Clean Air Act ("CAA"). (ECF No. 117-1 at 39; ECF No. 118-1 at 55). This argument has been discussed thoroughly and rejected several times over by courts dealing with diesel emissions litigations. *Volkswagen*, 2018 WL 4777134, at *18–23; *FCA*, 295 F. Supp. 3d at 990–1003; *Duramax*, 298 F. Supp. 3d at 1057–65; *Counts*, 237 F. Supp. 3d at 588–92. For the same reasons, this Court also rejects Defendants' preemption arguments.

"Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption." *Farina v. Nokia*, 625 F.3d 97, 115 (3d Cir. 2010).

> Express preemption applies where Congress, through a statute's express language, declares its intent to displace state law. Field preemption applies where "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* (quoting *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). Both Defendants argue that Plaintiffs state-law claims are expressly preempted by the CAA, while Mercedes advances an additional implied preemption argument.

1. Express Preemption

Section 209 of the Clean Air Act reads:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a). Defendants are correct that the CAA contains an express preemption clause. *See In re Caterpillar, Inc. C13 and C15 Engine Prods. Liab. Litig.*, 14-3722, 2015 WL 4591236, at *10 (D.N.J. July 29, 2015) ("The CAA's express preemption provision is specific and unambiguous.").

Defendants argue that Plaintiffs' state-law claims fall squarely within that preemption provision because they relate to the Polluting Vehicles' compliance with emissions standards and are an attempt to enforce federal regulatory standards under state law. (ECF No. 117-1 at 41–42; ECF No. 118-1 at 56–57). Plaintiffs' state-law claims do not fall under the express preemptive

scope of the CAA for several reasons. First, while Plaintiffs do reference violations of federal emissions standards those violations are not an essential element of their state-law claims. To prove their state-law claims, Plaintiffs must show that Defendants lied to or deceived them, not that Defendants violated federal emissions standards. The proof in which Plaintiffs must ground their claims pulls those claims outside the scope of the express preemption of the CAA. *Volkswagen*, 2018 WL 4777134, at *19; *FCA*, 295 F. Supp. 3d at 993–94; *Duramax*, 298 F. Supp. 3d at 1061; *Counts*, 237 F. Supp. 3d at 591–92. Second, Plaintiffs could prove that Mercedes lied about claims concerning its BlueTec engines, such as that it was "the world's cleanest and most advanced diesel" with "ultra-low emissions, high fuel economy and responsive performance," (FAC ¶ 11), without having to prove that emissions exceeded EPA-established limitations or that Defendants installed a defeat-device prohibited by the EPA. *Volkswagen*, 2018 WL 477134, at *20; *FCA*, 295 F. Supp. 3d at 993–94; *Duramax*, 298 F. Supp. 3d at 1061–62; *Counts*, 237 F. Supp. 3d at 591–92. Thus, Plaintiffs' state-law claims are not expressly preempted by the CAA.[7]

### 2. Implied Preemption

Mercedes argues that even if Plaintiffs' claims are not expressly preempted, they are impliedly preempted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). When dealing with a question of implied preemption, the Court begins its "analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria*

---

[7] The key cases that Defendants rely on in support of their express preemption argument, such as *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), *Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570 (S.D.N.Y. 2011), and *In re Office of Att'y Gen. of N.Y.*, 709 N.Y.S.2d 1 (App. Div. 2000), have already been discussed at length and distinguished appropriately by the four cases cited in this paragraph. As such, in the interest of judicial economy, the Court refers the parties to the appropriate discussion of these cases in *Volkswagen*, *FCA*, *Duramax*, and *Counts*.

*Grp. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). *Buckman* involved a defendant that allegedly made fraudulent representations to the FDA in order to gain approval for its orthopedic bone screws that plaintiffs alleged caused their injuries. 531 U.S. at 343. The Supreme Court held that allowing the plaintiffs to proceed on their state tort claims based on the alleged fraud on the FDA would "inevitably conflict with the [agency's] responsibility to police fraud consistently with [its] judgment and objectives." *Id.* at 350. Mercedes argues that *Buckman* thus preempts all state tort claims "stemming from a defendant's alleged fraud on a federal agency." (ECF No. 117-1 at 43–44).

Importantly, *Buckman's* holding rested in part on the fact that the Supreme Court had "clear evidence that Congress intended that the [Medical Device Amendments] be enforced exclusively by the Federal Government," and that the plaintiffs' "fraud claims exist[ed] solely by virtue of the [Food, Drug, and Cosmetic Act] disclosure requirements." 531 U.S. at 352–53. While Mercedes frames Plaintiffs' claims as "all stem[ing] from the threshold allegation that 'the COCs were fraudulently obtained' and the vehicles were therefore 'never legal for sale; nor were they EPA and/or CARB complaint,'" (ECF No. 117-1 at 44 (quoting FAC ¶ 275)), this does not place Plaintiffs' state-law claims within the realm of *Buckman*. As explained above, Plaintiffs' claims do not "exist solely by virtue" of the alleged violations of the EPA's emissions standards. The core allegation of Plaintiffs' state-law tort claims is that Defendants lied to and deceived consumers, and so *Buckman* does not preempt these claims. *See FCA*, 295 F. Supp. 3d at 994–95 (applying the same reasoning to distinguish *Buckman* from state-law claims nearly identical to those before this Court); *In re Caterpillar*, 2015 WL 4591236, at *14 (holding that consumer fraud claims were not impliedly preempted by the CAA, as those claims were not "about the ability of Caterpillar's Engines to comply with EPA emissions standards").

## D. Plaintiffs' State-Law Misrepresentation Claims

Mercedes argues that "[a] vast majority of plaintiffs' misrepresentation claims—including those arising under state common law and state consumer protection statutes—should also be dismissed because they are based on nonactionable puffery." (ECF No. 117-1 at 44). As mentioned *supra* Section III.A.2.i, Plaintiffs have shifted the focus of the FAC away from claims relying on Defendants' affirmative misrepresentations and are instead basing those claims on Defendants' omissions. This is reinforced by the fact that Plaintiffs do not respond to Mercedes' argument that their state-law misrepresentation claims should be dismissed. (*See* ECF No. 126 at 60 (addressing Mercedes' puffery arguments only in the context of fraudulent concealment)). Thus, to the extent that Plaintiffs' state-law consumer protection claims are based solely on affirmative misrepresentations, those affirmative misrepresentation claims are dismissed. *Griglak v. CTX Mortg. Co.*, No. 09-5247, 2010 WL 1424023, at *3 (D.N.J. Apr. 8, 2010) ("The failure to respond to a substantive argument to dismiss a count, when a party otherwise files opposition, results in a waiver of that count.").

## E. Plaintiffs' State-Law Fraudulent Concealment Claims

Defendants also argue that this Court should dismiss Plaintiffs' fraudulent concealment claims. Both Defendants claim that Plaintiffs have failed to set forth facts showing a duty to disclose, (ECF Nos. 117-1 at 51–53; 118-1 at 58–60), while Mercedes also attacks the fraudulent concealment allegations in the FAC under Rule 9(b), (ECF No. 117-1 at 48–51). Defendants principally challenge Plaintiffs' fraudulent concealment claims under New Jersey law, which

Plaintiffs seek to apply to the nationwide class.[8] To state a claim for fraudulent concealment under New Jersey law, a plaintiff must establish: (1) a material misrepresentation or omission of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity or knowing the omission to be material; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Delaney v. Am. Express Co.*, No. 06-5134, 2007 WL 1420766, at *5 (D.N.J. May 11, 2007); *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997). Rule 9(b) applies to fraudulent concealment claims, *GKE Enters., LLC v. Ford Motor Credit Co. LLC USA*, No. 09-4656, 2010 WL 2179094, at *4 (D.N.J. May 26, 2010); however, as mentioned above, Plaintiffs are not required to plead fraud by omissions claims as precisely as affirmative misrepresentation claims, *Feldman*, 2012 WL 6596830, at *10, so long as the complaint places "the defendant on notice of the precise misconduct with which it is charged, *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 443 (D.N.J. 2012) (quoting *Frederico*, 507 F.3d at 200).

Mercedes contends that Plaintiffs have failed to satisfy the what, who, where, or when of the alleged fraudulent concealment, as required by Rule 9(b). In doing so, Mercedes mistakenly focuses on Mercedes' affirmative misrepresentations set forth in the FAC. For example, Mercedes argues that "every plaintiff fails to plead sufficiently the 'what' to satisfy Rule 9(b) because they fail to specify what false statements were allegedly made regarding *their* vehicle." (ECF No. 117-

---

[8] Mercedes' challenges to fraudulent concealment claims under laws other than New Jersey's are few. Defendant alleges that there is no private cause of action for fraudulent concealment under Connecticut law, (ECF No. 117-1 at 48 n.17 (citing *Traylor v. Awwa*, 899 F. Supp. 2d 216, 224-25 (D. Conn. 2012))), and argues that a commercial transaction does not give rise to a duty to disclose under Illinois law, and thus mirrors New Jersey law, (ECF No. 117-1 at 52 n.22). The Court agrees with Plaintiffs regarding Connecticut law, in that Connecticut recognizes claims for fraudulent concealment but calls them fraud by "suppression" or "nondisclosure." *Reville v. Reville*, 312 Conn. 428, 441 (2014) ("Fraud by nondisclosure . . . involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there is a duty to speak. . . . A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment."). As to the question of whether Defendants had a duty to disclose under Illinois law, that question is answered below.

1 at 48–49 (referring to Plaintiff Andary, who "allege[d] that she read on the 'Mercedes website' 'something about a "green generation of Mercedes""') (quoting FAC ¶ 33)). With regard to the "who" element of Rule 9(b), Mercedes again argues that "[f]orty-nine plaintiffs . . . attribut[e] claimed statements to dealership representatives or unidentified third-party websites." (ECF No. 117-1 at 49). In attacking Plaintiffs' fraudulent concealment claims, Mercedes applies a heightened Rule 9(b) standard to affirmative statements that Plaintiffs no longer rely on except to show the materiality of the omissions.

When looking at Plaintiffs' allegations concerning Defendants' omissions, they have sufficiently notified Mercedes and Bosch of the precise misconduct with which they are charged. Plaintiffs allege that Defendants "programmed [the] BlueTEC vehicles to turn off or otherwise limit the effectives of the emission reduction systems during normal real world driving," throughout the entire period of BlueTEC vehicle production and sale in the U.S. (FAC ¶¶ 10, 13). Plaintiffs also allege that Mercedes failed to disclose these facts about the emissions controls nationwide. (FAC ¶ 316). Similar allegations have been found to satisfy Rule 9(b) both within and outside of this district in other automotive defect cases. *See Volkswagen*, 2018 WL 4777134, at *24 (dismissing plaintiffs' fraudulent misrepresentation claims but finding that the fraudulent omissions claims survived, because plaintiffs identified "the specifics of what VW failed to disclose: (1) that 'the Clean Diesel engine systems were not EPA-compliant,' and (2) that the class vehicles 'used software that caused the vehicles to operate in low-emission test mode during emissions testing"'); *Counts*, 237 F. Supp. 3d at 599 (finding that plaintiffs sufficiently alleged that GM "actively concealed and had exclusive knowledge of the alleged 'defect device'"); *Feldman*, 2012 WL 6596830, at *10 (holding that plaintiffs adequately stated a claim of fraud by omission where they "allege[d] specific facts showing Defendants' knowledge and concealment

of the alleged defect"). This Court will not dismiss Plaintiffs' state-law fraudulent concealment claims for failure to meet the standards of Rule 9(b).

Mercedes concludes that "[b]ecause no plaintiff has sufficiently alleged under Rule 9(b)'s heightened pleading standard the *what, who, where*, and *when* of any fraud, no plaintiff has adequately pled reliance, and all of their claims must be dismissed." (ECF No. 117-1 at 50–51). However, as the Court just found, Plaintiffs met the standards of Rule 9(b). Even still, the burden of establishing reliance on an omission is not difficult. Plaintiffs need not "offer direct proof that the entire class relied on defendant's representation that omitted materials facts, where the plaintiffs have established that the defendant withheld these material facts for the purpose of inducing the very action the plaintiffs pursued." *Varacallo v. Mass. Mut. Life Ins. Co.*, 332 N.J. Super. 31, 50 (App. Div. 2000); *see also Counts*, 237 F. Supp. 3d at 596–97 (citing *Varacallo* and concluding that the plaintiffs need not plead individualized reliance for fraud by omission under New Jersey law).[9]

Bosch also contends that Plaintiffs "fail[ed] to plead any facts to suggest reliance on any specific or actionable representation by [it]." (ECF No. 118-1 at 59). However, for the same reasons that Plaintiffs need not establish direct reliance on Mercedes representations, they need not establish direct reliance on Bosch's: they allege that Bosch intentionally withheld the existence of the defeat device while simultaneously promoting clean diesel technology around the country.

---

[9] Mercedes does not brief the Court on the differences in the laws of the various state subclasses with respect to reliance and fraudulent concealment. To the extent that Mercedes purports to rely on Appendix A to its brief, that attachment does not provide state-specific legal citation or information beyond a boilerplate statement that there was a "[f]ailure to satisfy Rule 9(b) with respect to *reliance*, by failing to allege the *what* and *when* of the purported fraud." (*e.g.*, ECF No. 117-2 at 4 (referencing Plaintiff Roberts)). Thus, the Court declines to do a state-by-state analysis on the differing requirements for pleading reliance in fraudulent concealment claims at this stage. *See Counts*, 237 F. Supp. 3d at 597 (deciding that "the Court will not *sua sponte* analyze the elements of fraudulent concealment from each state's law that Plaintiffs purport to sue under" where the defendant did not specifically raise the argument).

Under New Jersey law, "courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'" *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). The categories of relationships that give rise to a duty to disclose are: "(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." *Id.* Here, Plaintiffs do not assert that they fall into one of the special relationship categories with Defendants. As such, the Court will only focus on the parties' arguments challenging whether or not a duty to disclose existed to make a previous statement true.[10]

Mercedes claims that Plaintiffs "cannot establish that disclosure was necessary to make true a previous statement made by [Mercedes]," because "the alleged representations vary from plaintiff to plaintiff." (ECF No. 117-1 at 53). Mercedes argues that this distinguishes the facts at hand from *In re Volkswagen Timing Chain Products Liability Litigation*, No. 16-2765, 2017 WL 1902160 (D.N.J. May 8, 2017), because in *Timing Chain*, the partial disclosures were uniform. (ECF No. 117-1 at 53). The Court disagrees and finds that the facts at hand establish a duty to disclose for Mercedes and Bosch. Here, Plaintiffs set forth numerous examples of Mercedes' nationwide marketing efforts to promote its BlueTEC clean diesel vehicles. (FAC ¶¶ 323–27). In none of those examples does Mercedes disclose that the purported benefits of the BlueTEC engine could only be achieved through or were completely obscured by the use of a defeat device. These

---

[10] Bosch ignores the aspect of the duty to disclose that flows from a previous false statement and instead only focuses on the existence of a special relationship. (ECF No. 118-1 at 59).

allegations are sufficient to establish partial disclosures that Mercedes had an obligation to make true. *See Timing Chain*, 2017 WL 1902160, at *20 (finding that the plaintiffs plead a partial disclosure after which the defendant had a duty to disclose "any and all information regarding the Timing Chain System" to plaintiffs, where the plaintiffs alleged that the defendant "represent[ed] in the maintenance schedules that the timing belt, which performs the same function as the Timing Chain System, will need service after a certain time but makes no representation that the Timing Chain System will need maintenance"); *Strawn v. Canuso*, 271 N.J. Super. 88, 104 (App. Div. 1994) (establishing a duty on buyers and brokers of real estate to disclose the existence of off-site conditions that were unknown to the buyer but that were known or should have been known to the seller and that would reasonably and foreseeably affect the value or desirability of the property), *aff'd* 140 N.J. 43 (1995).

In fact, in *Strawn*, the New Jersey Supreme Court adopted the interpretation of the Restatement (Second) of Torts which imposes a "duty upon a party to disclose to another 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake . . . and the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts,'" where the nondisclosure of those facts amounts to taking advantage of the plaintiffs ignorance, such that it would be "shocking to the ethical sense of the community, and [would be] so extreme and unfair, as to amount to a form of swindling.'" *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 554 (App. Div. 1997) (citations omitted). It is this Court's opinion that Mercedes and Bosch's active concealment of the existence of the defeat device amounts to such a situation. *Cf. FCA*, 295 F. Supp. 3d at 1009 (finding that allegations of defendants' active concealment of the defeat devices was sufficient to establish a duty to disclose under New Jersey law); *Counts*, 237 F. Supp. 3d at 600 (noting that the

defendant's alleged active concealment of the defeat device was sufficient to establish a duty to disclose in some states).[11]

## F. Plaintiffs' State Statutory Claims

### 1. Rule 9(b), Causal Nexus, and False, Deceptive, or Misleading Statements

Mercedes argues that Plaintiffs fail to state claims for violations of various states' consumer protection statutes under Rule 9(b) because Plaintiffs have not pled a "causal nexus" between Mercedes' unlawful conduct and Plaintiffs' injury with enough specificity and because Plaintiffs have "failed to allege facts establishing that the Mercedes Defendants made" false, deceptive, or misleading statements. (ECF No. 117-1 at 54–55). Mercedes attempts to address these state-specific arguments by citing to an "Appendix B," attached to their brief. (ECF No. 117 at 54–55). Appendix B is a six-page document containing four columns: the state law that applies, the causes of action under that state's law, the elements of the cause of action that Plaintiffs allegedly fail to establish, and "relevant authorities." (ECF No. 117-3 at 1–6). There is no context or analysis accompanying this document. Two courts have rejected similar attempts to argue that Plaintiffs have failed to meet the pleading requirements of various states' consumer protection statutes through an appendix. *See FCA*, 295 F. Supp. 3d at 1015 (deeming arguments made in a joint appendix regarding the plaintiffs' failure to allege reliance, a deceptive act, omission, or practice, and a concrete, nonspeculative loss in relation to consumer protection claims as waived); *Counts*, 237 F. Supp. 3d at 593–94 ("Neither party makes a colorable effort to individually address the validity of Plaintiffs' . . . consumer protection . . . claims on a state specific basis. Rather, each

---

[11] As to Mercedes' contention that Illinois law would also not impose a duty to disclose in this scenario, that argument fails. *See Heider v. Leewards Creative Crafts*, 613 N.E.2d 805, 814 (1993) ("Mere silence in a business transaction does not amount to fraud. Yet, silence accompanied by deceptive conduct or suppression of material facts gives rise to active concealment; it is then the duty of the party which has concealed information to speak.").

attempts to 'raise' certain state-specific arguments by referencing appendices attached to their briefing. . . . The parties' scattershot effort to raise arguments and defenses by simply citing to dozens, if not hundreds, of state court cases will not be addressed."). This Court will also do the same. As in *Counts*, this Court agrees that "[c]ourts are not responsible for combing through appendices in an attempt to *sua sponte* raise and resolve legal arguments which the parties have not briefed." 237 F. Supp. 3d at 594.

In any event, Mercedes' arguments regarding causal nexus and false, deceptive, or misleading statements have been adequately addressed elsewhere in this Opinion. As to the existence of a causal nexus, this Court conducted an in-depth analysis of the causal link between Mercedes' alleged unlawful conduct and Plaintiffs' alleged injuries in the portions of the brief discussing Article III standing and RICO causation. *See supra* Sections III.A.2, B.2. With respect to whether Plaintiffs have adequately pled false, deceptive, or misleading statements, that has been discussed throughout, but particularly in reference to Plaintiffs' common law fraud claims *supra* Section III.E. This Court also notes that *Duramax* analyzed the state consumer protection claims in conjunction with the state common law fraud claims without meaningful distinction. 298 F. Supp. 3d at 1057–65.

1. Bosch and the Michigan Consumer Protection Act

Bosch argues that Plaintiffs fail to state a claim under the Michigan Consumer Protection Act ("MCPA"), because they have failed "to identify any purportedly false affirmative misrepresentation by" Bosch, they have not identified Bosch's duty to disclose, and they have not alleged any injury as a result of Bosch's conduct. (ECF No. 118-1 at 60). By Bosch's own admission, an omission suffices as a "material misrepresentation" under the MCPA. (ECF No. 118-1 at 60). The Court has already established that Bosch made material omissions that it had a

duty to disclose. *Supra* Section III.E. Additionally, the Court has rejected Bosch's argument that Plaintiffs have not adequately pled that they suffered an injury as a result of Bosch's conduct. *Supra* Section III.A.2.ii.

## 2. Ascertainable Loss under New Jersey and Florida Law

Mercedes argues that Plaintiffs Caputo, Caniero, Watkins, Carroll, and Cunningham "fail to plead injury with the specificity required under the consumer protection statutes of New Jersey and Florida because they have not alleged sufficient facts to show they suffered an ascertainable loss." (ECF No. 117-1 at 56). Ascertainable loss is an essential element of a claim under the New Jersey Consumer Fraud Act (NJCFA). *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 97 (D.N.J. 2011). Mercedes claims that because Plaintiffs have failed to plead how much they paid for their vehicles and how much a comparable vehicle would cost, they have not satisfied the standard for ascertainable loss. (ECF No. 117-1 at 56 (citing *In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 439 (D.N.J. 2015))). Plaintiffs contend that *Riddell* is in conflict with New Jersey Supreme Court precedent, suggesting that New Jersey's highest court does not require a plaintiff to plead a price comparison, because "if the damages calculation were so simple, expert testimony would never be necessary." (ECF No. 126 at 66–67).

Here, Mercedes has the better argument. "In cases involving . . . misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle . . . ." *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248 (2005). In demonstrating that out-of-pocket loss or loss in value, the New Jersey Supreme Court has explicitly endorsed the necessity of a price comparison in pleadings seeking to state a claim under the NJCFA. *See D'Agostino v. Maldonado*, 216 N.J. 168, 191 (2013) (detailing that an ascertainable loss must be capable of calculation); *Thiedemann*, 183 N.J. at 248 (describing ascertainable loss

as "not hypothetical or illusory" and a loss that "must be presented with some certainty demonstrating that it is capable of calculation, although it need not be demonstrated in all its particularity"). This district has interpreted the New Jersey Supreme Court precedent to require this price comparison as well. *E.g.*, *Riddell*, 77 F. Supp. 3d at 439; *Smajlaj*, 782 F. Supp. 2d at 100–01. In fact, in *Bosland v. Warnock Dodge, Inc.*, the New Jersey Supreme Court addressed the question of ascertainable loss in an automobile overcharge case. There, the Supreme Court held that "the overcharge in question is one that can be readily quantified and thus [] ascertainable within the meaning of the CFA." 197 N.J. 543, 559 (2009). The plaintiff in *Bosland* though had specifically outlined the fee payments demonstrating that she could have been overcharged by either $40 or $20. *Id.* at 548.

Plaintiffs have not done that here. In their brief they do not set forth any instances of a price comparison in the FAC, nor can the Court find any. What Plaintiffs have done is set the table for a price comparison, alleging that Plaintiffs would not have purchased or leased the BlueTEC vehicles at the prices they paid, or would have purchased or leased a less expensive alternative. (*E.g.*, FAC ¶ 535). They have not gone one step further to compare the price of a Polluting Vehicle with what they believe to be a comparable replacement. *E.g.*, *Smajlaj*, 782 F. Supp. 2d at 103 (finding a sufficient allegation of ascertainable loss where plaintiffs alleged that when they bought a can of soup mislabeled as low-sodium they overpaid for what was essentially full-sodium soup that they alleged to be 20 to 80 cents cheaper).

Additionally, Plaintiffs' argument that expert testimony would never be required if the NJCFA only allowed claims with easily calculable ascertainable losses misses the mark. This is because, as mentioned above, the pleading need not demonstrate the ascertainable loss "in all its particularity." *Thiedemann*, 183 N.J. at 248. Ascertainable loss sets "the stage for establishing

49

the measure of damages." *Id.* "There is no calculation of 'damages sustained' unless the ascertainable loss requirement is first satisfied. The two concepts indeed have separate functions in the analysis." *D'Agostino*, 216 N.J. at 192. Thus, the idea that requiring Plaintiffs to plead ascertainable loss as described above will necessarily write out a nuanced calculation of damages is incorrect. As such, Plaintiffs have failed to state a claim under the NJCFA. The Court will allow Plaintiffs to amend this claim.

As to Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), this Court agrees with Judge Simandle in *Riddell* that actual damages under the FDUTPA are measured as "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." 77 F. Supp. 3d at 439 (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)). However, this Court does not agree that this definition from *Rollins* establishes a pleading standard, as nothing in that case indicates that the Florida District Court of Appeal intended that definition to apply as a hurdle that must be cleared at the motion to dismiss phase. In fact, the 11th Circuit, the Southern District of Florida, and other courts analyzing FDUTPA have held that the *pleading standard* for a an FDUTPA claim is less stringent than the definition of actual damages. *See, e.g., Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011) ("[E]ach putative class member would only need to show that he or she paid a premium for YoPlus to be entitled to damages under the FDUTPA."); *Hasemann v. Gerber Prods. Co.*, No. 15-2995, 2016 WL 5477595, at * 21 (E.D.N.Y. Sept. 28, 2016) ("A plaintiff may recover damages under the FDUTPA by alleging that the plaintiff 'paid a price premium' for the allegedly deceptive product.") (quoting *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 986 (11th Cir. 2016)); *Moss v. Walgreen Co.*, 765 F. Supp. 2d 1363, 1367 n.1 (S.D. Fla. 2011) (stating that a consumer

suffers damages when she pays "more for the product than she otherwise would have," based on a manufacturer's deceptive practice, regardless of whether or not the consumer relied on the deceptive practice). Thus, Plaintiffs have adequately stated their FDUTPA claim.

3. Statutory Time Bars

Mercedes next argues that Plaintiff Mose's Alabama claim, Findlay and Rubey's Indiana claims, and Watkins' Florida claim are time barred, as those statutes of limitation and repose "begin to run from the date that the alleged tort *occurred—i.e.*, the original purchase date of the vehicles." (ECF No. 117-1 at 57).

The parties do not dispute that Alabama's consumer protection statute is subject to a four-year statute of repose. Mercedes presumes that Mose's purchase took place "in or near 2007," because it was a 2007 model vehicle. (ECF No. 117-1 at 57). However, the FAC explicitly states that Mose purchased his vehicle in February of 2013, (FAC ¶ 29), and thus falls within the statute of repose. Mercedes also argues in a footnote that because Mose asserted an Alabama Deceptive Trade Practices Act, he waived his right to bring other claims. (ECF No. 117-1 at 57 n.25). Given that Mercedes asserted an argument on which there is a split of authority, *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 405 (S.D.N.Y. 2017), in a footnote, this Court declines to address that argument. *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived).

As to Plaintiff Watkins' Florida claim, Mercedes again argues that because Watkins purchased a used vehicle in 2013, the vehicle must have originally been sold prior to 2013 and thus is subject to a four-year statute of limitations. (ECF No. 117-1 at 57–58). Mercedes cites no law supporting its proposition that the original sale date of the new car is what starts the clock

running on the statue of limitations rather than the purchase date of the used car by Plaintiff Watkins. Moreover, Mercedes incorrectly argues that FDUTPA's statute is not tolled by the actions at bar. *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324,1344, 1346 (S.D. Fla. 2016) (stating that "the doctrine of fraudulent concealment will operate to toll the statute of limitations when it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him from discovering his injury," and tolling the plaintiff's FDUTPA claim based on this reasoning). Plaintiff Watkins' FDUTPA claim is not barred by the statute of limitations.

With respect to Findlay and Rubey's Indiana consumer protection claims, Mercedes again uses the vehicle model years as the purchase dates, (ECF No. 117-1 at 58), when Findlay purchased his vehicle in August 2015 and Rubey purchased his vehicle in January 2014. This would put Findlay's purchase inside the two year statute of limitations. Ind. Code § 24-5-0.5-5(b). As to Rubey's purchase, Mercedes' alleged active and intentional fraudulent concealment operates to toll the statute of limitations. *Cwiakala v. Economy Autos, Ltd.*, 587 F. Supp. 1462, 1466 (N.D. Ind. 1984).

4. State Consumer Protection Class Action Bars

Mercedes also argues that Plaintiffs' claims under the consumer protection laws of Alabama, Georgia, Mississippi, Montana, Ohio, South Carolina, and Tennessee are barred because the consumer protection laws of those states do not permit class actions. (ECF No. 117-1 at 59). Mercedes argues that pursuant to *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Company*, 559 U.S. 393 (2010), Rule 23 does not override state substantive law to permit class actions in this situation. (ECF No. 117-1 at 59). This Court has twice addressed and rejected this argument. *In re Liquid Aluminum Sulfate Antitrust Litig.*, 16-md-2687, 2017 WL 3131977, at *25

(D.N.J. July 20, 2017) (holding that *Shady Grove* instructs that state consumer protection class action bars do not apply to those claims if brought as a class action under Federal Rule of Civil Procedure 23); *Timing Chain*, 2017 WL 1902160, at *24 (holding the same); *see also Fitzgerald v. Gann Law Books, Inc.*, 956 F. Supp. 2d 581, 586 (D.N.J. 2013) ("*Shady Grove* holds that, even where a federal-court plaintiff asserts a state-law cause of action, Rule 23 may permit class-wide relief where state law would deny it.").

## G. Arbitration

Mercedes' final argument is that two plaintiffs, Andary and Feller, are bound to arbitrate all of their claims pursuant to their purchase agreements. (ECF No. 117-1 at 61). Generally, an agreement to arbitrate a dispute "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 812 F.2d 91, 94 (3d Cir. 1987) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). The Federal Arbitration Act ("FAA"), applies to arbitration clauses contained in contracts involving matters of interstate commerce. *See* 9 U.S.C. § 2; *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). When a party, whose claims are subject to the FAA, refuses to arbitrate the district court must decipher whether the claims are arbitrable. *Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 54 (3d Cir. 2001) (citing *AT&T Techs., Inc. v. Comms. Workers of Am.*, 475 U.S. 643, 649 (1986)). In doing so, the district court applies "the relevant state contract law to questions of arbitrability, which may be decided as a matter of law only if there is no genuine issue of material fact when viewing the facts in the light most favorable to the nonmoving party." *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 288–89 (3d Cir. 2017).

"[F]ederal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration." *Medtronic*, 247 F.3d at 55 (citing *Moses H. Cone*, 460 U.S. at 24–25). However, "[i]f there is doubt as to whether such an agreement [to arbitrate] exists, the matter, upon a proper and timely demand, should be submitted to a jury." *Par-Knit*, *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980), *abrogated on other grounds by Aliments*, 851 F.3d at 287–88. In considering a motion to compel arbitration, a court must engage in a two-step analysis: it must determine first whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the scope of said agreement. *See Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009).

Andary and Feller's arbitration provision reads as follows:

### ARBITRATION PROVISION

### PLEASE REVIEW • IMPORTANT • AFFECTS YOUR LEGAL RIGHTS

1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.

2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIDIVDUAL ARBITRATIONS.

3. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAIABLE IN ARBITRATION.

(ECF No. 117-4 at 9, 13).

Mercedes admits that it was not a signatory to these purchase or lease agreements. (ECF No. 117-1 at 62). As this Court explained in *Timing Chain*:

> Basic contract law requires parties to be in privity with each other in order for them to enforce the terms of a contract. *See Black's Law Dictionary* (10th ed. 2014) (defining privity of contract as "[t]he relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so"). Since the parties never personally entered into an agreement with each other, no privity of contract between Plaintiffs and Defendant can be established. . . . Hence, without privity of contract between the parties, Defendant . . . cannot enforce the arbitration clause contained within the purchase and/or lease agreements signed by Plaintiffs and the various dealerships. Thus, in accordance with [*Century Indemnification Company*,] there is no valid agreement between the parties that this Court can enforce, and the Motion to Compel Arbitration must be denied.

2017 WL 1902160, at *8.

Even still, Mercedes argues, this is the type of relationship in which a non-signatory can enforce the arbitration agreement. (ECF No. 117-1 at 62). Courts have permitted "non-signatory third party beneficiaries to compel arbitration against signatories of arbitration agreements." *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001). For example, courts have "bound a signatory to arbitrate with a non-signatory at the nonsignatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." *E.I. DuPont*, 269 F.3d at 199–200 (citations and quotations omitted). "The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged." *Id.* at 202.

This Court rejected the same argument in *Timing Chain*. 2017 WL 1902160, at *9. As in *Timing Chain*, the FAC indicates that Plaintiffs each purchased and/or leased their vehicle from

an authorized car dealership, that they entered into the purchase or lease agreement with that dealership, and that the agreement contained only the dealership's name and Andary and Feller's names. "Accordingly, there [is] no relationship, let alone a close one, that" indicates that the Court should permit Mercedes to enforce the arbitration agreements. As such Mercedes' motion to compel arbitration is denied.

## IV.  CONCLUSION

For the reasons stated herein, Mercedes' motion to dismiss the First Amended Complaint is granted in part and denied in part, and Bosch's motion to dismiss the First Amended Complaint is denied. An appropriate Order accompanies this Opinion.

DATED: February 1st, 2019

HON. JOSE L. LINARES
Chief Judge, United States District Court