James E.  Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel:  (973) 994-1700
Fax:  (973) 994-1744

Steve W.  Berman
Sean R.  Matt
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington  98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com

*Interim Lead Counsel for Plaintiffs and the Proposed Classes*

[*Other counsel appear on the signature page*]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUSAN ALBERS, DAVID I. ASHCRAFT, JIMMY BIRD, KEITH CANIERO, LARS DANNBERG, ANDREW DEUTSCH, SEID DILGISIC, WENDELL DINGLE, JEFF FINDLAY, GUSTAVO FRAGA-ERRECART, TERRENCE GARMEY, ROBERT GERSHBERG, KEITH HALL, BOBBY HAMILTON, FREDDIE T.  HOLBROOK, MELANIE JOHNSON, SHELBY A.  JORDAN, TIFFANY KNIGHT, ZBIGNIEW KURZAWA , JOHN LAURINO, CAROLINE A.  LEDLIE, WALTER LOUIS, JR., JOHN LINGUA, ULYANA LYNEVYCH, MICHAEL MEDLER, MARYANA MELNYK, VINCENT MINERVA, SCOTT MORGAN, CATHERINE ROBERTS, DR., ADRIAN CLIVE ROBERTS, RANDOLPH ROLLE, JORGE SALVADOR SERVIN, JANICE SHEEHY, | Civil Action No.  16-881(JLL)(JAD <br><br><br><br> **FIFTH CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

CRAIG THORSON, ROBERT TREPPER, THOMAS
WEISS, CHARLES WOLFORD, RICHARD
YANUS, and HASSAN ZAVAREEI on behalf of
themselves and all others similarly situated,

                                Plaintiffs,

      v.

MERCEDES-BENZ USA, LLC, a Delaware Limited
Liability Company, DAIMLER AG, a foreign
corporation, ROBERT BOSCH LLC, a Delaware
Limited Liability Company, and ROBERT BOSCH
GMBH, a foreign corporation,

                                Defendants.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION ................................................................................................. 9

III.    VENUE .............................................................................................................. 9

IV.     PARTIES ........................................................................................................... 9

        A.      Plaintiffs ................................................................................................... 9

                1.      New Jersey Plaintiff ....................................................................... 10

                2.      Alabama Plaintiff ............................................................................ 11

                3.      California Plaintiffs ......................................................................... 12

                4.      Colorado Plaintiffs ......................................................................... 16

                5.      Connecticut Plaintiff ...................................................................... 19

                6.      Georgia Plaintiff............................................................................. 20

                7.      Idaho Plaintiff ................................................................................ 22

                8.      Illinois Plaintiff .............................................................................. 23

                9.      Indiana Plaintiff ............................................................................. 25

                10.     Maryland Plaintiffs ........................................................................ 26

                11.     Massachusetts Plaintiff ................................................................... 30

                12.     Minnesota Plaintiff.......................................................................... 32

                13.     Mississippi Plaintiff ....................................................................... 34

                14.     Missouri Plaintiff ........................................................................... 35

                15.     Nevada Plaintiff .............................................................................. 36

                16.     New York Plaintiffs ........................................................................ 37

                17.     North Carolina Plaintiffs ................................................................ 40

                18.     Ohio Plaintiff ................................................................................. 44

19.     Pennsylvania Plaintiff ................................................................ 45

20.     South Carolina Plaintiff ............................................................ 46

21.     Texas Plaintiffs ........................................................................ 47

22.     Utah Plaintiffs .......................................................................... 50

23.     Virginia Plaintiffs ..................................................................... 53

24.     Washington Plaintiffs ............................................................... 54

25.     West Virginia Plaintiffs ........................................................... 58

26.     Wisconsin Plaintiffs ................................................................. 60

B.      Defendants ........................................................................................ 62

1.      The Mercedes Defendants ......................................................... 62

2.      Daimler AG ............................................................................... 63

3.      The Bosch Defendants ............................................................... 65

V.     FACTUAL ALLEGATIONS ...................................................................... 72

A.      The environmental challenges posed by diesel engines and the
        United States regulatory response thereto ......................................... 72

1.      The BlueTEC technology. ......................................................... 74

2.      The Mercedes and Daimler deception by omission. ................. 76

3.      European studies and reports. ................................................... 78

4.      Plaintiffs' testing of BlueTEC Clean Diesels in the United
        States. ........................................................................................ 85

5.      2014 GLK250 BlueTEC. ........................................................... 94

6.      2012 R350 BlueTEC. ............................................................... 109

7.      2014 Mercedes/Freightliner Sprinter 2500 BlueTEC. ........... 120

8.      Summary. .................................................................................. 134

9.      Bosch's critical role in Mercedes' Emissions Scheme. .......... 140

B.  Bosch played a critical role in the defeat device scheme in many diesel vehicles in the U.S., giving rise to a strong inference that Bosch played a key role in implementing the Mercedes emission strategy. ..................................................................................................... 145

   1.  Although this case is not about Volkswagen, Bosch's history with Volkswagen provides background and support for its participation in the RICO enterprise alleged herein, of which Bosch and Mercedes were participants.  On information and belief, Plaintiffs allege that the same level of coordination between Bosch and Volkswagen also occurred between Bosch and Mercedes to develop the illegal defeat device. .......................................................................... 145

   2.  Volkswagen and Bosch conspire to conceal the illegal "akustikfunktion." ................................................................. 149

   3.  Volkswagen and Bosch conspire in the U.S. and Germany to elude U.S.  regulators who regulated not just Volkswagen diesels, but all diesels. ....................................... 149

   4.  Bosch keeps the emissions cheating secret safe and pushes "clean" diesel in the U.S. as a concept applicable to all diesel car manufacturers. ..................................................... 150

   5.  Bosch's EDC 17 is at the core of the FCA emission scandal. ................................................................................ 152

C.  Mercedes' material omissions are actionable. .................................... 154

D.  Mercedes' affirmative misrepresentations of the environmental benefits of the BlueTEC Clean Diesels and Mercedes' promotion of the environmental benefits of the BlueTEC evidences the materiality of the omissions. ............................................................. 156

   2.  Mercedes advertised and promoted BlueTEC Clean Diesel vehicles as low-emitting, because Mercedes understood it was material to a reasonable consumer ................................. 157

E.  Mercedes advertised and promoted BlueTEC Clean Diesel as environmentally friendly, because Mercedes understood it was material to a reasonable consumer. ................................................... 160

F.  Mercedes advertised and promoted BlueTEC Clean Diesel as meeting and exceeding compliance with U.S.  emissions standards in all 50 states, because Mercedes understood it was material to a reasonable consumer. ...................................................................... 162

G.      Bosch Promoted "Clean Diesel" To Help Create The Market For Diesel Cars Including Mercedes Vehicles. ...................................................... 162

H.      The damage to the environment is at odds with what a reasonable purchaser of a BlueTEC expected. ...................................................... 169

VI.    TOLLING OF THE STATUTE OF LIMITATIONS ...................................................... 171

A.      Discovery rule tolling. ...................................................... 171

B.      Fraudulent concealment tolling ...................................................... 172

C.      Estoppel ...................................................... 173

VII.   CLASS ALLEGATIONS ...................................................... 173

VIII.  CLAIMS ...................................................... 179

A.      Claims brought on behalf of the nationwide RICO class. ...................................................... 179

COUNT I  VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) VIOLATION OF 18 U.S.C. § 1962(C) - (D) ...................................................... 179

1.      The members of the emissions fraud enterprise. ...................................................... 180

2.      The predicate acts. ...................................................... 188

B.      Claims brought on behalf of the nationwide Unfair and Deceptive Practices Act Class and the New Jersey Subclass under New Jersey law. ...................................................... 196

COUNT I  VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J.S.A.. §§ 56:8-1, *ET SEQ.*) ...................................................... 196

COUNT II  FRAUDULENT CONCEALMENT (BASED ON NEW JERSEY LAW) ...................................................... 201

C.      Claims brought on behalf of the Alabama Subclass. ...................................................... 206

COUNT I  VIOLATIONS OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALA. CODE §§ 8-19-1, *ET SEQ.*) ...................................................... 206

COUNT II  FRAUDULENT CONCEALMENT (BASED ON ALABAMA LAW) ...................................................... 210

D.      Claims brought on behalf of the California Subclass. ...................................................... 215

COUNT I  VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION
LAW (CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*)............................................215

COUNT II  VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL
REMEDIES ACT (CAL. CIV. CODE §§ 1750, *ET SEQ.*)............................................218

COUNT III  VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING
LAW (CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*)............................................222

COUNT IV  FRAUDULENT CONCEALMENT (BASED ON CALIFORNIA
LAW)...................................................................................................................224

    E.     Claims brought on behalf of the Colorado Subclass..........................................229

COUNT I  VIOLATIONS OF THE COLORADO CONSUMER PROTECTION
ACT (COLO. REV. STAT. §§ 6-1-101, *ET SEQ.*) ........................................................229

COUNT II  FRAUDULENT CONCEALMENT (BASED ON COLORADO
LAW).................................................................................................................233

    F.     Claims brought on behalf of the Connecticut Subclass. ....................................238

COUNT I  VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE
PRACTICES ACT (CONN. GEN. STAT. ANN. §§ 42-110A, *ET SEQ.*)....................238

COUNT II  FRAUDULENT NON-DISCLOSURE (BASED ON
CONNECTICUT LAW)......................................................................................241

    G.     Claims brought on behalf of the Georgia Subclass............................................246

COUNT I  VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
(GA. CODE ANN. § 10-1-390, *ET SEQ.*).....................................................................246

COUNT II  VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE
PRACTICES ACT (GA. CODE ANN § 10-1-370 ET SEQ.)......................................250

COUNT III  FRAUDULENT CONCEALMENT (BASED ON GEORGIA LAW) ...............250

    H.     Claims brought on behalf of the Idaho Subclass. ..............................................256

COUNT I  VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
(IDAHO CIV. CODE §§ 48-601, *ET SEQ.*)..................................................................256

COUNT II  FRAUDULENT CONCEALMENT (BASED ON IDAHO LAW)......................259

    I.     Claims brought on behalf of the Illinois Subclass. ............................................264

COUNT I  VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *ET SEQ.*
AND 720 ILCS 295/1A) ................................................................................. 264

J.         Claims brought on behalf of the Indiana Subclass ............................. 272

COUNT I  VIOLATIONS OF THE INDIANA DECEPTIVE CONSUMER
SALES ACT (IND. CODE § 24-5-0.5-3) ....................................................... 272

COUNT II  FRAUDULENT CONCEALMENT (BASED ON INDIANA LAW) ................. 276

K.        Claims brought on behalf of the Maryland Subclass. ....................... 281

COUNT I  VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION
ACT  (MD. CODE COM. LAW §§ 13-101, *ET SEQ.*) ................................. 281

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MARYLAND
LAW) ............................................................................................................... 284

L.         Claims brought on behalf of the Massachusetts Subclass. ............... 289

COUNT I  VIOLATIONS OF THE MASSACHUSETTS CONSUMER ACT
(MASS. GEN. LAWS CH. 93A) .................................................................... 289

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
MASSACHUSETTS LAW) ........................................................................... 293

M.        Claims brought on behalf of the Minnesota Subclass ...................... 298

COUNT I  VIOLATION OF THE MINNESOTA PREVENTION OF
CONSUMER FRAUD ACT (MINN. STAT. § 325F.68, *ET SEQ.*) ........... 298

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MINNESOTA
LAW) ............................................................................................................... 301

N.        Claims brought on behalf of the Mississippi Subclass. ................... 306

COUNT I  VIOLATIONS OF THE MISSISSIPPI CONSUMER PROTECTION
ACT  (MISS. CODE ANN. §§ 75-24-1, *ET SEQ.*) ..................................... 306

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MISSISSIPPI
LAW) ............................................................................................................... 310

O.        Claims brought on behalf of the Missouri Subclass. ....................... 315

COUNT I  VIOLATIONS OF THE MISSOURI MERCHANDISING
PRACTICES ACT (MO. REV. STAT. §§ 407.010, *ET SEQ.*) ................... 315

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MISSOURI LAW) ............... 318

P.        Claims brought on behalf of the Nevada Subclass. ........................................... 323

COUNT I  VIOLATIONS OF THE NEVADA DECEPTIVE TRADE
PRACTICES ACT (NEV. REV. STAT. §§ 598.0903, *ET SEQ.*) ................................ 323

COUNT II  FRAUDULENT CONCEALMENT (BASED ON NEVADA LAW) .................. 327

Q.        Claims brought on behalf of the New York Subclass. ....................................... 332

COUNT I  VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
(N.Y. GEN. BUS. LAW § 349) .................................................................................. 332

COUNT II  VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
(N.Y. GEN. BUS. LAW § 350) .................................................................................. 335

COUNT III  FRAUDULENT CONCEALMENT (BASED ON NEW YORK
LAW) ........................................................................................................................ 338

R.        Claims brought on behalf of the North Carolina Subclass. .............................. 343

COUNT I  VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND
DECEPTIVE ACTS  AND PRACTICES ACT (N.C. GEN. STAT. §§ 75-
1.1, *ET SEQ.*) .......................................................................................................... 343

COUNT II  FRAUDULENT CONCEALMENT (BASED ON NORTH
CAROLINA LAW) .................................................................................................... 346

S.        Claims brought on behalf of the Ohio Subclass................................................. 351

COUNT I  VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT
(OHIO REV. CODE ANN. §§ 1345.01, *ET SEQ.*) ....................................................... 351

COUNT II  FRAUDULENT CONCEALMENT (BASED ON OHIO LAW) ......................... 355

T.        Claims brought on behalf of the Pennsylvania Subclass. .................................. 360

COUNT I  VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION LAW (73 P.S. §§ 201-
1, *ET SEQ.*) .............................................................................................................. 360

COUNT II  FRAUDULENT CONCEALMENT (BASED ON PENNSYLVANIA
LAW) ........................................................................................................................ 363

U.        Claims brought on behalf of the South Carolina Subclass. .............................. 368

COUNT I  VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE
PRACTICES ACT (S.C. CODE ANN. §§ 39-5-10, *ET SEQ*.) ...................................... 368

010585-11/1108566 V1

COUNT II  FRAUDULENT CONCEALMENT (BASED ON SOUTH
CAROLINA LAW) ..................................................................................... 372

V.     Claims brought on behalf of the Texas Subclass ................................ 376

COUNT II  FRAUD BY CONCEALMENT (BASED ON TEXAS LAW) ............................ 380

W.     Claims brought on behalf of the Utah Subclass ................................. 385

COUNT I  VIOLATIONS OF THE UTAH CONSUMER SALES PRACTICES
ACT (UTAH CODE ANN. §§ 13-11-1, *ET SEQ.*) ......................................... 385

COUNT II  FRAUDULENT CONCEALMENT (BASED ON UTAH LAW) ........................ 389

X.     Claims brought on behalf of the Virginia Subclass. .......................... 394

COUNT I  VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION
ACT (VA. CODE ANN. §§ 59.1-196, *ET SEQ.*) ........................................... 394

COUNT II  FRAUD BY CONCEALMENT (UNDER VIRGINIA LAW) ............................. 398

Y.     Claims brought on behalf of the Washington Subclass. .................... 403

COUNT I  VIOLATION OF THE WASHINGTON CONSUMER
PROTECTION ACT (WASH. REV. CODE ANN. §§ 19.86.010, *ET
SEQ.*) ...................................................................................................... 403

COUNT II  FRAUDULENT CONCEALMENT (BASED ON WASHINGTON
LAW) ....................................................................................................... 406

Z.     Claims brought on behalf of the West Virginia Subclass. ................. 411

COUNT I  VIOLATIONS OF THE WEST VIRGINIA CONSUMER CREDIT
AND PROTECTION ACT (W. VA. CODE §§ 46A-1-101, *ET SEQ.*) ......................... 411

COUNT II  FRAUDULENT CONCEALMENT (BASED ON WEST VIRGINIA
LAW) ....................................................................................................... 416

AA.    Claims brought on behalf of the Wisconsin Subclass ....................... 421

COUNT I  VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE
PRACTICES ACT (WIS. STAT. § 110.18) .................................................... 421

COUNT II  FRAUDULENT CONCEALMENT (BASED ON WISCONSIN
LAW) ....................................................................................................... 424

REQUEST FOR RELIEF ..................................................................................... 429

DEMAND FOR JURY TRIAL ............................................................................... 430

- viii -

Plaintiffs, individually and on behalf of all others similarly situated (the "Class"), allege the following based upon the investigation of counsel, the review of scientific papers, and the investigation of experts.

## I.    INTRODUCTION

1.    When Mercedes sold its popular BlueTEC "Clean Diesel" vehicles, it promised that they convert nitrous oxide emissions into "pure, earth-friendly nitrogen and water," that they produce "fewer greenhouse gases than gasoline," that they exceed "statutory [emissions] requirements," that they reduce "Nitrogen Oxides by up to 80%," and that they are "for the air we breathe."



And Mercedes could not have sold a single diesel vehicle without applying for a certificate in which Mercedes attested to the EPA and other agencies as to emissions test results.

2.    As explained in detail below, this is not what Mercedes delivered.  In contrast to Mercedes promises, scientifically valid real world emissions testing by Plaintiffs on Mercedes vehicles certified as compliant in the United States has revealed that these vehicles emit dangerous oxides of nitrogen (NOx) at levels **many times higher than (i) their gasoline counterparts, (ii) what a reasonable consumer would expect from a "Clean Diesel," (iii) what Mercedes had**

***advertised, and (iv) United States Environmental Protection Agency and California Air Resources Board maximum standards.***  The Mercedes "Clean Diesel" is far from "clean."

3.      In the last two years, there have been major scandals involving diesel vehicles made by Volkswagen, Audi, Porsche, Mercedes, and FCA.  Volkswagen pled guilty to criminal violations of the Clean Air Act, Mercedes and Bosch are under investigation by the Department of Justice, and FCA has been sued by the EPA for violating the Clean Air Act for improper emissions in thousands of 2014-2016 Dodge Ram 1500 EcoDiesels and 2014-2016 Jeep Grand Cherokee EcoDiesels and settled their claims on January 10, 2019.  The diesel vehicles made by these manufacturers evade emissions standards with the help of certain software supplied by Bosch that turns off or down emissions controls when the vehicles sense they are not in a test environment

4.      Testing conducted by engineering experts in emissions testing indicates that Mercedes, like Volkswagen, is a serious and serial emissions cheater.  Its BlueTEC vehicles emit far more pollution on the road than in the emission certification testing environment.  These vehicles exceed federal and state emission standards and employ "defeat devices" to turn down the emissions controls when the vehicle senses that it is not in the laboratory certification test cycle.  A defeat device as used in this complaint means an auxiliary emissions control device that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use.

5.      The Mercedes vehicles employ an astonishing wide range of Defeat Devices including: (1) a timer that reduces effectiveness of emissions controls after a short period; (2) a defeat device that detects road grade and reduces overall emissions system performance; and (3) a defeat device that turns off or down emissions controls when certain temperature parameters are met.

- 2 -

6.      The results of expert testing, summarized below, reveals a shocking case of emissions cheating.  The chart indicates how many times emissions exceed the stop and go and highway standards, and indicates what percent of time (drive miles) emissions exceed a standard:



7.      Diesel engines pose a difficult challenge to the environment because they have an inherent trade-off between power, fuel efficiency, and emissions.  Compared to gasoline engines,

diesel engines generally produce greater torque, low-end power, better drivability and much higher fuel efficiency.  But these benefits come at the cost of much dirtier and more harmful emissions.

8.     One by-product of diesel combustion is NOx, which generally describes several compounds comprised of nitrogen and oxygen atoms.  These compounds are formed in the cylinder of the engine during the high temperature combustion process.  NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone.  Exposure to these pollutants has been linked with serious health dangers, including serious respiratory illnesses and premature death due to respiratory-related or cardiovascular-related effects.  The United States Government, through the Environmental Protection Agency (EPA), has passed and enforced laws designed to protect United States citizens from these pollutants and certain chemicals and agents known to cause disease in humans.  Automobile manufacturers must abide by these U.S.  laws and must adhere to EPA rules and regulations.

9.     In order to produce a diesel engine that has desirable torque and  power characteristics, good fuel economy, and emissions levels low enough to meet the stringent European and United States governmental emission standards,  Mercedes developed the BlueTEC™ diesel engine.  The BlueTEC name is a general trade name used to describe a number of in-cylinder and after-treatment technologies used to reduce and control emissions in diesel vehicles.  The primary emission control after-treatment technologies include a diesel particulate filter (DPF) and a selective catalytic reduction (SCR) system.  The DPF traps and removes particulate (soot) emissions, while the SCR system facilitates a chemical reaction to reduce NOx into less harmful substances, such as nitrogen and oxygen.

10.     Seeing a major opportunity for growth, almost all of the major automobile manufacturers  developed allegedly "Clean Diesel" engines and promoted new diesel vehicles as

- 4 -

environmentally friendly and "clean."  Volkswagen, Mercedes, GM, Fiat Chrysler America (FCA), and other manufacturers began selling diesel cars and trucks as more powerful, yet also as an environmentally friendly alternative to gasoline vehicles.  And the marketing worked, as millions of diesel vehicles were purchased between 2007 and 2016.

11.     Mercedes understood the materiality to consumers of a "clean car message."  Thus, Mercedes aggressively and consistently markets its BlueTEC vehicles across all media as "the world's cleanest and most advanced diesel" with "ultra-low emissions, high fuel economy and responsive performance" that emits "up to 30% lower greenhouse-gas emissions than gasoline."  Mercedes also represents that its BlueTEC vehicles "convert[] the nitrogen oxide emissions into harmless nitrogen and oxygen" and "reduces the nitrogen oxides in the exhaust gases by up to 90%."

12.     Additionally, Mercedes promotes its Clean Diesel vehicles as "Earth Friendly": "With BlueTEC, cleaner emissions are now an equally appealing benefit."  In fact, Mercedes proclaims itself "#1 in CO2 emissions for luxury vehicles."

13.     As noted, the "BlueTEC Clean Diesel" is a lie.  Just like its Volkswagen, Audi, GM and FCA counterparts, the claims, representations, and marketing concerning the environmental characteristics of the BlueTEC Clean Diesel are materially false and misleading in that they all rely upon the suppression and concealment of critical material facts about the operation and true environmental characteristics of the BlueTEC Clean Diesel.  Among other critical, material suppressed facts, which were not revealed to consumers, is that Mercedes, with the help of various Bosch entities, programmed its BlueTEC vehicles to turn off or otherwise limit the effectiveness of the emission reduction systems during normal real world driving.  As a consequence of this critical concealed material fact, consumers are unaware that—contrary to the clean diesel message

transmitted in a uniform and consistent way by Mercedes—the Polluting Vehicles are not clean diesels at all and, to the contrary, emit enormous amounts of NOx pollutants into the atmosphere.

14.     Mercedes recently admitted, in response to this litigation, that a shut-off device in the engine management of certain BlueTEC diesel cars stops NOx cleaning when ambient temperatures drop below 50 degrees Fahrenheit and under other, unspecified circumstances. Testing by Plaintiffs on American certified vehicles at highway speeds, at low temperatures, and at variable speeds, indicate a systemic failure to meet emissions standards.  Low temperature testing at highway speeds, for example, produced emissions that were 8.1 to 19.7 times the highway emissions standard.  Testing at low temperatures at variable speeds produced emissions as high as 30.8 times the standard.

15.     But, as noted, contrary to its admissions and to what it represents to the public, the Mercedes emissions "shut off device" goes well beyond when the temperature drops below 50 degrees Fahrenheit.  Testing by Plaintiffs has also revealed that Mercedes BlueTEC vehicles do not meet emission standards in virtually **all** real world driving conditions.  In virtually every road test at a variety of speeds and temperatures, the emissions exceeded emissions standards.

16.     Testing using specialized test equipment also used by EPA and CARB for the same purpose reveals that Mercedes intentionally shuts down or severely limits the emissions control system when the BlueTEC vehicles are on the road.  Plaintiffs' testing revealed that, while the Mercedes BlueTEC vehicle's on-road emissions were very high and exceeded federal standards, the same vehicle when tested on a dynamometer using EPA testing protocols had low emissions and either passed the tests, or were within a close margin of doing so.  This contrast between real world driving and the laboratory test actively demonstrates that Mercedes has programmed its emission systems to reduce effectiveness or turn off altogether when the vehicle is on the road.  And

this means that when Mercedes cars are tested in the laboratory, they undoubtedly use a defeat device to obtain test results that appear to pass emissions standards.  As noted, this critical material fact has been intentionally concealed and hidden from the consuming public at the same time that Mercedes has touted the vehicles as "clean," "earth friendly," and "compliant with all relevant emissions standards."

17.     Mercedes did not act alone.  At the heart of the diesel scandal in the United States and Europe are Bosch GmbH and Bosch LLC (together, "Bosch").  Each Bosch entity was an active and knowing participant in the scheme to evade U.S.  emissions requirements.   In vehicles manufactured by Volkswagen, GM, Mercedes and Fiat Chrysler America, Bosch GmbH manufactured, tested, calibrated and distributed the electronic diesel control ("EDC") that allowed Mercedes to implement the defeat device, and Bosch LLC helped promote "Clean Diesel" in the United States and acted to deceive regulators and consumers as to compliance with emissions standards.  Absent Bosch's active cooperation in the development of the EDC and its constituent software, the fraud perpetrated by Mercedes would not have been possible.  The entire emission architecture, from fuel injection to PDF Regeneration Control, to EGR, and SCR dosing is controlled by the Bosch EDC 17.  Bosch's and Bosch GmbH's business model is not to just sell the hardware but also to sell the follow on services, which includes programming the EDC 17 for emission testing purposes.  Because the EDC 17 software is highly proprietary and contains valuable intellectual property, each of Bosch's entity's cooperation in programming that software to enable the "Clean Diesel" scheme was essential.

18.     Plaintiffs allege that the following Mercedes models powered by BlueTEC diesel fueled engines are affected by the unlawful, unfair, deceptive, and otherwise defective emission controls utilized by Mercedes: ML 320, ML 350, GL 320, E320, S350, R320, E Class, GL Class,

ML Class, R Class, S Class, GLK Class, GLE Class, and Sprinter (the Polluting Vehicles).  As explained below, Plaintiffs testing of certain models, based on the similarity of engine design and the common Bosch software, is sufficient to plausibly allege that all Mercedes diesels named herein exceed U.S.  and state emissions standards and exceed the levels a reasonable consumer would expect.  It is equally true that in all cases Mercedes concealed from consumers the use of the illegal defeat device.

19.     Mercedes and Bosch never disclosed and actively concealed from consumers a variety of critical, material facts including, but not limited to, the fact that: (1) Mercedes diesels with BlueTEC engines are only  "clean" diesels in very limited circumstances; (2) the BlueTEC engines  are "dirty" diesels under most normal driving conditions; (3)  BlueTEC vehicles emissions materially exceed the emissions from gasoline powered vehicles; (4) that the emissions exceeded what a reasonable consumer would expect from a purportedly "Clean Diesel," vehicle; (5) that its vehicles emissions materially exceed applicable emissions limits in real world driving conditions, and (6) that Mercedes derates its emission control system in a variety of normal driving conditions.  NOx is one of the most noxious emissions by products and is highly regulated as a result.  It is readily apparent that, based on (among other things) Mercedes' marketing of the Polluting Vehicles as clean diesels, these concealed facts and omissions would have been material to a reasonable consumer.  Further, Bosch conceded the fact that "Clean Diesel" that it promoted in the United States was a myth as all of the diesels sold in the United States with the Bosch EDC 17 were polluting more than a consumer would expect, and contained defeat devices.

20.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of Polluting Vehicles.   Plaintiffs seek damages and equitable relief for

Defendants' misconduct related to the design, manufacture, marketing, sale, and lease of Polluting Vehicles with unlawfully high emissions, as alleged in this Complaint.

## II.   JURISDICTION

21.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the RICO Act, 18 U.S.C. § 1962.  The Court also has diversity jurisdiction because Plaintiffs and Defendants reside in different states.  The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. 1367.  This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), as modified by the Class Action Fairness Act of 2005, because Plaintiffs and Defendants are citizens of different states; there are more than 100 members of the Class (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class members reside across the United States.  The citizenship of each party is described further below in the "Parties" section.

## III.   VENUE

22.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, where Mercedes was headquartered for most of the relevant time period.  Moreover, Mercedes has marketed, advertised, sold, and leased the Polluting Vehicles within this District.

## IV.   PARTIES

**A.   Plaintiffs**

23.     Each and every Plaintiff and each Class member has suffered an ascertainable loss as a result of Mercedes' omissions and/or misrepresentations associated with the BlueTEC Clean Diesel engine system, including, but not limited to, loss of the benefit of the bargain, and diminished value of the vehicle.

24.     Neither Mercedes nor any of its agents, dealers, or other representatives informed Plaintiffs or Class members of the existence of the comparatively and unlawfully high emissions and/or defective nature of the BlueTEC Clean Diesel engine system of the Polluting Vehicles prior to purchase.

### 1.     New Jersey Plaintiff

25.     Plaintiff KEITH CANIERO (for the purpose of this paragraph, "Plaintiff") is a citizen of New Jersey domiciled in Colts Neck, New Jersey.  In December 2012, Plaintiff purchased a new 2012 Mercedes ML 350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Contemporary Motors, an authorized Mercedes dealer in Little Silver, New Jersey. Plaintiff purchased, and still owns, this vehicle.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that

- 10 -

the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.   None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the ML 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

2.      **Alabama Plaintiff**

26.     Plaintiff WALTER LOUIS, JR. (for the purpose of this paragraph, "Plaintiff") is a citizen of Louisiana domiciled in Lafayette, Louisiana.  In April 2013, Plaintiff purchased a used 2012 Mercedes ML 350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle "), from McConnell Honda in Montgomery, Alabama.  Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel," and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle

- 11 -

was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle  had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the ML 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 3.    California Plaintiffs

27.    Plaintiff CATHERINE ROBERTS (for the purpose of this paragraph, "Plaintiff") is a citizen of Vermont domiciled in Montpelier, Vermont.  On or about February 2, 2016, Plaintiff purchased a used 2012 Mercedes Sprinter BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle "), in Fresno, California.  Plaintiff purchased, and still owns, this vehicle. Plaintiff researched the Mercedes BlueTEC Sprinter on Mercedes' website and saw that Mercedes BlueTEC vehicles were described as "the world's most advanced diesels" with "ultra- low emissions, high fuel economy, and responsive performance."  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a

- 12 -

reasonable consumer would expect from a "Clean Diesel," and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Sprinter without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of her vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased her vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.   None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle  had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the Sprinter actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

28.     Plaintiff DR. ADRIAN CLIVE ROBERTS (for the purpose of this paragraph, "Plaintiff") is a citizen of New Jersey domiciled in Princeton, New Jersey.  On or about February 25, 2012, Plaintiff purchased a used 2009 Mercedes ML 320 BlueTEC (for the purpose of this

- 13 -

paragraph, the "Polluting Vehicle"), from Smothers European Mercedes of Santa Rosa in Santa Rosa, California.  Plaintiff purchased, and still owns, this vehicle.  Plaintiff conducted extensive online research before selecting the Mercedes ML320 BlueTEC and read that the BlueTEC was a clean burning diesel with excellent gas mileage.  The dealer confirmed these claims in conversations during negotiations prior to Plaintiff's purchase of his 2009 Mercedes ML320

29.     Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 320 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle  had high emissions

- 14 -

compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the ML 320 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

30.    Plaintiff JORGE SALVADOR SERVIN (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in Lake Elsinore, California.  On or about February 2016, Plaintiff purchased a used 2007 Mercedes E320 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Car Show Dealership in Corona, California.  Plaintiff purchased, and still owns, this vehicle.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited NOx reduction during normal driving conditions and emitted many multiples of the allowed level of pollutants such as NOx.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the E 320 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the

- 15 -

cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure relating to the unlawfully high emissions and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the E 320 actually emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 4.     Colorado Plaintiffs

31.     Plaintiff KEITH HALL (for the purpose of this paragraph, "Plaintiff") is a citizen of Colorado domiciled in Arvada, Colorado.  On or about December 26, 2014, Plaintiff purchased a used 2011 Mercedes S Class BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from a private seller in Denver, Colorado.  Plaintiff purchased, and still owns, this vehicle. Plaintiff's belief that the Mercedes BlueTEC Clean Diesel was indeed a clean diesel was pivotal to his purchase.  In 2014, Plaintiff conducted web research into diesel engines in RVs and reviewed online articles about the BlueTEC Clean Diesel, including "How Mercedes-Benz BLUETEC Works"   (at   http://cars.about.com/od/thingsyouneedtoknow/a/ag_BLUETEC.htm),   "BlueTEC Clean    Diesel    Technology"    (at    http://alternativefuels.about.com/od/researchdevelopment/a/bluetec.htm);"Mercedes-Benz 3.0 V6 Diesel" (at http://ae-plus.com/features/mercedes-benz-30-v6-diesel/page:1); and "The New V6 Diesel Engine from Mercedes-Benz" (at http://www.whnet.com/4x4/diesel.html).  The latter article convinced Plaintiff that Mercedes was committed to a "green" philosophy and emission reduction and sold him on the OM642LS engine package which appeared in 2010 models of the Sprinter.  He was convinced by the data that the OM642LS engine with the BlueTEC/AdBlue urea injection system was the cleanest diesel package available.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an

emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the S Class without proper emission controls has caused Plaintiff out-of- pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the S Class actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

- 17 -

32.     Plaintiff SUSAN ALBERS (for the purpose of this paragraph, "Plaintiff") is a citizen of Colorado domiciled in Oak Creek, Colorado.  On or about June 29, 2013, Plaintiff purchased a new 2013 Mercedes GL350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Mercedes-Benz of Littleton, an authorized Mercedes dealer, in Littleton, Colorado.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law.  Plaintiff traded in the Polluting Vehicle  at a loss earlier this year because of problems related to the Blue Tec technology.   In addition, related to the BlueTEC emissions system, the check engine light in the Polluting Vehicle came on and stayed on throughout the winter every winter.  The Mercedes Benz service department in Westminster told Plaintiff the problem could not be fixed.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the GL350 without proper emission controls has caused Plaintiff out-of-pocket loss and diminished value of her vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased her vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the

environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes and/or Bosch disclosed this design, and the fact that the GL350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 5.    Connecticut Plaintiff

33.    Plaintiff JOHN LINGUA (for the purpose of this paragraph, "Plaintiff") is a citizen of Connecticut domiciled in Windsor Locks, Connecticut. On or about July 10, 2015, Plaintiff purchased a new 2015 Mercedes ML250 BlueTEC and in or about September 2013, Plaintiff purchased a new 2014 Mercedes ML 350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicles"), from New Country Mercedes in Hartford, Connecticut. Plaintiff purchased, and still owns, the vehicles. In making his purchase decision, Plaintiff relied on Mercedes literature that promoted "clean" diesel. Unknown to Plaintiff, at the time the vehicles were purchased, they were equipped with an emissions system that turned off or limited their emissions reduction systems during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 250 and ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicles. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving

conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicles on the reasonable, but mistaken, belief that his vehicles were "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of their operating characteristics throughout their useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicles, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicles had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes and/or Bosch disclosed this design, and the fact that the ML 250 and ML 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicles, or would have paid less for them.

### 6.    Georgia Plaintiff

34.    Plaintiff BOBBY HAMILTON (for the purpose of this paragraph, "Plaintiff") is a citizen of Alabama domiciled in Phenix City, Alabama.  On or about December 24, 2013, Plaintiff purchased a used 2012 Mercedes E Class BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Mercedes Benz of Columbus in Columbus, Georgia.  Plaintiff purchased, and still owns, this vehicle.  Prior to purchasing the 2012 Mercedes E Class BlueTEC, Plaintiff reviewed marketing and advertising by Mercedes that promised fuel efficiency and ultra-low emissions in its BlueTEC models. The salespeople at Mercedes of Columbus, Gary St.  Louis and Debi Lewis, represented to Plaintiff that the BlueTEC engine is the "cleanest diesel" engine.  Plaintiff also

recalls discussing expected performance, durability, and fuel economy with the salespeople at the Mercedes dealership. Although Plaintiff purchased his 2012 Mercedes E350 BlueTEC used, the window sticker on the vehicle indicated the vehicle had a "Global Warming Score" that was above average for a new vehicle and a "Smog Score" that was average for a new vehicle. Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the E Class without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal

driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the E Class actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 7.    Idaho Plaintiff

35.    Plaintiff SCOTT MORGAN (for the purpose of this paragraph, "Plaintiff") is a citizen of Idaho domiciled in McCall, Idaho.  On or about April 20, 2015, Plaintiff purchased a New 2015 Sprinter BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Lyle Pearson Auto in Boise, Idaho.  Plaintiff purchased, and still owns, this vehicle.  Plaintiff spent several months doing research prior to purchasing his 2015 Mercedes Sprinter BlueTEC Clean Diesel.  He discussed the exhaust emissions of Sprinter vehicles with BlueTEC technology with a Mercedes salesperson at Mercedes Seattle, and Tom McCabe at the Lyle Pearson Auto Show in Boise, Idaho.  He recalls generally discussing expected performance, durability and fuel economy with both sales people.  Plaintiff specifically remembers being told by Mr. Morgan that the BlueTEC engine was better than a gasoline engine because it was a cleaner running engine with lower emissions and better gas mileage.  In addition, Plaintiff researched the Mercedes BlueTEC Sprinter motorhome chassis on the Internet.  He reviewed electronic advertisements on the Mercedes Sprinter website and the Winnebago website and specifically recalls that the Mercedes website specifically discussed emissions for the BlueTEC Clean Diesel Sprinter.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline- powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in

- 22 -

designing, manufacturing, marketing, selling, and leasing the Sprinter without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the Sprinter actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 8.    Illinois Plaintiff

36.    Plaintiff MARYANA MELNYK (for the purpose of this paragraph, "Plaintiff") is a citizen of Illinois domiciled in Elmwood Park, Illinois.  On or about October 18, 2014, Plaintiff purchased a used 2012 Mercedes S350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Mercedes-Benz of Chicago in Chicago, Illinois.  Plaintiff purchased, and still owns, this vehicle.  Plaintiff conducted extensive internet research into the BlueTEC Clean Diesel

technology before she purchased her 2012 Mercedes S350 BlueTEC.  She also discussed Mercedes BlueTEC exhaust emissions with the salesperson at Mercedes-Benz of Chicago.  The salesperson told her that even though the 2012 Mercedes S350 BlueTEC she was interested in purchasing was used, the emissions would be like new and very clean because of the BlueTEC technology. Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the S350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of her vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased her vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving

- 24 -

conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the S350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 9.    Indiana Plaintiff

37.    Plaintiff JEFF FINDLAY (for the purpose of this paragraph, "Plaintiff") is a citizen of Indiana domiciled in Lafayette, Indiana.  In August 2015, Plaintiff purchased a used 2011 Mercedes Sprinter 3500 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Paul Richard GM Center in Peru, Indiana.  Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel," and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Sprinter 3500 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations

- 25 -

touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the Sprinter 3500 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 10.   Maryland Plaintiffs

38.    Plaintiff GUSTAVO FRAGA-ERRECART (for the purpose of this paragraph, "Plaintiff") is a citizen of Maryland domiciled in Potomac, Maryland.  On or about October 2, 2013, Plaintiff purchased a new 2013 Mercedes ML 350 BlueTEC, and on or about November 1, 2012, Plaintiff purchased a new 2012 Mercedes S350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicles"), from EuroMotorcars in Gaithersburg, Maryland.  Plaintiff purchased, and still owns, the vehicles.  Plaintiff conducted extensive research into Mercedes BlueTEC technology prior to purchasing his BlueTEC vehicles from EuroMotorcars in Germantown, Maryland.  He travelled to the Mercedes-Benz headquarters in Stuttgart, Germany to test-drive all the BlueTEC models there.  He was assured by Mercedes-Benz representatives that the new BlueTEC technology minimized emissions and the environmental impact and was "years away" from the old Mercedes diesel vehicles.  He also recalls discussing expected performance, durability, and fuel economy with the Mercedes representative.  Unknown to Plaintiff, at the time the vehicles were purchased, they were equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of

- 26 -

emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel," and at many multiples of that allowed by federal law. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 350 and the S350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicles. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicles on the reasonable, but mistaken, belief that his vehicles were "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of their operating characteristics throughout their useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicles, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicles had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes and/or Bosch disclosed this design, and the fact that the ML 350 and the S350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicles, or would have paid less for them.

39.     Plaintiff HASSAN ZAVAREEI (for the purpose of this paragraph, "Plaintiff") is a citizen of Maryland domiciled in Bethesda, Maryland. On or about February 18, 2013, Plaintiff

purchased a used 2011 Mercedes E350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from EuroMotorcars in Gaithersburg, Maryland.  Plaintiff purchased, and still owns, the vehicle.  In making the purchase, Plaintiff relied in general on written and oral communications that indicated that BlueTEC was an effective way to reduce emissions.   Plaintiff also recalls conversations with a salesman at EuroMotorcars, the dealership where he purchased his vehicle, in which Plaintiff asked about the emissions of the Mercedes BlueTEC vehicle he was considering purchasing.  The salesman represented to Plaintiff that the BlueTEC engines were fuel efficient and that the emissions technology employed in these vehicles was top of the line.  Plaintiff understood that BlueTEC was an effective and legal means of complying with U.S.  emissions controls. Plaintiff knew he wanted a fuel efficient car and had learned through advertisements that Mercedes' BlueTEC technology solved the problem of diesel's high emissions.  He researched and compared Mercedes' "clean diesel" to other competitive eco- friendly cars, relying in part on representations on Mercedes' website about its BlueTEC emissions technology.  He also relied on Mercedes' representations about how many miles per gallon his vehicle would run, and that the car he purchased complied with EPA regulations.  In the absence of such representations, Plaintiff would not have purchased a Mercedes BlueTEC vehicle.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the E350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about,

manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.   Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.   None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the E350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle.

40.     Plaintiff JANICE SHEEHY (for the purpose of this paragraph, "Plaintiff") is a citizen of Maryland domiciled in Poolesville, Maryland.  On or about January 2009, Plaintiff purchased a used 2007 Mercedes E 320 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from EuroMotorcars Germantown Mercedes-Benz in  Germantown, Maryland. Plaintiff purchased, and still owns, this vehicle.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many

- 29 -

multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel," and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the E 320 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of her vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased her vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the E 320 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 11.  Massachusetts Plaintiff

41.  Plaintiff TERRENCE GARMEY (for the purpose of this paragraph, "Plaintiff") is a citizen of Maine domiciled in Cape Elizabeth, Maine.  On or about January 15, 2015, Plaintiff

purchased a used 2012 Mercedes S350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle "), from Herb Chambers  Honda in Seekonk, Massachusetts.  Plaintiff purchased, and still owns, this vehicle.  Plaintiff read a lot of material relating to Mercedes BlueTEC technology, some of it on the Mercedes website, prior to purchasing his 2012 Mercedes S350 BlueTEC.  Mercedes' website described BlueTEC as a "clean diesel" with "ultra-low emissions."  In addition, Plaintiff recalls that Mercedes described BlueTEC technology as clean and fuel efficient in its advertisements and marketing materials.  Plaintiff also specifically recalls reviewing the following articles:                        https://www.wired.com/2012/04/benz-                        s350/, http://www.thedieseldriver.com/2011/09/2012-mercedes-benz-s350-bluetec-review-and-first-test-drive/,  and  http://www.caranddriver.com/reviews/2012-mercedes-benz-s350-bluetec-diesel-road-test-review.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the S350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that

- 31 -

the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.   None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.   Had Mercedes and/or Bosch disclosed this design, and the fact that the S350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 12.   Minnesota Plaintiff

42.    Plaintiff CHARLES WOLFORD (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in Three Rivers, California.   In June 2013, Plaintiff purchased a new 2013 Mercedes ML 350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Sears Imported Autos in Minneapolis, Minnesota.   Plaintiff purchased, and still owns, this vehicle. Plaintiff discussed the 2013 Mercedes ML350 BlueTEC with Glenn Brantley and Christian Even, sales representatives at the Sears Imported Autos, and the manager, Gary Emfield.   They each represented to Plaintiff that the Mercedes BlueTEC was a "clean diesel" vehicle.   Plaintiff also recalls discussing expected performance, durability, and fuel economy with the sales representatives and manager at Sears Imported Autos.   Sears Imported emailed to Plaintiff electronic advertisements for Mercedes BlueTEC models including the ML350.  Prior to purchasing the 2013 Mercedes ML 350 BlueTEC, Plaintiff read about the so-called cleanliness of the BlueTEC engine system for the environment and the efficiency and power/performance of the BlueTEC engine system in Edmunds, Car & Driver, and on online forums.   He also viewed local advertisements by Mercedes in the Minnesota television market, advertising on Mercedes' website,

- 32 -

and downloaded the electronic brochure for the vehicle from the website and recalls that they specifically discussed emissions.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the ML 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

- 33 -

### 13. Mississippi Plaintiff

43.      Plaintiff DAVID I.  ASHCRAFT (for the purpose of this paragraph, "Plaintiff") is a citizen of Mississippi domiciled in Madison, Mississippi.  In June 2013, Plaintiff purchased a new 2013 Mercedes S350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Higginbotham Automotive in Jackson, Mississippi.  Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel," and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the S350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving

- 34 -

conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the S350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 14.    Missouri Plaintiff

44.    Plaintiff CRAIG THORSON (for the purpose of this paragraph, "Plaintiff") is a citizen of Missouri domiciled in Columbia, Missouri.  On or about June 15, 2013, Plaintiff purchased a New 2013 Mercedes GLK 250 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Joe Machens dealership in Columbia, Missouri.  Plaintiff purchased, and still owns, this vehicle.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the GLK 250 without proper emission controls has caused Plaintiff  out-of-pocket  loss, future  attempted  repairs,  and  diminished  value  of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None

- 35 -

of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the GLK 250 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 15.   Nevada Plaintiff

45.     Plaintiff RICHARD YANUS (for the purpose of this paragraph, "Plaintiff") is a citizen of New Hampshire domiciled in Rye, New Hampshire.  On or about May 22, 2012, Plaintiff purchased a new 2011 Sprinter BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Mercedes Benz of Henderson in Henderson, Nevada.  Plaintiff purchased, and still owns, this vehicle.  Plaintiff researched the Mercedes Sprinter BlueTEC on the Internet and recalls reading about low emissions and "clean" diesel.  Plaintiff discussed the exhaust emissions of the Sprinter with the salesperson at Mercedes Benz of Henderson and was told that the Sprinter BlueTEC was "cleaner" than his Toyota Prius which he drove to the dealership.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Sprinter without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a

- 36 -

"clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the Sprinter actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 16.   New York Plaintiffs

46.     Plaintiff THOMAS WEISS (for the purpose of this paragraph, "Plaintiff") is a citizen of New York domiciled in Rome, New York.  On or about November 30, 2015, Plaintiff purchased a new 2015 Mercedes Sprinter BlueTEC (Itasca Navion 24G) (for the purpose of this paragraph, the "Polluting Vehicle"), from Camping World of Syracuse in Syracuse, New York.  Plaintiff purchased, and still owns, this vehicle.   Plaintiff researched the Mercedes BlueTEC Sprinter motorhome chassis on the Internet.   He reviewed electronic advertisements on the Mercedes Sprinter website and the Winnebago website and specifically recalls that the Mercedes website specifically discussed emissions for the BlueTEC Sprinter.  Plaintiff discussed the exhaust emissions of diesel vehicles with the salesperson at Camping World RV Sales and was assured that

the BlueTEC urea injection system of the Sprinter chassis minimized emissions and environmental impact.  This information was later confirmed with statements contained in the online product brochure for the Sprinter Cab Chassis.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Sprinter without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle  had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the Sprinter actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than

a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

47.    Plaintiff JOHN LAURINO (for the purpose of this paragraph, "Plaintiff") is a citizen of Massachusetts domiciled in Orleans, Massachusetts.  On or about December 26, 2012, Plaintiff purchased a new 2013 Mercedes ML 350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Estate Motors in Golden's Bridge, New York.  Plaintiff purchased, and still owns, this vehicle.  Plaintiff discussed the low exhaust emissions of BlueTEC Clean Diesel vehicles with the manager (Jeff Bertrant) and sales representative (Michael Torres) at Estate Motors, in addition to discussing expected performance, durability, and fuel economy.  Plaintiff also researched Mercedes BlueTEC technology on the Mercedes website and on internet car sites that provide reviews and side-by-side comparisons of vehicles.  Mr. Laurino recalls reading positive reviews for Mercedes BlueTEC technology and representations by Mercedes that the ML350 BlueTEC is a "clean" diesel with low emissions.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.

Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the ML 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 17.   North Carolina Plaintiffs

48.   Plaintiff VINCENT MINERVA (for the purpose of this paragraph, "Plaintiff") is a citizen of North Carolina domiciled in Denver, North Carolina.  On or about November 2013, Plaintiff purchased a new Sprinter BlueTEC from Hendrick Mercedes in Charlotte, North Carolina. On or about February 2014, Plaintiff purchased a used E350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicles"), from Hendrick in Charlotte, North Carolina.  Plaintiff purchased, and still owns, these vehicles.  Unknown to Plaintiff, at the time the vehicles were purchased, they were equipped with an emissions system that turned off or limited their emissions reduction systems during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the E350 and Sprinter without proper emission controls has caused

- 40 -

Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicles. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicles on the reasonable, but mistaken, belief that his vehicles were "clean diesels," complied with United States emissions standards, were properly EPA certified, and would retain all of their operating characteristics throughout their useful life.  Plaintiff selected and ultimately purchased his vehicles, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicles had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes and/or Bosch disclosed this design, and the fact that the E350 and Sprinter actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicles, or would have paid less for them.

49.     Plaintiff FREDDIE T.  HOLBROOK (for the purpose of this paragraph, "Plaintiff") is a citizen of North Carolina domiciled in Morganton, North Carolina.  On or about January 20, 2014, Plaintiff purchased a new 2013 Mercedes Sprinter 2500 BlueTEC from Leith Mercedes in Raleigh, North Carolina.  On or about July 2014, Plaintiff purchased another new 2013 Mercedes Sprinter BlueTEC (for the purpose of this paragraph, the "Polluting Vehicles"), from the same dealership.  Plaintiff purchased, and still owns, these vehicles.  Unknown to Plaintiff, at the time

the vehicles were purchased, they were equipped with an emissions system that turned off or limited their emissions reduction systems during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law.   Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Sprinters without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicles. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicles on the reasonable, but mistaken, belief that his vehicles were "clean diesels," complied with United States emissions standards, were properly EPA certified, and would retain all of their operating characteristics throughout their useful life.   Plaintiff selected and ultimately purchased his vehicles, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.   Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.   None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicles had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes and/or Bosch disclosed this design, and the fact that the Sprinters actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicles, or would have paid less for them.

- 42 -

50.     Plaintiff ROBERT TREPPER (for the purpose of this paragraph, "Plaintiff") is a citizen of North Carolina domiciled in Cary, North Carolina.  On or about October 14, 2011, Plaintiff purchased a new 2012 Mercedes E350 BlueTEC (for the purpose of this paragraph, one of the "Polluting Vehicles"), from Mercedes of Cary, an authorized Mercedes dealership in Cary, North Carolina.  On June 11, 2013, Plaintiff purchased a new 2013 Mercedes ML 350 BlueTEC (for the purpose of this paragraph, one of the "Polluting Vehicles"), from Mercedes of Cary, an authorized Mercedes dealership in Cary, North Carolina.  Plaintiff purchased, and still owns, these vehicles.  Unknown to Plaintiff, at the time the Polluting Vehicles were purchased, the Polluting Vehicles were equipped with an emissions system that turned off or limited NOx reduction during normal driving conditions and emitted many multiples of the allowed level of pollutants such as NOx.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicles without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicles.  Mercedes knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the Polluting Vehicles on the reasonable, but mistaken, belief that the Polluting Vehicles were "clean diesels," complied with United States emissions standards, were properly EPA certified, and would retain all of their operating characteristics throughout their useful lives.  Plaintiff selected and ultimately purchased the Polluting Vehicles in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure relating

- 43 -

to the unlawfully high emissions and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes disclosed this design, and the fact that the Polluting Vehicles actually emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the Polluting Vehicles, or would have paid less for them.

### 18.    Ohio Plaintiff

51.    Plaintiff ANDREW DEUTSCH (for the purpose of this paragraph, "Plaintiff") is a citizen of Ohio domiciled in Moreland Hills, Ohio.  On or about January 14, 2016, Plaintiff leased a new 2015 Mercedes GLK Class BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from a dealership in Cleveland, Ohio.  Plaintiff is currently leasing this vehicle.  Prior to entering into the lease, Plaintiff discussed the vehicle with the sales representative at the Mercedes dealership.  He was debating between a vehicle with a gasoline engine and one with a diesel engine. The sales person at the Mercedes dealership told Plaintiff that the Mercedes BlueTEC produces far less pollution and gets much better gas mileage than a vehicle with a gasoline engine.  These representations were consistent with statements Plaintiff read about BlueTEC technology on the Mercedes' website, which described BlueTEC vehicles as having low emissions, high fuel economy, and great performance.  Unknown to Plaintiff, at the time he entered into the lease for this vehicle, it was equipped with an emissions system that turned off or limited NOx reduction during normal driving conditions and emitted many multiples of the allowed level of pollutants such as NOx.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the GLK Class without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff leased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," as compared to

- 44 -

gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately leased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the GLK Class actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have leased the vehicle, or would have paid less for it.

### 19.    Pennsylvania Plaintiff

52.    Plaintiff WENDELL A.  DINGLE (for the purpose of this paragraph, "Plaintiff") is a citizen of Pennsylvania domiciled in Philadelphia, Pennsylvania.  On or about December 2015, Plaintiff purchased a used 2011 Mercedes GL 350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Mercedes-Benz of Fort Washington in Fort Washington, Pennsylvania. Plaintiff purchased, and still owns, this vehicle.   The salesperson at Mercedes-Benz of Fort Washington assured Plaintiff that the vehicle was quiet with low emissions.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the GL 350 without proper emission controls has

- 45 -

caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle  had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the GL 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 20.   South Carolina Plaintiff

53.   Plaintiff CAROLINE A. LEDLIE is a citizen and domiciliary of the State of South Carolina.  In August 2011, Plaintiff purchased a Mercedes BlueTEC E350 from an authorized Mercedes dealer in Charleston, South Carolina (for purposes of this paragraph, the "Polluting Vehicle").  Plaintiff purchased, and still owns, this vehicle.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its

- 46 -

emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the E350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of her vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased her vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the E350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 21.    Texas Plaintiffs

54.    Plaintiff SHELBY A.  JORDAN (for the purpose of this paragraph, "Plaintiff") is a citizen of Texas domiciled in Corpus Christi, Texas.  On or about July 2009, Plaintiff purchased a

new 2009 Mercedes GL 320 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Ed Hicks Imports in Corpus Christi, Texas.  Plaintiff purchased, and still owns, this vehicle. Plaintiff spoke to a salesperson at Ed Hicks Imports in Corpus Christi, Texas.  He specifically remembers that the salesperson directed him toward the BlueTEC and represented to him that the BlueTEC was the cleanest diesel burning engine manufactured.  The salesperson also took out a white paper towel from his pocket and rubbed it on the exhaust to show him no black residue. Plaintiff also reviewed Mercedes promotional materials provided to him by the dealership which discussed low emissions in BlueTEC vehicles and the environmental impact.  Plaintiff visited the Mercedes website to learn more about BlueTEC technology and researched "clean diesel" and BlueTEC on the Internet and read about the environmentally clean and efficient diesel being built by Mercedes.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the GL 320 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that

- 48 -

the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.   None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle  had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes and/or Bosch disclosed this design, and the fact that the GL 320 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

55.     Plaintiff JIMMY BIRD (for the purpose of this paragraph, "Plaintiff") is a citizen of Texas domiciled in Houston, Texas.  In March 2007, Plaintiff purchased a new 2007 Mercedes E320 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Mercedes Benz of Houston in Houston, Texas.  Plaintiff purchased, and still owns, this vehicle.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline- powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel," and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the E320 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a

"clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the E320 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 22.   Utah Plaintiffs

56.   Plaintiff SEID DILGISIC (for the purpose of this paragraph, "Plaintiff") is a citizen of Utah domiciled in Salt Lake City, Utah.  On or about February 1, 2013, Plaintiff leased a new 2013 Mercedes ML 350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Mercedes Benz of Salt Lake City in Salt Lake City, Utah.   Salt Lake City Mercedes-Benz salesperson, Brett Robinson, told Plaintiff that the resale value for the vehicle was better than any other in its class.  The Mercedes-Benz salesperson promised Mr. Dilgisic that the vehicle had low emissions, great fuel efficiency and performance.  He also told him that the BlueTEC had greater value than its competitors with gasoline engines.  Plaintiff extensively researched the vehicle prior to entering into the lease.  He read a BBC article about the Mercedes-Benz ML 350 BlueTEC titled, "Is this Mercedes' Best kept secret?"  In addition, he read an article in the New York Times dated

- 50 -

March 23, 2013, titled, "A Lower-Cost Filling Solution for the Mercedes-Benz ML350 BlueTEC." He also read a review of the 2013 Mercedes- Benz M-Class in U.S. News and World Report and a Car and Driver review of the 2013 Mercedes-Benz 350 RWD/4Matic. Plaintiff also viewed Mercedes BlueTEC advertisements on KSL, YouTube, Google, and CNN. Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff leased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately leased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes and/or Bosch disclosed this design, and the fact that the ML 350 actually emitted pollutants at a much higher level

- 51 -

than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have leased the vehicle, or would have paid less for it.

57.   Plaintiff TIFFANY KNIGHT (for the purpose of this paragraph, "Plaintiff") is a citizen of Utah domiciled in Salt Lake City, Utah.  Plaintiff purchased a used 2012 Mercedes ML 350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Mercedes-Benz of Lindon in Provo, Utah.  Plaintiff purchased, and still owns, this vehicle.  Plaintiff discussed low emissions, expected performance, durability, and fuel economy with the Mercedes sales people. The salesperson at Mercedes Benz of Lindon gave Plaintiff several brochures and information sheets on the efficiency of Mercedes BlueTEC vehicles.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of her vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased her vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations

- 52 -

touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the ML 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 23.    Virginia Plaintiffs

58.    Plaintiff ULYANA LYNEVYCH (for the purpose of this paragraph, "Plaintiff") is a citizen of Illinois domiciled in Schiller Park, Illinois.  In August 2014, Plaintiff purchased a used 2014 Mercedes ML 350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Tysinger Motor Co., Inc. of Hampton, Virginia.  Plaintiff purchased, and still owns, this vehicle. Plaintiff conducted extensive research on BlueTEC technology.  She picked up product brochures for Mercedes BlueTEC vehicles at a local dealership, visited the Mercedes website and watched YouTube videos on BlueTEC technology.  Plaintiff also discussed Mercedes BlueTEC exhaust emissions with the salesperson at Tysinger Motor Co., Chai Gouanglee.  The salesperson assured her that the 2014 Mercedes ML350 BlueTEC was clean and efficient with low-emissions and high fuel economy.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted

- 53 -

repairs, and diminished value of her vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased her vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.   None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle  had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes and/or Bosch disclosed this design, and the fact that the ML 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 24.    Washington Plaintiffs

59.    Plaintiff MICHAEL MEDLER (for the purpose of this paragraph, "Plaintiff") is a citizen of Washington domiciled in Bellingham, Washington.  On or about December 24, 2015, Plaintiff purchased a used 2015 Mercedes Sprinter BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Wilson Motors in Bellingham, Washington.  Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal

- 54 -

driving conditions and emitted many multiples of the allowed level of pollutants.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Sprinter without proper emission controls has caused Plaintiff out-of- pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.   None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the Sprinter actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

60.     Plaintiff ROBERT GERSHBERG (for the purpose of this paragraph, "Plaintiff") is a citizen of Washington domiciled in Bothell, Washington. On or about December 24, 2015, Plaintiff purchased a new Mercedes GL 350 BlueTEC (for the purpose of this paragraph, the

"Polluting Vehicle"), from Mercedes-Benz of Seattle in Seattle, Washington. Plaintiff purchased, and still owns, this vehicle. In 2010-2011, Plaintiff leased a 2011 ML 350 BlueTEC from Mercedes-Benz of Lynnwood. Plaintiff conducted extensive internet research into the BlueTEC Clean Diesel technology before leasing the 2011 ML 350 BlueTEC and purchasing the 2015 GL 350 BlueTEC. The selling point of both vehicles was fuel economy and low emissions. Unknown to Plaintiff, at the time the vehicles were leased and purchased, they were equipped with an emissions system that turned off or limited their emissions reduction systems during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the GL 350 and the ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff leased and purchased his vehicles on the reasonable, but mistaken, belief the vehicle were "clean diesel" vehicles, as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of their operating characteristics throughout their useful lives, including high fuel economy.  Plaintiff selected and ultimately leased and purchased his vehicles, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the

Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes and/or Bosch disclosed this design, and the fact that the GL 350 and ML 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have leased and purchased the vehicles, or would have paid less for them.

61.     Plaintiff RANDOLPH ROLLE (for the purpose of this paragraph, "Plaintiff") is a citizen of Washington domiciled in Seabeck, Washington.  On or about August 1, 2015, Plaintiff purchased a new 2015 Mercedes ML Class BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Larson Mercedes Benz in Tacoma, Washington.  Plaintiff purchased, and still owns, this vehicle.  Plaintiff discussed the exhaust emissions of Mercedes BlueTEC vehicles with the salesperson at Larson Mercedes-Benz, being assured that the Mercedes BlueTEC was a "clean diesel" and that it met the highest tier emissions standards, Tier 4.  Plaintiff also visited the Mercedes website several times where he read that Mercedes' BlueTEC models "are simply the world's most advanced diesels," with "ultra-low emissions."  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML Class without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean

diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the ML Class actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

### 25. West Virginia Plaintiffs

62.    Plaintiff MELANIE JOHNSON (for the purpose of this paragraph, "Plaintiff") is a citizen of West Virginia domiciled in Lewisburg, West Virginia. On or about August 2, 2016, Plaintiff purchased a used 2014 Mercedes ML350 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Mercedes-Benz of Roanoke d/b/a Berglund Luxury Roanoke in Roanoke, Virginia. Plaintiff purchased, and still owns, this vehicle. Plaintiff conducted extensive internet research into the BlueTEC Clean Diesel technology before she purchased her 2014 Mercedes ML350 BlueTEC. She also had at least two discussions about Mercedes BlueTEC exhaust emissions with the salesman at Mercedes-Benz of Roanoke. When questioned, the salesman told her that Mercedes BlueTEC technology did not contain devices such as in Volkswagen

CleanDiesel vehicles that overrode the emissions system to produce unlawfully high levels of pollutants.  Contrary to these representations and unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel", and at many multiples of that allowed by federal law. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML350 BlueTEC without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of her vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased her vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes and/or Bosch disclosed this design, and the fact that the ML350 BlueTEC actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer

would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle.

### 26.    Wisconsin Plaintiffs

63.    Plaintiff LARS DANNBERG (for the purpose of this paragraph, "Plaintiff") is a citizen of Florida domiciled in West Palm Beach, Florida.  On or about November 22, 2013, Plaintiff purchased a new 2014 Mercedes E Class BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Bergstrom Enterprise Motorcars in Appleton, Wisconsin.  Plaintiff purchased, and still owns, this vehicle.  Prior to the purchase of the vehicle, the sales representative at the Mercedes dealership told Plaintiff that the BlueTEC technology provided a "clean" engine system with low emissions and low fuel cost that was better for the environment than a gasoline engine.  Plaintiff also read advertisements and brochures, visited the Mercedes website, and saw television ads all touting Mercedes BlueTEC models as having ultra-low emissions, high fuel economy, and zippy performance prior to purchasing the vehicle.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted many multiples of the allowed level of pollutants.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the E Class without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel," as compared to gasoline vehicles, complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part,

- 60 -

because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the E Class actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

64.    Plaintiff ZBIGNIEW KURZAWA (for the purpose of this paragraph, "Plaintiff") is a citizen of Illinois domiciled in Glenview, Illinois.   On or about December 2015, Plaintiff purchased a used 2007 Mercedes E320 BlueTEC (for the purpose of this paragraph, the "Polluting Vehicle"), from Krueger Auto Mart in Oshkosh, Wisconsin.  Plaintiff purchased, and still owns, this vehicle.  Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel," and at many multiples of that allowed by federal law.  Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the E320 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle.  Mercedes knew about, manipulated, or recklessly disregarded,

the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy.  Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes.  Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system.  None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions.  Had Mercedes and/or Bosch disclosed this design, and the fact that the E320 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

## B.     Defendants

### 1.     The Mercedes Defendants.

65.     Defendant Mercedes-Benz USA, LLC ("Mercedes") is a Delaware limited liability corporation whose principal place of business is 303 Perimeter Center North, Suite 202, Atlanta, Georgia, 30346.  Until approximately July 2015, Mercedes' principal place of business was 1 Mercedes Drive, Montvale, New Jersey 07645.  Mercedes' Customer Service Center is at 3 Mercedes Drive, Montvale, New Jersey 07645, and it operates a Learning and Performance Center at the same location.  Mercedes operates a regional sales office at Morris Corporate Center 3, Bldg.

D, 400 Interpace Parkway, Parsippany, New Jersey 07054, and has a parts distribution center at 100 New Canton Way, Robbinsville, New Jersey 08691.  Mercedes' registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

66.     Mercedes, through its various entities, designs, manufactures, markets, distributes and sell Mercedes automobiles in New Jersey and multiple other locations in the United States and worldwide.  Mercedes and/or its agents designed, manufactured, and installed the BlueTEC Clean Diesel engine systems in the Polluting Vehicles.  Mercedes also developed, approved and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Polluting Vehicles.

67.     Mercedes intends that its dealerships disseminate brochures, booklets and advertisements to potential consumers.  Mercedes also communicates with its dealer network through Technical Services Bulletins and through electronic mail.  All of these communications provided Mercedes with an opportunity to disclose the truth about the Polluting Vehicles to dealers for dissemination to potential purchasers or owners.

### 2.     Daimler AG.

68.     Defendant Daimler Aktiengesellschaft ("Daimler AG") is a foreign corporation headquartered in Stuttgart, Baden-Württemberg, Germany.

69.     Daimler AG is engaged in the business of designing, engineering, manufacturing, testing, marketing, supplying, selling and distributing motor vehicles, including the Polluting Vehicles, in the United States.

70.     Daimler AG engineered, designed, developed, manufactured and installed the emissions systems on the Polluting Vehicles, manipulated the emission systems in such a manner so as to reduce the systems' effectiveness during on-road driving conditions, and exported these

- 63 -

vehicles with the knowledge and understanding that they would be sold throughout the United States.

71.     Daimler AG is and was at all relevant times doing business in a continuous manner through a chain of distribution and dealers throughout the United States, including within the District of New Jersey in the State of New Jersey by selling, advertising, promoting and distributing Mercedes-Benz motor vehicles.

72.     Through its wholly-owned subsidiaries and/or agents, Daimler AG markets its products in a continuous manner in the United States, including the State of New Jersey.

73.     Daimler AG is the parent of, controls and communicates with Mercedes-Benz USA, LLC concerning virtually all aspects of the Polluting Vehicles distributed in the United States.

74.     Mercedes-Benz USA, LLC acts as the sole distributor for Mercedes-Benz vehicles in the United States, purchasing those vehicles from Daimler in Germany for sale in this country.

75.     Daimler AG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell the Polluting Vehicles.

76.     On information and belief, the relationship between Daimler AG and Mercedes-Benz USA LLC is governed by a General Distributor Agreement that gives Daimler AG the right to control nearly every aspect of Mercedes-Benz USA, LLC's operations—including sales, marketing, management policies, information governance policies, pricing, and warranty terms.

77.     Daimler AG owns 100% of the capital share in Mercedes-Benz USA, LLC.[1]

78.     Daimler AG paid 19 million euros (approximately 21.8 million U.S. dollars) in relocation expenses for Mercedes-Benz USA, LLC's headquarters.

---

[1] Daimler AG 2015 Annual Report, Notes to the Consolidated Financial Statement, p. 274.

79.     Communications to investors about emissions investigations in the United States—the very object of this Complaint—and the class actions that it faces in the United States come directly from Daimler AG, not from Mercedes-Benz USA, LLC.  In one communication, Daimler AG says that it will defend itself against U.S.  class action emissions lawsuits "with all available legal means."2

80.     Service of process on this defendant is proper by serving it via its wholly owned subsidiary and alter ego, Mercedes-Benz USA, LLC, in Montvale, New Jersey.

**3.     The Bosch Defendants.**

81.     From at least 2005 to 2015, Robert Bosch GmbH, Robert Bosch LLC and currently unnamed Bosch employees (together, "Bosch") were knowing and active participants in the creation, development, marketing, and sale of illegal defeat devices specifically designed to evade U.S.  emissions requirements in vehicles sold solely in the United States.  These vehicles include the Polluting Vehicles, as well as diesels made by Volkswagen, Audi, Porsche, GM, and Fiat Chrysler (FCA).

82.     The following is a list, including the Mercedes vehicles in this case, of diesel models in the United States with Bosch-supplied software whose emissions exceed federal and California emission standards and whose emissions are beyond what a reasonable consumer would expect from cars marketed as "clean" or "low emission":

---

2 Press Release, Daimler Conducts Internal Investigation Regarding its Certification Process Related to Exhaust Emissions in the United States (April 22, 2016), *available at* https://www.daimler.com/documents/investors/ nachrichten/kapitalmarktmeldungen/daimler-ir-release-en-20160422-2.pdf.



83.     Each Bosch entity participated not just in the development of the defeat device, but in the scheme to prevent U.S.  regulators from uncovering the device's true functionality. Moreover, Bosch's participation was not limited to engineering the defeat device (in a collaboration described as unusually close).  Rather, Bosch LLC marketed "Clean Diesel" in the United States and lobbied U.S. regulators to approve "Clean Diesel," another highly unusual activity for a

supplier.  These lobbying efforts, taken together with evidence of each of Bosch's entity's actual knowledge that its software could be operated as a defeat device and participation in concealing the true functionality of the device from U.S.  regulators, can be interpreted only one way under U.S. law:  Bosch was a knowing and active participant in a massive, decade-long conspiracy with Volkswagen, Audi, Mercedes, FCA, GM and others to defraud U.S. consumers, regulators, and diesel car purchasers or lessees.  Bosch GmbH and Bosch LLC have enabled over 1.3 million vehicles to be on the road in the United States polluting at levels that exceed emissions standards and which use software that manipulate emissions controls in a manner not expected by a reasonable consumer.

84.     Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Gerlingen, Germany.  Robert Bosch GmbH is the parent company of Robert Bosch LLC.  Robert Bosch GmbH, directly and/or through its North-American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the defeat device to Mercedes for use in the Polluting Vehicles.  Bosch GmbH is subject to the personal jurisdiction of this Court because it has availed itself of the laws of the United States through its management and control over Bosch, LLC, and over the design, development, manufacture, distribution, testing, and sale of hundreds of thousands of the defeat devices installed in the Polluting Vehicles sold or leased in the U.S.  Employees of Bosch GmbH and Bosch LLC have collaborated in the emissions scheme with Mercedes in this judicial district and have been present in this district.

85.     Robert Bosch LLC is a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331.  Robert Bosch LLC is a wholly-owned subsidiary of Robert Bosch GmbH.  Robert Bosch LLC, directly and/or in

conjunction with its parent Robert Bosch GmbH, at all material times, designed, manufactured, and supplied elements of the defeat device to Mercedes for use in the Polluting Vehicles.

86.     Both Robert Bosch GmbH and Robert Bosch LLC operate under the umbrella of the Bosch Group ("Bosch"), which encompasses some 340 subsidiaries and companies.  The Bosch Group is divided into four business sectors:  Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology.  The Mobility Solutions sector, which supplies parts to the automotive industry, and its Diesel Systems division, which develops, manufacturers, and supplies diesel systems, are particularly at issue here and include the relevant individuals at both Bosch GmbH and Bosch LLC.  Bosch's sectors and divisions are grouped not by location, but by subject matter.  Mobility Solutions includes the relevant individuals at both Bosch GmbH and Bosch LLC.  Mobility Solutions includes the individuals involved in the RICO enterprise and conspiracy at both Bosch GmbH and Bosch LLC. Some individuals worked at both Bosch LLC and Bosch GmbH during the course of the RICO conspiracy.  The acts of individuals described in this Complaint have been associated with Bosch GmbH and Bosch LLC whenever possible.  Regardless of whether an individual works for Bosch in Germany or the U.S., the individual holds him or herself out as working for Bosch.  This collective identity is captured by Bosch's mission statement:  "We are Bosch," a unifying principle that links each entity and person within the Bosch Group.[3]  Bosch documents and press releases often refer to the source of the document as "Bosch" without identifying any particular Bosch entity. Thus, the identity of which Bosch defendant was the author of such documents and press releases

---

[3] Bosch 2014 Annual Report, *Experiencing quality of life*, available at http://www.bosch.com/media/ com/bosch_group/bosch_in_figures/publications/archive/GB2014_EN.pdf (last accessed November 30, 2016).

cannot be ascertained with certainty until Bosch GmbH and Bosch LLC respond to discovery requests in this matter.

87.     The Diesel Systems division, which developed the EDC17, is described as part of the Bosch Group.  In the case of the Mobility Solutions sector, which oversees the Diesel Systems Group, the Bosch Group competes with other large automotive suppliers.[4]

88.     The Bosch publication *Bosch in North America* represents that "Bosch supplies . . . clean-diesel fuel technology for cars and trucks."  Throughout the document describing its North American operations, the company refers to itself as "Bosch" or "the Bosch Group."[5]

89.     The *Bosch in North America* document proclaims that Automotive Technology is "Bosch's largest business sector in North America."  In this publication, Bosch never describes the actions of any separate Bosch legal entity, like Bosch LLC, when describing its business, but always holds itself out as "the Bosch Group."[6]

90.     German authorities are now investigating Bosch GmbH with respect to diesel emissions and are focusing on certain Bosch employees:[7]

> **Three Bosch Managers Targeted as German Diesel Probe Expands**
>
> A German probe into whether Robert Bosch GmbH helped Volkswagen AG cheat on emissions tests intensified as

---

[4] *See, e.g.*, Bosch's 2016 Annual Report, available at https://assets.bosch.com/media/global/bosch_group/our_figures/pdf/bosch-annual-report-2016.pdf, at 23.

[5] *Bosch in North America* (May 2007), available at http://www.bosch.us/content/language1/downloads/BINA07.pdf, at 2.

[6] *Id.*  at 5.

[7] *Three Bosch Managers Targeted as German Diesel Probe Expands*, Bloomberg (June 29, 2007), https://www.bloomberg.com/news/articles/2017-06-29/three-bosch-managers-targeted-as-german-diesel-probe-expands.

- 69 -

Stuttgart prosecutors said they were focusing on three managers at the car-parts maker.

While Stuttgart prosecutors didn't identify the employees, the step indicates that investigators may have found specific evidence in the probe.  Previously, prosecutors have said they were looking into the role "unidentified" Bosch employees may have played in providing software that was used to cheat on emission tests.

"We have opened a probe against all three on suspicions they aided fraud in connection to possible manipulation in emissions treatments in VW cars," Jan Holzner, a spokesman for the agency, said in an emailed statement.  " All of them are mangers with the highest in middle management."

Bosch, which is also being investigated by the U.S.  Department of Justice, has been caught up in the VW diesel scandal that emerged in 2015 over allegations its employees may have helped rig software that helped the carmaker to cheat emission tests.  Earlier this year, Stuttgart prosecutors opened a similar probe into Bosch's role in connection with emission tests of Daimler cars.

A spokesman for Bosch said that while he can't comment on individual employees, the company "takes the overall allegations in diesel cases seriously and has been cooperating fully from the beginning of the probes."

The Stuttgart probe is running parallel to the central criminal investigation in Braunschweig, closer to VW's headquarters.  That investigation is targeting nearly 40 people on fraud allegations related to diesel-emission software, including former VW Chief Executive Officer Martin Winterkorn.

Prosecutors' interest extends to multiple units in the VW family -- including luxury brands Audi and Porsche.  In addition, Stuttgart prosecutors are also reviewing a third case related to Bosch's cooperation with Fiat Chrysler Automobiles NV on software for diesel engines.

91.     Recently, researchers from Rohr-Universität in Bochum, Germany, and University of California-San Diego uncovered Bosch's role in connection with the manipulation of emission controls in certain Volkswagen and FCA vehicles.   The researchers found no evidence that Volkswagen and FCA wrote the code that allowed the operation of defeat devices.  All the code they analyzed was found in documents copyrighted by Robert Bosch GmbH.  These researchers

found that in the "function sheets" copyrighted by Robert Bosch GmbH, the code to cheat the emissions test was labeled as modifying the "acoustic condition" of the engine, a label that helped the cheat fly under the radar.  Given that Mercedes cars have a Bosch EDC17 as did the cheating Volkswagen and FCA cars, and given testing by Plaintiffs' experts described below that reveals defeat devices in Mercedes cars, it is plausible to allege that Bosch was a participant in the scheme to hide the true emissions of Mercedes diesels, and supplied a similar "function sheet" to Mercedes to enable a similar emission deception.

92.     On April 24, 2018, Bosch issued a press release tacitly admitting it had facilitated emissions cheating.  In the release, Bosch's CEO Volkmar Denner cited to new company principles including one that "the incorporation of functions that automatically detect test cycles is strictly forbidden."  Of course, and as alleged herein, Bosch had designed Mercedes vehicles (as well as VW's Audi's and FCA's) to detect cycles.  Second, Denner announced a new company policy that "Bosch products must not be optimized for test situations."  As alleged herein, Bosch's EDC 17 and its software code did allow Mercedes' to optimize vehicles for test conditions and Bosch programmers communicated with Mercedes on exactly how to optimize the vehicles for test situations.

93.     Bosch GmbH is not a stranger to the U.S. Courts or the U.S. criminal justice system.  In *United States v. Robert Bosch GmbH*, the company, on June 22, 2015, pled guilty to fixing the price of spark plugs, oxygen sensors, and starter motors.[8]

---

[8] Criminal Case No. 2:15-cr-20197, E.D. Michigan.

## V.   FACTUAL ALLEGATIONS

**A.   The environmental challenges posed by diesel engines and the United States regulatory response thereto.**

94.   The United States Government, through the Environmental Protection Agency (EPA), has passed and enforced laws designed to protect United States citizens from pollution and, in particular, certain chemicals and agents known to cause disease in humans.   Automobile manufacturers must abide by these U.S.  laws and must adhere to EPA rules and regulations.

95.   The U.S.  Clean Air Act has strict emissions standards for vehicles, and it requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emissions standards to control air pollution.  Every vehicle sold in the United States must be covered by an EPA issued certificate of conformity.

96.   There is a very good reason that these laws and regulations exist, particularly as regards vehicles with diesel engines:  In 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic and about as dangerous as asbestos.

97.   Diesel engines pose a particularly difficult challenge to the environment because they have an inherent trade-off between power, fuel efficiency, and emissions:  the greater the power and fuel efficiency, the dirtier and more harmful the emissions.

98.   Instead of using a spark plug to combust highly refined fuel with short hydrocarbon chains, as gasoline engines do, diesel engines compress a mist of liquid fuel and air to very high temperatures and pressures, which causes the diesel to spontaneously combust.  This causes a more powerful compression of the pistons, which produces greater engine torque (that is, more power).

99.   The diesel engine is able to do this both because it operates at a higher compression ratio than a gasoline engine and because diesel fuel contains more energy than gasoline.

100.    But this greater energy and fuel efficiency comes at a cost:  diesel produces dirtier and more dangerous emissions.  One by-product of diesel combustion is oxides of nitrogen (NOx), which include a variety of nitrogen and oxygen chemical compounds that only form at high temperatures.

101.    NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone.  Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illness serious enough to send people to the hospital.  Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects.  Children, the elderly, and people with pre-existing respiratory illness are at acute risk of health effects from these pollutants.  NOx can cause breathing problems, headaches, chronically reduced lung function, eye irritation, and corroded teeth.  It can indirectly affect humans by damaging the ecosystems they rely on.

102.    Though more efficient, diesel engines come with their own set of challenges, emissions from diesel engines can include higher levels of NOx and particulate matter (PM) or soot than emissions from gasoline engines due to the different ways the different fuels combust and the different ways the resulting emissions are treated following combustion.  One way NOx emissions can be reduced is by adjusting the compression and temperature, but that in turn produces particulate matter (PM), a similarly undesirable hydrocarbon-based emission.  Another way NOx emissions can be reduced is through exhaust gas recirculation or "EGR", whereby exhaust gases are routed back into the intake of the engine and mixed with fresh incoming air.  Exhaust gas recirculation lowers NOx by reducing the available oxygen and by reducing maximum combustion temperatures; however, EGR can also lead to an increase in PM as well.  Another way NOx emissions can be

- 73 -

reduced is through expensive exhaust gas after- treatment devices, primarily, catalytic converters, that use a series of chemical reactions to transform the chemical composition of a vehicle's NOx emissions into less harmful, relatively inert, and triple bonded nitrogen gas ($N_2$) and carbon dioxide ($CO_2$).

103.    Diesel engines thus operate according to this trade-off between price, NOx, and PM, and for a diesel car to be considered as a "clean" vehicle, it must produce both low PM and low NOx.  In 2000, the EPA announced stricter emission standards requiring all diesel models starting in 2007 to produce drastically less NOx than years prior.    Before introducing a Polluting Vehicle into the U.S.  stream of commerce, Mercedes was required to first apply for, and obtain, an EPA-administered COC, certifying that the vehicle comported with the emission standards for pollutants enumerated in 40 C.F.R. §§ 86.1811-04, 86.1811-09, and 86.1811-10.   The CAA expressly prohibits automakers, like Mercedes, from introducing a new vehicle into the stream of commerce without a valid EPA COC.  *See* 42 U.S.C. § 7522(a)(1).  Moreover, vehicles must be accurately described in the COC application "in all material respects" to be deemed covered by a valid COC. *See* 40 C.F.R. §§ 86.1848-10(c)(6).  California's emission standards are even more stringent than those of the EPA.  California's regulator, CARB, requires a similar application from automakers to obtain an EO, confirming compliance with California's emission regulations, before allowing the vehicle onto California's roads.

### 1.    The BlueTEC technology.

104.    Car manufacturers have struggled to produce diesel engines that have high power and strong fuel efficiency but also cleaner emissions.  Removing NOx from the untreated exhaust is difficult, and diesel car makers have reacted by trying to remove NOx from the car's exhaust using catalysts.

- 74 -

105.    Mercedes' response to the challenge has been a diesel engine that it calls the "BlueTEC Clean Diesel."

106.    In order to successfully grow the U.S. diesel market and meet its ambitious objectives, it was critical that Mercedes develop the technology to maintain the efficient, powerful performance of a diesel, while drastically reducing NOx emissions to comply with the federal and state emission standards.

107.    This high-stakes engineering dilemma led to a deep divide within the company, as two divergent exhaust gas after-treatment technical approaches emerged.  One approach involved a selective catalytic reduction (SCR) system that proved to be effective but expensive.  The other, which utilized a lean NOx trap, was significantly cheaper but was less effective and resulted in lower fuel efficiency.

108.    A SCR System is depicted below:



- 75 -

109.    In 2006, Wolfgang Bernhard, then a top executive at VW AG (and former Daimler executive), advocated for the SCR system and championed a technology-sharing agreement with Mercedes-Benz and BMW to jointly develop a SCR emission control system utilizing urea.  The urea functions as a post-combustion emission reductant.  It is generically referred to as "Diesel Exhaust Fluid" or "DEF" and marketed as "AdBlue" by Mercedes, Volkswagen, and other German vehicle manufacturers.   When DEF is injected into the exhaust stream in a catalyst chamber, it converts NOx into nitrogen gas, water, and carbon dioxide.  This SCR system was expensive, costing $350 per vehicle, and came with other compromises, including, primarily, the need for installation of a DEF tank that would require regular refills.

110.    All of the BlueTEC Clean Diesel engines control emissions as follows: After the by-products of combustion leave the engine, some of the exhaust is cooled and returned to the combustion chamber using exhaust gas recirculation (EGR).  This is the first step in reducing engine-out NOx.  In the second step after the exhaust passes through a particulate filter, the BlueTEC Clean Diesel technology injects ammonia-rich urea into the exhaust in order to convert NOx into less harmful substances, such as nitrogen and oxygen.

111.    The BlueTEC Clean Diesel approach, when it is operating, results in cleaner emissions.  However, when the foregoing mechanisms are turned off or do not work, the BlueTEC engines are not "Clean Diesels."

**2.    The Mercedes and Daimler deception by omission.**

112.    In the wake of a major public scandal involving Volkswagen and Audi diesel vehicles evading emissions standards with the help of certain software that manipulates emissions controls (called "defeat devices"),[9] scientific literature, reports, and Plaintiffs' testing indicate that

---

[9] The EPA's Notice of Violation ("NOV") to Volkswagen Group of America, Inc.  can be found at: *http://www3.epa.gov/otaq/cert/documents/vw-nov-caa-09-18-15.pdf*.  As detailed in the EPA's Notice of Violation

Mercedes' so-called BlueTEC Clean Diesel vehicles emit far more pollution on the road than in lab tests, far more pollution than gasoline powered vehicles, and cannot be considered "Clean Diesels." The EPA has widened its probe of auto emissions to include, for example, the Mercedes E250 BlueTEC Clean Diesel. Upon information and belief, the California Air Resources Board is also investigating the Mercedes BlueTEC vehicles.

113.    As first reported in a February 2016 issue of German language magazine Der Spiegel, Mercedes has admitted that a shut-off device in the engine management of its C-Class diesel cars stops NOx cleaning when ambient temperatures drop below 50 degrees Fahrenheit and in other, unspecified circumstances. Mercedes asserts, without providing details, that the shut-off is done to "protect" the engine (notwithstanding the fact that 50 degrees Fahrenheit can hardly be considered a cold temperature and certainly not a dangerously cold temperature).

114.    So, while the Mercedes diesels with the BlueTEC Clean Diesel engine are designed to pass official emissions tests, which are usually conducted at a temperature *exceeding* 50 degrees, Mercedes has now admitted that the vehicles nonetheless emit far more pollution than government emissions standards in the United States permit when the temperature drops below 50 degrees. Mercedes admission also confirms the fraud alleged in this complaint. Put simply, at no time did Mercedes tell the public (or the relevant regulatory authorities) the true facts of how and when its emissions systems operate and, most particularly, that it does not operate at all during most normal driving conditions. Mercedes' admissions confirm that the scheme articulated in this complaint is not only plausible but is factually demonstrable and true.

---

("NOV"), software in Volkswagen and Audi diesel vehicles detects when the vehicle is undergoing official emissions testing and turns full emissions controls on only during the test. But otherwise, while the vehicle is running, the emissions controls are suppressed. This results in cars that meet emissions standards in the laboratory or state testing station, but during normal operation emit NOx at up to 40 times the standard allowed under United States laws and regulations. Volkswagen has admitted to installing a defeat device in its diesel vehicles.

115.    Thus, the BlueTEC Clean Diesel is not a clean diesel vehicle at all because, when the ambient temperature falls below 50 degrees, the Polluting Vehicles spew excessive unmitigated NOx into the air.

116.    Mercedes never disclosed to consumers that Mercedes diesels with BlueTEC Clean Diesel engines may be "clean" diesels when it is warm, but are "dirty" diesels when ambient temperatures are below 50 degrees.  And although Mercedes has admitted to a German magazine that no American consumer would see that its BlueTEC Clean Diesel vehicles spew high NOx emissions when it is cold—much higher than NOx emissions in gasoline engines—the scope of the deception is much broader and damaging than Mercedes has admitted: Mercedes BlueTEC vehicles produce much higher NOx emissions than gasoline vehicles under a wide variety of normal driving conditions even when the ambient temperature exceeds 50 degrees F as detailed below.

### 3.    European studies and reports.

117.    As noted, the world was shocked to learn that Volkswagen had manufactured over 11 million cars that were on the road in violation of European emissions standards, and over 480,000 vehicles were operating in the U.S.  in violation of EPA and state standards.  But Volkswagen was not the only manufacturer of vehicles equipped with illegal defeat devices.

118.    A May 2015 study conducted on behalf of the Dutch Ministry of Infrastructure and the Environment confirms that, in real world testing, the Mercedes C-Class 220 emits NOx at levels much higher than in controlled dynamometer tests and much higher than the "Euro 6 standard," which is less stringent than the U.S. standard.  More specifically, the May 2015 TNO Report found that post-selective catalytic reduction (SCR) tailpipe NOx emissions ranged from 250 to 2000 mg/km; for reference, the Euro 6 max, which is less stringent than U.S. standards, is 80 mg/km. "Overall the NOx real-world emissions of [the C-Class 220] are relatively high, especially during the very short trips . . .  and trips at high speeds."  *See* TNO Report at 34.  Furthermore, the "results

show clearly that different control strategies of the engine are applied in chassis dynamometer tests and on the road." *Id.*, Appendix B, page 3. In other words, the vehicle emitted significantly more NOx on real-world test trips on the road than during a type approval test in the laboratory, suggesting that the vehicle senses when it is tested in a laboratory and employs a device to cheat.

119. TNO added: "In chassis dynamometer tests the engine out NOx emissions are 100 to 450 mg/km, indicating an effective EGR [exhaust gas recirculation] system which reduces NOx emissions in certain chassis dynamometer tests. In real-world tests the EGR system seems to be less effective or not effective at all, as engine out NOx emissions in real-world tests range from 450 to as much as 2250 mg/km." TNO Report at 34. The fact that Mercedes passed the dynamometer test in all tests, but failed the real world test, suggests that like VW, Mercedes is implementing a "defeat device." As discussed below, Plaintiffs' dynamometer testing indicates that Mercedes employs a defeat device in its diesels.

120. TNO also found that the tank holding the AdBlue in the Mercedes C-Class 220 was too small to hold the amount of AdBlue catalyst necessary to reduce NOx emissions below regulatory limits for the advertised service interval (22,000 km). The tank size is 25 liters, and TNO found that a 45.8 liter tank would be necessary to meet the Euro 6 80 mg/km NOx emission level—a level that is less stringent than U.S. limits. TNO Report at 45.

121. TNO further remarked: "It is remarkable that the NOx emission under real-world conditions exceeds the type approval value by [so much]. It demonstrates that the settings of the engine, the EGR and the SCR during a real-world test trip are such that they do not result in low NOx emissions in practice. In other words: ***In most circumstances arising in normal situations on the road, the systems scarcely succeed in any effective reduction of NOx emissions***." TNO Report at 6 (emphasis added). The lack of any "effective reduction of NOx emissions" is a complete

- 79 -

contradiction of Mercedes' claim that its vehicles are "Earth Friendly," produce "harmless nitrogen and oxygen," "Reduce[] Nitrogen Oxides by 80%," are "For the air we breathe," or "significantly reduce[] greenhouse gases."

122.    Other organizations are beginning to take notice of the Mercedes deception.  The Transportation and Environment (T&E) organization, a European group aimed at promoting sustainable transportation, compiled data from "respected testing authorities around Europe" that show Mercedes might sell cars that produce illegal levels of tailpipe emissions.  T&E stated in September 2015 that real-world emissions testing showed drastic differences from laboratory tests such that the Mercedes models tested emitted 50% more pollutants such as $CO_2$ on the road than in their laboratory tests.  "For virtually every new model that comes onto the market the gap between test and real-world performance leaps," the report asserts.

123.    In a summary report, T&E graphically depicted the widespread failure of most manufacturers:[10]

---

[10] *Five facts about diesel the car industry would* rather *not tell you*, Transport & Environment (Sept.  2015), http://www.transportenvironment.org/sites/te/files/publications/2015_09_Five_facts_about_diesel_FINAL.pdf.

**2. The problem is endemic across the car industry – but the performance of individual models and manufacturers varies widely**

In tests by the ICCT[1] 12 out of 13 modern diesel cars failed to achieve the Euro 6 limit in on the road. The worst vehicle, an Audi, emitted 22 times the allowed limit. Emissions are highest in urban areas where most people are exposed to the pollution. On average a new diesel car emits **over** 800mg/km of nitrogen oxides driving in town compared to the limit of 80mg/km. Data obtained on around 20 modern diesel cars by T&E shows every major manufacturer is selling cars that fail to meet Euro 6 limits on the road. A minority of vehicles do meet the limits – but most don't. This is because the industry uses cheaper less effective exhaust treatment systems or fails to configure the best systems in a way that minimizes emissions. The cost of a modern diesel after treatment system is just €300.



Source: T&E                                                           Transport & Environment

124.     The T&E report found that the current system for testing cars in a laboratory produces "meaningless results."[11]

125.     Furthermore, it was reported in October 2015 that certain diesel models sold by Mercedes in Europe (including the C 220 BlueTEC and the GLA 200 d) were found to emit 2 to 3 times higher levels of NOx pollution when tested in more realistic driving conditions, according to

---

[11] *Id.*

new research data compiled by ADAC, Europe's largest motoring organization.  The new testing results are based on a U.N.-developed test called "WLTC."

126.   Worse still, according to on-road testing in Europe by Emissions Analytics, publicized on October 9, 2015, Mercedes' diesel cars produced an average of 0.406g/km of NOx on the road, 5 times higher than the Euro 6 level permits—and more than 13 times higher than the U.S.  level permits (.03g/km).

127.   Emissions Analytics is a U.K. company, which says that it was formed to "overcome the challenge of finding accurate fuel consumption and emissions figures for road vehicles."  With regard to its recent on-road emissions testing, the company explains: "[I]n the European market, we have found that real-world emissions of the regulated nitrogen oxides are four times above the official level, determined in the laboratory.  Real-world emissions of carbon dioxide are almost one-third above that suggested by official figures.  For car buyers, this means that fuel economy on average is one quarter worse than advertised.  This matters, even if no illegal activity is found."

128.   Testing by the Institute for Transport Studies in the UK in 2015 also confirmed that Mercedes' vehicles exceeded the more lax European NOx standards:



129.    The German Environmental Aid organization (DUH) recently called for emergency action to ban the C220 from city centers in Germany when the temperature drops below 10 degrees Celsius/50 degrees Fahrenheit. *See* https://translate.google.com/translate?hl=en&sl=de&u=http://www.duh.de/pressemitteilung.html%3F%26tx_ttnews%255Btt_news%255D%3D3726&prev=search.

130.    In response to the current diesel emissions controversy, Mercedes' parent company, Daimler AG, has issued a statement claiming: "We categorically deny the accusation of manipulating emission tests regarding our vehicles.  A defeat device, a function which illegitimately reduces emissions during testing, has never been and will never be used at Daimler.  This holds true for both diesel and petrol engines.  Our engines meet and adhere to every legal requirement.  .  .  . [W]e can confirm that none of the allegations apply to our vehicles.  The technical programming of our engines adheres to all legal requirements."

131.   A spokesman for Mercedes evaded the ramifications of the findings that Mercedes diesel cars violate emissions standards, saying only:  "Since real-world driving conditions do not generally reflect those in the laboratory, the consumption figures may differ from the standardized figures."  Notably, Mercedes and its parent company have not actually denied that their diesel cars violate emissions standards.

132.   Recent testing by the German Federal Department of Motor Vehicles has revealed that certain Mercedes vehicles, in addition to vehicles produced by other manufacturers, had "conspicuously high NOx emissions that apparently could not be sufficiently explained from a technical point of view."  The findings, announced April 22, 2016, have led to the "voluntary" recall of 630,000 vehicles in Europe, including Mercedes vehicles.

133.   Mercedes diesel vehicles recently failed on-road emissions tests conducted by French authorities, leading the French government to order Mercedes to present plans to reduce the vehicles' emissions.

134.   Studies and reports pertaining to the emissions of Mercedes diesels in Europe are directly relevant to the emissions performance of the BlueTEC Clean Diesels sold in the United States given the engineering similarities across Mercedes' European and American vehicle platforms.  Indeed, it is highly *implausible* to believe that Mercedes would manufacture an entirely separate diesel engine emissions system for vehicle models that are identical in all material respects. To the contrary, the European findings – in and of themselves – suggest that the same emissions evading systems were utilized in America.  Mercedes developed the BlueTEC Clean Diesel engine for use in multiple markets, including Europe and the United States.  The basic BlueTEC engine platform and design is the same.  Further, while emission standards are more stringent in the U.S. than in Europe, the BlueTEC emission systems used in the United States are but variants of those

used in Europe.  For example, the catalytic converter is larger in the U.S. vehicles, yet the basic design and layout of the catalytic converter units are the same as in the European version.  The same is true for EGR: the BlueTEC vehicles in both markets use the same switchable EGR cooler, and the EGR strategy used in the United States vehicles is otherwise but a variant of that deployed in European vehicles.

135.    Because the core components of the BlueTEC Clean Diesel emission system are largely the same across market segments, the underlying technical shortcomings that would motivate Mercedes to employ defeat strategies in Europe would also motivate them to cheat in the United States.  Thus, investigations in Europe into underlying motivations and sources of cheating are highly applicable in the U.S.  and directly demonstrate the factual accuracy and plausibility of the allegations made here.  Put simply, the same defeat strategies or variants of those strategies are deployed in the United States to address the same underlying technological limitations.  A diesel engine does not become easier to make emissions compliant by crossing the Atlantic.

136.    Plaintiffs' testing of vehicles in the United States, discussed immediately below, supports this conclusion and confirms the presence of a defeat device on Mercedes' United States vehicles and that the European tests are relevant to assessing the plausibility of Plaintiffs' claims here.  Indeed, the American passenger cars tested by Plaintiffs at temperatures below 50°F showed a significant increase in NOx, just as was found in the Europe studies discussed above.  This was observed both in the GLK250 and R350 (2.1 Liter and 3.0 Liter engines), which is further proof that the same underlying technical issues from the European variants are driving Mercedes to cheat in the U.S.  Plaintiffs' testing already proves a technical link.

**4.    Plaintiffs' testing of BlueTEC Clean Diesels in the United States.**

137.    The following three Mercedes clean diesel vehicles were tested over the course of testing.

- 85 -

(1)     2013 Mercedes GLK250 BlueTEC

    a.  approximately 39,000 miles (120,00 mile useful life)

    b.   OM651 2.1 Liter engine

    c.  Clean vehicle record with no accidents and regular scheduled maintenance

(2)     2012 Mercedes R350 BlueTEC

    a.  approximately 45,000 miles (120,000 mile useful life)

    b.  OM642 3.0 Liter engine

    c.  Clean vehicle record with no accidents and regular scheduled maintenance

(3)     2014 Mercedes/Freightliner Sprinter 2500 BlueTEC (the 2.1 liter OM-651 engine variant)

    a.  approximately 32,000 miles (150,000 mile useful life)

    b.  OM651 2.1 Liter engine

    c.  Clean vehicle record with no accidents and regular scheduled maintenance

138.    All vehicle records were checked for proper maintenance history and to ensure the vehicles were accident free. The vehicles were loaded to the equivalent test weight listed in the EPA certification application for each vehicle. None of the vehicles displayed any fault codes or malfunction indicator lights (MILs) indicating there might have been a problem with the vehicle(s) and their emission systems.

139.    All vehicles are well under the useful life listed on their emissions certificate.

140.    Emissions on all three vehicles were found to be well in excess of the relevant standards for emissions of nitrogen oxides (NOx). The excesses stem from a variety of defeat devices described for each vehicle below.

010585-11/1108566 V1

141.    In general, the defeat devices trigger a reduction in performance of the two main NOx reduction systems in a clean diesel vehicle: 1) the exhaust gas recirculation (EGR) system and 2) the selective catalytic reduction (SCR) system.

142.    Exhaust gas recirculation feeds some of the exhaust gas back into the engine intake using a controllable valve that routes the exhaust from the exhaust manifold, through an EGR cooler, and into the engine intake. The mixture of exhaust gas with fresh incoming air reduces NOx generated in the cylinder during normal engine operation. The system can be shut off by completely closing the valve that allows exhaust gases to enter the intake. The amount of EGR can be controlled by opening the valve to a larger or smaller extent. A lower "percentage" of EGR indicates a valve that is more closed, which restricts the amount of EGR. Conversely, a high percentage indicates a high level of EGR. High EGR results in a more significant reduction in NOx emissions. Simply speaking, high EGR rates lead to lower NOx. The EGR rate is controlled by the engines electronic control module (ECM), and can thus be programmed to behave in any way.

143.    The SCR system is a catalyst through which all of the exhaust stream flows. When urea (sometimes called diesel exhaust fluid (DEF) or AdBlue) is injected into the tailpipe upstream of the SCR system, a reaction takes place on the surface of the catalyst to reduce NOx to nitrogen and water. With no urea present, the reaction will not take place, and no NOx reduction will occur over the SCR catalyst. Therefore, by changing the amount of urea injected, the effectiveness of the SCR system can be altered by the engine's ECM. If high levels of urea are injected, high NOx reduction occurs provided there is sufficient exhaust temperature. If no urea is injected, no NOx reduction takes place.

144.    It should be noted that the exhaust gas temperatures were studied extensively for all three vehicles over a wide variety of operating conditions. Except in the most extreme conditions

- 87 -

on hills in excess of 6% downhill and very briefly during startup, exhaust gas temperatures entering the SCR systems were well in excess of the light-off temperature (i.e. the minimum temperature for the reaction to occur) required for successful SCR operation.

145.    NOx emissions are first reduced in the engine cylinder by various means related to injection timing and engine design. The EGR system is the next system in line to reduce NOx coming out of the engine. The SCR system comes last in line.

146.    In the case of all three vehicles, Mercedes manipulated the programming of the software to reduce EGR and SCR effectiveness at various times using defeat devices (auxiliary emission control devices, or AECDs, that are not approved by the EPA or California Air Resources). The programming of these vehicles is meant to cheat the emissions certification standards.

147.    The vehicles were tested with a portable emission measurement system (PEMS) as well as a chassis dynamometer running the federal certification FTP-75 and HWFET tests. The vehicles were outfitted with a on board diagnostics (OBD) monitoring system to monitor data on the vehicle's ECM (e.g. EGR rate, exhaust gas temperatures, SCR inlet and outlet NOx, etc).

148.    Importantly, it should be noted that the relative positive acceleration (RPA), a measurement of how aggressively the vehicle is being driven, was tracked for every test performed. The RPAs were kept well below the values experienced during the certification cycles, which means that the vehicles were driven less aggressively than the conditions experienced during certification. The results are therefore *conservative* and representative of "light footed" driving styles. It is anticipated that more aggressive driving styles would lead to even higher emission values than those presented below.

149.    Furthermore, the vehicles tested were relatively "young" compared to their full useful life. It is anticipated that vehicles closer to full useful life will have experienced, among other

things, degradation in the SCR catalyst as well as possible fouling of the EGR valve and cooler. This degradation would likely lead to higher NOx levels than those presented below as the vehicles approach their full useful lives.

150.   Lastly, all vehicles were monitored for active regenerations, events where high exhaust temperatures are used to remove soot collected in the diesel particulate filter. In general, NOx emissions increase dramatically during these infrequent events (though a high frequency of these events would be of great concern). These infrequent events are monitored and noted where relevant. They are not included in the analyses of defeat devices as they would confuse the data on the defeat device strategy. For these three vehicles, active regenerations are so infrequent that they can be excluded from the analysis.

151.   The vehicles were tested over a variety of conditions using a portable emission measurement system (PEMS). As explained below, PEMS is essentially a "portable laboratory" that allows measurement of emissions outside of a laboratory setting used for certification testing.

152.   PEMS is a collection of measurement devices that has been used since the 1990s to measure real-world vehicle emissions performance outside of a laboratory. PEMS measures oxides of nitrogen, total hydrocarbon, methane, carbon monoxide, and carbon dioxide as well as particulate matter (PM) emissions during on-road driving of light and heavy-duty vehicles.

153.   PEMS systems are highly accurate when compared to chassis dynamometer-based tests used for vehicle emissions certification. In fact, their accuracy is such that they are currently integrated into the European vehicle emission certification process to test RDE (real driving emissions). Both EPA and CARB employ PEMS as part of the heavy duty in-use compliance program to measure emissions against the not to exceed (NTE) standards, where procedures have been codified in the code of federal regulations. Furthermore, both CARB and EPA make wide use

- 89 -

of PEMS to evaluate vehicles for the presence of defeat devices. One such study, published by the Center for Alternative Fuels Engines and Emissions (CAFEE) in collaboration with CARB, made heavy use of PEMS to discover the presence of defeat devices in Volkswagen diesels.[12]

154.    PEMS has been used since the 1990s to measure real-world vehicle emissions performance. These systems are manufactured by highly respected and well-established emissions measurement equipment suppliers like AVL, Horiba, and Sensors Incorporated. All three of these companies are leading suppliers of emissions measurement systems used for vehicle and engine certification, and they bring their experience in conventional emissions analyzers to bear in designing PEMS. Conventional gas analysis systems are very large and complex. Since the years when chassis dynamometer testing was originally introduced, advances in analyzer technologies over the past three decades have allowed for the miniaturization of conventional laboratory analyzers, yielding major size and weight reductions. The introduction of powerful laptop computers capable of controlling and capturing data from these systems was also essential their introduction. These technological advances made it possible for high-accuracy emissions analyzers to be deployed on vehicles while driving on the road outside of the laboratory setting.

155.    Conventional emissions testing used for certification of vehicles is performed on a chassis dynamometer. As mentioned above, the dynamometer is a "treadmill" for the driven wheels of a vehicle. The driven wheels are placed on rollers attached to an electric motor capable of simulating the forces on the vehicle during real-world driving on the road (in certain instances, flywheels may also be used to simulate vehicle inertia). The chassis dynamometer simulates inertial forces (i.e., the resistance to acceleration or deceleration from the vehicle's weight), static friction, rolling resistance, and aerodynamic drag. When properly calibrated, the chassis dynamometer will

---

[12] Thompson, Gregory J., *et. al.* "In-Use Emissions Testing of Light-Duty Diesel Vehicles in the United States," CAFEE publication, May 15, 2014.

simulate real-world driving with a high degree of accuracy. A "coastdown" procedure is used to verify that rolling resistance and drag are accurately simulated. However, the inertial load simulation requires very rapid and precise response from the electric motor for high accuracy. Slow responding systems can under-load the vehicle during acceleration. By contrast, real-world inertial forces on the vehicle are inherent in PEMS testing since this testing is conducted on the road in normal driving.

156.   The analyzers used to measure gaseous emissions in the chassis dynamometer setting are accurate to within 1% of the full measurement scale. These analyzers are calibrated before and after each emissions test to ensure they deliver a high level of accuracy and that the calibration does not appreciably change (or drift) during the emissions test. Furthermore, analyzers undergo monthly 10-point calibrations to ensure their response is accurate throughout the measurement range of each analyzer. These measurements are supplemented with high precision measurement of ambient temperature and relative humidity. NOx is adjusted for those values.

157.   PEMS analyzers are subject to the same requirements. In fact, analyzers used by Plaintiffs' experts have an accuracy of 0.3% of full scale, well within the 1% requirement used for chassis dynamometer analyzers. These analyzers are also subject to the same monthly 10-point calibration to ensure accuracy throughout the measurement range. The analyzers are also calibrated before and after each test to ensure they are both accurate and free of excessive drift. Drift has been shown to be far less than 1% even after several hours of testing. PEMS also employs high accuracy temperature and relative humidity measurements to adjust NOx.

158.   Put simply, the analyzers used in chassis dynamometer testing and PEMS testing have virtually identical levels of accuracy and are subject to the same strict requirements for calibration and drift.

159.     Notably, because PEMS testing is designed for and is conducted on the road in actual driving, it is potentially more accurate than chassis dynamometer testing in certain respects. The chassis dynamometer simulates inertial forces (i.e., the resistance to acceleration or deceleration from the vehicle's weight), static friction, rolling resistance, and aerodynamic drag. When properly calibrated, the chassis dynamometer will simulate real-world driving with a high degree of accuracy. A "coastdown" procedure is used to verify that rolling resistance and drag are accurately simulated. However, the inertial load simulation requires very rapid and precise responses from the electric motor for high accuracy. Slow responding systems can under-load the vehicle during acceleration. By contrast, real-world inertial forces on the vehicle are inherent in PEMS testing since this testing is conducted on the road in normal driving.

160.     One primary difference between PEMS and chassis dynamometer emissions testing is that the latter mixes the raw exhaust with ambient air in a dilution tunnel to simulate the effects of vehicle exhaust mixing with ambient air immediately after emission from the tailpipe. In the case of PEMS, the raw exhaust emissions are measured. The dilution tunnel has the largest effect on particulate matter measurements, where sulfate and hydrocarbon aerosols may be formed during the dilution process, thereby increasing PM emissions. In modern diesels using low-sulfur fuels, these effects are much less important than in the past, where hydrocarbon and sulfate formation was much higher. The effect on gaseous pollutants, and in particular NOx, is negligible. Therefore, the raw gas measurement of NOx taken during PEMS testing will closely match the diluted exhaust measurement taken in a dilution tunnel.

161.     A wide variety of studies have been performed over the years to validate the accuracy of PEMS. One such study, conducted by experts at Ricardo UK, one of the world's leading vehicle research and development companies, concluded that, "NOx emissions agreed within ~10%

- 92 -

across a wide range of values."[13] When considering that defeat devices result in emissions that are often several times, or even orders of magnitude, higher than the relevant emissions standards, this level of agreement with chassis dynamometer emissions measurement is more than sufficient to identify the presence of defeat devices and to quantify the effects.

162.    A well-designed PEMS test program can account for ambient temperature, traffic variability, relative positive acceleration (RPA—i.e., the "hardness" or "softness" of the driver's driving style), road quality, and wind speed. The effect of wind speed, in particular, can be averaged out by conducting a large number of tests with variable wind conditions. Tests are typically repeated dozens of times, with careful attention paid to, among other things, the average cycle speed, ambient temperature, RPA, and road grade. Plaintiffs' experts, who have extensive experience with chassis dynamometer and PEMS testing, took careful measures to ensure tests were conducted properly and according to best practice, with awareness of the variety of variables to be considered and factored into the interpretation of the results.

163.    Importantly, it is often not possible to test conditions on a chassis dynamometer that might be experienced in the real world. As was discovered during the Volkswagen diesel scandal, the vehicle's engine control module can often detect that the vehicle is being tested on a chassis dynamometer. In addition to being able to detect that a certification test cycle is being run, as with Volkswagen, vehicles can use various sensors to determine the vehicle is on a chassis dynamometer. Types of algorithms used to detect a chassis dynamometer include, but are not limited to, the following:

> a)    Driven wheels are moving but the front wheels are not turning, a condition only experienced on a chassis dynamometer. All modern vehicles are

---

[13] Anderson, Jon, *et. al.*, "On-Road and Chassis Dynamometer Evaluations of Emissions from Two Euro 6 Diesel Vehicles," SAE 2014-01-2826, October 2014.

equipped with steering wheel angle sensors and can detect when the steering wheel is being turned.

b)    On a 2-wheel drive vehicle, the driven wheels are moving but the non-driven wheels are not, a condition only experience on a chassis dynamometer.

c)    On a vehicle equipped with GPS, the vehicle's wheels are moving while the GPS position is not changing.

164.    PEMS testing was also used by CAFEE at West Virginia University to test light duty vehicles under a contract from the International Council on Clean Transportation ("ICCT"). CAFEE relied primarily on PEMs testing and in the process uncovered the fact that Volkswagen vehicles were not meeting emissions standards. The ICCT contract with CAFEE mandates that CAFEE use PEMs.

**5.    2014 GLK250 BlueTEC.**

165.    This vehicle was tested with a PEMS over the course of 1,330 miles, 953 of which were on the highway and 207 of which were in stop and go or variable speed conditions. A generator was installed on the rear of the vehicle to power the PEMS equipment in a position that was considered to have a minimal impact on the vehicle's aerodynamic drag.

- 94 -



166.    The stop and go emissions were found to be 208 mg/mile on average over all tests conducted, or 4.2 times the standard of 50 mg/mile. Maximum emissions in stop and go conditions were found to be 1,725 mg/mile, a condition where the EGR and SCR systems had been completely shut off. That is 34.5 times the standard.

167.    The "compliance factor" can be considered a multiple of the emission standard. It is the actual emission rate found during testing divided by the certification standard. A vehicle that meets the standard will have a compliance factor less than 1. A vehicle with a compliance factor of 1 meets the standard exactly. A compliance factor of 2 means the vehicle exceeds the standard by a factor of 2.

168.    The compliance factor for stop and go conditions is plotted below.



169.    The bar chart for a compliance factor of "1" represents the fraction of the total miles that are at or above the standard. The bar for a compliance factor of "2" represents the total miles that are twice the standard or more, and so on. What is notable is that the vehicles spends 79% of its time above the standard. That means only 21% of the miles traveled in stop and go conditions actually met the standard. What is also notable is that the vehicle spends 50% of its time at twice the standard *or more.* Finally, we see that the vehicle spends 8% of its time at 10 times the standard or more.

170.    The highway emissions were found to be 319 mg/mile on average over all tests conducted, or 6.4 times the standard of 50 mg/mile. Maximum emissions in highway conditions were found to be 4,166 mg/mile, or 83 times the standard.

171.    Similarly, the compliance factor for highway driving is plotted below.



172.    The vehicle spends 92% of the miles traveled above the standard (a compliance factor greater than 1), leaving only 8% of the vehicle miles traveled (VMT) having met the standard. The vehicle spends 54% of its VMT at 4 times the standard or above, and 4% at 20 times the standard or above.

173.    The excessive emissions are a result of a number of defeat devices. On the GLK250, the EGR and SCR rates are both turned down significantly at various moments in time where one would not expect a change, most notably when the speed and road grade are not changing.

174.    The plot below is one of several that shows the typical behavior. The orange line represents the vehicle speed. Note that it is relatively constant at 100 km/hour (62 mph). The small fluctuations observed in the speed over the several plots presented below are normal, as vehicle speed is usually maintained by small accelerations and decelerations that the driver doesn't usually notice.

175.    The gray line indicates the percent reduction of the SCR system. A higher percentage

reduction represents a very low NOx emission rate from the tailpipe. In the limit that NOx reduction

is 100% on the SCR catalyst, the emissions will be 0 mg/mile from the tailpipe. The yellow line

represents the percent EGR. The absolute value of this number is not so important compared to the

relative value in various situations. Note that around 5,450 seconds in the plot that EGR is shutoff

(the yellow line goes to 0) and the SCR reduction (gray line) also goes to near 0. As a result, the

NOx emission rate (represented by the blue line) exceeds the upper limit of the chart. After a short

period of time, the EGR system is reactivated, but the SCR system doesn't come back up to high

NOx reduction until about 6,450 seconds. This is typical.



176.    The following plot shows similar behavior. At around 16,150 seconds, the SCR

system reduction begins to decrease and NOx begins to increase. At 16,350 seconds, the EGR

system is shut off completely and the SCR reduction goes to near 0. Again, the NOx emissions

(blue line) increase to values that exceed the maximum 2,000 mg/mile limit on the chart. These

changes are not associated with any load change due to speed or road grade.



177.    The GLK250 also seems to employ a timer that will meet the emission standard for a certain period of time and then begin to increase emissions after a certain period of operation. In the plot below, the vehicle speed remains constant at 110 km/hr while the SCR reduction (gray line) decreases over time. In this case, the emissions are 46 mg/mile for about 400 seconds, and then the SCR effectiveness (i.e. amount of urea injected) decreases starting at 7,800 seconds. Although the speed and road grade haven't changed at all, the emissions increase to 203 mg/mile after the SCR system is slowly turned off.

010585-11/1108566 V1



178.    The same behavior is observed in the plot below. Emissions are 63 mg/mile for about

400 seconds before the SCR system is de-rated (i.e. urea injection is reduced). After the SCR system

is de-rated, emissions increase to 167 mg/mile.



179.    Similar events are summarized in the following table.

| Condition | Temp | Event # | Pre timeout NOx (mg/mile) | After timeout NOx (mg/mile) | Factor Increase | Del NOx mg/mile |
|---|---|---|---|---|---|---|
| Flat | 71.6 | 1 | 46 | 203 | 4.4 | 157 |
| Flat | 60.6 | 2 | 63 | 167 | 2.7 | 104 |
| Flat | 63.1 | 3 | 119 | 252 | 2.1 | 133 |
| Uphill 2.8% | 57.8 | 4 | 355 | 4166 | 11.7 | 3811 |
| | | | | Average | 5.2 | 1051 |

180.    On average, these events result in an increase in NOx emissions by a factor of 5.2, but in some cases as high as 11.7. On average, the EGR rate is decreased from 36.6% to 32.0% after the system is de-rated and the SCR effectiveness is reduced from 80% to 43% after the urea injection is turned down.

- 101 -

181.    The data were analyzed for both stop and go conditions and highway conditions on flat roads and several road grades. The results from flat roads in stop and go conditions are plotted below. Each represents an individual test point. The horizontal red bar represents the NOx emission standard of 50 mg/mile. The vertical blue lines are the upper and lower bounds for the ambient temperature while performing certification testing (68 and 86°F). It is believed that the vehicle triggers an increase in NOx when the ambient temperature is outside the certification test window.

182.    In the plot below, the blue dots represent emission tests for which low ambient temperature defeat device is triggered (i.e. temperature generally below 68°F). The red dots represent emission tests for which the high ambient temperature defeat device is believed to be active (i.e. temperature generally above 86°F). The green dots represent the tests for which the certification test software is active (i.e. low NOx, in between 68 and 86°F).

183.    The vehicle's ambient temperature sensor is usually mounted in front of the radiator close to the road. These sensors are not necessarily shielded from the sun and are highly susceptible to false readings at high ambient temperatures from heat generated by hot black top or direct sunlight.

184.    When it comes to a defeat device based on ambient temperature, the vehicle may use one or more temperature sensors in the intake that are affected by ambient temperature. There are several temperature sensors in the intake manifold for the engine, any combination of which could be used to trigger a defeat device (in addition to the possible use of the ambient temperature sensor). The temperature sensors may not directly measure ambient temperature, but are certainly related to ambient temperature. Therefore, the cutoff temperatures, as measured by the ambient temperature sensor, are not necessarily exactly 68°F or 86°F. Hence, the high and low temperature defeat devices can occasionally fall within the certification test window. In general, however, these instances occur

- 102 -

when the vehicle is very close to the certification test window temperature or when the ambient temperature is changing and the intake temperature sensors may not yet have changed in response. This applies to the R350 data presented in the next section as well.



185.    It appears that NOx emissions are high in both the low ambient temperature modes and high ambient temperature modes, while the emissions appear to meet the standard inside the test window. In this case, the red dots occur during a transition from high temperature to low temperature. In this case, it is believed that the high temperature defeat device is active even though the ambient temperature sensor is below 86°F (probably triggered by another sensor in the intake manifold that still shows a high reading as a result of the high ambient temperature). As explained above, this is likely due to lingering high temperatures at some sensor or combination of sensors in the intake under the hood.

186.    The emissions for the cold ambient defeat device are 453 mg/mile on average. The emissions for the high ambient temperature defeat device are 278 mg/mile, while the emissions inside the certification test window are 41 mg/mile on average (i.e. meet the standard).

187.    Similar behavior is observed for highway driving on flat roads. In this case, high temperature data was not taken as these temperatures were not available in the necessary road conditions during testing. Emissions in the certification test window are well below the standard, while emissions below 68°F are well in excess of the standard. Cold defeat device NOx emissions are 230 mg/mile while emissions in the certification window are 19 mg/mile.

188.    In general, the SCR reduction efficiency in stop and go flat road conditions is 96% for conditions where the vehicle meets the standard and 33% on average for all other conditions. That is a major reduction in SCR reduction efficiency, accomplished by a major reduction in injected urea by the program in the engine's ECM. The EGR rate is reduced from 34% to 32% for the compliant and non-compliant conditions, respectively.

189.    Similarly, for steady highway driving on flat roads, the SCR efficiency decreases from 97% to 65%, while the EGR rate decreases from 39% to 36%.



190.    The vehicle also employs a defeat device that detects the grade in the road. During certification, the vehicle does not experience either physical or simulated road grade. Therefore, a defeat device that triggers higher emissions on an uphill or downhill road grade would not be detectable on a certification dynamometer. That device could only be detected using a PEMS system.

191.    Road grades tested in stop and go conditions ranged from 0.4 to 3.7%. It should be noted that, in the colloquial sense, a road grade less than 1.0% would be considered "flat" by the average person. Even at modest grades like 2.7% in stop and go conditions, the NOx emissions increase to 983 mg/mile (nearly 20 times the standard). That level of road grade would generally be considered a very slight hill. As shown in the plot below, this defeat device appears to be active at all temperature ranges, not just above and below the certification test window.



192.    Average stop and go emissions on hills are 308 mg/mile, which is 7.5 times the value of 41 mg/mile measured during stop and go conditions in the certification test window. The SCR efficiency is reduced from 96% when the vehicle meets certification in flat stop and go driving to 73% in this case.

193.    Emissions during downhill stop and go test runs ranging in grade from 0.5 to 3.3% downhill were as high as 464 mg/mile and were 190 mg/mile on average. That's 4.6 times the emissions measured during stop and go conditions in the certification test window. The SCR system effectiveness is reduced to 55%, compared to 96% when the vehicle meets the standard on flat roads.



194.    Uphill grades between 0.6% and 5.3% were tested. On average, highway emissions on uphill grades are 1,035 mg/mile, more than 20 times the standard. Emissions are as high as 4,166 mg/mile on a 4.2% road grade. That's 83 times the standard. Even on a grade as small as 1.7%, emissions were 355 mg/mile, some 7 times the standard. The overall SCR reduction effectiveness is reduced to 61%, compared to 97% where the vehicle meets the standard on flat roads. EGR rates are reduced from 39% in cases where the vehicle meets the standard on flat roads to 30% on uphill grades.

- 107 -



195.    Downhill grades between 0.4% and 5.5% were tested, with an average NOx emission rate of 210 mg/mile. Even on a road grade as small as 1.4%, emissions were as high as 1,408 mg/mile. The SCR effectiveness is reduced, on average from 97% where the vehicle meets the standard on flat roads to 61%.



196.    Finally, this vehicle was tested on a chassis dynamometer following the protocol for the FTP-75 and HWFET tests, with the following results.

|  | Test Cycle (values in mg/mile) | |
| --- | --- | --- |
|  | FTP | HWFET |
| EPA Cert Standard | 50 | 70 |
| Reported Cert Values | 40 | 20 |
| Dyno Test Values | 66 | 8 |

197.    The certification values are either close to (in the case of the FTP-75) or under the standards, so the vehicle is believed to operate according to the manufacturer's original specifications. It is clear that the over-the-road driving emissions increase dramatically above the standard, which would suggest the vehicle is able to detect the certification test, as was done in the case of the Volkswagen diesel emissions scandal.

**6.    2012 R350 BlueTEC.**

198.    This vehicle was tested with a PEMS over the course of 1,742 miles, 1,395 of which were on the highway and 347 of which were in stop and go or variable speed conditions. A generator

- 109 -

was installed on the rear of the vehicle to power the PEMS equipment in a position that was considered to have a minimal impact on the vehicle's aerodynamic drag.



199.    The stop and go emissions were found to be 361 mg/mile on average over all tests conducted, or 7.2 times the standard of 50 mg/mile. Maximum emissions in stop and go conditions were found to be 1,500 mg/mile, or 30 times the standard.

200.    The compliance factor for stop and go conditions is plotted below.



201.    The vehicle spends 82% of its time above the standard. That means only 18% of the miles traveled in stop and go conditions actually met the standard. The vehicle spends fully 36% of the time more than 10 times the emission standard.

202.    The highway emissions were found to be 286 mg/mile on average over all tests conducted, or 5.7 times the standard of 50 mg/mile. Maximum emissions in highway conditions were found to be 4,558 mg/mile, or 91 times the standard.

203.    Similarly, the compliance factor for highway driving is plotted below.

010585-11/1108566 V1



204.    The vehicle spends 92% of the miles traveled above the standard, leaving only 8% of the vehicle miles traveled (VMT) having met the standard. The vehicle spends 41% of its VMT at 4 times the standard or above, and 13% at 10 times the standard or above.

205.    As with the GLK250, the R350 employs a number of defeat device strategies that reduce the effectiveness of the EGR and SCR systems. Like the GLK250, the EGR and SCR systems are periodically turned off or de-rated in a manner which is not justified by operating conditions (e.g. steady operation with no change in speed or road grade). This behavior is also observed in stop and go conditions, where the EGR system is periodically turned off, leading to a spike in NOx.

206.    The plot below shows one such event. As with the plots above, the orange line is the vehicle speed; the blue line is the NOx emissions in mg/mile; yellow line is the EGR rate; and the

gray line is the SCR percent reduction. At multiple points in this plot, the yellow line (EGR rate) drops to zero, leading to a significant spike in NOx emissions. These periodic spikes lead to greatly increased overall NOx emissions. The first event in the plot occurs near 6,000 seconds, the second at 6,120 seconds, and the third at 6,170 seconds. Notice that in each case, the NOx spikes are well above the standard. In the first case, we see a spike to nearly 600 mg/mile. The second spike leads to over 800 mg/mile. The third leads to over 200 mg/mile. These spikes are well in excess of the 50 mg/mile standard and lead to a composite emission rate for this test of 279 mg/mile, or 5.6 times the standard.



207.    In many circumstances, the SCR system is significantly de-rated. In the plot below, the speed is relatively constant at 120 km/hr (71.2 mph). Near 3,550 seconds, the SCR system (gray line) drops from approximately 80% reduction to 0-40% reduction. The resulting NOx goes off the plot, with levels exceeding the 2,000 mg/mile upper bound of the plot. The resulting NOx rate for this test is 4,558 mg/mile, or 91 times the standard.

- 113 -



208.   Here we see a plot where the SCR system is de-rated on a periodic basis (gray line) over the course of 1.2 hours, driving the NOx up to levels above 200 mg/mile. As a result, the overall NOx emission rate for this segment is 131 mg/mile.



209.   The plot below shows the same behavior, with SCR effectiveness dropping from the 80% region to 0-40% region around 4,550 seconds. Again, the NOx levels exceed the upper bound

of the plot, with NOx in excess of 2,000 mg/mile, with the composite NOx emission rate for the test at 1,880 mg/mile.



210.    These plots are presented for illustrative purposes, as there are dozens of similar plots that were collected over the course of testing the R350.

211.    As with the GLK250, the data was analyzed in stop and go and highway conditions on flat roads and grades. This data is plotted against ambient temperature, as a similar ambient temperature defeat device strategy is employed with the R350.

212.    For stop and go driving on flat roads, the emissions appear to meet the standard in the temperature window between 68 and 86°F, as with the GLK250. However, outside of that temperature window, the NOx emissions increase significantly. The details of the coloring for the points (and classification as "cold," "mid," or "high") and justification are presented above in the discussion of the GLK250. Within the certification test window, stop and go results are 23 mg/mile on average, well below the 50 mg/mile standard. At temperatures below 68°F, emissions spike as

high as 624 mg/mile, with an average of 264 mg/mile. At temperatures above 86°F, emissions spike as high as 521 mg/mile, with an average of 428 mg/mile.



213.    For stop and go flat driving, the SCR reduction rate is 97% for conditions where the vehicle meets the standard. This number drops to 74%, on average, for conditions where the vehicle exceeds the standard. Similarly, the EGR rate drops from 44% to 29%, on average.

214.    The same behavior is observed for highway driving. Note that the coloring of the points presented on the plots and discussion of the exact ambient temperature where the defeat devices are active is discussed in the GLK250 section above. Within the certification test window, highway results are 62 mg/mile on average, very close to the 50 mg/mile standard. At temperatures below 68°F, emissions spike as high as 583 mg/mile, with an average of 216 mg/mile. At temperatures above 86°F, emissions spike as high as 991 mg/mile, with an average of 401 mg/mile.



215.   For highway flat driving, the SCR reduction rate is 88% for conditions where the vehicle meets the standard. This number drops to 80%, on average, for conditions where the vehicle exceeds the standard. Similarly, the EGR rate drops from 47% to 38%, on average.

216.   Similar to the GLK250, the R350 has a defeat device that dramatically increases NOx on uphill and downhill road grades. The vehicle was driven on uphill road grades ranging from 0.4% to 2.6%. These are modest grades, and yet NOx increases to levels as high as 1,500 mg/mile, some 30 times the standard. Average NOx emissions for all stop and go testing on an uphill grade are 523 mg/mile. SCR effectiveness drops from 97% in cases where the vehicle meets the standard on flat roads to 70% on uphill grades. Similarly, EGR drops from 44% to 27% for the flat road and uphill road tests, respectively.

217.   There are not enough data points in stop and go downhill conditions to present, but downhill emissions for steady highway driving are presented later.

- 117 -



218.   For steady highway driving, grades between 0.5% and 3.5% were tested. Emission levels were measured as high as 4,558 mg/mile, with an average of 942 mg/mile. These are extraordinarily high numbers given the relatively low road grade. The SCR effectiveness drops from 88% in cases where the vehicle meets the standard on flat roads during highway driving to 54%. Similarly, the EGR rates drops from 47% to 32% for the flat road and uphill grade conditions, respectively.



219.    Downhill emissions under steady highway conditions were measured from 0.5% downhill grade to 3.2% downhill grade. On average, emissions were 190 mg/mile, with values as high as 857 mg/mile. The SCR effectiveness drops from 88% in cases where the vehicle meets the standard on flat roads during highway driving to 74%. Similarly, the EGR rates drops from 47% to 37% for the flat road and downhill grade conditions, respectively.

010585-11/1108566 V1



220.    Finally, the R350 was tested using the certification protocols for the FTP-75 and HWFET tests. As can be seen, the vehicle meets the certification standard for both tests, so the emissions system is operating within the manufacturer's design specifications. It is clear that the over-the-road driving emissions increase dramatically above the standard, which would suggest the vehicle is able to detect the certification test, as with the Volkswagen scandal.

|  | Test Cycle (values in mg/mile) | |
|---|---|---|
|  | FTP | HWFET |
| EPA Cert Standard | 50 | 70 |
| Reported Cert Values | 50 | 10 |
| Dyno Test Values | 23 | 47 |

### 7.    2014 Mercedes/Freightliner Sprinter 2500 BlueTEC.

221.    This vehicle was tested with a PEMS over the course of 1,712 miles, 1,224 of which were on the highway and 488 of which were in stop and go conditions (or city conditions as represented by the FTP-75 certification test). A generator was installed on the rear of the vehicle to power the PEMS equipment in a position that was considered to have a minimal impact on the vehicle's aerodynamic drag.

- 120 -

222.    The vehicle was found to have at least 2 defeat devices: 1) a timer on the SCR system that reduces the effectiveness after a short period of time, and 2) a defeat device that detects road grade and reduces overall emission system performance.





223.   The stop and go emissions were found to be 465 mg/mile on average over all tests conducted, or 2.3 times the standard of 200 mg/mile. Maximum emissions in stop and go conditions were found to be 1,844 mg/mile, or 9.2 times the standard.

224.   The compliance factor for stop and go conditions is plotted below.



225.    The vehicle spends 61% of its time above the standard. That means only 39% of the miles traveled in stop and go conditions actually met the standard. The vehicle spends fully 25% of the time more than 4 times the emission standard.

226.    It should be noted that, although the magnitude of the compliance factors is lower than with the passenger cars (GLK250 and R350), the actual excess NOx emitted is just as significant as that seen on the passenger cars. For example, if the passenger cars are at 1,000 mg/mile NOx, that's 20 times the standard of 50 mg/mile, with an increase of 950 mg/mile above the standard. If the Sprinter is at 1,000 mg/mile NOx, that's 5 times the standard with an increase in 800 mg/mile above the standard. In terms of excess NOx emitted, the Sprinter is similar to the passenger cars even though the compliance factors are relatively lower.

227.    The highway emissions were found to be 798 mg/mile on average over all tests conducted, or 4.0 times the standard of 200 mg/mile. Maximum emissions in highway conditions were found to be 1,790 mg/mile, or 9.0 times the standard.

228.    Similarly, the compliance factor for highway driving is plotted below.



229.    The vehicle spends 96% of the miles traveled above the standard, leaving only 4% of the vehicle miles traveled (VMT) having met the standard. The vehicle spends 51% of its VMT at 4 times the standard of above, and 4% at 8 times the standard or above.

230.    As with the GLK250 and R350, the Sprinter employs a number of defeat device strategies that reduce the effectiveness of the EGR and SCR systems. As with the passenger cars, the EGR and SCR systems are periodically turned off or de-rated in a manner which is not justified by operating conditions (e.g. steady operation with no change in speed or road grade).

231.    In several instances, the SCR effectiveness is de-rated significantly after a short period of time, if not shut off altogether. Here we observe a very well-behaved system. The EGR rate is removed from the plot for the sake of clarity, though it's relatively constant throughout. Although the vehicle is operating at a variety of speeds, the SCR reduction rate (gray line) is 94% overall, and the resulting NOx emissions are 116 mg/mile, well within the 200 mg/mile standard.



232.    Here, however, the SCR effectiveness is reduced from over 90% to some 50% over the course of a short period of time during steady driving at approximately 60 mph (triggered by a reduction in urea injected into the SCR system by the engine ECM). The reduction starts at about 3,250 seconds. The resulting NOx levels spike above the 1,000 mg/mile limit of the plot, with the composite emission rate for this segment of 710 mg/mile. Prior to the reduction in urea injection, the emission rate is 216 mg/mile, which is very close to the standard. After the reduction in urea injection, the emission rate increases to 766 mg/mile.



233.    Another instance in the following plot, where the reduction in SCR effectiveness begins to reduce at 2,900 seconds. The SCR effectiveness reduces from well over 90% to approximately 50%, just as before, with a composite NOx emission rate of 428 mg/mile. Prior to the reduction in urea injection, the emission rate is 58 mg/mile, well below the standard. After the reduction in urea injection, the emission rate increases to 586 mg/mile.



234.    A wide variety of these SCR urea injection defeat devices were observed over the course of testing. These instances are summarized in the table below. In general, this defeat device results in a factor of 6.4 increase in NOx once the defeat device is triggered. The defeat device generates an additional 467 mg/mile of NOx above the standard. The SCR effectiveness is decreased on average from 90% to 59% once the defeat device is enabled. The EGR rate drops from 29.8% to 28.6%, so it would appear the primary defeat device is related to a reduction in urea injection into the SCR system.

- 127 -

| Condition | Temp | Event # | Pre timeout NOx (mg/mile) | After timeout NOx (mg/mile) | Factor Increase | Del NOx mg/mile |
|---|---|---|---|---|---|---|
| Uphill 0.7% | 70 | 1 | 77 | 507 | 6.6 | 430 |
| Uphill 2.0% | 91 | 2 | 788 | 1176 | 1.5 | 388 |
| Flat | 94 | 3 | 103 | 965 | 9.4 | 862 |
| Flat | 90.2 | 4 | 210 | 667 | 3.2 | 457 |
| Flat | 75.5 | 5 | 109 | 324 | 3.0 | 215 |
| Flat | 88.5 | 6 | 127 | 811 | 6.4 | 684 |
| Downill -0.6% | 78.3 | 7 | 101 | 272 | 2.7 | 171 |
| Uphill 0.5% | 91.4 | 8 | 216 | 766 | 3.5 | 550 |
| Flat | 86 | 9 | 58 | 586 | 10.1 | 528 |
| Flat | 67.6 | 10 | 98 | 445 | 4.5 | 347 |
| Hilly | 80.8 | 11 | 108 | 851 | 7.9 | 743 |
| Flat | 90.7 | 12 | 74 | 603 | 8.1 | 529 |
| Flat | 76.9 | 13 | 52 | 529 | 10.2 | 477 |
| Flat | 65.2 | 14 | 16 | 206 | 12.9 | 190 |
| Uphill 0.7% | 70 | 15 | 77 | 507 | 6.6 | 430 |
| | | | | Average | 6.4 | 467 |

235.    The vehicle was tested on flat roads in stop and go conditions across a wide variety of ambient temperatures. Unlike the GLK250 and R350, there does not appear to be any ambient temperature dependence for the SCR defeat device. The defeat devices are active across all ambient temperatures.

236.    On average, the NOx emissions are 293 mg/mile, with spikes as high as 1,618 mg/mile. On average, the SCR effectiveness is reduced from 87% in cases where the vehicle meets the standard to 63% in cases where the vehicle exceeds the standard.



237.   Similarly, for steady highway conditions on flat roads, the average NOx emission rate is 615 mg/mile, or 3 times the standard of 200 mg/mile. We observe emission rates as high as 1,254 mg/mile, or 6.3 times the standard. On average, the SCR effectiveness is reduced from 86% in cases where the vehicle meets the standard to 54% in cases where the vehicle exceeds the standard.

- 129 -



238.    As with the passenger cars, the effects of modest road grades were studied in both

stop and go and highway driving conditions. In stop and go conditions, road grades between 0.7%

and 3.7% were tested, with a resulting average NOx of 738 mg/mile and maximum of 1,844

mg/mile. Even on a grade as insignificant as 1.0%, the emissions are as high as 845 mg/mile. In

only one case on uphill grades did the vehicle meet the standard. The SCR effectiveness is reduced

from 87% in cases where the vehicle meets the standard on flat roads to 53% on uphill grades. The

EGR rate is reduced from 30% in cases where the vehicle meets the standard on flat roads to 23%

on uphill grades.

- 130 -



239.    For highway conditions, road grades between 0.6% and 4.4% were tested, with a resulting average NOx of 1,003 mg/mile and a maximum of 1,790 mg/mile. Even with an almost imperceptible grade of 0.4%, the emissions are 698 mg/mile, or 3.5 times the standard. In no cases does the vehicle meet the standard on uphill grades. On average, the SCR reduction rate is 43%, compared to the high 80% range when the vehicle meets the standard. EGR rates are on average 22%, compared to 27% when the vehicle meets the standard in highway conditions (only on flat roads in this case).



240.    Stop and go data for downhill conditions is relatively limited, but grades were tested between 0.7% downhill to 2.4% downhill, producing NOx emissions of 343 mg/mile on average. Interestingly, the highest NOx emission rate for downhill stop and go occurs at a very modest 0.7% downhill grade, yielding a NOx emission rate of 1,087 mg/mile. The SCR reduction rate is, on average, 70%, which compares to the 87% reduction rate when the vehicle meets the standard on flat roads.



241.   Downhill grades between 0.6% and 2.9% were tested under steady highway conditions. The average NOx for these conditions is 714 mg/mile, with a maximum of 899 mg/mile at 1.0% downhill. The SCR effectiveness is 42% on average, compared to 86% where the vehicle meets the standard on flat roads.



- 133 -

242.    It is thus clear that the vehicle is able to detect both uphill and downhill grades and reduce the level of urea injection. This defeat device results in a reduced effectiveness of the SCR and EGR systems and dramatic and consistent increases in NOx above the standard. Combined with the timeout defeat device that reduces the SCR effectiveness after a short period of time, the vehicle rarely meets the NOx emission standard.

**8.    Summary.**

243.    It is clear from the testing that Mercedes uses a systematic set of defeat devices across their entire OM642 and OM651 engine platforms. The tested vehicles are representative of the entire group of vehicles in the complaint as they test both the 3.0 and 2.1 Liter platforms. In the latter case, the OM651 platform is demonstrated to use defeat devices in both passenger car and medium duty vehicle applications. The vehicles use consistent defeat devices to reduce both EGR rates and SCR rates under a wide variety of test conditions that are not discoverable using the certification test.

244.    These defeat devices are only discoverable when conducting over-the-road testing that is not part of the certification protocol. A variety of defeat devices are used, including ambient temperature sensing, road grade sensing, SCR "timeout" (reduction after a period of time), and periodic and sporadic de-rate of the EGR and SCR systems. The result is that all three vehicles grossly exceed the relevant emission standards when operated in normal driving conditions representative of a wide variety of driving styles.

245.    Plaintiffs did not test each model to derive plausible allegations that each Polluting Vehicle violates U.S. and CARB emissions standards and produces emissions beyond those a reasonable consumer would have expected when he or she purchased their Mercedes. Plaintiffs did not have to, because, they did not need to. As set forth in more detail below, all of the models share either identical or very similar engines and emissions systems, allowing Plaintiffs' experts to

plausibly conclude that all Polluting Vehicles violate U.S. and CARB standards and the expectations of a reasonable consumer.

246.    Mercedes itself grouped various engines and vehicles into certain emission control groups. There is a standard EPA and CARB allowed practice, whereby vehicle manufacturers combine vehicles and engines into groups to reduce the cost of testing. This same approach lays the groundwork for allegations of similarity and sameness across multiple models, model years, and configurations.

247.    When a manufacturer submits an application for emissions certification to the EPA or CARB, they will group similar vehicles into the same test group that (i) have the same engine and emission control system, (ii) have similar weights, and (iii) are certified to the same emission standard. In some cases, only one vehicle will go in a test group. In some cases, there may be two or more vehicles in a test group. The manufacturer will group them based on the equivalency of the engine/emission control system and weight. For example, the 2009 ML320 BlueTEC and R320 BlueTEC are grouped together in the same test group because their engines/emission control systems are identical (3.0 Liter OM642 with SCR after treatment) and they are a similar weight class. The GL320, which has the same engine and emission control system as the ML320/R320, goes into a different test group because it is in a different weight class (even though the engine and emission control system is the same). When a manufacturer groups multiple models onto the same certification application, only one vehicle is used for the manufacturer's testing in order to reduce cost; the manufacturer need not test every vehicle or even a sampling.

248.    If the EPA considers the vehicles similar enough to allow grouping on the same application for a test group, then the EPA considers the vehicles identical from an emissions standpoint.

- 135 -

249.    Comparisons to the "emissions data vehicle" (EDV) and the "durability data vehicle" (DDV) across multiple test groups also reinforces this conclusion.  An EDV is used to demonstrate compliance with the relevant emission standard; this is the vehicle that is actually tested on the dynamometer to determine emissions performance and compliance with the standard.  The DDV is used to show the durability of the emission control system and to determine the rate of deterioration for the emission control system over the vehicle's useful life.

250.    When a manufacturer submits an application for certification, it will use a unique identifier (like a serial number) to identify the EDV and DDV that are being used to support the application.  In many cases, the EDV will be the same vehicle as used in previous years, which means the application is a carryover from the previous year and no model changes were made.  If the EDV is the same from one application to the next, the vehicles in those test groups should be considered equivalent from an emissions performance standpoint.

251.    The DDV applies more broadly across multiple test groups, as it is primarily a measure of catalyst deterioration.  Many different models and model years may use the same DDV to demonstrate the durability of the emissions system.  If two test groups use the same DDV, it provides some additional evidence that there is equivalence between the two engines and emission control systems.

252.    All variants of the two base Mercedes BlueTEC engines sold in the U.S.—the 2.1L OM651 and the 3.0L OM 642—are well represented by both the Plaintiff list of vehicles and Plaintiffs' test vehicles.  Though there are different configurations and possibly subtle changes from vehicle to vehicle and model year to model year, these engines are substantially similar.

253.    As noted, manufacturers tend to try to leverage the same engine/emissions technology across multiple vehicle platforms and model years in order to reduce the burden of

testing. In fact, a single engine and/or vehicle has been used across multiple vehicle models and models years to achieve certification. This strongly (and plausibly) suggests that any defeat strategies would reasonably operate across the broad class of similar engines. Indeed, it would be prohibitively expensive and impractical for Mercedes to develop completely separate emissions control systems for vehicles that have the same or similar engines.

254. Plaintiffs' experts also conducted additional research into the public technical literature providing an understanding of the various configurations of BlueTEC engines sold between 2007 and 2016. The literature provides some insight into the architecture of the variants of the OM642 and OM651 engines. In all cases, the engines are shown to have much more commonality than not, leading Plaintiffs' experts to conclude there is a strong basis for sufficient similarity or "sameness" to warrant inclusion on the list of Polluting Vehicles. *The vehicles are either equivalent from an emissions standpoint to the test vehicles or use the same core technologies and engine platforms as the tested vehicles*.

255. The vehicles can be broken down into four categories, all of which are well represented by the test vehicles identified for the reasons discussed above and as further explained below:

> *3.0 Liter OM642 with SCR*
>
> All of the Polluting Vehicles featuring a 3.0 Liter engine share the same basic engine architecture, code named OM642-30 by Mercedes. Although there are variations from revisions of the OM642-30, the same basic emission control architecture is employed through the line.
>
> This architecture of the OM642 engine comprises the following emission control technologies: exhaust gas recirculation (EGR), a turbo-charger, a diesel oxidation catalyst (DOC), a diesel particulate filter (DPF), a selective catalytic reduction (SCR) system, a urea dosing tank and dosing system, and a Bosch EDC17 engine control module (ECM).

This architecture is well represented by the 2012 R350 BlueTEC test vehicle, which uses the OM642-30 engine along with all the aforementioned emission control devices. This test vehicle should be considered a reasonable representation of all 3.0 Liter Polluting Vehicles that employ SCR.

*3.0 Liter OM642 with NOx Storage Catalyst*

The very earliest (MY2007) implementation of the BlueTEC diesel engine employed an OM642-30 engine with a NOx storage catalyst after-treatment. Although this older after-treatment technology differs from the SCR systems, the *same* OM642-30 engine is used. In particular, the EGR system is well represented by the 2012 R350 BlueTEC tested. This is important because the tested R350 employs a defeat device (EGR valve de-rate or shutoff at ambient temperatures below approximately 50°F) to significantly reduce EGR flow rate to prevent condensation in the engine intake. NOx emissions increase as EGR flow rates are reduced. This defeat device is well-documented in Europe and has been demonstrated on the Plaintiffs' R350 BlueTEC test vehicle. This defeat device results in a significant increase in NOx emissions. The 2007-2009 E320 BlueTEC vehicles configured with the NOx storage catalyst make use of the same EGR system as the tested 2012 R350 BlueTEC (as well as many other parts of the same OM642-30 engine system) and, for this reason, the 2012 R350 BlueTEC is be considered appropriately representative.

*2.1 Liter OM651 with SCR*

All of the Polluting Vehicles featuring a 2.1 Liter engine share the same basic engine architecture, internally code named OM651-22 by Mercedes. Based on literature and certification documents, the OM651-22 does not appear to have been significantly altered since its introduction in 2013.

This architecture comprises the OM651-22 engine with exhaust gas recirculation (EGR), a turbo-charger, a diesel oxidation catalyst (DOC), a diesel particulate filter (DPF), a selective catalytic reduction (SCR) system, a urea dosing tank and dosing system, and a Bosch EDC17 engine control module (ECM).

This architecture is well represented by the 2013 GLK250 BlueTEC 4matic test vehicle, which uses the OM651-22 engine along with all the aforementioned emission control devices. This test vehicle should be considered a reasonable representation of all 2.1 Liter Polluting Vehicles.

*Sprinter*

In the Sprinter, the emission control architecture remains largely unchanged from the aforementioned passenger cars.  In fact, the Sprinter makes use of the same OM642-30 and OM651-22 engines and SCR emission control systems.

In both cases, this architecture comprises the base engine (either OM651-22 or OM642-30) with exhaust gas recirculation (EGR), a turbo-charger, a diesel oxidation catalyst (DOC), a diesel particulate filter (DPF), a selective catalytic reduction (SCR) system, a urea dosing tank and dosing system, and a Bosch EDC17 engine control module (ECM).

The tested 2014 Freightliner Sprinter 2500 with 2.1 Liter engine is representative of all 2.1 Liter equipped OM651-22 Sprinter vans. Although the 2.1 Liter Sprinter is certified to multiple weight classes in some cases, the emissions generally increase with higher weight ratings.  The same engine and emissions control system is used across the various weight ratings, probably with very minor tweaks to account for the difference in weight.

The 3.0 Liter versions of the Sprinter contain OM642-30 engines that were taken from the passenger car market.  The 2012 R350 BlueTEC, which employs the same basic OM642-22 architecture and emission control setup, is representative.  Furthermore, the more modern 2014 Freightliner Sprinter 2500 that was tested provides additional evidence that a defeat device is likely to be employed in the 3.0 Liter Sprinter platform as well.

256.     The foregoing summary, backed by a deeper analysis that is not necessary to further detail at this time, is sufficient to demonstrate the representativeness of the test vehicles to the Plaintiffs' vehicles (and, indeed, all Polluting Vehicles).  Any differences between the test vehicles and the Polluting Vehicles are not material and not significant enough to suggest that the same defeat device would not be present in all Polluting Vehicles.

257.     Indeed, in the Volkswagen case, the EPA issued violation notices based on engine size (2.0 and 3.0 liters) and did not differentiate based on models or years.  In other words, all 2.0 models were in violation, not, for example, some but not all Jettas or Jettas but not Passats.

9.     **Bosch's critical role in Mercedes' Emissions Scheme.**

258.   Plaintiffs' United States testing results and the European reports and studies cited above definitely demonstrate that Mercedes has programmed its BlueTEC Clean Diesels with a so-called "defeat device."

259.   All modern engines are integrated with sophisticated computer components to manage the vehicle's operation, such as an electronic diesel control ("EDC").  Bosch GmbH tested, manufactured and sold the EDC system used by Volkswagen, Mercedes, GM, and FCA in the Polluting Vehicles.  This system is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17").  Upon its introduction, EDC Unit 17 was publicly touted by Bosch as follows:[14]

> EDC17 … controls every parameter that is important for effective, low-emission combustion.
>
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides.  The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary.  This improves the precision of injection throughout the vehicle's entire service life.  The system therefore makes an important contribution to observing future exhaust gas emission limits.

260.   Bosch worked with each vehicle manufacturer, including Mercedes, that utilized the EDC Unit 17 to create a unique set of specifications and software code to manage the vehicles' engine operation.

---

[14] *See* Bosch Press Release, *The brain of diesel injection: New Bosch EDC17 engine management system* (Feb. 28, 2006), http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

261.    Bosch's EDC Unit 17 controls emissions by periodically reading sensor values, evaluating a control function, and controlling actuators based on the control signal.[15] Sensor readings include crankshaft position, air pressure, air temperature, air mass, fuel temperature, oil temperature, coolant temperature, vehicle speed, exhaust oxygen content, as well as driver inputs such as accelerator pedal position, brake pedal position, cruise control setting, and selected gear. Based on sensor input, EDC17 controls and influences the fuel combustion process including, in particular, fuel injection timing, which affects engine power, fuel consumption, and the composition of the exhaust gas.[16]

262.    All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch GmbH exerts near-total control.  In fact, the software is typically locked to prevent customers, like Mercedes, from making significant changes on their own.  Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end.

263.    With respect to the Polluting Vehicles, the EDC Unit 17 was enabled by Bosch GmbH and Mercedes to surreptitiously evade emissions regulations.  Bosch GmbH and Mercedes worked together to develop and implement a specific set of software algorithms for implementation in the Polluting Vehicles, including algorithms which enabled Mercedes to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates (for applicable vehicles).[17]  Bosch GmbH and Bosch LLC employees exchanged emails with Mercedes engineers

---

[15] Moritz Contag *et al.*, How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles, p.4 (2017).

[16] *Id.*

[17] *See, e.g.*, *Engine management*, Bosch Auto Parts, http://de.bosch-automotive.com/en/parts_ and_accessories/ motor_and_sytems/diesel/engine_management_2/engine_control_unit_1 (last accessed Nov. 30, 2016).

that expressly considered and discussed how to optimize emissions performance in the laboratory and how to turn down or off emissions controls outside the laboratory.

264.    When carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations.  Bosch's EDC Unit 17 gave Volkswagen, Mercedes, and other manufacturers the power to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel.  When the EDC Unit 17's detection algorithm detected that the vehicle was on a dynamometer (and undergoing an emission test), additional software code within the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration" to cause a subsequent reduction in emissions to legal levels.  Once the EDC Unit 17 detected that the emission test was complete, the EDC Unit would then enable a different "road calibration" that caused the engine to return to full power while reducing the emissions control systems' performance, and consequently caused the car to spew the full amount of illegal NOx emissions out on the road.[18]  This general process is illustrated in the following diagram :

---

[18] Russell Hotten, *Volkswagen: The scandal explained*, BBC (Dec.  10, 2015), http://www.bbc.com/news/business-34324772.



265.    This workaround was and is illegal and is the same or similar to the workaround used in Mercedes' vehicles.  The Clean Air Act expressly prohibits defeat devices, defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use."  40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device.").  Moreover, the Clean Air Act prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."  42 U.S.C. § 7522(a)(3).  Finally, in order to obtain a certificate of compliance ("COC"), automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

266.    Thus, in order to obtain the COCs necessary to sell their vehicles, Mercedes did not disclose, and affirmatively concealed, the presence of the test-detecting and performance- altering software code that it developed with Bosch from government regulators, thus making that software an illegal defeat device.  In other words, Mercedes lied to the government, its customers, its dealers, and the public at large.

267.    Because the COCs were fraudulently obtained, and because the Polluting Vehicles did not conform "in all material respects" to the specifications provided in the COC applications, the Polluting Vehicles were never covered by a valid COC, and thus, were never legal for sale; nor were they EPA and/or CARB compliant, as represented.  Mercedes and Bosch hid these facts from the EPA, other regulators, its dealers and consumers, and it continued to sell and lease the Polluting Vehicles to the driving public, despite their illegality, and with the complicity of Bosch.

268.    Mercedes' illegal workaround was enabled by its close partnership with Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in Mercedes' and other manufacturers' diesel vehicles.[19]  Bosch was well aware that Mercedes was using its emissions control components as a defeat device and, in fact, worked with Mercedes to develop the software algorithm specifically tailored for the Polluting Vehicles.

269.    Mercedes is not the only manufacturer to have mislead consumers about the environmental aspects of their cars.  Volkswagen has entered into a consent decree admitting its vehicles contained defect devices as has Audi.  The EPA has issued a notice of violation and has brought suit against Fiat Chrysler America "FCA" over certain of its vehicles.  FCA is also the subject of emission litigation over its Dodge 2500 vehicles at the heart of each of these

---

[19] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch.  *See Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-helped-vws-emissions-rigging.

manufacturers emissions system is the Bosch EDC 17.  And GM vehicles containing the EDC 17—Chevy Cruze diesel passenger cars and Duramax (Chevy Silverado and GMC Sierra) diesel trucks—are the subject of emissions litigation.

270.    A German investigation committee has summoned Daimler's director of development to answer questions about emissions irregularities and Stuttgart prosecutors have served Daimler's Stuttgart headquarters for documents related to the "thermal switching system" which turned off emissions controls based on temperature.

**B.      Bosch played a critical role in the defeat device scheme in many diesel vehicles in the U.S., giving rise to a strong inference that Bosch played a key role in implementing the Mercedes emission strategy.**

**1.      Although this case is not about Volkswagen, Bosch's history with Volkswagen provides background and support for its participation in the RICO enterprise alleged herein, of which Bosch and Mercedes were participants.  On information and belief, Plaintiffs allege that the same level of coordination between Bosch and Volkswagen also occurred between Bosch and Mercedes to develop the illegal defeat device.**

271.    Bosch tightly controlled development of the control units in the Polluting Vehicles, and actively participated in the development of the defeat device.  This is to be expected given that much of the software and codes within the EDC17 are proprietary and represent Bosch's valuable intellectual property.

272.    As discussed above, Bosch introduced a new generation of diesel EDCs for Volkswagen.  The development of the EDC17 was a massive undertaking, which began years before Volkswagen began its push into the U.S.  market.

273.    A February 28, 2006 Bosch press release introduced the "New Bosch EDC17 engine management system" as the "brain of diesel injection" which "controls every parameter that is important for effective, low-emission combustion."  The EDC17 offered "[e]ffective control of

combustion" and a "[c]oncept tailored for all vehicle classes and markets."  In the press release, Bosch touted the EDC17 as follows:[20]

> **EDC17: Ready for future demands** Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets.  In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides.   The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary.  This improves the precision of injection throughout the vehicle's entire service life.  The system therefore makes an important contribution to observing future exhaust gas emission limits.

274.    Bosch, Bosch GmbH, and Volkswagen worked together closely to modify the software and to create specifications for each Volkswagen vehicle model.  Indeed, customizing a road-ready ECU is an intensive three- to five-year endeavor involving a full-time Bosch GmbH presence at an automaker's facility.  Such was the case with Mercedes as well.

275.    All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch exerts nearly total control.  In fact, the software is typically locked to prevent customers, like Volkswagen and Mercedes, from making significant changes on their own.

276.    Bosch's and Bosch GmbH's security measures further confirm that its customers cannot make significant changes to Bosch GmbH software without Bosch GmbH involvement.  Bosch GmbH boasts that its security modules protect vehicle systems against unauthorized access

---

[20] *See* Bosch press release, *The brain of diesel injection: New Bosch EDC17 engine management system* (Feb. 28, 2006), http://www.bosch-resse.de/presseforum/details.htm?txtID=2603&locale=en.

in every operating phase, meaning that no alteration could have been made without either a breach

of that security—and no such claims have been advanced—or Bosch's knowing participation.[21]

277.   Unsurprisingly, then, at least one car company engineer has confirmed that Bosch

maintains absolute control over its software as part of its regular business practices:[22]

> I've had many arguments with Bosch, and they certainly own the
> dataset software and let their customers tune the curves.  Before each
> dataset is released it goes back to Bosch for its own validation.
>
> Bosch is involved in all the development we ever do.  They insist on
> being present at all our physical tests and they log all their own data,
> so someone somewhere at Bosch will have known what was going
> on.
>
> All software routines have to go through the software verification of
> Bosch, and they have hundreds of milestones of verification, that's
> the structure ….
>
> The car company is *never* entitled by Bosch to do something on their
> own.

278.   Thus, Bosch GmbH cannot convincingly argue that the development of the Defect

Device was the work of a small group of rogue engineers.

279.   Bosch's and Bosch GmbH's role in the Volkswagen scandal highlights Bosch's role

in how a manufacturer's emissions system can be rigged, and there is no logical reason to believe

Bosch and Bosch GmbH did not act in a similar fashion with respect to the Mercedes' BlueTEC.

280.   Volkswagen's, Bosch's and Bosch GmbH's work on the EDC17 reflected a highly

unusual degree of coordination.  It was a massive project that required the work of numerous Bosch

---

[21] *Reliable Protection for ECUs*, ESCRYPT (May 12, 2016), https://www.escrypt.com/en/news-events/protection-for-ecus.

[22] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software/.

coders for a period of more than ten years, or perhaps more.[23]  Although Bosch publicly introduced the EDC17 in 2006, it had started to develop the engine management system years before.[24]

281.    In fact, Bosch was in on the secret and knew that Volkswagen was using Bosch's software algorithm as an "on/off" switch for emission controls when the Vehicles were undergoing testing.  As noted above, it has been said the decision to cheat was an "open secret" at Volkswagen.[25]  It was an "open secret" at Bosch as well.

282.    Volkswagen and Bosch GmbH personnel employed code language for the defeat device, referring to it as the "acoustic function" (in German, "akustikfunktion").  As described above, the roots of the "akustikfunktion"—and likely the cheating—can be traced back to the late 1990s when Audi devised software called the "akustikfunktion" that could switch off certain functions when the vehicle was in a test mode.[26]  The "akustik" term is derived from the function's ability to modify the noise and vibration produced by the engine.  News articles report that, in 2006, VWAG further developed this "akustikfunktion" for the Polluting Vehicles.[27]

---

[23] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world.  *See Bosch Probes Whether Its Staff Helped VW's Emissions Rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-helped-vws-emissions-rigging.

[24] Bosch press release, *The brain of diesel injection: New Bosch EDC17 engine management system* (Feb. 28, 2006), http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

[25] Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.  *See also* Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules (it was necessary for the "EA 189 engine to pass U.S. diesel emissions limits within the budget and time frame allotted").

[26] Martin Murphy, *Dieselgate's Roots Stretch Back to Audi*, Handelsblatt Global (Apr. 19, 2016), https://global.handelsblatt.com/edition/413/ressort/companies-markets/article/dieselgates-roots-stretch-back-to-audi?ref=MTI5ODU1J.

[27] *Volkswagen Probe Finds Manipulation Was Open Secret in Department: Newspaper*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.  VW Group Chairman, Hans Dieter Poetsch, explained that a small group of engineers and managers was involved in the creation of the manipulating software.  *See VW Chairman Poetsch:* Company *'Tolerated Breaches of Rules'*, Auto Week (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules.  *See also Scandal Explained*, BBC (Dec. 10, 2015), http://www.bbc.com/news/business-34324772;

- 148 -

283.    In sum, Bosch GmbH worked hand-in-glove with Volkswagen to develop and maintain the akustikfunktion/defeat device.  On information and belief, it did so with Mercedes as well.

### 2.    Volkswagen and Bosch conspire to conceal the illegal "akustikfunktion."

284.    By 2007, and likely earlier, Bosch GmbH was critical not only in developing the "akustikfunktion," but also in concealing it.

285.    Bosch GmbH was concerned about getting caught participating in the defeat device fraud.  As reported in the German newspaper, *Bild am Sonntag*, and a French publication, a Volkswagen internal inquiry found that in 2007, Bosch GmbH warned Volkswagen by letter that using the emissions-altering software in production vehicles would constitute an "offense."[28]

### 3.    Volkswagen and Bosch conspire in the U.S. and Germany to elude U.S. regulators who regulated not just Volkswagen diesels, but all diesels.

286.    The purpose of the defeat device was to evade stringent U.S.  emissions standards.  Once Bosch GmbH, Bosch LLC, and VW perfected the defeat device, therefore, their attention turned to deceiving U.S.  regulators.

287.    Bosch's North American subsidiary, Defendant Bosch LLC, was also part of and essential to the fraud.  Bosch LLC worked closely with Bosch GmbH and Volkswagen, in the United States and in Germany, to ensure that the non-compliant Polluting Vehicles passed U.S. emission tests.  Bosch LLC employees frequently communicated with U.S.  regulators, and actively worked to ensure the Polluting Vehicles were approved by regulators.

---

Sept.  18, 2015, http://www.autocar.co.uk/car-news/industry/vw-emissions-scandal-how-volkswagens-defeat-device-works.

[28] *Bosch warned VW about illegal software use in diesel cars, report says*, Automotive News (Sept.  27, 2015), http://www.autonews.com/article/20150927/COPY01/309279989/bosch-warned-vw-about-illegal-software-use-in-diesel-cars-report-says; *VW Scandal: Company Warned over Test Cheating Years Ago*, BBC (Sept.  27, 2015), http://www.bbc.com/news/business-34373637.

288.    Employees of Bosch LLC and Bosch GmbH provided specific information to U.S. regulators about how Volkswagen's vehicles functioned and unambiguously stated that the vehicles met emissions standards.   Bosch LLC regularly communicated to its colleagues and clients in Germany about ways to deflect and diffuse questions from U.S. regulators about the Polluting Vehicles—particularly CARB.

**4.    Bosch keeps the emissions cheating secret safe and pushes "clean" diesel in the U.S. as a concept applicable to all diesel car manufacturers.**

289.    Bosch, Bosch GmbH, and Bosch LLC not only kept Volkswagen's, and all the other diesel manufacturers' dirty secrets safe, it went a step further and actively lobbied lawmakers to push "Clean Diesel" in the U.S., including making Polluting Vehicles diesel vehicles available for regulators to drive.

290.    As early as 2004, Bosch announced a push to convince U.S.  automakers that its diesel technology could meet tougher 2007 U.S.  emission standards.[29]  Its efforts ended up being a multiple-year, multi-million dollar effort, involving key players from both Robert Bosch GmbH in Germany and Bosch LLC in the U.S.

291.    Bosch's promotion of diesel technology specifically targeted the U.S.  For example, Bosch put on "California Diesel Days"[30] and "SAE World Congress in Detroit."[31]  In 2008, Bosch LLC co-sponsored the "Future Motion Made in Germany-Second Symposium on Modern Drive Technologies" at the German Embassy in Washington, D.C., with the aim of providing a venue for

---

[29] Edmund Chew, *Bosch boosts US diesel lobbying*, Autonews (Mar.  8, 2004), http://www.auto news.com/article/20040308/SUB/403080876/bosch-boosts-us-diesel-lobbying.

[30] Bosch drives clean diesel in California, http://www.bosch.us/content/language1 /html/734_4066.htm?section=28799C0E86C147799E02226E942307F2

[31] *E.g.*, Bosch Brings Innovation, Green Technology to SAE 2009 World Congress

"stakeholders to gain insight into the latest technology trends and engage in a vital dialogue with industry leaders and policymakers."[32]

292.    Bosch LLC hosted multi-day conferences open to many regulators and legislators and held private meetings with regulators, in which it proclaimed extensive knowledge of the specifics of diesel technology, including calibrations necessary for the Polluting Vehicles to comply with emissions regulations.

293.    In April 2009, Bosch organized and hosted a two-day "California Diesel Days" event in Sacramento, California.  Bosch invited a roster of lawmakers, journalists, executives, regulators, and NGOs[33] with the aim of changing perceptions of diesel from "dirty" to "clean."  The event featured Polluting Vehicles as ambassadors of "Clean Diesel" technology, including a 2009 VW Jetta "green car."  The stated goals were to "build support for light-duty diesel as a viable solution for achieving California's petroleum and emission reduction objectives."

294.    In 2009, Bosch also became a founding member of the U.S. Coalition for Advanced Diesel Cars.[34]  One of this advocacy group's purposes included "promoting the energy efficiency and environmental benefits of advanced clean diesel technology for passenger vehicles in the U.S. marketplace."[35]  This group lobbies Congress, U.S. regulators, and the California Air Resources Board in connection with rules affecting "Clean Diesel" technology.[36]

---

[32] Bosch: Clean Diesel is Key Part of Future Technology Mix, http://us.bosch-press.com /tbwebdb/bosch-usa/en-US/PressText.cfm?CFID=60452038&CFTOKEN=9c778a2564be2c9b-56CC21B6-96AB-5F79-32445B13EC121DBE&nh=00&Search=0&id=364

[33] Bosch drives clean diesel in California, http://www.bosch.us/content/language1/html/ 734_4066.htm?section=28799C0E86C147799E02226E942307F2;*see also*, http://www.californiadieseldays.com/

[34] Chrissie Thompson, New Coalition Aims To Promote Diesel Cars, Automotive News (Feb. 2, 2009), http://www.autonews.com/article/20090202/OEM06/302029728/new-coalition-aims-to-promote-diesel-cars

[35] About the Coalition, http://cleandieseldelivers.com/about/

[36] *Id.  See also, e.g.*, Letter to Mary T. Nichols & the California Air Resources Board concerning a statement made about diesel technology (Jan. 8, 2016), http://cleandieseldelivers.com/media/Mary-Nichols-Letter-01082016.pdf

- 151 -

295.    In 2010, Bosch sponsored the Virginia International Raceway with the support of the 2010 Volkswagen Jetta TDI Cup Series.  This event included TDI vehicles featuring Bosch technology.[37]

296.    In 2012 Audi, BMW, Bosch, Daimler, Porsche and VW joined to form The Clearly Better Diesel initiative.[38]  The initiative was announced in Berlin by the German Association of the Automotive Industry.  Its stated goal was to promote the sale of clean diesel vehicles in the U.S. The initiative's slogan was "Clean Diesel.  Clearly Better."

297.    In its efforts to promote "Clean Diesel," including the Polluting Vehicles, Bosch GmbH acted on behalf of its global group.

### 5.    Bosch's EDC 17 is at the core of the FCA emission scandal.

298.    Bosch's involvement in another emissions scandal helps establish the plausibility of its acting in concert with Mercedes.

299.    After a lawsuit had already been filed by Plaintiffs' lead counsel in this case against Fiat Chrysler Automobile ("FCA"), on January 12, 2017, the United States Environmental Protection Agency issued a Notice of Violation against Fiat Chrysler Automobiles N.V.  and FCA US LLC for failing to justify or disclose defeat devices in model year 2014-2016 Dodge Ram 1500 EcoDiesel and 2014-2016 Jeep Grand Cherokee EcoDiesel vehicles.[39] The EPA is currently working in coordination with the California Air Resources Board (CARB), which has also issued a

---

[37] Volkswagen of America, Inc., Volkswagen Jetta TDI Cup Drivers Take to the Track for the First Time in 2010 at VIR, http://www.prnewswire.com/news-releases/volkswagen-jetta-tdi-cup-drivers-take-to-the-track-for-the-first-time-in-2010-at-vir-91985604.html

[38] Diesel Technology Forum, Press Release, "Clean Diesel Clearly Better" Campaign for Clean Diesel Cars Welcomed (Dec.  12, 2012).

[39] EPA Notice of Violation to FCA (Jan.  12, 2017), https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.

notice of violation to FCA. [40] EPA and CARB have both initiated investigations based on FCA's alleged actions.

300. The Notice of Violation is based in part on emissions testing performed by the EPA at the National Vehicle and Fuel Emissions Laboratory. The EPA performed this testing "using driving cycles and conditions that may reasonably be expected to be encountered in normal operation and use for the purposes of investigating a potential defeat device."[41]

301. The EPA identified at least eight Auxiliary Emissions Control Devices (AECDs) in the Polluting Vehicles all of which have the Bosch EDC 17 unit:

- AECD 1 (Full EGR Shut-Off at Highway Speed)
- AECD 2 (Reduced EGR with Increasing Vehicle Speed)
- AECD 3 (EGR Shut-off for Exhaust Valve Cleaning)
- AECD 4 (DEF Dosing Disablement during SCR Adaptation)
- AECD 5 (EGR Reduction due to Modeled Engine Temperature)
- AECD 6 (SCR Catalyst Warm-Up Disablement)
- AECD 7 (Alternative SCR Dosing Modes)
- AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

302. EPA testing found that "some of these AECDs appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards using

---

[40] EPA news release, *EPA Notifies Fiat Chrysler of Clean Air Act Violations* (Jan. 12, 2017), https://www.epa.gov/newsreleases/epa-notifies-fiat-chrysler-clean-air-act-violations.

[41] EPA Notice of Violation to FCA (Jan. 12, 2017), https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.

the Federal emission test procedure (e.g. FTP, US06) than in normal operation and use."[42] For

example:

> a. AECD 3, when combined with either AECD 7 or AECD 8, disables the EGR system without increasing the effectiveness of SCR system. Under some normal driving conditions, this disabling reduces the effectiveness of the overall emission control system. The AECD 3 uses a timer to shut off the EGR, which does not appear to the EPA to meet any exceptions to the regulatory definition of "defeat device."
>
> b. AECD 5 & 6 together reduce the effectiveness of the NOx emissions control system, using a timer to discontinue warming of the SCR after treatment system, which reduces its effectiveness.
>
> c. AECD 4, particularly when combined with AECD 8, increases emissions of tailpipe NOx during normal vehicle operation and use. The operation of AECD 1. AECD 2 and/or AECD 5 increase the frequency of occurrence of AECD 4.
>
> d. AECDs 7 & 8 work together to reduce NOx emissions during variable-grade and high-load conditions.

303.   The EPA and CARB have filed suit against FCA.

304.   On January 10, 2019, DOJ announced a settlement with FCA that included a recall

program to fix the cars and a civil penalty of $305 million to settle claims "on cheating emissions

tests and failing to disclose unlawful defeat devices."[43]

305.   Bosch GmbH made the EDC17 for the polluting FCA vehicles.

**C.   Mercedes' material omissions are actionable.**

306.   By manufacturing and selling the BlueTEC Clean Diesel vehicles and by failing to

disclose that such vehicles emit far more pollutants than their gasoline counterparts, that emit far

more pollutants than permitted under EPA standards, that emit far more pollutants on the road than

in laboratory tests, and that emit far more pollutants than a reasonable consumer would expect from

---

[42] *Id.*

[43] https://www.justice.gov/opa/pr/civil-settlements-united-states-and-california-fiat-chrysler-will-resolve-allegations.

a clean diesel, Mercedes defrauded its customers by omission, and engaged in fraud and unfair and deceptive conduct under federal and state law.  Because of Mercedes' manipulations of the BlueTEC emissions system, Mercedes *knew* that it was selling BlueTEC's that were *not* clean diesels.

307.    Defendants' non-disclosure was an immediate cause of Plaintiffs' and the Class members' injuries.  Each Plaintiff and Class member purchased their Polluting Vehicles on the reasonable, but mistaken, belief that the Polluting Vehicles were "clean diesels" as compared to gasoline vehicles and other diesels, complied with United States emissions standards, and would retain all of their operating characteristics throughout their useful life, including high fuel economy. Plaintiffs and all putative Class members selected and ultimately purchased their BlueTEC Clean Diesel vehicles, in part, because of the BlueTEC Clean Diesel system.

308.    Mercedes never disclosed to Plaintiffs or the Class the facts that the Polluting Vehicles had high emissions compared to gasoline vehicles and that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions, and that absent its Defect Device the vehicles would have lower miles per gallon.

309.    Mercedes had ample opportunity to disclose these important facts given that it engaged in national advertising campaigns for the BlueTEC Clean Diesels on the Internet, in print, on the radio, and on television (see below), and distributed BlueTEC Clean Diesel vehicle brochures to dealers for provision to potential customers.  Plaintiffs and the Class also would have been aware of the deception had Mercedes disclosed it to Mercedes dealerships given that each Plaintiff interacted with and received information from sales representatives at authorized Mercedes dealerships prior to purchasing their Polluting Vehicles.  Mercedes routinely communicates with consumers through Mercedes' authorized dealerships via product brochures, special service

messages, technical service bulletins, and warranty programs (under the terms of Mercedes' express warranties, Plaintiffs and the Class need to return to Mercedes dealerships to have warranty repairs performed). Mercedes had ample opportunity to disclose its omissions to Plaintiffs and the proposed Class through these channels and more, but failed to do so.

310. Mercedes' omissions were material. After all, Mercedes called the Polluting Vehicles "BlueTEC *Clean* Diesels" (emphasis added). Had Mercedes disclosed this design, and the fact that the Polluting Vehicles actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect from a clean diesel, and emitted unlawfully high levels of pollutants, Plaintiffs would not have purchased the Polluting Vehicles, or would have paid less for them.

**D.**   **Mercedes' affirmative misrepresentations of the environmental benefits of the BlueTEC Clean Diesels and Mercedes' promotion of the environmental benefits of the BlueTEC evidences the materiality of the omissions.**

311. In addition to engaging in fraudulent omissions, Mercedes made affirmative misrepresentations about the BlueTEC Clean Diesels. Mercedes' decision to pervasively promote BlueTEC Clean Diesel vehicles as "clean" diesels, as environmentally friendly, and as the World's cleanest diesels demonstrates the materiality of the "clean diesel" message to consumers. Certainly, Mercedes would not have carefully crafted its "clean diesel" message and spent money on an advertising and promotional campaign centered around that central product claim if Mercedes did not believe that "clean diesel" was material to consumers.

**1.**   **Materiality to a reasonable consumer: Mercedes advertised and promoted BlueTEC Clean Diesels as the world's cleanest diesel vehicles.**

312. Mercedes understood that promoting its BlueTEC vehicles as environmentally superior to gasoline cars would be material to a reasonable consumer interested in environmental issues with respect to a decision to purchase a car.

313.   Mercedes customers expect "exceptional environmental sustainability."[44]  In a 2008 press release, Mercedes acknowledged that "the environmental sustainability of vehicles is gaining importance in the purchasing decision."[45]

314.   To induce consumers to purchase BlueTEC Clean Diesel vehicles, Mercedes marketed the BlueTEC-equipped vehicles as environmentally friendly and fuel efficient "without the need to forego the characteristic brand features—safety, comfort and refined driving pleasure."[46]

315.   Mercedes advertising is widely disseminated throughout the United States.  It includes, among other things, televised advertisements, online social media campaigns, press releases and public statements (claiming BlueTEC Clean Diesel vehicles comply with EPA emissions standards), print advertising, brochures and other materials distributed to dealers and distributors, and strategic product placement (for instance, a Mercedes fleet of "low-emission" vehicles, including the E320 BlueTEC Clean Diesel, shuttled superstar musicians at each of the eight 2007 Live Earth climate protection concerts, two of which took place in the United States[47]).

**2.   Mercedes advertised and promoted BlueTEC Clean Diesel vehicles as low-emitting, because Mercedes understood it was material to a reasonable consumer**

316.   Mercedes' advertisements, promotional campaigns, and public statements represented that the Polluting Vehicles had high fuel economy, low emissions, reduced NOx by

---

[44] Press Release, Mercedes-Benz, Mercedes-Benz launches "Formula Green" in the five, four and three-litre consumption class, *available at* http://media.daimler.com/dcmedia/0-921-658901-1-1277592-1-0-0-0-0-1-0-0-0-1-0-0-0-0-0.html.

[45] Press Release, Mercedes-Benz, Road to the Future: From BlueTEC Diesel Vehicles to Electric Vehicles: Modular Technologies for a Clean Future of the Premium Automobile, *available at*, http://media.daimler.com/dcmedia/0-921-657591-1-1091617-1-0-1-0-0-1-12639-0-0-1-0-0-0-0-0.html?TS=1459448202325.

[46] Press Release, Mercedes-Benz, Road to the Future: From BlueTEC Diesel Vehicles to Electric Vehicles: Modular Technologies for a Clean Future of the Premium Automobile, *available at*, http://media.daimler.com/dcmedia/0-921-657591-1-1091617-1-0-1-0-0-1-12639-0-0-1-0-0-0-0-0.html?TS=1459448202325.

[47] Press Release, Mercedes-Benz, Phil Collins, Jon Bon Jovi, Snoop Dogg and the Black Eyed Peas Join Smart to Protect the Environment, *available at* http://media.daimler.com/dcmedia/0-921-1653632-1-893475-1-0-0-0-0-1-0-0-0-1-0-0-0-0-0.html.

90%, had lower emissions than comparable diesel vehicles, and had lower emissions than other comparable vehicles.  For example:

    a.    According to Mercedes, it offers consumers "the world's cleanest diesel automobiles."[48]

    b.    Mercedes promises that BlueTEC Clean Diesel vehicles have "ultra-low emissions,"[49] with "up to 30% lower greenhouse-gas emissions than gasoline."

    c.    On its website, Mercedes depicts a BlueTEC Clean Diesel SUV driving next to a shoreline with ebullient waves under a clear-blue sky.  In a faded-blue portion in the vehicles' path, Mercedes asks consumers to "imagine a fuel that produces fewer greenhouse gases than gasoline."[50]

    d.    Mercedes claims that BlueTEC Clean Diesel produces up to 90% fewer emissions than equivalent gas-powered vehicles,[51] and converts nitrous oxide emissions into "pure, earth-friendly nitrogen and water."[52]

    e.    In a technical explanation of BlueTEC Clean Diesel on its website, Mercedes tells consumers that it "reduces Nitrogen Oxides by up to 80%"[53]

    f.    Mercedes proclaims itself "#1 in CO2 emissions for luxury vehicles."[54]

    g.    Mercedes' web site proclaimed:

---

[48] Press Release, Mercedes-Benz, Phil Collins, Jon Bon Jovi, Snoop Dogg and the Black Eyed Peas Join Smart to Protect the Environment, *available at* http://media.daimler.com/dcmedia/0-921-1653632-1-893475-1-0-0-0-0-1-0-0-0-1-0-0-0-0-0.html

[49] *E.g.*, 2011 GL Class Brochure, p.  5 ("Advanced BlueTEC technology starts with cleaner combustion of its diesel fuel, and finishes with certified Ultra Low Emissions, even in the most stringent U.S.  states.").

[50] *BlueTEC Clean Diesel*, https://www.mbusa.com/mercedes/benz/green/diesel_bluetec (last visited March 29, 2016).

[51] *E.g.*, 2016 Sprinter Van Brochure, p.  2.

[52] *E.g.*, 2011 M-Class Brochure, p.  5.

[53] How Mercedes-Benz BlueTEC Works—Clean Diesel Technology, Mercedes-Benz Official  YouTube Channel, https://youtu.be/w4T5B_UmgJo.

[54] *BlueTEC Clean Diesel*, https://www.mbusa.com/mercedes/benz/green/diesel_bluetec (last visited March 29, 2016).

Mercedes-Benz continues to reinvent this alternative fuel that offers higher torque and efficiency with up to 30% lower greenhouse-gas emissions than gasoline.

Today's BlueTEC models are simply the world's most advanced diesels, with the ultra-low emissions, high fuel economy and responsive performance that makes them not merely available in all 50 states, but desirable.

### *Earth-friendly, around the world*

**THE LEADER IN DIESEL, SINCE THE BEGINNING.**

Drivers in much of Europe and Asia frequently choose diesel over gasoline for its rich torque output and higher fuel efficiency.  With BlueTEC, cleaner emissions are now an equally appealing benefit.

ADAC, Germany's largest automobile association, rates BlueTEC as #1 in CO2 emissions for luxury vehicles.

h.     One Mercedes BlueTEC Clean Diesel advertisement depicts two rear mufflers side-by-side in the shape of human lungs.  The caption underneath claims that BlueTEC is "For the air we breathe."



55

---

55 Advertisement created by Jung von Matt, Swiss creative agency, *available at* http://www.jvm.ch/en/arbeiten /kampagne/mercedes-benz/bluetec-1/print

010585-11/1108566 V1

**E.    Mercedes advertised and promoted BlueTEC Clean Diesel as environmentally friendly, because Mercedes understood it was material to a reasonable consumer.**

317.    Mercedes holds itself out as a protector of the environment: "Long before it became front-page news, Mercedes-Benz has been innovating and implementing new ways to help minimize the impact of cars and trucks on the world we share. It's a promise that's been kept for generations, and not just with cleaner, more efficient power under the hood."[56] Indeed, the company relishes its message that it plays an industry leading role in advancing "green" technologies like BlueTEC Clean Diesel.

318.    BlueTEC is part of a line-up of Mercedes technologies that it says are "green."[57] Mercedes widely disseminates advertisements, promotional campaigns, and public statements throughout the United States to induce the purchase of BlueTEC Clean Diesel vehicles by customers that are concerned about the environment. For example:

    a.    Mercedes calls its BlueTEC engine, "[e]arth-friendly, around the world."[58]

    b.    A promotional video created for Mercedes in 2009 opens with the camera pointing up to the sky with rays of sun coming through clouds. "The Earth," says the narrator "is changing." He then tells us that Mercedes-Benz BlueTEC is "cleaner . . . and—with a revolutionary system which significantly reduces greenhouse gases and smog-forming pollutants—more respectful of the earth."[59]

    c.    A technical description of BlueTEC available on the Mercedes-Benz website closes with, "BlueTEC—the world's cleanest diesel engines. Environmentally-friendly technology, without sacrificing

---

[56] *Mercedes-Benz & The Environment*, https://www.mbusa.com/mercedes/benz/green#main (last visited March 31, 2016).

[57] *Mercedes-Benz & The Environment*, https://www.mbusa.com/mercedes/benz/green#main (last visited March 31, 2016).

[58] *BlueTEC Clean Diesel*, https://www.mbusa.com/mercedes/benz/green/diesel_bluetec (last visited March 29, 2016).

[59] Studio Dialog, Video for Mercedes-Benz BlueTEC, *available at* https://vimeo.com/8989688.

performance or driving pleasure."[60]

d.     Mercedes claims in a brochure for the 2016 Sprinter that "Thanks to BlueTEC clean-diesel technology, the Sprinter is one of the greenest vans in the land."[61]

e.     Mercedes strategically placed its BlueTEC Clean Diesel vehicles among a fleet of Mercedes-Benz vehicles that shuttled superstar musicians like Bon Jovi, Snoop Dogg, The Police, Kanye West and others at the 2007 Live Earth climate protection concerts.  Live Earth attendees were asked to pledge that they would take personal action to solve the climate crises and "buy from businesses .  .  .  who share my commitment to solving the climate crises."[62]

f.     A 2009 website designed for Mercedes-Benz pictured a 2009 ML320 BlueTEC Clean Diesel driving in the sky through clouds, with the title, "Why you should go BLUE if you want to go green."[63] The site promised consumers, "an environmentally-smart solution that doesn't demand sacrifices."  On information and belief, this design was disseminated to U.S.  consumers by Mercedes-Benz U.S.  via its website on or around 2009.

319.    Mercedes' manipulations of the BlueTEC Clean Diesel emission controls puts the lie to Mercedes' claims that BlueTEC Clean Diesel is "the world's cleanest diesel passenger vehicle" with "ultralow emissions:" Mercedes misrepresents the emissions performance of its vehicles equipped with BlueTEC engines because of its manipulations that limit emission controls in normal driving conditions.

---

[60] How Mercedes-Benz BlueTEC Works—Clean Diesel Technology, Mercedes-Benz Official YouTube Channel, https://youtu.be/w4T5B_UmgJo.

[61] 2016 Sprinter Van Brochure, p.  2

[62] *Gore Urges "7 Point Pledge" Ahead of Live Earth*, Associated Press, June 29, 2007, *available at* http://www.nbcnews.com/id/19502465/ns/us_news-environment/t/gore-urges-point-pledge-ahead-live-earth/#.

[63] Portfolio of Chris Lacey, Mercedes-Benz BlueTEC, http://www.chrislacey.net/354/uncategorized/mercedes-benz-bluetec.

F.   **Mercedes advertised and promoted BlueTEC Clean Diesel as meeting and exceeding compliance with U.S. emissions standards in all 50 states, because Mercedes understood it was material to a reasonable consumer.**

320.   Mercedes expressly markets the Polluting Vehicles as Clean Diesel vehicles, with registration approvals in all 50 states.  For example:

a.   Mercedes' website proudly presents "BlueTEC: . . . now available in five different Mercedes-Benz BlueTEC models in all 50 states."[64]

b.   A June 2008 press release boasts that Mercedes-Benz was the first manufacturer in the world to achieve registration approval in all 50 states for Diesel SUVs.[65]

c.   In an April 2009 interview about the Mercedes-Benz E-Class, Professor Dr. Herbert Kohler, Chief Environmental Officer at Daimler AG, claims that Mercedes-Benz "goes beyond statutory requirements," because "sustainable mobility means more than the mere fulfilment of rigid environmental guidelines."[66]

G.   **Bosch Promoted "Clean Diesel" To Help Create The Market For Diesel Cars Including Mercedes Vehicles.**

321.   It's not unheard of for manufacturers of dangerous products to use trade associations to cover up the danger of their products. Tobacco companies created several trade associations to promote phony science claiming tobacco use was neither harmful nor addictive. The opioid manufacturers did the same as did Bosch with respect to promotion of clean diesel. Bosch was a member of the Diesel Technology Forum ("DTF"), a "non-profit" dedicated "to raising awareness about the importance of diesel engines." The DTF was formed in 2000, and its members include Bosch, Daimler, GM, and FCA. Bosch was aware that cars made by BMW, GM, FCA, and Mercedes used cheat devices to meet emissions requirements and were not the "clean diesel" as

---

[64] *Mercedes-Benz & The Environment*, http://www.mbusa.com/mercedes/benz/green#module-2 (last visited March 31, 2016).

[65] Press Release, Mercedes-Benz, Road to the Future: From BlueTEC Diesel Vehicles to Electric Vehicles: Modular Technologies for a Clean Future of the Premium Automobile, *available at*, http://media.daimler.com/dcmedia/0-921-657591-1-1091617-1-0-1-0-0-1-12639-0-0-1-0-0-0-0-0.html?TS=1459448202325.

[66] Life Cycle, Environmental Certificate for the E-Class, p. 6 (April 2009).

claimed. Despite this knowledge, Bosch, as a member of the DTF, and as part of its complicit conduct in promoting illegal diesels, authorized a steady stream of announcements about "clean diesel technology", as described below.

322. So, for example, the DTF on December 12, 2012, issued a press release proclaiming "Clean Diesel. Clearly Better" and highlighted new diesel models coming to the U.S. The release noted that the new "Clean Diesel" campaign was announced jointly by Audi, BMW, Bosch, Daimler, Porsche, and Volkswagen.



December 12, 2012 | Diesel Technology Forum

**PRESS RELEASE**

# "CLEAN DIESEL. CLEARLY BETTER." CAMPAIGN FOR CLEAN DIESEL CARS WELCOMED

**Contact: Steve Hansen (301) 668-7230 shansen@dieselforum.org**

**New Effort by German Automakers to Promote Diesel Cars in U.S.**

Washington, D.C. – The first ever joint promotion campaign by German automakers to promote clean diesel vehicles in the U.S. was welcomed today with the hope that it can accelerate current market successes for domestic clean diesel vehicle sales, according to Allen Schaeffer, the Executive Director of the Diesel Technology Forum (/).



The new promotional diesel campaign was announced today in Berlin by the German Association of the Automotive Industry (http://www.vda.de/en/index.html) (VDA) and member companies – Audi, BMW, Bosch, Daimler, Porsche and Volkswagen.

"We welcome this new effort to raise awareness of American car buyers to all of the benefits of the new generation of clean diesel technology," Schaeffer said. "People who know about the new clean diesel technology are extremely impressed by the improved fuel efficiency, power and lower emissions over gasoline and hybrid autos."

The slogan "Clean Diesel. Clearly Better." was unveiled along with the promotional effort's new website – www.clearlybetterdiesel.org (http://www.clearlybetterdiesel.org/) – which includes information highlighting the advantages of modern clean diesel passenger cars over gasoline engines "in terms of cleanliness, consumption and performance," according to VDA.

"The success of diesel technology is well documented in Western Europe where 55 percent of all new auto sales are clean diesels. Even though diesels represent a more modest three percent of all new vehicle sales in the U.S., we're in the midst of a resurgence of diesel in America and can easily see this percentage doubling and tripling in the next five to 10 years," said Schaeffer.

"Today's clean diesels are fast, efficient, and clean - a far cry from previous diesels in the 1970s and 1980s. Consumers are taking to new clean diesels for their long-term green value as evidenced by diesel sales increases of 24.5 percent through November 2012 compared to 2011, according to Hybrid Cars.com and Baum and Associates. Diesel sales have increased in 27 of the past 28 months in year-over-year sales, with 24 of these months showing double-digit increases. In addition, sales increased by 20 percent or better in 20 of the past 28 months.

"The growing role that clean diesel technology will play here in the U.S. meeting federal fuel economy goals is evident by the anticipated major increase in the number of diesel offerings that will be available in the U.S. in the next 12 to 18 months," Schaeffer said.

"With higher and fluctuating fuel prices, Americans are seeking more fuel efficient cars (/index.cfm?objectid=1CDF6110-DA5D-11E0-8228000C296BA163)," Schaeffer said. "The new U.S. federal fuel efficiency standards that will required a 54.5 mpg average by 2025 will significantly boost clean diesel auto sales because diesel cars (/index.cfm?objectid=7BCD5900-B1BF-11E0-8DA1000C296BA163) are 20 to 40 percent more fuel efficient than gasoline versions."

Schaeffer said the U.S. Energy Information Administration (EIA) forecasts that compared to 2012 the price of diesel fuel will decline by about 3 percent in 2013 to $3.83/gallon.

**New Clean Diesels Coming To the U.S. Market**

Schaeffer said a number of additional diesels will be available soon in the U.S. including:

- Audi A6, A7, A8 and Q5 TDI diesels will be available in 2013 joining the Q7 and A3 TDI to bring Audi's diesel offerings to a total of six. A TDI clean diesel A4 version is also expected in 2014 or early as 2013.

- BMW announced that the U.S. market will see a 2.0-liter four cylinder diesel and 3.0-liter inline six diesel engine in the next 12 months.

- Chrysler will introduce its new Jeep Grand Cherokee Ecodiesel in 2013.

- Ford will offer a new diesel Transit full-size commercial van in 2013.

- General Motors will offer a Cadillac ATS diesel and a diesel version of the Chevrolet Cruze in 2013.

- Mazda will become the only Asian car manufacturer to sell diesel cars in the U.S. when it introduces its SKYACTIV-D 2.2-liter clean diesel engine.

- The Mercedes S350 BlueTEC marks the return of the diesel-powered Mercedes-Benz S-Class to the United States in 2012. Mercedes also plans to bring a diesel in the GLK and C-class for a total of eight diesel models by 2014.

**ABOUT THE DIESEL TECHNOLOGY FORUM**

**The Diesel Technology Forum is a non-profit national organization dedicated to raising awareness about the importance of diesel engines, fuel and technology. Forum members are leaders in clean diesel technology and represent the three key elements of the modern clean-diesel system: advanced engines, vehicles and equipment, cleaner diesel fuel and emissions-control systems. For more information visit www.dieselforum.org (/).**

010585-11/1108566 V1

https://www.dieselforum.org/news/clean-diesel-clearly-better-campaign-for-clean-diesel-cars-welcomed

323.    As part of the continuing and false clean diesel promise, DTF posted on its website after the VW scandal that the new diesel technology enables emissions control systems that met "near zero" emissions standards.



**ABOUT CLEAN DIESEL**
# WHY DIESEL ISN'T DIRTY

*With a higher degree of certainty than ever before, we can say that diesel is a clean technology.*

## The Clean Diesel Journey

Diesel is a technology of continuous improvement and that goes for the fuel as well. Ultra-low sulfur diesel fuel has been the standard for both on-highway and off-highway diesel engines nationwide since 2007. By cutting sulfur levels in diesel fuel by 97 percent, immediate clean air benefits accrued - through lower soot emissions from all diesel vehicles and equipment using the fuel (both old and new) by 10 percent. Reducing the sulfur content of diesel fuel is similar to removing lead from gasoline during the 1970s.

Cleaner diesel fuel is the foundation that enabled the development and introduction of a new generation of advanced engines and emission control devices to meet strict "near zero" emissions standards.

324.    The DTF posted on its website information about "Clean Diesel" proclaiming "near zero emissions."

- 165 -



ABOUT CLEAN DIESEL

# WHAT IS CLEAN DIESEL?

*Cleaner diesel fuel, advanced engines and effective emissions control technology make up a new generation of diesel. It's clean diesel.*

What is clean diesel?

What makes it different from regular diesel?

Clean diesel is the new generation of diesel technology.



Today's ultra-low sulfur diesel fuel, advanced engines and effective emissions control combine to achieve near zero emissions that is smoke free. Clean diesel has proven energy efficiency, and ability to use a wide range of renewable fuels that position diesel as a key technology for growing economies to achieve cleaner air, lower greenhouse gas emissions and a sustainable environment around the world.

Cleaner diesel fuel, advanced engines and effective emissions control make up a new generation of diesel. It's clean diesel.

325.    The DTF website claimed the clean diesels resulted in "Clean Diesel and Clean Air,"

and that the manufacturers had "Effective Emissions Controls":



## Cleaner Diesel Fuel

Clean diesel fuel - containing 97 percent less sulfur - is now the standard for both on-highway and off-highway diesel engines nationwide. Using this ultra-low sulfur diesel (ULSD) immediately cuts soot emissions from diesel vehicles and equipment by 10 percent. Reducing the sulfur content of diesel fuel is similar to removing lead from gasoline during the 1970s.

Cleaner diesel fuel enables the development of a new generation of advanced engines and emission control devices that can't operate effectively with higher sulfur content in diesel fuel.

## Why is diesel technology so fuel efficient?

A combination of the energy-rich properties of the fuel, and the efficiency and completeness of the combustion of fuel to create useful mechanical energy. Diesel is a petroleum-based fuel with the highest energy density among transportation fuels - that's more energy per gallon than other alternatives. The U.S. Energy Information Administration states that few transportation fuels surpass the energy density of diesel (http://www.eia.gov/todayinenergy/detail.cfm?id=9991).

Read DTF's Diesel Fuel Study - Diesel: Fueling the Future in a Green Economy (/index.cfm?objectid=346EBC1F-A348-11E0-B3DD000C296BA163).

## Advanced Engines

Diesel is the world's most efficient internal combustion engine. It provides more power and more fuel efficiency than alternatives such as gasoline, compressed natural gas or liquefied natural gas. Read more about the history of the diesel engine (/files/dmfile/DieselHistory.pdf).

Fuel combustion is the primary difference between gasoline and diesel engines. Gasoline engines ignite fuel with spark plugs, whereas diesels ignite fuel with compression. Inside the engine, the combustion of air and fuel takes place under pressure and heat created by compressing the air-fuel mixture so intensely that it combusts spontaneously, releasing energy, that is transmitted to powering the wheels on a vehicle, the piston's motion and creating mechanical energy.

Advanced new technologies such as electronic controls, common rail fuel injection, variable injection timing, improved combustion chamber configuration and turbocharging have made diesel engines cleaner, quieter and more powerful than past vehicles.

## Effective Emissions Control

Manufactures have been very innovative in the methods used to meet emission standards using a variety of aftertreatment technologies and advanced engine systems that do not involve the use of additional emissions control technology, particularly in the off-road sector.

Introduction of ultra-low sulfur diesel fuels for both on- and off-road applications is a central part of the clean diesel system designed to meet near zero emissions standards. With the introduction of lower sulfur diesel fuel came the ability to use a number of exhaust aftertreatment options such as diesel particulate filters (DPF), exhaust gas recirculation (EGR), diesel oxidation catalysts (DOC), and selective catalyst reduction (SCR) with the use of  diesel exhaust fluid (DEF) that can be sensitive to the sulfur levels in the fuel.

The installation of various emission control technologies may also improve emissions from older diesel engines through retrofit capabilities. Read more about retrofit capabilities to reduce emissions from older vehicles and equipment (/retrofit).

326.    A document entitled "Diesel: Fueling the Future in a Green Economy," by Hart Energy Consulting, prepared for the Diesel Technology Forum, October 13, 2010,[67] was posted on the DTF website and proclaimed that:

---

[67] http://www.dieselforum.org/files/dmfile/Diesel-FuelingtheFutureinaGreenEconomy.pdf.

P. 3 - "**Introduction of advanced diesel technology in 2007 that relied on ultra low sulfur clean diesel fuel has today reduced emissions of particulate matter and nitrogen oxides**—an ozone precursor— by more than 98% in heavy-duty truck applications compared to 2000 models. It has enabled introduction of high performance diesel cars, trucks and SUVs that are cleaner, quieter and safer than ever."

P. 9 - "**Fuel economy advantages of 20% to 35% for diesel fuel/engines over gasoline vehicles will also provide options for meeting low carbon fuel objectives and reducing GHG emissions**. California has initiated a low carbon fuel initiative and the U.S. EPA has promulgated its first GHG control requirements in the form of vehicle CO2 reduction regulations. Congress continues to debate on climate change and related GHG initiatives."

P. 10 - "**These new levels of near-zero emissions are being met through advancements in the engine fuel and air management systems that dramatically improve combustion efficiency, and the use of ultra-low sulfur diesel fuel that enables the use of high efficiency exhaust control**. As a result, new trucks and buses are more than 98% cleaner than 2000-era models (Figure 3). In fact, results from the first phases of joint government and industry research (Advanced Collaborative Emissions Study, ACES) have demonstrated that the emissions reductions from these technologies have actually exceeded requirements, providing substantially greater performance and benefits than anticipated."

P. 11 - "While new engines are now on a path to near-zero emissions, the **widespread availability of cleaner diesel fuel has created new and substantial efforts to modernize and upgrade emissions performance of existing engines and equipment**. A 2009 Report to Congress by U.S. EPA on results of the first year of a federal program to fund diesel retrofits (Diesel Emissions Reduction Program) found it to be among the most cost effective clean air programs, yielding over $13 in environmental and public health benefits for each $1 invested."

P. 27 - "**The diesel industry is in the midst of implementing advanced engine and emissions control technology that will lower emissions from on-road vehicles and non-road machines and equipment by more than 98% relative to 2000 era technology. Continued investments and research to further increase fuel efficiency while lowering emissions will keep diesel engines for light duty vehicles competitive with other technologies.**"

- 168 -

**H.    The damage to the environment is at odds with what a reasonable purchaser of a BlueTEC expected.**

327.    NOx contributes to ground-level ozone and fine particulate matter.  According to the EPA, "Exposure to these pollutants has been linked with a range of serious health effects, including increased asthma attacks and other respiratory illnesses that can be serious enough to send people to the hospital.  Exposure to ozone and particulate matter have also been associated with premature death due to respiratory-related or cardiovascular-related effects.  Children, the elderly, and people with pre-existing respiratory disease are particularly at risk for health effects of these pollutants."

328.    The EPA describes the danger of NOx as follows:



**Acid Rain** - $NO_x$ and sulfur dioxide react with other substances in the air to form acids which fall to earth as rain, fog, snow, or dry particles. Some may be carried by the wind for hundreds of miles.  Acid rain damages forests; causes deterioration of cars, buildings, and historical monuments; and causes lakes and streams to become acidic and unsuitable for many fish.



**Water Quality Deterioration** - Increased nitrogen loading in water bodies, particularly coastal estuaries, upsets the chemical balance of nutrients used by aquatic plants and animals.  Additional nitrogen accelerates "eutrophication," which leads to oxygen depletion and reduces fish and shellfish populations. $NO_x$ emissions in the air are one of the largest sources of nitrogen pollution to the Chesapeake Bay.

- 169 -



**Toxic Chemicals** - In the air, $NO_x$ reacts readily with common organic chemicals, and even ozone, to form a wide variety of toxic products, some of which may cause biological mutations. Examples of these chemicals include the nitrate radical, nitroarenes, and nitrosamines.

**Ground-level Ozone (Smog)** - is formed when $NO_x$ and volatile organic compounds (VOCs) react in the presence of heat and sunlight. Children, the elderly, people with lung diseases such as asthma, and people who work or exercise outside are susceptible to adverse effects such as damage to lung tissue and reduction in lung function. Ozone can be transported by wind currents and cause health impacts far from the original sources. Millions of Americans live in areas that do not meet the health standards for ozone. Other impacts from ozone include damaged vegetation and reduced crop yields.



- 170 -



**Particles** - $NO_x$ react with ammonia, moisture, and other compounds to form nitric acid vapor and related particles. Human health concerns include effects on breathing and the respiratory system, damage to lung tissue, and premature death. Small particles penetrate deeply into sensitive parts of the lungs and can cause or worsen respiratory disease, such as emphysema and bronchitis, and aggravate existing heart disease.



**Global Warming** - One member of the $NO_x$ family, nitrous oxide, is a greenhouse gas. It accumulates in the atmosphere with other greenhouse gases causing a gradual rise in the earth's temperature. This will lead to increased risks to human health, a rise in the sea level, and other adverse changes to plant and animal habitat.

329. A recent study published in NATURE estimates that there are 38,000 deaths worldwide due to excess NOx emissions. A study published in ENVIRONMENTAL RESEARCH LETTERS (2017) estimates 10,000 deaths in Europe due to excess NOx emissions.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Discovery rule tolling.

330. Class members had no way of knowing about Mercedes' deception with respect to the comparatively and unlawfully high emissions of its BlueTEC Clean Diesel engine system in Polluting Vehicles. To be sure, Mercedes continues to market the Polluting Vehicles as "clean" diesels that have lower emissions than gasoline vehicles and also continues to claim that Polluting Vehicles comply with EPA emissions standards.

- 171 -

331. Within the time period of any applicable statutes of limitation, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Mercedes was concealing the conduct complained of herein and misrepresenting the Company's true position with respect to the emission qualities of the Polluting Vehicles.

332. Plaintiffs and the other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Mercedes did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Mercedes had concealed information about the true emissions of the Polluting Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiffs and other Class members have disclosed that Mercedes valued profits over truthful marketing and compliance with law.

333. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Polluting Vehicles.

**B. Fraudulent concealment tolling.**

334. All applicable statutes of limitation have also been tolled by Mercedes' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

335. Instead of disclosing its emissions scheme, or that the quality and quantity of emissions from the Polluting Vehicles were far worse than represented, and of its disregard of law, Mercedes falsely represented that the Polluting Vehicles had emissions cleaner than their gasoline powered counterparts, complied with federal and state emissions standards, that the diesel engines were "Clean," and that it was a reputable manufacturer whose representation could be trusted.

## C.     Estoppel.

336.     Mercedes was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of emissions from the Polluting Vehicles, and of those vehicles' emissions systems.

337.     Mercedes knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the emissions systems, and the emissions, of the Polluting Vehicles.

338.     Based on the foregoing, Mercedes is estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLASS ALLEGATIONS

339.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class and subclasses (collectively, the "Classes"):

### THE NATIONWIDE RICO CLASS

All persons or entities in the United States who owned and or leased an "Polluting Vehicle " as of February 18, 2016.  Polluting Vehicles include, without limitation, the diesel-powered: ML 320, ML 350, GL 320, E320, S350, R320, E Class, GL Class, ML Class, R Class, S Class, GLK Class, GLE Class, and Sprinter.

### THE NATIONWIDE UNFAIR AND DECEPTIVE PRACTICES ACT CLASS

All persons or entities in the United States who owned and or leased an "Polluting Vehicle " as of February 18, 2016.  Polluting Vehicles include, without limitation, the diesel-powered: ML 320, ML 350, GL 320, E320, S350, R320, E Class, GL Class, ML Class, R Class, S Class, GLK Class, GLE Class, and Sprinter.

### THE ALABAMA SUBCLASS

All persons or entities in the state of Alabama who owned and/or leased an Polluting Vehicle as of February 18, 2016.

- 173 -

**THE CALIFORNIA SUBCLASS**

All persons or entities in the state of California who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE COLORADO SUBCLASS**

All persons or entities in the state of Colorado who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE CONNECTICUT SUBCLASS**

All persons or entities in the state of Connecticut who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE GEORGIA SUBCLASS**

All persons or entities in the state of Georgia who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE IDAHO SUBCLASS**

All persons or entities in the state of Idaho who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE ILLINOIS SUBCLASS**

All persons or entities in the state of Illinois who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE INDIANA SUBCLASS**

All persons or entities in the state of Indiana who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE MARYLAND SUBCLASS**

All persons or entities in the state of Maryland who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE MASSACHUSETTS SUBCLASS**

All persons or entities in the state of Massachusetts who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE MINNESOTA SUBCLASS**

All persons or entities in the state of Minnesota who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE MISSISSIPPI SUBCLASS**

All persons or entities in the state of Mississippi who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE MISSOURI SUBCLASS**

All persons or entities in the state of Missouri who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE NEVADA SUBCLASS**

All persons or entities in the state of Nevada who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE NEW JERSEY SUBCLASS**

All persons or entities in the state of New Jersey who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE NEW YORK SUBCLASS**

All persons or entities in the state of New York who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE NORTH CAROLINA SUBCLASS**

All persons or entities in the state of North Carolina who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE OHIO SUBCLASS**

All persons or entities in the state of Ohio who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE PENNSYLVANIA SUBCLASS**

All persons or entities in the state of Pennsylvania who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE SOUTH CAROLINA SUBCLASS**

All persons or entities in the state of South Carolina who owned and/or leased an Polluting Vehicle as of February 18, 2016.

**THE TEXAS SUBCLASS**

All persons or entities in the state of Texas who owned and/or leased an Polluting Vehicle as of February 18, 2016.

010585-11/1108566 V1

### THE UTAH SUBCLASS

All persons or entities in the state of Utah who owned and/or leased an Polluting Vehicle as of February 18, 2016.

### THE VIRGINIA SUBCLASS

All persons or entities in the state of Virginia who owned and/or leased an Polluting Vehicle as of February 18, 2016.

### THE WASHINGTON SUBCLASS

All persons or entities in the state of Washington who owned and/or leased an Polluting Vehicle as of February 18, 2016.

### THE WEST VIRGINIA SUBCLASS

All persons or entities in the state of West Virginia who owned and/or leased an Polluting Vehicle as of February 18, 2016.

### THE WISCONSIN SUBCLASS

All persons or entities in the state of Wisconsin who owned and/or leased an Polluting Vehicle as of February 18, 2016.

340.    Excluded from the Class and each Subclass are individuals who have personal injury claims resulting from the high emissions in the BlueTEC Clean Diesel system of Polluting Vehicles. Also excluded from the Class are Mercedes and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family.   Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

341.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

342.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

343.   **Numerosity**.  Federal Rule of Civil Procedure 23(a)(1):  The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are over two hundred thousand members of the Class, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from Mercedes' books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

344.   **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a)   Whether Mercedes and Bosch engaged in the conduct alleged herein;

b)   Whether Mercedes designed, advertised, marketed, distributed, leased, sold, or otherwise placed Polluting Vehicles into the stream of commerce in the United States;

c)   Whether the BlueTEC Clean Diesel engine system in the Polluting Vehicles emit pollutants at levels that do not make them "clean" diesels and that do not comply with U.S. EPA requirements;

d)   Whether Mercedes knew about the comparatively and unlawfully high emissions and, if so, how long Mercedes has known;

e)   Whether Mercedes and Bosch knew about the defeat device and, if so, how long have they known;

f)   Whether Bosch designed and manufactured a defeat device;

g)   Whether Bosch supplied the defeat device to Mercedes with the knowledge that Mercedes would use it in the production of Polluting Vehicles;

h)   Whether Bosch acted in concert with Mercedes and aided and abetted Mercedes' fraud;

i)   Whether Mercedes designed, manufactured, marketed, and distributed Polluting Vehicles with defective or otherwise inadequate emission controls;

- 177 -

j)      Whether Mercedes' and Bosch's conduct violates RICO and consumer protection statutes and constitutes fraudulent concealment as asserted herein;

k)      Whether Plaintiffs and the other Class members overpaid for their Polluting Vehicles and/or did not receive the benefit of the bargain;

l)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

345.    **Typicality:**    Federal Rule of Civil Procedure 23(a)(3):    Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Mercedes' wrongful conduct as described above.

346.    **Adequacy**:    Federal Rule of Civil Procedure 23(a)(4):    Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

347.    **Declaratory Relief**:  Federal Rule of Civil Procedure 23(b)(2):  Mercedes has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate declaratory relief, with respect to each Class as a whole.

348.    **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Mercedes, so it would be impracticable for the members of the Classes to individually seek redress for Mercedes' wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.   Individualized litigation creates a potential for inconsistent or

- 178 -

contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   CLAIMS

A.   **Claims brought on behalf of the nationwide RICO class.**

### COUNT I

### VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) VIOLATION OF 18 U.S.C. § 1962(C) - (D)

349.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

350.   Plaintiffs bring this Count individually and on behalf of the Nationwide RICO Class against Defendants Mercedes-Benz USA, LLC, Daimler AG, Robert Bosch GmbH, and Robert Bosch LLC (collectively, "RICO Defendants").

351.   The RICO Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

352.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate."

353.   For many years now, the RICO Defendants have aggressively sought to increase the sales of Polluting Vehicles in an effort to bolster revenue, augment profits and increase Mercedes' share of the diesel vehicle market.  Finding it impossible to achieve their goals lawfully, however, the RICO Defendants resorted instead to orchestrating a fraudulent scheme and conspiracy.  In

particular, the RICO Defendants, along with other entities and individuals, created and/or participated in the affairs of an illegal enterprise ("Emissions Fraud Enterprise") whose direct purpose was to deceive the regulators and the public into believing the Polluting Vehicles were "clean diesels."  As explained in greater detail below, the RICO Defendants' acts in furtherance of the Emissions Fraud Enterprise violate § 1962(c) and (d).

### 1.   The members of the emissions fraud enterprise.

354.   Upon information and belief, the Emissions Fraud Enterprise consisted of the following entities and individuals:  Mercedes-Benz USA, LLC, Daimler AG, Robert Bosch GmbH, and Robert Bosch LLC.

355.   Robert Bosch GmbH and Robert Bosch LLC tested, manufactured, and sold the electronic control module ("ECM") that managed the emissions control system used by Mercedes in the Polluting Vehicles.  This particular ECM is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17").[68]

356.   Defendant Bosch GmbH is a multinational engineering and electronics company headquartered in Gerlingen, Germany, which has hundreds of subsidiaries and companies.  It wholly owns defendant Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan.  As explained above, Bosch's sectors and divisions are grouped by subject matter, not location.  The Mobility Solutions (formerly Automotive Technology) is the Bosch sector at issue, particularly its Diesel Services division, and it encompasses employees of Bosch GmbH and Bosch LLC.  These individuals were responsible for the design, manufacture, development, customization, and supply of the defeat device to Mercedes for use in the Polluting Vehicles.

---

[68] http://www.bosch-presse.de/presseforum/details.htm?txtID=7421&tk_id=108.

357.    Bosch worked with Mercedes, Volkswagen, GM, and Fiat Chrysler (FCA) to develop and implement a specific and unique set of software algorithms to surreptitiously evade emissions regulations.  Bosch customized their EDC Unit 17s for installation in the Polluting Vehicles with unique software code to detect when it was undergoing emissions testing, as described above, and did so for other vehicles with defeat devices in Volkswagen and FCA vehicles.[69]

358.    Bosch, Bosch GmbH, and Bosch LLC's conduct with respect to Volkswagen and other manufacturers, adds plausibility to its participation in the enterprise described herein.  For example, Bosch was well aware that the EDC Unit 17 would be used by automobile manufacturers, including Mercedes, to cheat on emissions testing.  Each Bosch entity was also critical to the concealment of the defeat device in communications with U.S.  regulators and went even further to actively lobby U.S.  lawmakers on behalf of Volkswagen and its "clean diesel" vehicles.

359.    EDC Unit 17 could not effectively lower NOx emissions to legal levels during normal operating conditions.  In order to pass the emissions test, then, EDC Unit 17 is equipped with a "defeat device," which is software that allows the vehicle to determine whether it is being operated under normal conditions or testing conditions.

360.    The EDC 17 ECU was manufactured by Bosch GmbH and sold to Mercedes.  Bosch built the ECU hardware and developed the software running in the ECU.  Bosch developed a "function sheet" that documents the functional behavior of a particular release of the ECU firmware.  All function sheets used in the Mercedes EDC, on information and belief, bear a "Robert Bosch GmbH" copyright.

---

[69] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver (Nov.  23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software.

361.   As was publicly reported, the Bosch Defendants, seeking to conceal their involvement in the unlawful Emissions Fraud Enterprise, sent a letter to Volkswagen AG in 2007 stating that Volkswagen Diesels could not be lawfully operated if the LNT or SCR after- treatment system was disabled.[70]  The exact same logic applies to the Mercedes Polluting Vehicles.

362.   Indeed, notwithstanding their knowledge that the Volkswagen Diesels could not be lawfully operated if the emissions system was disabled, the Bosch Defendants, driven to cement their position as a leading supplier of diesel emissions equipment, went on to sell approximately eleven million EDC Unit 17s to Volkswagen over an eight year period, and sold hundreds of thousands of EDC Unit 17s to Mercedes for use in Polluting Vehicles.[71]

363.   The persons and entities described in the preceding section are members of and constitute an "association-in-fact" enterprise.

364.   At all relevant times, the Emissions Fraud Enterprise:  (a) had an existence separate and distinct from each Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing organization consisting of legal entities, including the Mercedes Defendants, the Bosch Defendants, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Polluting Vehicles through fraudulent COCs and EOs, false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities.  Each member of the Emissions Fraud Enterprise shared in the bounty generated by the

---

[70] Stef Shrader, *Feds Are Now Investigating Volkswagen Supplier Bosch Over Dieselgate*, Jalopnik (Nov. 19, 2015), http://jalopnik.com/feds-are-now-investigating-volkswagen-supplier-bosch-ov-1743624448.

[71] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software.

enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud consumers and franchise dealers alike nationwide.[72]

365.    The Emissions Fraud Enterprise functioned by selling vehicles and component parts to the consuming public.  Many of these products are legitimate, including vehicles that do not contain defeat devices.  However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in- fact with the Enterprise's activities through the illegal scheme to sell the Polluting Vehicles.

366.    The Emissions Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Polluting Vehicles throughout the country, and the receipt of monies from the sale of the same.

367.    Within the Emissions Fraud Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis.  The Emissions Fraud Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Polluting Vehicles to the general public nationwide.

368.    Each participant in the Emissions Fraud Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the Emissions Fraud Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

---

[72] Volkswagen sold more Polluting Vehicles by utilizing an emissions control system that was cheaper than SCRs, all the while charging consumers a premium for purportedly "clean," "environmentally friendly" and "fuel efficient" vehicles.  Bosch, in turn, sold more EDC Units because Volkswagen manufactured and sold more Polluting Vehicles.

369.    The RICO Defendants participated in the operation and management of the Emissions Fraud Enterprise by directing its affairs, as described herein.   While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

370.    Mercedes and Daimler exerted substantial control and participated in the affairs of the Emissions Fraud Enterprise by:

    a.    Designing the Polluting Vehicles with defeat devices;

    b.    Failing to correct or disable the defeat devices when warned;

    c.    Manufacturing, distributing, and selling the Polluting Vehicles that emitted greater pollution than allowable under the applicable regulations;

    d.    Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

    e.    Introducing the Polluting Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

    f.    Concealing the existence of the defeat devices and the unlawfully high emissions from regulators and the public;

    g.    Persisting in the manufacturing, distribution, and sale of the Polluting Vehicles even after questions were raised about the emissions testing and discrepancies concerning the same;

    h.    Misleading government regulators as to the nature of the defeat devices and the defects in the Polluting Vehicles;

    i.    Misleading the driving public as to the nature of the defeat devices and the defects in the Polluting Vehicles;

    j.    Designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

    k.    Otherwise misrepresenting or concealing the defective nature of the Polluting Vehicles from the public and regulators; and

    l.    Illegally selling and/or distributing the Polluting Vehicles; collecting

revenues and profits from the sale of such products; and ensuring that the other RICO Defendants and unnamed co-conspirators complied with the fraudulent scheme.

371. Each Bosch entity also participated in, operated and/or directed the Emissions Fraud Enterprise. Bosch GmbH participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 which operated as a "defeat device" in the Polluting Vehicles. Bosch GmbH exercised tight control over the coding and other aspects of the defeat device software and closely collaborated with Mercedes to develop, customize, and calibrate the defeat devices. Additionally, each Bosch entity continuously cooperated with Mercedes to ensure that the EDC Unit 17 was fully integrated into the Polluting Vehicles. Bosch LLC also participated in the affairs of the Enterprise by concealing the defeat devices on U.S. documentation and in communications with U.S. regulators. The Bosch entities collected tens of millions of dollars in revenues and profits from the hidden defeat devices installed in the Polluting Vehicles.

372. Without the RICO Defendants' willing participation, including each of the Bosch entities active involvement in developing and supplying the critical defeat devices for the Polluting Vehicles, the Emissions Fraud Enterprise's scheme and common course of conduct would not have been successful.

373. The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

374. The members of the Emissions Fraud Enterprise all served a common purpose; namely, to outsell their law-abiding competitors and increase their revenues through the sale of as many Polluting Vehicles (including the emissions components made and sold by Bosch) as possible. Each member of the Emissions Fraud Enterprise shared the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud.

Mercedes sold more Polluting Vehicles by utilizing an emissions control system that was cheaper to install and allowed for generous performance and efficiency tuning, all the while charging consumers a premium for purportedly "clean," "environmentally friendly" and "fuel efficient" Polluting Vehicles. The Bosch Defendants, in turn, sold more EDC Units because Mercedes manufactured and sold more Polluting Vehicles. The RICO Defendants achieved their common purpose by repeatedly misrepresenting and concealing the nature of the Polluting Vehicles and the ability of the emissions control systems (including the Bosch-supplied parts) to effectively reduce toxic emissions during normal operating conditions.

375. The RICO Defendants continued their enterprise even after the Volkswagen scandal became public in September 2015. Mercedes continued to manufacture and sell 2016 Polluting Vehicles. Assuming top executives at Mercedes did not know of the defeat devices in its vehicles (an assumption not true of Volkswagen or Bosch), a responsible chief executive would have inquired: Do we have a diesel problem? Either top executives at Mercedes failed to ask questions or they agreed to continue a cover-up because Mercedes did not stop selling Polluting Vehicles and has continued to conceal the truth.

376. Indeed, on April 7, 2016, plaintiffs' counsel, shortly after filing this litigation, sent a letter to the Chairman of the Board of Daimler AG requesting a prompt meeting to work on a remediation plan to protect the public health:



T 206.623.7292   F 206.623.0594

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 EIGHTH AVENUE, SUITE 3300
SEATTLE, WA 98101
www.hbsslaw.com
**Direct (206) 268-9320**
steve@hbsslaw.com

April 7, 2016

Dr. Dieter Zetsche
Chairman of the Board of Management of Daimler AG, Head of Mercedes-Benz
Daimler AG
70546 Stuttgart, Germany

Re:   **Mercedes-Benz Dirty Diesel**

Dear Dr. Zetsche:

At a 2007 auto show in Washington, D.C., you urged Americans to rethink diesel. You told us that BlueTEC reduces NOx emissions by 90%. You told us that BlueTEC was an ultra-modern, "clean" diesel technology. And then—in the same breath that you criticized the Environmental Protection Agency's CAFE standards—you boasted that your BlueTEC vehicles met 2010 emissions standards three years ahead of schedule, and for all 50 states. You lied.

For almost a decade, Mercedes has perpetuated the myth of the "world's cleanest diesel." Mercedes calls BlueTEC-equipped vehicles the "greenest . . . in the land," "[e]arth-friendly, around the world," and "respectful of the earth." Mercedes portrays these vehicles under clear blue skies and even calls BlueTEC emissions "pure, earth-friendly nitrogen and water." In one BlueTEC advertisement, two rear mufflers sit side-by-side, as though they are a set of human lungs; below, Mercedes tells us that BlueTEC is "[f]or the air we breathe."

Far from "pure, earth-friendly nitrogen and water," BlueTEC-equipped vehicles emit NOx at dangerous levels—many times higher than the U.S. Environmental Protection Agency permits. During virtually all real-world driving conditions, we found that Mercedes BlueTEC technology scarcely achieves any meaningful reduction of NOx emissions. Our equipment has recorded levels of NOx emissions between 4.5 and 30.8 times the legal limit in real-world driving conditions.

Not only has Mercedes violated the Clean Air Act, defrauded consumers, and engaged in unfair competition under state and federal law, you have put the health of Americans in jeopardy. NOx emissions have been linked to increased asthma and other respiratory illnesses. In places like California, where smog is a serious public health concern, NOx-emitting dirty-diesels worsen smog. And according to the EPA, exposure

SEATTLE  BOSTON  CHICAGO  COLORADO SPRINGS  LOS ANGELES  NEW YORK  PHOENIX  SAN DIEGO  SAN FRANCISCO  WASHINGTON, D.C.

010585-11/1108566 V1

April 7, 2016
Page 2

to NOx can lead to hospitalization and premature death from respiratory and heart conditions. Our children and elderly are particularly vulnerable.

We have uncovered your deception. Now it is time for you to do right by your customers, the U.S. government, and the American people. Admit your deception. Fix your dirty-diesel engines. And compensate your customers for the fraud you have committed.

Every day I hear from another Mercedes customer who feels betrayed by your scam. Because of your deception, Mercedes customers who care deeply about air quality and the environment have purchased BlueTEC vehicles. Unwittingly, they have been releasing dangerous amounts of NOx into the atmosphere. I represent these customers in lawsuits that have been filed here in the United States.

As you have said about sustainability at Mercedes, there is still much more to do. Correcting this fraud should be priority-one. To that end, I invite you to sit down with me in the next two weeks to craft a remediation plan. I believe we can work together to create a comprehensive remedy that compensates your customers fairly and allows Mercedes to move forward after this shameful deception.

Sincerely,

HAGENS BERMAN SOBOL SHAPIRO LLP

Steve W. Berman

SWB:jt

377.    Dr. Dieter Zetsche did not respond, and unlike Volkswagen, Mercedes has continued to stonewall regarding its emissions deception.

**2.      The predicate acts.**

378.    To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants conducted or participated in the conduct of the affairs of the Emissions Fraud Enterprise through a pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

379.    Specifically, the RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce.

- 188 -

380.    The RICO Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

   a.    Application for certificates submitted to the EPA and CARB;

   b.    The Polluting Vehicles themselves;

   c.    Component parts for the defeat devices;

   d.    Essential hardware for the Polluting Vehicles;

   e.    Falsified emission tests;

   f.    Fraudulently-obtained EPA COCs and CARB EOs;

   g.    Vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

   h.    Documents and communications that facilitated the falsified emission tests;

   i.    False or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

   j.    Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Polluting Vehicles;

   k.    Documents intended to facilitate the manufacture and sale of the Polluting Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

   l.    Documents to process and receive payment for the Polluting Vehicles by unsuspecting franchise dealers, including invoices and receipts;

   m.    Payments to Bosch entities;

   n.    Deposits of proceeds; and

   o.    Other documents and things, including electronic communications.

381.    In particular, the use of the wires and mails included the following applications for certification filed with the EPA:

**2016 MY GL 350 Bluetec 4MATIC; GLE 350 D 4MATIC:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=35797&flag=1

**2016 E250 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34975&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34976&flag=1

**2015 E250 Bluetec; GLK 250 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34033&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34034&flag=1

**2015 ML 250:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34040&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34043&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34042&flag=1

**2015 ML 350; GL 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=33471&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34457&flag=1

**2014 GLK 250 Bluetec, E 250 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=31616&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=31617&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=31618&flag=1 Update
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=31620&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=31619&flag=1

**2014 GL 350 Bluetec, ML 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=31627&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=31629&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=31628&flag=1

**2013 GL 350 Bluetec, ML 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29896&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29898&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29897&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29899&flag=1

**2013 R 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29184&flag=1

**2013 GL 3505 Bluetec, ML 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29185&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29186&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29187&flag=1

- 190 -

**2013 S 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29198&flag=1

**2013 E 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=29900&flag=1

**2012 ML 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=27527&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=27528&flag=1

**2012 GL 350 Bluetec, R 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=27529&flag=1

**2012 S 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=27533&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=27534&flag=1

**2012 E 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=27535&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=27537&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=27536&flag=1

**2011 ML 350 Bluetec, R 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=23987&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=23988&flag=1

**2011 GL 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=23989&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=23990&flag=1

**2011 E 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=23996&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=23997&flag=1

**2010 ML 350 Bluetec, R 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=25006&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=25008&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=25007&flag=1

**2010 GL 350 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=25009&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=25011&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=25010&flag=1

- 191 -

**2009 ML 320 Bluetec, R 320 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=19981&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=19982&flag=1

**2009 GL 320 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=19983&flag=1 Update:
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=19984&flag=1

**2009 E 320 Bluetec:**
https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=19987&flag=1

**2007 E320 Bluetec:** https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=14695&flag=1

382.    In each of the applications for certification, Mercedes and Daimler used the wires and mails to make specific false statements regarding NOx test results.  Each Bosch entity was aware that these applications were being made by Mercedes.

383.    The RICO Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

384.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.  Specifically, Mercedes made misrepresentations about the Polluting Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

385.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Polluting Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Polluting Vehicles were "clean" diesel cars.

386.     Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.  However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.  They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

387.     The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein.  Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

388.     The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

389.     To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness and emission dangers of the Polluting Vehicles and obfuscated the true nature of the defect even after regulators raised concerns.  The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the defeat devices present in the Polluting Vehicles.

390.     The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course

of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Polluting Vehicles (and the defeat devices contained therein).

391.    Indeed, for the conspiracy to succeed each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics—specifically complete secrecy about the defeat devices in the Polluting Vehicles.

392.    The RICO Defendants knew and intended that government regulators, as well as Plaintiff and Class members, would rely on the material misrepresentations and omissions made by them about the Polluting Vehicles.  The RICO Defendants knew and intended Plaintiffs and the Class would incur costs and damages as a result.  As fully alleged herein, Plaintiffs and the Class relied upon Defendants' representations and omissions that were made or caused by them. Plaintiffs' reliance is made obvious by the fact that they purchased or leased tens of thousands of vehicles that never should have been introduced into the U.S. stream of commerce and whose worth is far less.  In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material omissions made or caused to be made by the RICO Defendants; otherwise Mercedes could not have obtained valid COCs and EOs to sell the Polluting Vehicles.

393.    The RICO Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and the Class were harmed as a result of the RICO Defendants' intentional conduct. Plaintiffs, the Class, regulators and consumers, among others, relied on the RICO Defendants' material misrepresentations and omissions.

394.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for many years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and other Class members and obtaining significant monies and revenues from them and through them while

providing Polluting Vehicles worth significantly less than the invoice price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

395.   The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and the Class, and consumers. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Emissions Fraud Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds, artificially inflating the brand and dealership goodwill values, and avoiding the expenses associated with remediating the Polluting Vehicles.

396.   During the design, manufacture, testing, marketing and sale of the Polluting Vehicles, the RICO Defendants shared technical, marketing and financial information that plainly revealed the emissions control systems in the Polluting Vehicles as the ineffective, illegal and fraudulent piece of technology they were and are. Nevertheless, the RICO Defendants shared and disseminated information that deliberately represented Polluting Vehicles as "clean," "environmentally friendly," and "fuel efficient."

397.   By reason of and as a result of the conduct of the RICO Defendants, and, in particular, its pattern of racketeering activity, Plaintiffs and the Class have been injured in multiple ways, including, but not limited to:

> a.   Overpayment for Polluting Vehicles, in that Plaintiffs and the Class at the time of purchase believed they were paying for vehicles that met certain emission and fuel efficiency standards and obtained vehicles that did not meet these standards and were worth less than what was paid;

b.      The value of the Polluting Vehicles has diminished, thus reducing their sale and resale value, and has resulted in a loss of property for Plaintiffs and the Class; and

c.      Plaintiffs have been wrongfully deprived of their property in that the price for their vehicles was artificially inflated by deliberate acts of false statements, omissions and concealment and by Defendants' acts of racketeering.

398.    The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).  Each of the RICO defendants knew, understood and intended for members of the Class to purchase the Polluting Vehicles, and knew, understood, and foresaw that revelation of the truth would injure members of the Class.

**B.      Claims brought on behalf of the nationwide Unfair and Deceptive Practices Act Class and the New Jersey Subclass under New Jersey law.**

## COUNT I

**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J.S.A.. §§ 56:8-1, *ET SEQ.*)**

399.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

400.    Plaintiffs bring this Count on behalf of the Nationwide Unfair and Deceptive Practices Class and New Jersey Subclass.

401.    The New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, et seq. ("NJ CFA"), declares that "[t]he act, use or employment by any person of any unconscionable commercial

practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate . . . whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice….."  N.J.S.A. §§ 56:8-2.

402.    Mercedes is a "person" pursuant to N.J.S.A. § 56:8-1(d).

403.    Bosch is a "person" pursuant to N.J.S.A.  § 56:8-1(d).

404.    The Polluting Vehicles are considered "merchandise," which includes any objects, goods and commodities offered, directly or indirectly, to the public for sale.  N.J.S.A. § 56:8- 1(c).

405.    "Sale" includes "any sale, rental or distribution, offer for sale,  rental or distribution or attempt directly or indirectly to sell, rent or distribute," N.J.S.A. § 56:8-1(e), and therefore includes Mercedes' sale of Polluting Vehicles.

406.    In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above, all with the intent that consumers rely upon these omissions of material facts.  Accordingly, Mercedes has used an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, and the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of merchandise. In the course of its business Bosch was aware that Mercedes was promoting the sale of class vehicles as "clean diesel" and that the environmental quality and emissions of class vehicles

- 197 -

were material to reasonable consumers.  Bosch knew that Mercedes was concealing the true nature of the class vehicles' operation and emissions controls.  Bosch also engaged in promoting and creating a market for "clean diesel."  Accordingly, Bosch has used an unconscionable commercial practice, deception, fraud, false pretense, and engaged in the concealment, suppression or omission of material fact with intent that others rely upon such concealment or omission, in connection with the sale or advertisement of merchandise.  Further, Defendants' acts and practices described herein offend established public policy because the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Defendants fraudulently concealed the defective nature of the Polluting Vehicles from consumers.

407. Mercedes' and Bosch's actions as set forth above occurred in the conduct of trade or commerce.

408. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

409. Defendants intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Class and Subclass.

410. Defendants knew or should have known that its conduct violated the New Jersey CFA.

411. Defendants owed Plaintiffs and the Class and Subclass a duty to disclose the truth about their emissions systems manipulation because they:

      a.    Possessed exclusive knowledge that they jointly manipulated the emissions system in the Polluting Vehicles to turn off or limit the emission systems' effectiveness in normal driving conditions;

      b.    Intentionally concealed the foregoing from Plaintiffs and the Class and Subclass; and/or

- 198 -

      c.     Made incomplete representations about the emissions system because they had jointly manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Class and Subclass that contradicted these representations.

412.   Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiffs, Subclass members, and to the public, Defendants had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Defendants' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

413.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

414.   Defendants' conduct proximately caused injuries to Plaintiffs and the other Class and Subclass members.

415.    Plaintiff and the other Class and Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs and the other Class and Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

416.    Each Plaintiff and the other Class and Subclass members has suffered an ascertainable loss, namely the difference between the value of what they believed they were purchasing and the value of what they received.  While the precise amount of that loss will be the subject of expert analysis, based on market prices reflecting the value consumers place on "Clean Diesel" Plaintiffs allege that the difference in value is at least 10% of the purchase price.  Plaintiffs anticipate relying on expert analyses, including conjoint analyses of the value consumers place on different product attributes and vehicles with and without certain attributes (including vehicles that have emissions controls that turn on and off and those that are not manipulated), as well as a standard statistical analysis concerning the impact of different attributes on consumers' "willingness to pay."  This analysis will quantify at trial the exact amount and such analysis allows for admissible proof of an ascertainable loss, which is alleged at this stage to be at least ten percent.

417.    Defendants' violations present a continuing risk to Plaintiff as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

418.    Pursuant to N.J.S.A. § 56:8-20, Plaintiffs will serve the New Jersey Attorney General with a copy of this Complaint within 10 days of filing.

010585-11/1108566 V1

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON NEW JERSEY LAW)

419.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

420.   Plaintiffs bring this Count on behalf of the Nationwide Unfair and Deceptive Practices Class and New Jersey Subclass, against Mercedes and Bosch.

421.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

422.   Mercedes further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

423.   Mercedes and Bosch knew these representations were false when made.

424.   The Polluting Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

010585-11/1108566 V1

425.     Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiffs and the other Class members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

426.     As alleged in this Complaint, at all relevant times, Mercedes, with Bosch's knowledge and assistance, has held out the Polluting Vehicles to be reduced emissions vehicles. Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

427.     The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiffs and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Subclass members.

428.     Plaintiffs and Subclass members reasonably relied upon Defendants' deception. They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiff and Subclass members did not, and could not, unravel Defendants' deception on their own.  Rather, Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

429.    Defendants also concealed and suppressed material facts concerning what is evidently the true culture of Defendants—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

430.    Defendants' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and  also because the representations played a significant role in Plaintiffs' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Defendants well knew, its customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

431.    Defendants had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Defendants, because Defendants had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members.  Defendants also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Subclass members, Defendants had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles

- 203 -

purchased or leased by Plaintiffs and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

432.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiffs and Subclass members.

433.    Defendants have still not made full and adequate disclosures, and continues to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

434.    Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

435.    Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they were deprived of the benefit of the bargain and overpaid at the point of sale, they own vehicles that are diminished in value as a result of Mercedes'

concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies.  Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

436.    Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

437.    Accordingly, Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

438.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

439.    Each Plaintiff and the other Class and Subclass members has suffered an ascertainable loss, namely the difference between the value of what they believed they were purchasing and the value of what they received.  While the precise amount of that loss will be the

subject of expert analysis, based on market prices reflecting the value consumers place on "Clean Diesel" (including as a price premium for Clean Diesel vehicles versus comparable gasoline vehicles), Plaintiffs allege that the difference in value is at least 10% of the purchase price.  Plaintiffs also anticipate relying on expert analyses, including conjoint analyses of the value consumers place on different product attributes and vehicles with and without certain attributes (including vehicles that have emissions controls that turn on and off and those that are not manipulated), as well as a standard statistical analysis concerning the impact of different attributes on consumers' "willingness to pay."

**C.     Claims brought on behalf of the Alabama Subclass.**

## COUNT I

### VIOLATIONS OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALA. CODE §§ 8-19-1, *ET SEQ.*)

440.    Plaintiff Walter Louis, Jr. (Plaintiff for purposes of all Alabama Subclass Counts) incorporate by reference all paragraphs as though fully set forth herein.

441.    Plaintiff brings this Count on behalf of the Alabama Subclass.

442.    Plaintiff and the Subclass members are "consumers" within the meaning of ALA. CODE § 8-19-3(2).

443.    Plaintiff, the Subclass members, and Mercedes are "persons" within the meaning of ALA. CODE § 8-19-3(5).

444.    The Polluting Vehicles are "goods" within the meaning of ALA. CODE § 8-19-3(3).

445.    Mercedes was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

446.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including:   "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5.

447.    In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, that the Polluting Vehicles emitted far more pollution than gasoline powered vehicles, and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above. Accordingly, Mercedes engaged in unfair and deceptive trade practices, including representing that the Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Polluting Vehicles are of a particular standard and quality when they are not; advertising the Polluting Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.   Further, Mercedes' acts and practices described herein offend established public policy because the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Mercedes fraudulently concealed the defective nature of the Polluting Vehicles from consumers.

448.    In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions

controls were defective, that the Polluting Vehicles emitted far more pollution than gasoline powered vehicles, and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above.

449.    Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.    They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

450.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

451.    Mercedes knew or should have known that its conduct violated the Alabama DTPA.

452.    Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

   a.    Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

   b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

   c.    Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

453.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because,

having volunteered to provide  information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

454.    Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

455.    Mercedes' conduct proximately caused injuries to Plaintiffs and  the  other Subclass members.

456.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

457.    Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

458.    Pursuant to ALA. CODE § 8-19-10(a), Plaintiff and the Subclass seek monetary relief against Mercedes measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) $100 for each Plaintiff and each Subclass member, in addition to treble damages.

459.    Plaintiff and the Subclass also seek declaratory relief, attorneys' fees, and any other just and proper relief available under the Alabama DTPA.

460.    Plaintiff has made a demand in satisfaction of ALA. CODE § 8-19-3.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON ALABAMA LAW)

461.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

462.    This claim is brought on behalf of the Alabama Subclass, against Mercedes and Bosch.

463.    Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles, and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

464.    Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

465.    Mercedes knew these representations were false when made.

466.    Bosch GmbH and LLC were aware of Mercedes representations.

- 210 -

467.    The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel, and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

468.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer, and were unreliable, because Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

469.    As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions, vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

470.    The truth about the defective emissions controls and Mercedes' manipulations of those controls, was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts, and Mercedes actively concealed these facts from Plaintiff and Subclass members.

471.    Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

472.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

473.    Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

474.    Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars, which were misleading, deceptive, and incomplete without

the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

475.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

476.    Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

477.    Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified.

Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

478.    Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

479.    The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

480.    Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

481.     Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

482.     Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**D.     Claims brought on behalf of the California Subclass.**

## COUNT I

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*)

483.     Plaintiffs Catherine Roberts, Dr. Adrian Clive Roberts and Jorge Salvador Servin (Plaintiffs, for purposes of all California Subclass Counts) incorporate by reference all paragraphs as though fully set forth herein.

484.     This claim is brought on behalf of the California Subclass.

485.     California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq., proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

486.     Mercedes' conduct, as described herein, was and is in violation of the UCL. Mercedes' conduct violates the UCL in at least the following ways:

> i.     By failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions;
>
> ii.     By selling and leasing Polluting Vehicles that suffer from a defective emissions control system and that emit unlawfully high levels of pollutants under normal driving conditions;
>
> iii.     By knowingly and intentionally concealing from Plaintiffs and the other

- 215 -

Subclass members that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that the Polluting Vehicles suffer from a defective emissions control system and emit unlawfully high levels of pollutants under normal driving conditions;

iv.    By marketing the Polluting Vehicles as reduced emissions vehicles possessing functional and defect-free diesel engine systems;

vii.   By violating other California laws, including California consumer protection laws.

487.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

488.    In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above.

489.    Plaintiffs and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations. They had no way of knowing that Mercedes' representations were false and gravely misleading. As alleged herein, Mercedes engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.

490.    Mercedes knew or should have known that its conduct violated the UCL.

491.    Mercedes owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

a.     Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.     Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

- 216 -

      c.      Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

492.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

493.    Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

494.    Mercedes' conduct proximately caused injuries to Plaintiffs and  the  other Subclass members.

495.    Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive

the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

496.     Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

497.     Mercedes' misrepresentations and omissions alleged herein caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain defective BlueTEC Clean Diesel engine systems.

498.     Accordingly, Plaintiffs and the other Subclass members have suffered injury in fact, including lost money or property, as a result of Mercedes' misrepresentations and omissions.

499.     Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and members of the Subclass any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345; and for such other as may be appropriate.

### COUNT II

### VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE §§ 1750, *ET SEQ.*)

500.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

501.     This claim is brought on behalf of the California Subclass.

502.     California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken

by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

503.     The Polluting Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

504.     Plaintiffs and the other Subclass members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs, the other Subclass members, and Mercedes are "persons" as defined in Cal. Civ. Code § 1761(c).

505.     As alleged above, Mercedes made representations concerning the   benefits, efficiency, performance, and safety features of the BlueTEC Clean Diesel engine systems that were misleading.

506.     In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that the Polluting Vehicles were equipped with defective BlueTEC Clean Diesel engine systems.

507.     Mercedes' conduct, as described hereinabove, was and is in violation of the CLRA. Mercedes' conduct violates at least the following enumerated CLRA provisions:

     i.       Cal. Civ. Code § 1770(a)(2): Misrepresenting the approval or certification of goods;

     ii.      Cal. Civ. Code § 1770(a)(3): Misrepresenting the certification by another;

     iii.     Cal. Civ. Code § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

     iv.      Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

     v.       Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

     vi.      Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied

- 219 -

in accordance with a previous representation when they have not.

508.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

509.    In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect form a clean diesel, as described above.

510.    Plaintiffs and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.   Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.

511.    Mercedes knew or should have known that its conduct violated the CLRA.

512.    Mercedes owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

> a.    Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;
>
> b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or
>
> c.    Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

513.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles

were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

514.    Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified.  Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

515.    Mercedes' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

516.    Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

517.    Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

518.     Mercedes knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the BlueTEC Clean Diesel engine systems, and that the Polluting Vehicles were not suitable for their intended use.

519.     The facts concealed and omitted by Mercedes from Plaintiffs and the other Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Polluting Vehicles or pay a lower price. Had Plaintiffs and the other Subclass members known about the defective nature of the Polluting Vehicles, they would not have purchased or leased the Polluting Vehicles or would not have paid the prices they paid.

520.     Plaintiffs and the Subclass have provided Mercedes with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a).

521.     Plaintiff's and the other Subclass members' injuries were proximately caused by Mercedes' unlawful and deceptive business practices.

522.     Plaintiffs and the Subclass are entitled to recover actual and punitive damages under the CLRA pursuant to Civil Code § 1780(a), and an additional award of up to $5,000 to each Plaintiff and Subclass member who is a "senior citizen."

## COUNT III

### VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*)

523.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

524.     This claim is brought on behalf of the California Subclass.

525.     California Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or

disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

526. Mercedes caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Mercedes, to be untrue and misleading to consumers, including Plaintiffs and the other Subclass members.

527. Mercedes has violated § 17500 because the misrepresentations and omissions regarding the functionality, reliability, and environmental-friendliness of the Polluting Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

528. Plaintiffs and the other Subclass members have suffered an injury in fact, including the loss of money or property, as a result of Mercedes' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Polluting Vehicles, Plaintiffs and the other Subclass members relied on the misrepresentations and/or omissions of Mercedes with respect to the functionality, reliability, and environmental-friendliness of the Polluting Vehicles.  Mercedes' representations turned out not to be true because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the Polluting Vehicles are distributed with BlueTEC Clean Diesel engine systems that include defective emissions controls.  Had Plaintiffs and the other Subclass members known this, they would not have purchased or leased their Polluting Vehicles and/or paid as much for them.  Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

529.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Mercedes' business.  Mercedes' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

530.   Plaintiffs, individually and on behalf of the other Subclass members, request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and the other Subclass members any money Mercedes acquired by unfair competition, including restitution and/or restitutionary disgorgement and for such other relief as may be appropriate.

**COUNT IV**

**FRAUDULENT CONCEALMENT**
**(BASED ON CALIFORNIA LAW)**

531.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

532.   This claim is brought on behalf of the California Subclass, against Mercedes and Bosch.

533.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles, and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

534.   Mercedes further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

535.     Mercedes knew these representations were false when made, as did Bosch.

536.     The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

537.     Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel and, were unreliable, because Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

538.     As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions, vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

539.     The truth about the defective emissions controls and Mercedes' manipulations of those controls, was known only to Mercedes; Plaintiffs and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Subclass members.

010585-11/1108566 V1

540.    Plaintiffs and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.   As consumers, Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

541.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

542.    Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiffs' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

543.    Mercedes had a duty to disclose the emissions defect and, defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars, which were misleading, deceptive, and incomplete without

- 226 -

the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles are material concerns to a consumer.  Mercedes represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

544.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiffs and Subclass members.

545.    Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

546.    Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified.

Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

547.    Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

548.    The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

549.    Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

550.    Accordingly, Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

551.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**E.      Claims brought on behalf of the Colorado Subclass.**

### COUNT I

### VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT (COLO. REV. STAT. §§ 6-1-101, *ET SEQ.*)

552.    Plaintiffs Keith Hall and Susan Albers (Plaintiffs, for purposes of all Colorado Subclass Counts) incorporate by reference all paragraphs as though fully set forth herein.

553.    Plaintiffs bring this Count on behalf of the Colorado Subclass.

554.    Colorado's Consumer Protection Act (the "Colorado CPA") prohibits a person from engaging in a "deceptive trade practice," which includes knowingly making "a false representation as to the source, sponsorship, approval, or certification of goods," or "a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods."  COLO. REV. STAT. § 6-1-105(1)(b), (e). The Colorado CPA further prohibits "represent[ing] that goods … are of a particular standard, quality, or grade … if he knows or should know that they are of another," and "advertis[ing] goods … with intent not to sell them as advertised."  COLO. REV. STAT. § 6-1-105(1)(g), (i).

555.    Mercedes is a "person" under § 6-1-102(6) of the Colorado CPA, COL. REV. STAT. § 6-1-101, et seq.

556.     Plaintiffs and Colorado Subclass members are "consumers" for the purpose of COL. REV. STAT. § 6-1-113(1)(a) who purchased or leased one or more Polluting Vehicles.

557.     In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, that the Polluting Vehicles emitted far more pollution than gasoline powered vehicles, and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above. Accordingly, Mercedes engaged in unfair and deceptive trade practices, including representing that the Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Polluting Vehicles are of a particular standard and quality when they are not; advertising the Polluting Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.  Further, Mercedes' acts and practices described herein offend established public policy because the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Mercedes fraudulently concealed the defective nature of the Polluting Vehicles from consumers.

558.     In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, that the Polluting Vehicles emitted far more pollution than gasoline powered vehicles, and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above.

559.     Plaintiffs and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing   that Mercedes'

representations were false and gravely misleading.  As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.

560.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

561.    Mercedes knew or should have known that its conduct violated the Colorado CPA.

562.    Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

563.    Mercedes owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

   a.    Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

   b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

   c.    Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

564.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide  information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

565.    Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

566.    Mercedes' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

567.    Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

568.    Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public.   Mercedes' unlawful acts and practices complained of herein affect the public interest.

569.    Pursuant to COL. REV. STAT. § 6-1-113, Plaintiffs and the Subclass seek monetary relief against Mercedes measured as the greater of (a) actual damages in an amount to be determined at trial and the discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff and each Subclass member.

570.    Plaintiffs and the Subclass also seek declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON COLORADO LAW)

571.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

572.    This claim is brought on behalf of the Colorado Subclass, against Mercedes and Bosch.

573.    Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

574.    Mercedes further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low emission vehicles, and would perform and operate properly when driven in normal usage.

575.    Mercedes knew these representations were false when made.

576.    The Polluting Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

577.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles

were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

578.   As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

579.   The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiffs and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Subclass members.

580.   Plaintiffs and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

581.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe

they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

582. Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiffs' decision to purchase the Polluting Vehicles and establishing the value of the vehicles. As Mercedes well knew, its customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

583. Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer. Mercedes represented to Plaintiffs and Subclass

members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

584.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiffs and Subclass members.

585.    Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

586.    Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

587.    Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies.

Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

588.    The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

589.    Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

590.    Accordingly, Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

591.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

F.    **Claims brought on behalf of the Connecticut Subclass.**

## COUNT I

### VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. ANN. §§ 42-110A, *ET SEQ.*)

592.    Plaintiff John Lingua (Plaintiff for purposes of all Connecticut Subclass Counts) incorporates by reference all paragraphs as though fully set forth herein.

593.    Plaintiff brings this Count on behalf of the Connecticut Subclass.

594.    Plaintiff and Mercedes are each "persons" as defined by CONN. GEN. STAT. ANN. § 42-110a(3).

595.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."   CONN. GEN. STAT. ANN. § 42-110b(a).   The Connecticut UTPA further provides a private right of action under CONN. GEN. STAT. ANN. § 42- 110g(a).   In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above.   Accordingly, Mercedes engaged in unfair and deceptive trade practices because its conduct (1) offends public policy as it has been established by statutes, the common law or other established concept of unfairness, (2) is immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury to consumers, competitors or other business persons.   The harm caused to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and Mercedes fraudulently concealed the defective nature of the Polluting Vehicles from consumers.

596.     Mercedes has also engaged in deceptive conduct because (1) it made representations, omissions, or engaged in other conduct likely to mislead consumers; (2) consumers interpret the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice is material—that is, likely to affect consumer decisions or conduct.

597.     In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that the emissions controls were defective, as described above.

598.     Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

599.     Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

600.     Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

601.     Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

602.     Mercedes knew or should have known that its conduct violated the Connecticut UTPA.

603.     Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

a.  Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.  Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

c.  Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

604.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

605.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

606.   Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

010585-11/1108566 V1

607.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

608.    Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

609.    Plaintiff and the other Class members sustained damages as a result of Mercedes' unlawful acts, and are therefore entitled to damages and other relief as provided under the Connecticut UTPA.

610.    Plaintiff also seeks court costs and attorneys' fees as a result of Mercedes' violation of the Connecticut UTPA as provided in CONN. GEN. STAT. ANN. § 42-110g(d).  A copy of this Complaint has been mailed to the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut in accordance with CONN. GEN. STAT. ANN. § 42-110g(c).

## COUNT II

### FRAUDULENT NON-DISCLOSURE
### (BASED ON CONNECTICUT LAW)

611.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

612.    Plaintiff brings this Count on behalf of the Connecticut Subclass, against Mercedes and Bosch.

613.    Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles

- 241 -

and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

614.    Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

615.    Mercedes knew these representations were false when made.

616.    The Polluting Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

617.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Class members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

618.    As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the

important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

619.    The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

620.    Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

621.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

622.    Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

623.    Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.   Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.   Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.   These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members.   Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.   Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

624.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

625.     Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

626.     Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

627.     Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

628.     The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles,

which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

629.   Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

630.   Accordingly, Defendants are liable to Plaintiff and Subclass  members for damages in an amount to be proven at trial.

631.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**G.    Claims brought on behalf of the Georgia Subclass.**

**COUNT I**

**VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT**
**(GA. CODE ANN. § 10-1-390, *ET SEQ*.)**

632.   Plaintiff Bobby Hamilton (Plaintiff for purposes of all Georgia Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

633.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices

in trade or commerce" to be unlawful, GA. CODE. ANN. § 10-1-393(a), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised." GA. CODE. ANN. § 10-1-393(b).  Mercedes participated in unfair and deceptive trade practices that violated the Georgia FBPA as described herein.  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes engaged in unfair or deceptive acts or practices by representing that the Polluting Vehicles have, characteristics, ingredients, uses, and benefits that they do not have, representing that the Polluting Vehicles are of a particular standard, quality, or grade when they are of another, and "advertising the Polluting Vehicles with intent not to sell them as advertised.

634.    In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above.

635.    Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.  They had no way of knowing that Mercedes' representations were false and gravely misleading.  As alleged herein, Mercedes engaged in

extremely sophisticated methods of deception.  Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

636.    Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

637.    Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

638.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

639.    Mercedes knew or should have known that its conduct violated the Georgia FBPA.

640.    Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

    a.    Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b.    Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

    c.    Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

641.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other

Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

642.    Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

643.    Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

644.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

645.    Mercedes' violations present a continuing risk to Plaintiff as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

646.    Accordingly, Mercedes is liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

647.    Plaintiff and the Georgia Class are entitled to recover damages and exemplary damages (for intentional violations) pursuant to GA. CODE. ANN § 10-1-399(a).

648.    Plaintiff also seeks attorneys' fees and any other just and proper relief available under the Georgia FBPA pursuant to GA. CODE. ANN § 10-1-399.

## COUNT II

**VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT (GA. CODE ANN § 10-1-370 ET SEQ.)**

649.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

650.    This claim is brought by Plaintiff on behalf of Georgia purchasers who are members of the Class.

651.    Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices," which include "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised." GA. CODE ANN. § 10-1-393(b).

652.    Mercedes, Bosch, Plaintiff, and Georgia Class members are "persons" within the meaning of GA. CODE ANN. §10-1-371(5).

653.    The Plaintiffs seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under GA. CODE ANN. § 10-1-373.

## COUNT III

**FRAUDULENT CONCEALMENT (BASED ON GEORGIA LAW)**

654.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

655.   This claim is brought on behalf of the Georgia Subclass, against Mercedes and Bosch.

656.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

657.   Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

658.   Mercedes knew these representations were false when made, as did Bosch.

659.   The Polluting Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel are and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

660.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Class members relied on Mercedes' material omissions and representations

that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

661.    As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

662.    The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

663.    Plaintiff and Subclass members reasonably relied upon Mercedes' deception.

664.    They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

665.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

666.    Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

667.    Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

668.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

669.    Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its Polluting Vehicles.

670.    Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified.  Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

671.    Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies.  Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members

who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

672.    The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

673.    Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

674.    Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

675.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

H.     **Claims brought on behalf of the Idaho Subclass.**

### COUNT I

### VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
### (IDAHO CIV. CODE §§ 48-601, *ET SEQ.*)

676.   Plaintiff Scott Morgan (Plaintiff for purposes of all Idaho Subclass Counts) incorporates by reference all paragraphs as though fully set forth herein.

677.   Plaintiff brings this Count on behalf of the Idaho Subclass.

678.   Mercedes is a "person" under the Idaho Consumer Protection Act ("Idaho CPA"), IDAHO CIV. CODE § 48-602(1).

679.   Mercedes' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CIV. CODE § 48-602(2).

680.   IDAHO CODE § 48-603 prohibits the following conduct in trade or commerce: engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer; and engaging in any unconscionable method, act or practice in the conduct of trade or commerce, as provided in section 48-603C.   Mercedes participated in misleading, false, or deceptive and unconscionable acts that violated the Idaho CPA.   In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above.

681.   In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions

controls were defective, and that the Polluting Vehicles emitted higher levels of pollution than expected by a reasonable consumer from a clean diesel, as described above.

682.    Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.   Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

683.    Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

684.    Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

685.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

686.    Mercedes knew or should have known that its conduct violated the Idaho CPA.

687.    Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

     a.    Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

     b.    Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

     c.    Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

688.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the

emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide  information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

689.    Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

690.    Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

691.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

692.    Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

693.     Plaintiff also seeks attorneys' fees and any other just and proper relief available under the Idaho CPA.

694.     Plaintiff also seeks punitive damages against Mercedes because Mercedes' conduct evidences an extreme deviation from reasonable standards.  Mercedes' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON IDAHO LAW)

695.     Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

696.     This claim is brought on behalf of the Idaho Subclass, against Mercedes and Bosch.

697.     Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

698.     Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

699.     Mercedes knew these representations were false when made.

700.     The Polluting Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are

unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

701.     Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Class members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

702.     As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

703.     The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

704.     Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.   As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on

- 260 -

their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

705.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

706.    Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

707.    Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial

truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

708.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

709.    Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

710.    Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

711.     Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

712.     The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

713.     Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

714.     Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

715.     Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**I.     Claims brought on behalf of the Illinois Subclass.**

**COUNT I**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT
(815 ILCS 505/1, *ET SEQ*. AND 720 ILCS 295/1A)**

716.     Plaintiff Maryana Melnyk (Plaintiff for purposes of all Illinois Subclass Counts) incorporates by reference all paragraphs as though fully set forth herein.

717.     This claim is brought on behalf of the Illinois Subclass.

718.     Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

719.     Plaintiff and the Subclass members are "consumers" as that term is defined in 815 ILCS 505/1(e).

720.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

721.     In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline

- 264 -

powered vehicles and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes engaged in unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact in the conduct of trade or commerce as prohibited by the Illinois CFA.

722.    In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollution than expected by a reasonable consumer, as described above.

723.    Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.  As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

724.    Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

725.    Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

726.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

727.    Mercedes knew or should have known that its conduct violated the Illinois CFA.

728.     Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

      a.     Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

      b.     Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

      c.     Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

729.     Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

730.     Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

731.     Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

732.     Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

733.     Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

734.     Pursuant to 815 ILCS 505/10a(a), Plaintiff and the Subclass members seek monetary relief against Mercedes in the amount of actual damages, as well as punitive damages because Mercedes acted with fraud and/or malice and/or was grossly negligent.

735.     Plaintiff also seeks punitive damages, attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1, *et seq.*

## COUNT II

## FRAUDULENT CONCEALMENT
### (BASED ON ILLINOIS LAW)

736.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

737.     This claim is brought on behalf of the Illinois Subclass, against Mercedes and Bosch.

738.     Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with

- 267 -

reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

739.    Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

740.    Mercedes knew these representations were false when made, as did Bosch.

741.    The Polluting Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

742.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Class members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

743.    As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during

normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

744.    The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

745.    Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

746.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

747.    Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

748.    Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.   Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.   Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.   These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members.   Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.   Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

749.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

750.     Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

751.     Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

752.     Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

753.     The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles,

which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

754.    Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

755.    Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

756.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**J.      Claims brought on behalf of the Indiana Subclass.**

### COUNT I

### VIOLATIONS OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
### (IND. CODE § 24-5-0.5-3)

757.    Plaintiff Jeff Findlay (Plaintiff for purposes of all Indiana Subclass Counts) incorporates by reference all paragraphs as though fully set forth herein.

758.    Plaintiff brings this Count on behalf of the Indiana Subclass.

759.   Mercedes and Bosch are "persons within the meaning of IND. CODE § 25-5-0.5-2(a)(2) and "suppliers" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

760.   Plaintiff's and the Subclass' vehicle purchases were "consumer transactions" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

761.   Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a person from engaging in a "deceptive business practice[s]" or acts, including but not limited to "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; . . . (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; . . . (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

762.    Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

763.    Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

764.    Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

765.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

766.    Mercedes knew or should have known that its conduct violated the Indiana DCSA.

767.    Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

    a.    Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b.    Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

    c.    Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

768.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the

duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

769.    Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

770.    Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

771.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

772.    Mercedes' violations present a continuing risk to Plaintiff as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

773.    Pursuant to IND. CODE ANN. § 24-5-0.5-4, Plaintiff and the Subclass seek monetary relief against Mercedes measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including

treble damages up to $1,000 for Defendants' willfully deceptive acts, and any other just and proper relief available under the Indiana DSCA.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON INDIANA LAW)

774.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

775.    This claim is brought on behalf of the Indiana Subclass, against Mercedes and Bosch.

776.    Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

777.    Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

778.    Mercedes knew these representations were false when made, as did Bosch.

779.    The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel

and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

780.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

781.    As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

782.    The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

783.    Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.   As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on

- 277 -

their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

784.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

785.    Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's and Subclass members' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

786.    Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial

truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

787.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

788.    Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

789.    Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

790.    Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

791.    The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

792.    Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

793.    Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

794.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**K.     Claims brought on behalf of the Maryland Subclass.**

**COUNT I**

**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
(MD. CODE COM. LAW §§ 13-101, *ET SEQ.*)**

795.    Plaintiffs Gustavo Fraga-Errecart, Hassan Zavareei, and Janice Sheehy (Plaintiffs for purposes of all Maryland Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

796.    This claim is brought only on behalf of members of the Maryland Subclass.

797.    Mercedes, Plaintiffs, and the Maryland Subclass are "persons" within the meaning of MD. CODE COM. LAW § 13-101(h).

798.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good.  MD. CODE COM. LAW § 13-303.  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective and that the Polluting Vehicles emitted higher levels of pollution than expected by a reasonable consumer from a clean diesel, as described above.  Accordingly, Mercedes engaged in unfair and deceptive trade practices.  Mercedes' acts and practices offend public policy; were immoral, unethical, oppressive, or unscrupulous; caused substantial injury to consumers; had the capacity, tendency, or effect of

- 281 -

deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

799.    In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollution than expected by a reasonable consumer from a clean diesel, as described above.

800.    Plaintiffs and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.

801.    Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

802.    Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

803.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

804.    Mercedes knew or should have known that its conduct violated the Maryland CPA.

805.    Mercedes owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

> a.    Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving

conditions;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

806.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide  information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

807.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

808.   Mercedes' conduct proximately caused injuries to Plaintiffs and  the  other Subclass members.

809.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

810.   Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

811.   Pursuant to MD. CODE COM. LAW § 13-408, Plaintiffs and the Maryland Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON MARYLAND LAW)

812.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

813.   This claim is brought on behalf of the Maryland Subclass, against Mercedes and Bosch.

814.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

815.    Mercedes further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

816.    Mercedes knew these representations were false when made, as did Bosch.

817.    The Polluting Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel, and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

818.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiffs and the other Class members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

819.    As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and

emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

820.    The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiffs and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Subclass members.

821.    Plaintiffs and Subclass members reasonably relied upon Mercedes' deception.

822.    They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

823.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

824.    Mercedes' omissions and false representations were material to consumers because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiffs' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

825.    Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or

accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

826.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiffs and Subclass members.

827.    Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

828.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

829.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

830.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

831.    Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

832.    Accordingly, Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

833.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**L.    Claims brought on behalf of the Massachusetts Subclass.**

## COUNT I

### VIOLATIONS OF THE MASSACHUSETTS CONSUMER ACT
### (MASS. GEN. LAWS CH. 93A)

834.    Plaintiff Terrence Garmey (Plaintiff for purposes of all Massachusetts Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

835.    Plaintiff bring this Count on behalf of the Massachusetts Subclass.

836.    Mercedes, Plaintiff, and the Massachusetts Subclass are each a "person" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

837.    Mercedes engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

838.    The Massachusetts Consumer Protection Act ("Massachusetts Act") broadly prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 2.  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes engaged in unfair and deceptive business practices prohibited by the Massachusetts Act. Mercedes' conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers.  Mercedes' conduct is deceptive because it has the capacity or tendency to deceive.

839.    In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

840.    Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.  They had no way of knowing that Mercedes' representations were false and gravely misleading.  As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

841.    Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

842.     Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

843.     Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

844.     Mercedes knew or should have known that its conduct violated the Massachusetts Act.

845.     Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

    a.     Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b.     Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

    c.     Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

846.     Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide  information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

847.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

848.   Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

849.   Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

850.   Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.   Mercedes' unlawful acts and practices complained of herein affect the public interest.

851.   Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiff and the Massachusetts Subclass seek monetary relief against Mercedes measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and Subclass member.   Because Mercedes' conduct was committed willfully and knowingly, Plaintiff are entitled to recover, for each Plaintiff and each Massachusetts Subclass member, up to three times actual damages, but no less than two times actual damages.

- 292 -

852.    Plaintiff also seek punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Massachusetts Act.

853.    Plaintiff has made a demand in satisfaction of MASS. GEN. LAWS CH. 93A, § 9(3).

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON MASSACHUSETTS LAW)

854.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

855.    This claim is brought on behalf of the Massachusetts Subclass, against Mercedes and Bosch.

856.    Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles, emitted pollutants higher than a reasonable consumer would expect from a clean diesel, and were non-compliant with EPA emission requirements, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

857.    Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

858.    Mercedes knew these representations were false when made, as did Bosch.

859.    The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, and emitted pollutants at a much higher rate than gasoline

powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel, because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

860.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

861.    As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

862.    The truth about the defective emissions controls and Mercedes' manipulations of those controls, was known only to Mercedes; Plaintiffs and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Subclass members.

863.    Plaintiffs and Subclass members reasonably relied upon Mercedes' deception.

864.    They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiffs and Subclass members did not, and could not, unravel

- 294 -

Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

865.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

866.    Mercedes' omissions and false representations were material to  consumers because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's decision to purchase  the  Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

867.    Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as reduced emissions diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial

truth, but the entire truth. These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer. Mercedes represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced emission diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

868. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiffs and Subclass members.

869. Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

870. Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

871.    Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

872.    The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

873.    Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

874.    Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

010585-11/1108566 V1

875.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**M.     Claims brought on behalf of the Minnesota Subclass.**

**COUNT I**

**VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
(MINN. STAT. § 325F.68, *ET SEQ*.)**

876.    Plaintiff Charles Wolford (Plaintiff for purposes of all Minnesota Subclass Counts) incorporates by reference all paragraphs as though fully set forth herein.

877.    This claim is brought on behalf of the Minnesota Subclass.

878.    The Polluting Vehicles constitute "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

879.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …."  MINN. STAT. § 325F.69(1).  The Minnesota CFA also prohibits the dissemination, directly or indirectly, of an advertisement "of any sort regarding merchandise," where that advertisement contains "any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading."  MINN. STAT. § 325F.67.  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions,

- 298 -

that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes used or employed a fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, and disseminated advertisements containing material assertions, representations, or statements of fact which were untrue, deceptive, or misleading, all in violation of the Minnesota CFA.

880.   In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer, as described above.

881.   Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.  They had no way of knowing that Mercedes' representations were false and gravely misleading.  As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

882.   Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

883.   Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

884.   Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

885.   Mercedes knew or should have known that its conduct violated the Minnesota CFA.

886.   Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

      a.   Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

      b.   Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

      c.   Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

887.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

888.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified.

Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

889.    Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

890.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

891.    Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

892.    Pursuant to MINN. STAT. § 8.31(3a), Plaintiff and the Minnesota Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

893.    Plaintiff also seeks punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that Mercedes' acts show deliberate disregard for the rights of others.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON MINNESOTA LAW)

894.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

895.    This claim is brought on behalf of the Minnesota Subclass, against Mercedes and Bosch.

010585-11/1108566 V1

896.    Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

897.    Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

898.    Mercedes knew these representations were false when made, as did Bosch.

899.    The Polluting Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

900.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Class members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

901.    As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

902.    The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

903.    Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

904.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

905.    Mercedes' omissions and false representations were material to consumers because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's decision to purchase the Polluting Vehicles and establishing the value

of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

906.    Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

907.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel

vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

908.    Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

909.    Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

910.    Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

010585-11/1108566 V1

911.    The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

912.    Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

913.    Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

914.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**N.    Claims brought on behalf of the Mississippi Subclass.**

## COUNT I

### VIOLATIONS OF THE MISSISSIPPI CONSUMER PROTECTION ACT
### (MISS. CODE ANN. §§ 75-24-1, *ET SEQ.*)

915.    Plaintiff David Ashcraft (Plaintiff, for purposes of all Mississippi Subclass Counts) incorporate by reference all paragraphs as though fully set forth herein.

- 306 -

916.     Plaintiff brings this Count on behalf of the Mississippi Subclass.

917.     Mississippi's Consumer Protection Act (the "Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce," which include but are not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have," and "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised."  MISS. CODE. ANN. § 75-24-5.

918.     In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, that the Polluting Vehicles emitted far more pollution than gasoline powered vehicles, and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above. Accordingly, Mercedes engaged in unfair and deceptive trade practices, including "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have," and "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised."  Further, Mercedes' acts and practices described herein offend established public policy because the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Mercedes fraudulently concealed the defective nature of the Polluting Vehicles from consumers.

919.    In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, that the Polluting Vehicles emitted far more pollution than gasoline powered vehicles, and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above.

920.    Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

921.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

922.    Mercedes knew or should have known that its conduct violated the Mississippi CPA.

923.    Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

924.    Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

a.      Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.      Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

c.      Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

- 308 -

925. Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

926. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

927. Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

928. Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

929.   Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

930.   Pursuant to MISS. CODE ANN. § 75-24-15(1), Plaintiff and the Subclass seek actual damages in an amount to be determined at trial.

931.   Plaintiff and the Subclass also seek declaratory relief and any other just and proper relief available under the Mississippi CPA.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON MISSISSIPPI LAW)

932.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

933.   This claim is brought on behalf of the Mississippi Subclass, against Mercedes and Bosch.

934.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

935.   Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

936.   Mercedes knew these representations were false when made, as did Bosch.

937.    The Polluting Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel, and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

938.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

939.    As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

940.    The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

941.    Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.   As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

942.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

943.    Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

944.    Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without

- 312 -

the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

945.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

946.    Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

947.    Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified.

Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

948.    Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

949.    The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

950.    Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment. Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so. Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

951.    Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

952.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**O.      Claims brought on behalf of the Missouri Subclass.**

### COUNT I

### VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT
### (MO. REV. STAT. §§ 407.010, *ET SEQ.*)

953.    Plaintiff Craig Thorson (Plaintiff for purposes of all Missouri Subclass Counts) incorporates by reference all paragraphs as though fully set forth herein.

954.    Plaintiff brings this Count on behalf of the Missouri Subclass.

955.    Mercedes, Plaintiff, and the Missouri Subclass are each "persons" within the meaning of MO. REV. STAT. § 407.010(5).

956.    Mercedes engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

957.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."  MO. REV. STAT. § 407.020.  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the

Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in violation of the Missouri MPA.  Mercedes' conduct offends public policy; is unethical, oppressive, or unscrupulous; and presents a risk of, or causes, substantial injury to consumers.

958.    In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

959.    Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.  They had no way of knowing that Mercedes' representations were false and gravely misleading.  As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

960.    Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

961.    Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

962.    Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

963.    Mercedes knew or should have known that its conduct violated the Missouri MPA.

964.     Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

        a.      Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

        b.      Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

        c.      Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

965.     Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

966.     Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

967.    Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

968.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

969.    Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

970.    Mercedes is liable to Plaintiff and the Missouri Subclass for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, and any other just and proper relief under MO. REV. STAT. § 407.025.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON MISSOURI LAW)

971.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

972.    This claim is brought on behalf of the Missouri Subclass, against Mercedes and Bosch.

973.    Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles, emitted pollutants higher than a reasonable consumer would expect from a clean diesel,

010585-11/1108566 V1

or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

974.    Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

975.    Mercedes knew these representations were false when made, as did Bosch.

976.    The Polluting Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel, and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

977.    Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Class members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

978.    As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during

normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

979.    The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

980.    Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

981.    Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

982.    Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

983.    Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.   Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.   Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.   These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members.   Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.   Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

984.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

985.     Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

986.     Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

987.     Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

988.     The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles,

which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

989.   Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

990.   Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

991.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**P.    Claims brought on behalf of the Nevada Subclass.**

## COUNT I

## VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
### (NEV. REV. STAT. §§ 598.0903, *ET SEQ.*)

992.   Plaintiff Richard Yanus (Plaintiff for purposes of all Nevada Subclass Counts) incorporates by reference all paragraphs as though fully set forth herein.

993.   Plaintiff bring this Count on behalf of the Nevada Subclass.

994.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, *et seq.*, prohibits deceptive trade practices.  NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person:

> "5.    Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith";

> "7.    Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model";

> "9.    Advertises goods or services with intent not to sell or lease them as advertised"; or

> "15.    Knowingly makes any other false representation in a transaction."

Accordingly, Mercedes has violated the Nevada DTPA by knowingly representing that Polluting Vehicles have uses and benefits which they do not have; representing that Polluting Vehicles are of a particular standard, quality, and grade when they are not; advertising Polluting Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Polluting Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

995.    In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollution than expected by a reasonable consumer from a clean diesel, as described above.

- 324 -

996.   Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.   Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

997.   Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

998.   Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

999.   Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

1000.   Mercedes knew or should have known that its conduct violated the Nevada DTPA.

1001.   Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

   a.   Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

   b.   Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

   c.   Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

1002.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the

duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1003.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1004.   Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

1005.   Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1006.   Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

1007.   Accordingly, Plaintiff and the Nevada Subclass seek their actual damages, punitive damages, costs of court, attorney's fees, and all other appropriate and available remedies under the Nevada DPTA.  NEV. REV. STAT. § 41.600.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON NEVADA LAW)

1008.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1009.   This claim is brought on behalf of the Nevada Subclass, against Mercedes and Bosch.

1010.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

1011.   Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1012.   Mercedes knew these representations were false when made, as did Bosch.

1013.   The Polluting Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel, and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

010585-11/1108566 V1

1014.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Class members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1015.   As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1016.   The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

1017.   Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1018.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1019.   Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1020.   Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or

leased by Plaintiff and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1021.   Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

1022.   Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1023.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1024.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and

quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1025.   The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1026.   Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

1027.   Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

1028.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct

- 331 -

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**Q.     Claims brought on behalf of the New York Subclass.**

**COUNT I**

**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. GEN. BUS. LAW § 349)**

1029.   Plaintiffs Thomas Weiss and John Laurino (Plaintiffs, for purposes of all New York Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

1030.   This claim is brought on behalf of the New York Subclass.

1031.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  The challenged act or practice was "consumer-oriented;" that the act or practice was misleading in a material way; and Plaintiffs suffered injury as a result of the deceptive act or practice.  Accordingly, Mercedes has violated General Business Law § 349.

1032.   In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

1033.   Plaintiffs and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.   Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1034.   Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1035.   Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1036.   Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1037.   Mercedes knew or should have known that its conduct violated General Business Law § 349.

1038.   Mercedes owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

> a.   Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;
>
> b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or
>
> c.   Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1039.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because,

having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1040.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1041.   Mercedes' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1042.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1043.   Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

010585-11/1108566 V1

1044.  Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiffs and each Subclass member may recover actual damages, in addition to three times actual damages up to $1,000 for Mercedes' willful and knowing violation of N.Y. Gen. Bus. Law § 349.

## COUNT II

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (N.Y. GEN. BUS. LAW § 350)

1045.  Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1046.  This claim is brought on behalf of the New York Subclass.

1047.  New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity…."  N.Y. Gen. Bus. Law § 350-a.

1048.  Mercedes caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Mercedes, to be untrue and misleading to consumers, including Plaintiffs and the other Subclass members.

1049.  Mercedes has violated N.Y. Gen. Bus. Law § 350 because of the misrepresentations and omissions alleged herein, including but not limited to Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1050.  In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the

Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

1051.   Plaintiffs and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.   Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1052.   Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1053.   Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1054.   Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1055.   Mercedes knew or should have known that its conduct violated General Business Law § 350.

1056.   Mercedes owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

      a.      Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

      b.      Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

      c.      Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1057.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1058.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1059.   Mercedes' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1060.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1061.   Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

1062.   Plaintiffs and the other Subclass members are entitled to recover their actual damages or $500, whichever is greater.  Because Mercedes acted willfully or knowingly, Plaintiffs and the other Subclass members are entitled to recover three times actual damages, up to $10,000.

## COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON NEW YORK LAW)

1063.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1064.   This claim is brought on behalf of the New York Subclass, against Mercedes and Bosch.

1065.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

1066.   Mercedes further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1067.   Mercedes knew these representations were false when made, as did Bosch.

1068.  The Polluting Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1069.  Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiffs and the other Class members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1070.  As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1071.  The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiffs and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Subclass members.

1072.   Plaintiffs and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1073.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

1074.   Mercedes' omissions and false representations were material to consumers because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiffs' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1075.   Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without

the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer. Mercedes represented to Plaintiffs and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1076.   Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiffs and Subclass members.

1077.   Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1078.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified.

Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1079.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1080.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1081.   Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

1082.   Accordingly, Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1083.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**R.      Claims brought on behalf of the North Carolina Subclass.**

### COUNT I

### VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT
### (N.C. GEN. STAT. §§ 75-1.1, *ET SEQ.*)

1084.   Plaintiffs Vincent Minerva, Freddie T.  Holbrook and Robert Trepper (Plaintiffs for purposes of all North Carolina Subclass Counts) incorporate by reference all paragraphs as though fully set forth herein.

1085.   Plaintiffs bring this Count on behalf of the North Carolina Subclass.

1086.   Mercedes engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

1087.   The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."  N.C. GEN. STAT. § 75-1.1(a).  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above. Accordingly, Mercedes engaged in unfair and deceptive trade practices because it (1) had the

- 343 -

capacity or tendency to deceive, (2) offends public policy, (3) is immoral, unethical, oppressive or unscrupulous, or (4) causes substantial injury to consumers.

1088. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

1089. Plaintiffs and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations. They had no way of knowing that Mercedes' representations were false and gravely misleading. As alleged herein, Mercedes engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1090. Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1091. Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1092. Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1093. Mercedes knew or should have known that its conduct violated the North Carolina UDTPA.

1094. Mercedes owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

      a.    Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.  Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.  Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1095.  Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1096.  Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1097.  Mercedes' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1098.  Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that

- 345 -

Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1099.   Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

1100.   Plaintiffs seek an order for treble their actual damages, costs of Court, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

1101.   Plaintiffs also seek punitive damages against Mercedes because Mercedes' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON NORTH CAROLINA LAW)

1102.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1103.   This claim is brought on behalf of the North Carolina Subclass, against Mercedes and Bosch.

1104.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1105.   Mercedes further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1106.   Mercedes knew these representations were false when made, as did Bosch.

1107.   The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1108.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1109.   As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and

- 347 -

emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1110.   The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiffs and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Subclass members.

1111.   Plaintiffs and Subclass members reasonably relied upon Mercedes' deception. They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1112.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1113.   Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiffs' and Subclass members' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1114.  Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or

accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer. Mercedes represented to Plaintiffs and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1115. Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiffs and Subclass members.

1116. Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1117.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1118.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1119.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

010585-11/1108566 V1

1120.   Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

1121.   Accordingly, Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1122.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**S.    Claims brought on behalf of the Ohio Subclass.**

### COUNT I

### VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT
### (OHIO REV. CODE ANN. §§ 1345.01, *ET SEQ.*)

1123.   Plaintiff Andrew Deutsch (Plaintiff for purposes of all Ohio Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

1124.   This claim is brought on behalf of the Ohio Subclass.

1125.   Plaintiff and the other Ohio Subclass members are "consumers" as defined by the Ohio Consumer Sales Practices Act, OHIO REV. CODE ANN. § 1345.01 ("Ohio CSPA").  Mercedes is a "supplier" as defined by the Ohio CSPA.  Plaintiff's and the other Ohio Subclass members'

purchases or leases of Polluting Vehicles were "consumer transactions" as defined by the Ohio CSPA.

1126.   The Ohio CSPA, OHIO REV. CODE ANN. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.  *Id.*  Mercedes' conduct as alleged above and below constitutes unfair and/or deceptive consumer sales practices in violation of OHIO REV. CODE ANN. § 1345.02.  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes engaged in unfair and deceptive trade practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; and supplying the Polluting Vehicles based on misrepresentations; and otherwise engaging in conduct likely to deceive.

1127.   In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

- 352 -

1128.   Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.   Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1129.   Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1130.   Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1131.   Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

1132.   Mercedes knew or should have known that its conduct violated the Ohio CSPA.

1133.   Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

    a.    Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b.    Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

    c.    Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

1134.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the

duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1135.  Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1136.  Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

1137.  Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1138.  Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

1139.  Plaintiff and the Subclass sustained damages as a result of Mercedes' unlawful acts and are, therefore, entitled to damages and other relief as provided under the Ohio CSPA.

1140.   Plaintiff also seeks court costs and attorneys' fees as a result of Mercedes' violations of the Ohio CSPA as provided in OHIO REV. CODE ANN. § 1345.09.

**COUNT II**

**FRAUDULENT CONCEALMENT
(BASED ON OHIO LAW)**

1141.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1142.   This claim is brought on behalf of the Ohio Subclass, against Mercedes and Bosch.

1143.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

1144.   Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1145.   Mercedes knew these representations were false when made, as did Bosch.

1146.   The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

- 355 -

1147.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1148.   As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1149.   The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

1150.   Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1151.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1152.   Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's and Subclass members' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1153.   Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or

- 357 -

leased by Plaintiff and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1154.   Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

1155.   Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1156.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1157.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and

- 358 -

quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1158. The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1159. Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment. Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so. Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

1160. Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

1161. Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants. Defendants' conduct

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**T.     Claims brought on behalf of the Pennsylvania Subclass.**

### COUNT I

### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. §§ 201-1, *ET SEQ.*)

1162.   Plaintiff Wendell A.  Dingle (Plaintiff for purposes of all Pennsylvania Subclass Counts) incorporates by reference all paragraphs as though fully set forth herein.

1163.   Plaintiff brings this Count on behalf of the Pennsylvania Subclass.

1164.   Plaintiff purchased or leased their Polluting Vehicle  primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

1165.   All of the acts complained of herein were perpetrated by Mercedes in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

1166.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: "Representing that goods or services have … characteristics, … [b]enefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 P.S. § 201-2(4).  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above.

Accordingly, Mercedes engaged in deceptive business practices prohibited by the Pennsylvania CPL, including: representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard, quality, and grade when they are not; advertising the Polluting Vehicles with the intent not to sell them as advertised; and engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or of misunderstanding.

1167.   In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

1168.   Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.   Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1169.   Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1170.   Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1171.   Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

1172.   Mercedes knew or should have known that its conduct violated the Pennsylvania CPL.

1173.   Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

    a.    Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b.    Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

    c.    Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

1174.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1175.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1176.   Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

1177.   Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1178.   Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

1179.   Mercedes is liable to Plaintiff and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 P.S. § 201-9.2(a).  Plaintiff and the Pennsylvania Subclass are also entitled to an award of punitive damages given that Mercedes' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT II

### FRAUDULENT CONCEALMENT (BASED ON PENNSYLVANIA LAW)

1180.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1181.   This claim is brought on behalf of the Pennsylvania Subclass, against Mercedes and Bosch.

1182.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with

reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

1183.   Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1184.   Mercedes knew these representations were false when made, as did Bosch.

1185.   The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1186.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1187.   As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during

normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1188.   The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

1189.   Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.   As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1190.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

1191.   Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's and Subclass members' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1192.   Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.   Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.   Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.   These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members.   Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.   Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1193.   Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

1194.   Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1195.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1196.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1197.   The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles,

which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1198.   Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

1199.   Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

1200.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**U.    Claims brought on behalf of the South Carolina Subclass.**

## COUNT I

### VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. §§ 39-5-10, *ET SEQ*.)

1201.   Plaintiff Caroline Ledlie (Plaintiff for purposes of all South Carolina Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

1202.   Plaintiff brings this Count on behalf of the South Carolina Subclass.

1203.   Mercedes, Plaintiff, and the South Carolina Subclass are "persons" within the meaning of S.C. CODE ANN. § 39-5-10(a).

1204.   Mercedes engaged in "trade" or "commerce" within the meaning of S.C. CODE ANN. § 39-5-10(b).

1205.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") broadly prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  S.C. CODE ANN. § 39-5-20(a).  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes engaged in unfair and deceptive business practices prohibited by the South Carolina UTPA. Mercedes' conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers.  Mercedes' conduct is deceptive because it has the capacity or tendency to deceive.

1206.   In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

1207.   Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes'

representations were false and gravely misleading. As alleged herein, Mercedes engaged in extremely sophisticated methods of deception. Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1208.  Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1209.  Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1210.  Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

1211.  Mercedes knew or should have known that its conduct violated the South Carolina UTPA.

1212.  Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

   a.  Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

   b.  Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

   c.  Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

1213.  Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff and the other Subclass

members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1214.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1215.   Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

1216.   Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1217.   Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.   Mercedes' unlawful acts and practices complained of herein affect the public interest.

1218.   Pursuant to S.C. CODE ANN. § 39-5-140(a), Mercedes is liable to Plaintiff and the Subclass for damages in amounts to be proven at trial, treble damages for willful and knowing violations, punitive damages, and attorneys' fees and costs, as well as any other remedies the Court may deem appropriate under the South Carolina UTPA.

**COUNT II**

**FRAUDULENT CONCEALMENT
(BASED ON SOUTH CAROLINA LAW)**

1219.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1220.   This claim is brought on behalf of the South Carolina Subclass, against Mercedes and Bosch.

1221.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

1222.   Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1223.   Mercedes knew these representations were false when made, as did Bosch.

1224.   The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1225.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1226.   As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1227.   The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

1228.   Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.   As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1229.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1230.   Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's and Subclass members' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1231.   Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or

- 374 -

leased by Plaintiff and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1232.  Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

1233.  Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1234.  Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1235.  Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and

quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1236.   The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1237.   Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

1238.   Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

V.      **Claims brought on behalf of the Texas Subclass**

## COUNT I

## VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT

## (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*)

1239. Plaintiffs Shelby A. Jordan and Jimmy Bird (Plaintiffs for purposes of all Texas Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

1240. Plaintiffs bring this Count on behalf of the Texas Subclass.

1241. Plaintiffs and the Texas Subclass are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* TEX. BUS. & COM. CODE § 17.41.

1242. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading or deceptive act or practice specifically enumerated in TEX. BUS. & COM. CODE § 17.46(b); or (ii) "an unconscionable action or course of action by any person." TEX. BUS. & COM. CODE § 17.50(a)(2) & (3). The Texas DTPA declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and (9) advertising goods or services with intent not to sell them as advertised." An "unconscionable action or course of action," means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5). As detailed herein, Mercedes has engaged in an unconscionable action or course of action and thereby caused economic damages to the Texas Subclass.

1243. In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline

powered vehicles, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes engaged in deceptive business practices prohibited by the Texas DTPA, including: representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard, quality, and grade when they are not; advertising Polluting Vehicles with intent not to sell them as advertised; and engaging in acts or practices which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.

1244.  In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

1245.  Plaintiffs and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.  They had no way of knowing that Mercedes' representations were false and gravely misleading.  As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1246.  Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1247.  Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1248.  Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

010585-11/1108566 V1

1249.   Mercedes knew or should have known that its conduct violated the Texas DTPA.

1250.   Mercedes owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

      a.     Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

      b.     Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

      c.     Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1251.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1252.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified.

Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1253.   Mercedes' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1254.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1255.   Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

1256.   Plaintiffs and the Subclass seek damages and treble damages for Mercedes' knowing violations.

1257.   Plaintiffs gave written notice prior to filing suit as required by TEX. BUS. & COM. CODE § 17.505(a).

**COUNT II**

**FRAUD BY CONCEALMENT**
**(BASED ON TEXAS LAW)**

1258.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1259.   This claim is brought on behalf of the Texas Subclass, against Mercedes and Bosch.

1260.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles

- 380 -

and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1261.   Mercedes further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1262.   Mercedes knew these representations were false when made, as did Bosch.

1263.   The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1264.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1265.   As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the

important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1266.   The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiffs and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Subclass members.

1267.   Plaintiffs and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.   As consumers, Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1268.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

1269.   Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiffs' and Subclass members' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.   As Mercedes well knew, its customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1270.  Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiffs and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1271.  Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiffs and Subclass members.

010585-11/1108566 V1

1272.   Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1273.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1274.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1275.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles,

- 384 -

which has greatly tarnished the Mercedes brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1276.   Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

1277.   Accordingly, Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1278.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**W.     Claims brought on behalf of the Utah Subclass.**

### COUNT I

### VIOLATIONS OF THE UTAH CONSUMER SALES PRACTICES ACT
### (UTAH CODE ANN. §§ 13-11-1, *ET SEQ.*)

1279.   Plaintiffs Seid Dilgisic and Tiffany Knight (Plaintiffs for purposes of all Utah Subclass Counts) incorporate by reference all paragraphs as though fully set forth herein.

1280.   Plaintiffs bring this Count on behalf of the Utah Subclass.

1281.  Mercedes is a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), UTAH CODE ANN. § 13-11-3.

1282.  Plaintiffs and the Subclass members are "persons" under UTAH CODE ANN. § 13-11-3.

1283.  Sales of the Polluting Vehicles to Plaintiffs and the Subclass were "consumer transactions" within the meaning of UTAH CODE ANN. § 13-11-3.

1284.  The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE ANN. § 13-11-4.  Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not."  UTAH CODE ANN. § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  UTAH CODE ANN. § 13-11-5.  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes engaged in conduct prohibited by the Utah CSPA, including, among other things, engaging in unconscionable acts, representing that the Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; and representing that the Polluting Vehicles are of a particular standard, quality, and grade when they are not. Mercedes also engaged in unlawful trade practices by employing deception, deceptive acts or

- 386 -

practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles.

1285.   In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

1286.   Plaintiffs and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.   Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1287.   Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1288.   Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1289.   Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1290.   Mercedes knew or should have known that its conduct violated the Utah CSPA.

1291.   Mercedes owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

> a.   Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1292.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1293.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1294.   Mercedes' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1295.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that

- 388 -

Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1296. Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

1297. Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiffs and the Subclass seek monetary relief against Mercedes measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff and each Utah Subclass member, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON UTAH LAW)

1298. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1299. This claim is brought on behalf of the Utah Subclass, against Mercedes and Bosch.

1300. Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1301. Mercedes further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the

- 389 -

Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1302.   Mercedes knew these representations were false when made, as did Bosch.

1303.   The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1304.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1305.   As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1306.   The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiffs and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Subclass members.

1307.   Plaintiffs and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.   As consumers, Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1308.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

1309.   Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiffs' and Subclass members' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1310.  Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or

Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiffs and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1311.   Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiffs and Subclass members.

1312.   Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1313.  Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel

cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1314.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1315.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1316.  Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the

Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

1317.   Accordingly, Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1318.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**X.    Claims brought on behalf of the Virginia Subclass.**

**COUNT I**

**VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT
(VA. CODE ANN. §§ 59.1-196, *ET SEQ.*)**

1319.   Plaintiff Ulyana Lynevych (Plaintiff for purposes of all Virginia Subclass Counts) incorporate by reference all paragraphs as though fully set forth herein.

1320.   This claim is brought on behalf of the Virginia Subclass.

1321.   Mercedes is a "person" as defined by VA. CODE ANN. § 59.1-198.  The transactions between Plaintiff and the other Subclass members on the one hand and Mercedes on the other, leading to the purchase or lease of the Polluting Vehicles by Plaintiff and the other Subclass members, are "consumer transactions" as defined by VA. CODE ANN. § 59.1-198, because the Polluting Vehicles were purchased or leased primarily for personal, family or household purposes.

1322.   The Virginia Consumer Protection Act (Virginia CPA) prohibits "(5) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or

- 394 -

benefits; (6) misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; … (8) advertising goods or services with intent not to sell them as advertised …; [and] (14) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]"  VA. CODE ANN. § 59.1-200(A).  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes engaged in acts and practices violating VA. CODE ANN. § 59.1-200(A), including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; advertising Polluting Vehicles with the intent not to sell them as advertised; and otherwise engaging in deception, fraud, false pretense, false promise or misrepresentations and conduct likely to deceive.

1323.  In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

1324.  Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.  They had no way of knowing that Mercedes' representations were false and gravely misleading.  As alleged herein, Mercedes engaged in

extremely sophisticated methods of deception.  Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1325.   Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1326.   Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1327.   Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1328.   Mercedes knew or should have known that its conduct violated the Virginia CPA.

1329.   Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

     a.     Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

     b.     Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

     c.     Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1330.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

- 396 -

1331.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1332.   Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

1333.   Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1334.   Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.   Mercedes' unlawful acts and practices complained of herein affect the public interest.

1335.   Pursuant to VA. CODE ANN. § 59.1-204, Plaintiff and the Subclass seek monetary relief against Mercedes measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Subclass member.   Because Mercedes' conduct was committed willfully and knowingly, Plaintiff are entitled to recover, for each Plaintiff and each Subclass member, the greater of (a) three times actual damages or (b) $1,000.

1336.   Plaintiff also seek punitive damages, and attorneys' fees, and any other just and proper relief available under VA. CODE ANN. § 59.1-204, *et seq.*

## COUNT II

## FRAUD BY CONCEALMENT
## (UNDER VIRGINIA LAW)

1337.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1338.   This claim is brought on behalf of the Virginia Subclass, against Mercedes and Bosch.

1339.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

1340.   Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1341.   Mercedes knew these representations were false when made, as did Bosch.

1342.   The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1343.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1344.   As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1345.   The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

1346.   Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.   As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1347.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1348.   Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's and Subclass members' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1349.   Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or

leased by Plaintiff and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiff and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1350.   Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

1351.   Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1352.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1353.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and

quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1354.   The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1355.   Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

1356.   Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

1357.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct

- 402 -

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**Y.     Claims brought on behalf of the Washington Subclass.**

### COUNT I

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT
### (WASH. REV. CODE ANN. §§ 19.86.010, *ET SEQ.*)

1358.   Plaintiffs Michael Medler, Randolph Rolle and Robert Gershberg (Plaintiffs for purposes of all Washington Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

1359.   Plaintiffs bring this Count on behalf of the Washington Subclass.

1360.   Mercedes, Plaintiffs, and the Washington Subclass are a "person" under WASH. REV. CODE ANN. § 19.86.010(1) ("Washington CPA").

1361.   Mercedes engaged in "trade" or "commerce" under WASH. REV. CODE ANN. § 19.86.010(2).

1362.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE. ANN. § 19.96.010.  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above. Accordingly, Mercedes engaged in unfair and deceptive business practices prohibited by the Washington CPA.  Mercedes' conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or

- 403 -

unscrupulous; or (3) causes substantial injury to consumers.  Mercedes' conduct is deceptive because it has the capacity or tendency to deceive.

1363.   In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

1364.   Plaintiffs and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.  Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1365.   Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1366.   Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1367.   Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1368.   Mercedes knew or should have known that its conduct violated the Washington CPA.

1369.   Mercedes owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

      a.     Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

      b.     Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

      c.     Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1370.  Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1371.  Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1372.  Mercedes' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1373.  Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that

Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1374.   Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public. Mercedes' unlawful acts and practices complained of herein affect the public interest.

1375.   Mercedes is liable to Plaintiffs and the Subclass for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under WASH. REV. CODE. ANN. § 19.86.090.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON WASHINGTON LAW)

1376.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1377.   This claim is brought on behalf of the Washington Subclass, against Mercedes and Bosch.

1378.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1379.   Mercedes further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the

- 406 -

Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1380.   Mercedes knew these representations were false when made, as did Bosch.

1381.   The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1382.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1383.   As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1384.   The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiffs and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Subclass members.

1385.   Plaintiffs and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.   As consumers, Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1386.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

1387.   Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiffs' and Subclass members' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1388.   Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or

- 408 -

Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiffs and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1389.   Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiffs and Subclass members.

1390.   Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1391.  Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel

cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1392.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1393.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1394.  Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the

Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

1395.   Accordingly, Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

**Z.      Claims brought on behalf of the West Virginia Subclass.**

**COUNT I**

**VIOLATIONS OF THE WEST VIRGINIA CONSUMER
CREDIT AND PROTECTION ACT
(W. VA. CODE §§ 46A-1-101, *ET SEQ.*)**

1396.   Plaintiff Melanie Johnson (Plaintiff for purposes of all West Virginia Subclass Counts) incorporates by reference all paragraphs as though fully set forth herein.

1397.   Plaintiff bring this Count on behalf of the West Virginia Subclass.

1398.   Mercedes is a "person" under W. VA. CODE § 46A-1-102(31).

1399.   Plaintiff and the West Virginia Subclass are "consumers," as defined by W. VA. CODE §§ 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Polluting Vehicles.

1400.   Mercedes engaged in trade or commerce as defined by W. VA. CODE § 46A-6-102(6).

1401.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  W. VA. CODE § 46A-6-104.  Without limitation, "unfair or deceptive" acts or practices include:

> (E)      Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have; …

- 411 -

(G)     Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another; …

(I)     Advertising goods or services with intent not to sell them as advertised; …

(L)     Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

(M)     The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; [and]

(N)     Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.

W. Va. Code § 46A-6-102(7).

1402.   In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes engaged in deceptive business practices prohibited by the West Virginia CCPA, including:  (1) representing that the Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Polluting Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Polluting Vehicles with the intent not to sell them as advertised; (4) engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding;

- 412 -

(5) employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles; and (6) advertising using false, misleading, or deceptive representations that omitted material information necessary to make the statements not false, misleading or deceptive.

1403.   In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

1404.   Plaintiff and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.   Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1405.   Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1406.   Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1407.   Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

1408.   Mercedes knew or should have known that its conduct violated the West Virginia CCPA.

1409.   Mercedes owed Plaintiff and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

> a.   Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;
>
> b.   Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or
>
> c.   Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

1410.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1411.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

- 414 -

1412.   Mercedes' conduct proximately caused injuries to Plaintiff and the other Subclass members.

1413.   Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1414.   Mercedes' violations present a continuing risk to Plaintiff as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

1415.   Pursuant to W. VA. CODE § 46A-6-106, Plaintiff seeks monetary relief against Mercedes measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff and each member of the West Virginia Subclass.

1416.   Plaintiff also seeks punitive damages against Mercedes because Mercedes carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting Plaintiff to cruel and unjust hardship as a result.  Mercedes' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

1417.   Plaintiff further seeks restitution, punitive damages, costs of Court, attorneys' fees under W. VA. CODE § 46A-5-101, *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

1418.   On March 28, 2016, Plaintiff sent a letter complying with W. VA. CODE § 46A-6-106(b).  Because Mercedes failed to remedy its unlawful conduct within the requisite time period, Plaintiff seeks all damages and relief to which Plaintiff and the West Virginia Subclass are entitled.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON WEST VIRGINIA LAW)

1419.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1420.   This claim is brought on behalf of the West Virginia Subclass, against Mercedes and Bosch.

1421.   Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

1422.   Mercedes further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1423.   Mercedes knew these representations were false when made, as did Bosch.

1424.   The Polluting Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1425.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were

- 416 -

defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiff and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1426.   As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1427.   The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiff and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiff and Subclass members.

1428.   Plaintiff and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiff and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1429.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe

- 417 -

they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.

And yet, that is precisely what the Polluting Vehicles are doing.

1430.  Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiff's and Subclass members' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.  As Mercedes well knew, its customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1431.  Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members.  Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue.  Having volunteered to provide information to Plaintiff and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members.  Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer.  Mercedes represented to Plaintiff and Subclass members that they were

- 418 -

purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1432.   Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiff and Subclass members.

1433.   Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1434.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.   Plaintiff's and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1435.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies.

Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1436.   The value of Plaintiff's and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1437.   Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

1438.   Accordingly, Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

1439.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**AA.    Claims brought on behalf of the Wisconsin Subclass.**

## COUNT I

### VIOLATIONS OF THE WISCONSIN DECEPTIVE
### TRADE PRACTICES ACT
### (WIS. STAT. § 110.18)

1440.   Plaintiff Lars Dannberg and Zbigniew Kurzawa(Plaintiffs for purposes of all Wisconsin Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

1441.   Plaintiffs bring this claim on behalf of the Wisconsin Subclass.

1442.   Mercedes is a "person, firm, corporation or association" within the meaning of WIS. STAT. § 100.18(1).

1443.   Plaintiffs and Wisconsin Subclass members are members of "the public" within the meaning of WIS. STAT. § 100.18(1).  Plaintiffs and Wisconsin Subclass members purchased or leased one or more Polluting Vehicles.

1444.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading."  WIS. STAT. § 100.18(1).  In the course of Mercedes' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline powered vehicles, and that the Polluting Vehicles emitted far more pollution than a reasonable consumer would expect from a clean diesel, as described above.  Accordingly, Mercedes engaged in deceptive business practices prohibited by the Wisconsin DTPA.

1445.   In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Mercedes' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions

controls were defective, and that the Polluting Vehicles emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, as described above.

1446.   Plaintiffs and Subclass members reasonably relied upon Mercedes' material omissions and false misrepresentations.   They had no way of knowing that Mercedes' representations were false and gravely misleading.   As alleged herein, Mercedes engaged in extremely sophisticated methods of deception.   Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.

1447.   Mercedes' actions as set forth above occurred in the conduct of trade or commerce.

1448.   Mercedes' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1449.   Mercedes intentionally and knowingly failed to disclose and misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1450.   Mercedes knew or should have known that its conduct violated the Wisconsin DTPA.

1451.   Mercedes owed Plaintiffs and the Subclass a duty to disclose the truth about its emissions systems manipulation because Mercedes:

a.   Possessed exclusive knowledge that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that it manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1452.   Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles

were defective and emitted pollutants at a much higher rate than gasoline powered vehicles and that the emissions far exceeded those expected by a reasonable consumer from a clean diesel, because, having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.  Further, Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1453.  Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiffs' and Subclass members' actions were justified. Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1454.  Mercedes' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1455.  Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Mercedes' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Mercedes' misrepresentations and omissions.

1456.  Mercedes' violations present a continuing risk to Plaintiffs as well as to the general public.  Mercedes' unlawful acts and practices complained of herein affect the public interest.

1457.  Plaintiffs and the Wisconsin Subclass are entitled to damages and other relief provided for under WIS. STAT. § 100.18(11)(b)(2).  Because Mercedes' conduct was committed knowingly and/or intentionally, Plaintiffs` and the Wisconsin Subclass are entitled to treble damages.

1458.  Plaintiffs and the Wisconsin Subclass also seek court costs and attorneys' fees under WIS. STAT. § 110.18(11)(b)(2).

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON WISCONSIN LAW)

1459.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1460.  This claim is brought on behalf of the Wisconsin Subclass, against Mercedes and Bosch.

1461.  Mercedes intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline powered vehicles and higher than a reasonable consumer would expect from a clean diesel, or Mercedes acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1462.  Mercedes further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles it was selling had no significant defects, were Earth-friendly and low- emission vehicles, and would perform and operate properly when driven in normal usage.

1463.  Mercedes knew these representations were false when made, as did Bosch.

1464.  The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitted pollutants at a much higher rate than gasoline powered vehicles and at a much higher rate than a reasonable consumer would expect from a clean diesel and are unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1465.  Mercedes had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that these Polluting Vehicles were defective and emitted pollutants at a much higher rate than gasoline powered vehicles, and that the emissions far exceeded those expected by a reasonable consumer and were unreliable, because Plaintiffs and the other Subclass members relied on Mercedes' material omissions and representations that the Polluting Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

1466.  As alleged in this Complaint, at all relevant times, Mercedes has held out the Polluting Vehicles to be reduced emissions vehicles.  Mercedes disclosed certain details about the BlueTEC Clean Diesel engine, but nonetheless, Mercedes intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls and emitted higher levels of pollutants than expected by a reasonable consumer from a clean diesel, making other disclosures about the emission system deceptive.

1467.  The truth about the defective emissions controls and Mercedes' manipulations of those controls was known only to Mercedes; Plaintiffs and the Subclass members did not know of these facts and Mercedes actively concealed these facts from Plaintiffs and Subclass members.

1468.   Plaintiffs and Subclass members reasonably relied upon Mercedes' deception.  They had no way of knowing that Mercedes' representations were false and/or misleading.  As consumers, Plaintiffs and Subclass members did not, and could not, unravel Mercedes' deception on their own.  Rather, Mercedes intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle  emissions.

1469.   Mercedes also concealed and suppressed material facts concerning what is evidently the true culture of Mercedes—one characterized by an emphasis on profits and sales above providing a clean diesel vehicle.  Consumers buy diesel cars from Mercedes because they believe they are clean diesel cars.  They do not want to be spewing noxious gases into the environment.  And yet, that is precisely what the Polluting Vehicles are doing.

1470.   Mercedes' omissions and false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, and also because the representations played a significant role in Plaintiffs' and Subclass members' decision to purchase the Polluting Vehicles and establishing the value of the vehicles.   As Mercedes well knew, its customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1471.   Mercedes had a duty to disclose the emissions defect and defective design of emissions controls in the Polluting Vehicles because details of the true facts were known and/or accessible only to Mercedes, because Mercedes had exclusive knowledge as to such facts, and because Mercedes knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members.   Mercedes also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions, starting with references to them as *reduced emissions* diesel cars, which were misleading, deceptive, and incomplete without

- 426 -

the disclosure of the additional facts set forth above regarding the actual emissions of its vehicles, and its actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, Mercedes had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the purchase or lease decision, as well as the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, and whether that manufacturer tells the truth about the emissions characteristics of its vehicles, are material concerns to a consumer. Mercedes represented to Plaintiffs and Subclass members that they were purchasing or leasing *reduced emission* diesel vehicles, when in fact, they were purchasing or leasing defective, high emission vehicles.

1472.  Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles, which perception would hurt the brand's image and cost Mercedes money, and it did so at the expense of Plaintiffs and Subclass members.

1473.  Mercedes has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of its referenced vehicles.

1474.  Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced emissions diesel cars manufactured by Mercedes, would have paid less, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified.

Mercedes was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1475.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they were deprived of the benefit of the bargain, they own vehicles that are diminished in value as a result of Mercedes' concealment of the true quality and quantity of those vehicles' emissions and Mercedes' failure to timely disclose the defect or defective design of the BlueTEC Clean Diesel engine system, the actual emissions qualities and quantities of Mercedes-branded vehicles, and the serious issues engendered by Mercedes' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Company's disregard for the truth, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1476.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of Mercedes' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, which has greatly tarnished the Mercedes brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1477.   Bosch played a critical role in facilitating, and itself contributed to, Mercedes' fraudulent concealment.  Bosch knew that Mercedes would use and had used the Bosch technology as a means to turn off or limit emission controls during normal driving conditions so that the Polluting Vehicles would not be clean diesels, and in fact Bosch helped Mercedes do so.  Without Bosch's complicity and silence, Mercedes could not have perpetrated the fraudulent scheme alleged herein, and Bosch's actions themselves constitute fraudulent concealment.

- 428 -

1478.   Accordingly, Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1479.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that Mercedes made to them, in order to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Subclasses, respectfully request that the Court enter judgment in their favor and against Mercedes, as follows:

A.     Certification of the proposed Nationwide Class and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.     Restitution, including at the election of Class members, recovery of the purchase price of their Polluting Vehicles, or the overpayment or diminution in value of their Polluting Vehicles;

C.     Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under certain consumer protection statutes, as stated above, shall be limited prior to completion of the applicable notice requirements;

D.     An order requiring Mercedes to pay both pre- and post-judgment interest on any amounts awarded;

E.     An award of costs and attorneys' fees; and

F.     Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: March 15, 2019                    Respectfully submitted,

**CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.**

By  _/s/ James E.  Cecchi_
    James E.  Cecchi
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700
Fax: (973) 994-1744

Steve W.  Berman
Sean R.  Matt
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com

_Interim Lead Counsel for Plaintiffs and the
Proposed Classes_

Christopher A.  Seeger
**SEEGER WEISS LLP**
77 Water Street, New York,
New York, NY 10005
Tel: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Bob Hilliard
**HILLIARD MUNOZ GONZALES LLP**
719 S Shoreline Blvd, # 500
Corpus Christi, TX 78401
Tel: (361) 882-1612
bobh@hmglawfirm.com

- 430 -

Jeffrey S.  Goldenberg
**GOLDENBERG SCHNEIDER, L.P.A.**
One West Fourth Street, 18th Floor
Cincinnati, OH 45202-3604
Tel: (513) 345-4291
Fax: (513) 345-8294
jgoldenberg@gs-legal.com

David Freydin
Timothy A.  Scott
**LAW OFFICES OF DAVID FREYDIN, PC**
8707 Skokie Blvd., Suite 305
Skokie, Illinois 60077
Tel: (847) 972-6157
Fax: (866) 897-7577
david.freydin@freydinlaw.com

Joseph F.  Rice, Esq.
Jodi Westbrook Flowers, Esq.
Kevin R.  Dean, Esq.
**MOTLEY RICE, LLC**
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 2216-9450
jrice@motleyrice.com
jflowers@motleyrice.com
kdean@motleyrice.com

Benjamin L. Bailey
**BAILEY GLASSER LLP**
209 Capitol Street
Charleston, WV  25301
Tel 304.345.6555
Fax: 304.342.1110
Email: bbailey@baileyglasser.com

*Other Attorneys for Plaintiffs and the Proposed Classes*