**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SUSAN ALBERS, *et al.*, individually and on behalf of all others similarly situated,<br><br>      **Plaintiffs,**<br><br>    **v.**<br><br>**MERCEDES-BENZ USA, LLC, a Delaware Limited Liability Company, DAIMLER AG, a foreign corporation, ROBERT BOSCH LLC, a Delaware Limited Liability Company, and ROBERT BOSCH GMBH, a foreign corporation,**<br><br>      **Defendants.** | Civ. No. 16-881(KM)(ESK)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.**

     This putative class action alleges that all Mercedes diesel vehicles sold in the U.S. from 2007 to February 18, 2016 containing the Mercedes BlueTEC diesel engines[1]—the 2.1 Liter OM 651 and the 3.0 Liter OM 642—(collectively, "the Subject Vehicles"), emit nitrogen oxides ("NOx") at levels in excess of federal and state emissions standards. Plaintiffs assert that Defendants Mercedes-Benz USA, LLC ("Mercedes USA"), and Daimler AG ("Daimler") (together, "Mercedes") colluded with Defendants Robert Bosch GmbH ("Bosch GmbH") and Robert Bosch LLC (Bosch LLC) to market the cars as "clean diesel" while they knew that the Subject Vehicles discharged emissions at impermissible levels. The true level of emissions was allegedly masked during laboratory testing by deceptive technology (a "defeat device") that Defendants

---

[1]    Specifically, these vehicles include the diesel-powered ML 320, ML 350, GL 320, E320, S350, R320, E Class, GL Class, ML Class, R Class, S Class, GLK Class, GLE Class, and Sprinter. (5CAC ¶ 18)

developed and employed. The named Plaintiffs are some 39 individuals from across the U.S. who allegedly owned or leased various Subject Vehicles. The complaint contains counts asserting claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and various state consumer protection laws. In the currently operative Fifth Consolidated and Amended Class Action Complaint (DE 185, cited as "5CAC"), Plaintiffs seek to bring these claims on behalf of themselves and a nationwide class of all persons or entities who purchased or leased the Mercedes Subject Vehicles in the relevant period.

The Mercedes Defendants and Bosch LLC previously moved to dismiss the then-current version of the complaint. (DE 117; DE 118) Chief Judge Linares, to whom this matter was assigned prior to his retirement, disposed of those Defendants' motion by Opinion and Order (DE 161; DE 162). At that time, however, Bosch GmbH had not yet been served.

Now, Bosch GmbH has been served, and has filed its own motion to dismiss the 5CAC for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE 239) Primarily, Bosch GmbH asserts that the RICO claim must be dismissed on various grounds: for example, because it cannot be used to circumvent the lack of a private right of action under the Clean Air Act, and because Plaintiffs, who were not direct purchasers from Bosch GmbH, lack standing. (DE 239-1 at 16–24) Bosch GmbH also moves to dismiss Plaintiffs' New Jersey and Georgia consumer protection law claims for failure to allege an ascertainable loss (NJ) or ongoing harm (GA). (*Id.* at 29–33) Finally, Bosch GmbH moves to dismiss all of Plaintiffs' fraudulent concealment claims for failure to allege that Bosch GmbH had a duty to disclose. (*Id.* at 33–37)

Plaintiffs oppose Bosch GmbH's motion, asserting that these arguments lack merit and that in any event, most of them have already been considered and rejected by Judge Linares in his prior Opinion and Order on the codefendants' motions to dismiss. (DE 161; DE 162). I agree. For the reasons set forth below, Bosch GmbH's motion to dismiss is denied.

# I.    BACKGROUND[2]

This Opinion assumes familiarity with the procedural history and facts of this action.

## a. Procedural History

Plaintiffs initiated this action on February 18, 2016. (DE 1) This action was thereafter consolidated with other actions asserting substantially similar claims against Mercedes: 16-cv-1063; 16-cv-1934; 16-cv-2272. (DE 19)

The consolidated complaint has been amended several times. (*See* DE 60 (Second Consolidated and Amended Class Action Complaint), DE 81 (Third Consolidated and Amended Class Action Complaint), DE108 (Fourth Consolidated and Amended Class Action Complaint ("4CAC")) On November 9, 2017, Mercedes, Daimler, and Bosch LLC moved to dismiss the 4CAC.[3] (DE 117; DE 118). These defendants collectively argued that the 4CAC should be dismissed on grounds of lack of Article III standing, lack of RICO standing, failure to state a claim, and preemption. Mercedes and Daimler also moved to compel arbitration of the claims of at least two Plaintiffs, Gwendolyn Andary and Darrell Feller. (DE 117-1 at 61).

On February 2, 2019, Judge Linares issued an Opinion (DE 161) and Order (DE 162) granting in part and denying in part those motions to dismiss.

On March 15, 2019, Plaintiffs filed the Fifth Consolidated and Amended Class Action Complaint. (DE 185) Thereafter, Plaintiffs filed a request for an order permitting them to serve Bosch GmbH under Federal Rule of Civil

---

[2]    Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated. For ease of reference, the most commonly used abbreviations of record items are collected here:

| | |
|---|---|
| "DE _" = | Docket Entry number in this Consolidated Class Action |
| "4CAC" = | Plaintiffs' Fourth Consolidated and Amended Class Action Complaint (DE 108) |
| "5CAC" = | Plaintiffs' Fifth Consolidated and Amended Class Action Complaint (DE 185) |

[3]    Bosch LLC was served with the 2CAC on January 20, 2017. (DE 68) Bosch GmbH—a German multinational engineering and electronics company headquartered in Gerlingen and the parent company of Bosch LLC—was not served at the time.

Procedure 4(f)(3), that is, by "other means not prohibited by international agreement." (DE 214) Plaintiffs detailed their efforts to serve Bosch GmbH under the Hague Convention and specifically asked the Court to authorize service on Bosch GmbH through their U.S. Counsel and through email. Bosch GmbH through its counsel opposed that motion, claiming that service was untimely and disputing that Plaintiffs had exercised due diligence in attempting to serve Bosch GmbH by conventional means. (DE 216) On July 2, 2019, Magistrate Judge Dickson granted Plaintiffs' request to serve Bosch GmbH through counsel. (DE 228) Bosch GmbH was served on July 8, 2019. (DE 232)

On November 18, 2019, following the retirement of Chief Judge Linares, this case was reassigned to me. (DE 262)

Now before the Court is a motion to dismiss the 5CAC by Bosch GmbH. (DE 239) In this round, no other defendants have moved to dismiss. Plaintiffs filed an opposition (DE 240), to which defendant replied (DE 245). The matter is briefed and ripe for decision.

### b. Factual Summary[4]

The factual allegations of the 5CAC are similar to those of the 4CAC, which was the subject of Judge Linares's prior Opinion (DE 161). I summarize them as follows.

Mercedes is a major manufacturer and seller of automobiles. Bosch is alleged to have manufactured components that enabled Mercedes to fool regulatory tests of their cars' emissions. Such evasion allegedly included the use of a defeat device, consisting of software within a car that alters the emission control system when tested by regulators in a specific test environment. This use of a defeat device would deceptively reduce a make a car's emissions appear to be lower when tested in the lab than they would be

---

[4] On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), I accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff. *Cardio–Med. Assoc., Ltd. v. Crozer–Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983).

under normal operation. In this way, a defeat device enables the vehicle to pass emissions tests but then reduces the effectiveness of the emissions control system during normal operation.

Other court and administrative proceedings have involved similar allegations against leading diesel vehicle manufacturers. Volkswagen pled guilty to criminal violations of the Clean Air Act; Mercedes and Bosch are under investigation by the U.S. Department of Justice ("DOJ"); Fiat Chrysler Automobiles ("FCA") has been subjected to civil proceedings by the Environmental Protection Agency ("EPA"). (5CAC ¶¶ 3) According to Plaintiffs, these diesel manufacturers used defeat devices made by Bosch that turn off or turn down emission controls when the vehicles electronically sense that they are not in a test environment.

Plaintiffs assert that Mercedes, its parent, Daimler, and Bosch have similarly engaged in an unlawful scheme to misrepresent the environmental impact of these Subject Vehicles during on-road driving. Specifically, Plaintiffs claim that due to the use of a defeat device the Subject Vehicles emit levels of NOx many times higher than (i) their gasoline counterparts; (ii) what a reasonable consumer would expect; (iii) what Mercedes has advertised; and (iv) the EPA's and certain states' maximum standards. (*Id.* ¶ 2)

### i. The Bosch Defendants

Robert Bosch LLC is organized under the laws of Delaware and has its principal place of business in Michigan. (5CAC ¶ 85) Bosch LLC is a wholly-owned subsidiary of Bosch GmbH. (*Id.*)

Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Germany. It is the parent company of Robert Bosch LLC. (*Id.* ¶ 84) Plaintiffs refer to these entities jointly as "Bosch" and assert that they share a common identity. (*Id.* ¶ 86) Both Bosch entities

are alleged to have designed, manufactured, and supplied parts of the defeat device to Mercedes. (*Id.* ¶ 84–85)[5]

### ii. Plaintiffs' Testing and Defeat Device Allegations

According to Plaintiffs, Mercedes advertisements, promotional campaigns, and public statements represented that the Subject Vehicles had high fuel economy, low emissions, reduced NOx by 90%, had lower emissions than comparable diesel vehicles, and had lower emissions than other comparable vehicles. (5CAC ¶¶ 11–12) However, Mercedes, with help of Bosch, installed an electronic control unit in the Subject Vehicles known as electronic diesel control unit or "EDC" 17. (*Id.* ¶¶ 17, 87, 259) EDC I7 allegedly functioned as a defeat device, *i.e.,* turned off or limited emissions reductions during real-world driving conditions as compared to lab testing.[6] (*Id.* ¶ 4–5) This defeat device was "only discoverable when conducting over-the-road testing that is not part of the certification protocol." (*Id.* ¶ 244) The Subject Vehicles also allegedly failed to perform up to their touted environmental

---

[5] German and U.S. prosecutors are currently investigating certain Bosch managers for their role in the emissions scandal involving Volkswagen, Mercedes, and other manufacturers. (*Id.* ¶ 90)

[6] When regulators test emission levels in a lab, they typically do so with a device called a chassis dynamometer, which might be compared to a treadmill. (5CAC ¶¶ 16, 115, 118–19, 155) The regulators then measure the emission levels at varying speeds and acceleration levels to see if the tested vehicle meets the relevant emission standards. (*Id.* ¶ 156) When properly calibrated, the chassis dynamometer can simulate real world driving with a high degree of accuracy. (*Id.* ¶ 155)

A separate form of testing can be done using a portable emission measurement system ("PEMS"), which measures the gaseous emissions from a vehicle, including NOx and PM. Being portable, the device can test emission levels during normal, on-road driving. (*Id.* ¶¶ 147, 151, 157) The critical distinction between PEMS and chassis dynamometer testing, then, is that the PEMS can operate during normal driving, while the chassis dynamometer operates only in a simulated, laboratory setting. (*Id.* ¶¶ 151–54) Defeat devices circumvented regulatory scrutiny by detecting that the vehicle was on a chassis dynamometer—i.e., not actually driving on the road. (*Id.* ¶ 164) If so, the defeat device would limit the emissions output to meet regulatory standards. If not—e.g., when the vehicle was driven on the road under normal conditions—the emission levels would not be limited, allowing the car to have better fuel economy and superior driving performance. (*Id.* ¶ 113)

standards in other situations, such as when ambient temperatures drop below 50°f/10°C—a defect Mercedes has acknowledged. (*Id.* ¶ 14)

Plaintiffs assert that the Bosch defendants, including Bosch GmbH, were actively involved in the scheme and worked with Mercedes to develop the defeat devices and hide their true purpose. (*Id.* ¶ 258–288) Specifically, Bosch LLC and Bosch GmbH are alleged to have developed, tested, and manufactured the EDC 17s and to have written the software that managed the functioning of each unit. (*Id.*) Plaintiffs allege that separation between the Bosch entities is difficult because Bosch's employees work simultaneously for both, and many divisions within the company function under both entities. (*Id.*)

Plaintiffs allege that defendants failed to disclose one or more defeat devices that Mercedes developed with Bosch for the Subject Vehicles. (*Id.* ¶¶ 19, 308–10). Plaintiffs base their allegations on their own testing of three different vehicles that they assert are representative of all Subject Vehicles in light of the fact that all of these vehicles contain substantially similar 2.0L or 3.1L engines. (*Id.* ¶¶ 137–257) They argue that since that these vehicles emitted suspiciously discrepant levels of emissions during road testing and lab testing, it follows that a defeat device must be present in all the Subject Vehicles. (*Id.*)

Plaintiffs also allude to 2015 and 2016 studies conducted by European groups called Transportation and Environment, ADAC, Emissions Analytics, and others. These studies allegedly found that certain other Mercedes diesel vehicles, along with almost every new diesel model, showed significant discrepancies between real-world emissions and laboratory emissions. (*Id.* ¶¶ 122–28, 132) Plaintiffs generally contend that these European diesel emission findings lend plausibility to their specific allegations against Mercedes and Bosch here. (*Id.* ¶¶ 134–36)

### iii. Marketing

Mercedes marketed its BlueTEC vehicles as "the world's cleanest and most advanced diesel" with "ultra-low emissions, high fuel economy and

responsive performance," representing that they emit "up to 30% lower greenhouse-gas emissions than gasoline." (5CAC ¶ 11) Mercedes promoted the Subject Vehicles to potential consumers in all 50 states as delivering reduced NOx emissions and generally as "clean diesels" that were "Earth Friendly" and complied with U.S. emissions standards (*Id.* ¶¶ 11–12, 307, 315–320)

Additionally, Bosch marketed "clean diesel" technology in the United States by communicating with the public through trade organizations, such as the Diesel Technology Forum ("DTF"), about the benefits of "clean diesel." (*Id.* ¶¶ 321–26)

### iv.  Legal Claims

Plaintiffs assert causes of action under the federal RICO statute (5CAC ¶¶ 349–418) and several state consumer protection laws (*Id.* ¶¶ 419–1479) With respect to economic harm, Plaintiffs allege that if they had known the true level of emissions produced by the Subject Vehicles they would not have purchased or leased them for the prices that they in fact paid. (*Id.* ¶ 310) Plaintiffs seek restitution, damages, injunctive relief, equitable relief, and attorneys' fees.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Constr. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. 544, 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. 662, 678.

With respect to allegations of fraud, "a party must state with particularity the circumstances constituting fraud," although "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) ("A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" (quoting *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002))). In doing so, "a party must plead [its] claim with enough particularity to place defendants on notice of the precise misconduct with which they are charged." *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (internal quotation and citation omitted).

III.   **RICO CLAIM**

a.  **Standard**

Plaintiffs allege that Bosch GmbH's conduct violates the federal RICO statute, 18 U.S.C § 1962(c)–(d); *see* 18 U.S.C. § 1964 (granting civil remedies for RICO violation). The RICO enterprise is alleged to be one by which the

Mercedes and Bosch defendants coordinated their operations through the design, manufacturing, distributing, testing, and sale of the Subject Vehicles.

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which effect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c)); *see In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362-63 (3d Cir. 2010). Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." To establish a claim under section 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 482-83 (1985); *see also District 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F.Supp.2d 508, 518-19 (D.N.J. 2011) (citation omitted).

The term "enterprise" for RICO purposes is exceedingly "broad," *Boyle v. United States*, 556 U.S. 938, 944 (2009). It includes "'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Ins. Brokerage*, 618 F.3d at 362-63 (citing 18 U.S.C. § 1961(4)). With respect to the pattern of racketeering activity, the statute "requires at least two acts of racketeering activity within a ten-year period," which may include federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343. *Id.* (citations omitted). In addition, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496.

The racketeering predicate acts alleged here are mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). (5CACA ¶ 378) Both statutes provide that "[w]hoever, having devised a scheme or artifice to defraud ... for the purpose of executing such scheme or artifice ..." either (a) "places in any post office or authorized depository for mail matter, any matter or thing," or (b)

"transmits or causes to be transmitted by means of wire … in interstate or foreign commerce" virtually any sort of material shall be guilty of an offense.

### b. Analysis

Bosch GmbH proffers four independent reasons that Plaintiffs' RICO claim must be dismissed:

> (1) Plaintiffs should not be allowed to convert their Clean Air Act claim into a RICO claim;
>
> (2) The direct-purchaser rule prohibits Plaintiffs from recovering against Bosch GmbH under RICO;
>
> (3) Plaintiffs may not base their RICO claim on a 'fraud on the regulator' theory; and
>
> (4) Plaintiffs have failed to allege a cognizable RICO injury.

(DE 239-1 at 16–29)

These arguments were for the most part discussed and decided in Judge Linares's prior motion to dismiss Opinion and Order (DE 161; DE 162). I give great deference to Judge Linares's rulings, which were well-considered and constitute the law of the case. *See generally Geibel v. United States*, 667 F. Supp. 215, 218-19 (W.D. Pa. 1987), *aff'd*, 845 F.2d 1011 (3d Cir. 1988) ("The doctrine of law of the case provides that when one district judge has rendered a decision in a case, and the case is later transferred to another judge, the successor should not ordinarily overrule the earlier decision.") (citation omitted); *ACLU v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) ("Under the law-of-the-case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."). Nevertheless, I briefly address these arguments.

### 1. Basis for Plaintiffs' claim Clean Air Act ("CAA") Claim

Bosch GmbH initially asserts that RICO cannot be used to create what amounts to a private right of action under the CAA, which does not provide for a private right of action. (DE 239-1 at 16–21)

Plaintiffs counter that the savings clause of the CAA[7] preserves their RICO claim. In any event, every court faced with this argument in emissions-fraud cases has rejected it. (DE 240 at 14 (citing *Counts v. Gen. Motors, LLC*, No. 16-CV-12541, 2018 WL 5264194, at *12 (E.D. Mich. Oct. 23, 2018)("In other words, the allegations concerning regulatory violations are collateral allegations which are unnecessary to sustain Plaintiffs' RICO claim."); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1088 (E.D. Mich. 2018) ("Plaintiffs' RICO claim is not primarily premised on proof of violation of EPA regulations and thus is cognizable. The alleged common purpose at the heart of the RICO scheme is the deception of consumers. The alleged injury is overpayment by consumers. . . . Plaintiffs' RICO claim is not an attempt to obtain a remedy which is exclusively within the purview of the EPA.").)

Judge Linares's prior opinion (DE 161) addressed a similar argument with respect to defendants' assertion that the CAA preempted Plaintiffs' state law claims. I find his reasoning equally applicable to Bosch GmbH's contention here that the CAA's lack of a private right of action bars a Plaintiffs' RICO claim:

> [W]hile Plaintiffs do reference violations of federal emissions standards those violations are not an essential element of their state-law claims. To prove their state-law claims, Plaintiffs must show that Defendants lied to or deceived them, not that Defendants violated federal emissions standards. The proof in which Plaintiffs must ground their claims pulls those claims outside the scope of the express preemption of the CAA. *Volkswagen*, 2018 WL 4777134, at *19; *FCA*, 295 F. Supp. 3d at 993–94; *Duramax*, 298 F. Supp. 3d at 1061: *Counts*, 237 F. Supp. 3d at 591—92. Second, Plaintiffs could prove that Mercedes lied about claims concerning its BlueTec engines, such as that it was "the world's cleanest and most advanced diesel" with "ultra-low emissions, high fuel economy and responsive performance," (FAC ¶ 11), without having to prove that emissions exceeded EPA-established limitations or that Defendants installed a defeat-device

---

[7] The savings clause states: "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief . . . ." 42 U.S.C. § 7604(e).

> prohibited by the EPA. Volkswagen. 2018 WL 477134, at *20; *FCA*,
> 295 F. Supp. 3d at 993–94; *Duramax*, 298 F. Supp. 3d at 1061–62;
> *Counts*, 237 F. Supp. 3d at 59 1–92. Thus. Plaintiffs' state-law
> claims are not expressly preempted by the CAA.

(DE 161 at 38)

In short the argument fails in its premise—*i.e.,* that RICO is simply a disguise for a private CAA claim. Plaintiffs' RICO claim, like their state law claims, is not premised on a violation of the CAA; rather, it alleges a pattern of deceptive marketing practices that amount to mail and wire fraud. These claims, while surely related to the concerns of the CAA, do not adopt the CAA as a predicate or rest on a violation of the CAA. "Plaintiffs' RICO claim is not primarily premised on proof of violation of EPA regulations and thus is cognizable. The alleged common purpose at the heart of the RICO scheme is the deception of consumers. The alleged injury is overpayment by consumers. The identified predicate acts of mail and wire fraud involve communications to consumers." *Duramax*, 298 F. Supp. 3d at 1088.

Therefore, I find that the CAA does not bar Plaintiffs' RICO claim here and **deny** Bosch GmbH's motion to dismiss on that basis.

## 2. Direct Purchaser Rule

Bosch GmbH next asserts that Plaintiffs' claims are barred by the RICO direct purchaser standing rule, first articulated for antitrust purposes in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). (DE 239-1 at 22–24) Of course, the price effects of an antitrust injury could indirectly affect anyone in the chain of distribution, and perhaps others as well. That judge-made direct seller rule, however, provides that only those direct purchasers harmed by an antitrust violation will be permitted to assert a claim for antitrust injury. *Id.* ¶ 735–36. The Third Circuit has applied this rule to RICO claims. *See McCarthy v. Recordex Serv. Inc.*, 80 F.3d 842, 847–48 (3d Cir. 1996). Bosch GmbH asserts that this rule bars Plaintiffs' claims against it because Plaintiffs are at best indirect purchasers from Bosch GmbH.

Plaintiffs counter that Bosch GmbH was a knowing participant in the RICO conspiracy and is therefore liable. (DE 240 at 19) Moreover, Plaintiffs state that the allegations in the 5CAC establish that their relationship with Bosch GmbH is sufficiently direct to overcome this hurdle. (*Id.* at 20–23)

This argument, or some version of this argument, has been rejected by several courts, including this one.

> Here, Plaintiffs make nearly identical allegations: "All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch GmbH exerts near-total control. In fact, the software is typically locked to prevent customers, like Mercedes, from making significant changes on their own. Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end." (FAC ¶ 270). Thus, Plaintiffs have established a sufficiently direct relationship between Bosch and the alleged RICO injury for purposes of RICO causation. *See Volkswagen*, 2018 WL 4777134, at *15–17 (rejecting Bosch's argument that the actions of the car manufacture break the causal link in the chain, and thus, that there is not a sufficiently direct relationship between Bosch and the plaintiffs RICO injury); *FCA*, 295 F. Supp. 3d at 967– 68 (same).

(DE 161 (Judge Linares Opinion) at 26) Accordingly, I **deny** Bosch GmbH's motion to dismiss insofar as it is based on the direct purchaser rule.

### 3. Fraud on the Regulator Theory

Bosch GmbH further asserts that the complaint fails to satisfy the requirement of proximate cause with respect to itself. (DE 239-1 at 24–25) Bosch GmbH seemingly concedes in general that Plaintiffs have adequately alleged mail and wire fraud, and that these are RICO predicate acts. (*Id.*) As to Bosch GmbH, however, the allegation is that it assisted Mercedes with false applications to the EPA. Such acts of "fraud on the regulator," says Bosch, do not constitute mail or wire fraud. (*Id.*)

Bosch GmbH heavily relies on *Cleveland v. U.S.*, 531 U.S. 12 (2000). In *Cleveland*, the issue was whether the submission of false statements in an application for a state gambling license could form the basis of a mail fraud

claim (which in turn was alleged as a RICO predicate). The Supreme Court held that the mail fraud statute aims at the deprivation of a victim's property. It requires "the object of the fraud to be 'property' in the victim's hands [but . . . ] a Louisiana video poker license in the State's hands is not 'property.'" *Id.* at 26-27. *Williams v. Dow Chem. Co.*, also cited by Bosch GmbH, is to similar effect: "Plaintiffs (unconvincingly) argue that Defendants' fraud on the EPA deprived Plaintiffs of the intangible right to honest services by the EPA." 255 F. Supp. 2d 219, 226 (S.D.N.Y. 2003) (internal quotes and citations omitted). Typically, the court observed, "the honest services theory of mail fraud is directed primarily at the deterrence and punishment of corruption among public officials." (*Id.*) In both cases, misrepresentations to a government agency was the sole basis of the plaintiff's mail fraud theory.

Those cases have limited application here. Plaintiffs here do not base their mail and wire fraud claims on an assertion that Bosch GmbH committed a fraud on the EPA; they allege substantive RICO and RICO conspiracy claims that Bosch GmbH participated in and had knowledge of. True, Plaintiffs assert that Bosch GmbH assisted with Mercedes' EPA applications, but the allegations go beyond that. The theory of Plaintiffs' case is that defendants made material misrepresentations that induced them to purchase vehicles. The 5CAC affirmatively outlines Bosch GmbH's involvement in the design and implementation of the scheme to use defeat devices in the Subject Vehicles and describes how the Bosch entities, including Bosch GmbH, and Mercedes together undertook marketing efforts to conceal this deception. (*See, e.g.*, 5CAC ¶¶ 321–26, 355–62) In short, the alleged scheme to defraud buyers included misrepresentations to the EPA, but EPA is not alleged to be the mail or wire fraud victim. The facts may or may not bear out the Plaintiffs' allegations as to the scope of Bosch GmbH's involvement. For purposes of this motion to dismiss, however, Bosch GmbH's singular focus on allegations concerning purported fraudulent statements to government regulators is misplaced. (*See* DE 239-1 at 24–25; DE 245 at 15–17)

Also critical here is the 5CAC's allegation that Bosch GmbH was part of a RICO conspiracy under Section 1962(d). A RICO conspiracy theory requires only that a defendant agreed to further the goals of the conspiracy, not that the defendant affirmatively engaged in a predicate act:

> The Supreme Court resolved a conflict among the Courts of Appeals, finding—as had the majority of our sister Courts of Appeals—that a RICO conspiracy defendant need not himself commit or agree to commit predicate acts. In upholding the result in the *Salinas* case, the Supreme Court found that a violation of section 1962(c) was not a prerequisite to a violation of section 1962(d). Rather, the Court found that for purposes of conspiracy it "suffices that [defendant] adopt the goal of furthering or facilitating the criminal endeavor." 522 U.S. at 65, 118 S. Ct. 469. Moreover, the Supreme Court provided an extensive discussion indicating that RICO's conspiracy section—section 1962(d)—is to be interpreted in light of the common law of criminal conspiracy and that all that is necessary for such a conspiracy is that the conspirators share a common purpose

*Smith v. Berg*, 247 F.3d 532, 537 (3d Cir. 2001). Here, the 5CAC sufficiently asserts an agreement through which Bosch GmbH is alleged to have committed to further the goals of the conspiracy by developing defeat devices to conceal each Subject Vehicle's true emissions and to assist with disseminating misleading marketing campaigns.

Accordingly, I **deny** Bosch GmbH's motion to dismiss insofar as it asserts that Plaintiffs have failed to allege predicate acts.

### 4. RICO Injury

Finally, I also reject Bosch GmbH's assertion that Plaintiffs have failed to establish a RICO injury.

Bosch GmbH proffers three reasons that the court erred when previously concluding that Plaintiffs had established a RICO injury. First, Bosch GmbH alleges that Chief Judge Linares invalidly distinguished three cases on which it relied: *Bridgestone*, *Ignition Switch*, and *McLaughlin*.[8] (DE 239-1 at 26–27)

---

[8]     *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 155 F. Supp. 2d 1069 (S.D. Ind. 2001); *In re: General Motors LLC Ignition Switch Litigation*, 2016 WL

Second, Bosch GmbH contends that Judge Linares relied upon nonprecedential Circuit Court opinions in other diesel emissions cases that are irrelevant here because these Plaintiffs, unlike those, have not pled specific overpayment amounts. (*Id.* at 27–28) Third, Bosch GmbH asserts that *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979), cited in Judge Linares's opinion, does not support the result in this case because Plaintiffs injuries are impermissibly based on what they expected to receive. (*Id.* at 29)

In essence, Bosch GmbH is asking this Court to wipe the slate clean of Judge Linares's reasoning. Absent strong reasons to do so, I will decline. *See Geibel*, 667 F. Supp. at 218-19 ("The doctrine of law of the case provides that when one district judge has rendered a decision in a case, and the case is later transferred to another judge, the successor should not ordinarily overrule the earlier decision.") (citation omitted); *ACLU v. Mukasey*, 534 F.3d at 187 ("Under the law-of-the-case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."). I see no sufficient reason to depart at this stage, although once again, the matter may appear different with the benefit of discovery.

Judge Linares reasoned that Plaintiffs' overpayment theory of RICO injury (now refined in the 5CACA to include an alleged price premium of 10%) was in general a valid one:

> Here, as in *Volkswagen*, *FCA*, and *Duramax*, Plaintiffs allege that Defendants participated in a scheme to place a defeat device in the Polluting Vehicles, rendering them defective from the moment they were manufactured. Because Defendants allegedly knew of—and orchestrated the creation of that defect, they had no intention of delivering vehicles with heightened fuel efficiency and environmental friendliness. *See Duramax*. 298 F. Supp. 3d at 1072 ("But, here, GM allegedly sold Duramax vehicles, for a premium. which did not perform as a reasonable consumer would expect. In other words, Defendants had no intention of delivering the emissions performance which consumers expected.").

---

3920353, at *7 (S.D.N.Y. July 15, 2016); *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008).

(DE 161 at 21. *See also id.* ( "The Supreme Court concluded that when "a consumer ... acquir[es] goods or services for personal use, [she] is injured in 'property' when the price of those goods or services is artificially inflated by reason of" defendants' racketeering conduct. (citing *Reiter v. Sonotone Corporation*, 442 U.S. 330, 337 (1979) and *Maio v. Aetna*, 221 F.3d 472, 483– 84 (3d Cir. 2000)).)

Overall, then, I **deny** Bosch GmbH's motion to dismiss the RICO counts.

## IV.   STATE LAW CLAIMS

### a. New Jersey Consumer Fraud Act

The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*, ("NJCFA"), requires a plaintiff to prove three elements: "(1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiffs ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557, 964 A.2d 741 (2009) (citations omitted).

Because the parties' briefing concerns element (2)—ascertainable loss—I will focus my attention there. As Judge Linares previously noted when reviewing similar arguments presented by Mercedes:

> "In cases involving . . . misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle . . . ." *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248 (2005). In demonstrating that out-of-pocket loss or loss in value, the New Jersey Supreme Court has explicitly endorsed the necessity of a price comparison in pleadings seeking to state a claim under the NJCFA. *See D'Agostino v. Maldonctclo*, 216 N.J. 168, 191 (2013) (detailing that an ascertainable loss must be capable of calculation); *Thiedemann*, 183 N.J. at 248 (describing ascertainable loss as 'not hypothetical or illusory" and a loss that "must be presented with some certainty demonstrating that it is capable of calculation, although it need not be demonstrated in all its particularity"). This district has interpreted the New Jersey Supreme Court precedent to require this price comparison as well. *E.g.*, *Riddell*, 77 F. Supp. 3d at 439; *Smajlaj*, 722 F. Supp. 2d at 100-01. In fact, in *Bosland v. Warnock Dodge, Inc.*, the New Jersey Supreme Court addressed the question of ascertainable loss in an automobile overcharge case. There, the Supreme Court held that

"the overcharge in question is one that can be readily quantified and thus [] ascertainable within the meaning of the CFA." 197 N.J. 543, 559 (2009). The plaintiff in *Bosland* though had specifically outlined the fee payments demonstrating that she could have been overcharged by either $40 or $20. *Id.* at 548.

(DE 161 at 48–49) Ultimately, Judge Linares determined that the 4CAC failed to compare what the plaintiffs paid to what they would have paid had the vehicles been as represented. (*Id.*) To remedy that deficiency, Plaintiffs now assert that the difference in the value of the care they thought they were purchasing versus the one they received is approximately 10% of the purchase price. (5CAC ¶ 416)

Bosch GmbH contends that these amended allegations still fail to quantify "ascertainable loss" because the 5CAC does not allege what each plaintiff paid for their vehicle or identify a cost of any comparable product. (DE 239-1 at 31–32) An ascertainable loss under the NJCFA "occurs when a consumer receives less than what was promised." *Union Ink Co., Inc. v. AT & T Corp.*, 352 N.J. Super. 617, 646, 801 A.2d 361 (App. Div. 2002) (citation omitted). The statute does not "require that the loss be monetary [ ]or that it must be pled beyond a reasonable degree of certainty." *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 300 (D.N.J. 2009). Indeed, Plaintiffs need not plead the exact dollar amount of their loss. *In re Gerber Probiotic Sales Practices Litig.*, No. 12–835, 2013 WL 4517994, at *5 n. 4 (D.N.J. Aug.23, 2013) (citing *Nelson v. XACTA 3000 Inc.*, No. 08–5426, 2010 WL 1931251, at *7 n. 3 (D.N.J. May 12, 2010); *Torres–Hernandez v. CVT Prepaid Solutions, Inc.*, No. 08–1057, 2008 WL 5381227, at *7 n. 3 (D.N.J. Dec.17, 2008)).

Where a lone plaintiff paid for a pound of hamburger but received only fifteen ounces, the ascertainable loss calculation may easily be alleged. By contrast, Plaintiffs' class-wide 10% figure has a certain plucked-from-the-air quality. The reduction in the market value of the cars, however, can be explored in discovery, whether in connection with class certification or on the merits. At the motion to dismiss stage, I find that the allegation is sufficient.

Accordingly, I **deny** Bosch GmbH's motion to dismiss Plaintiffs' NJCFA claim.

### b. Georgia Uniform Deceptive Trade Practices Act ("UDTPA")

Bosch GmbH challenges Plaintiffs' Georgia UDTPA claim, stating that Plaintiffs have not made the required allegation of ongoing harm. (DE 239-1 at 32– 33)

"Under Georgia's [UDTPA], '[a] person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he . . . [c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services. . . .'" *Wood v. Archbold Med. Ctr., Inc.*, No. 6:05 CV 53(HL), 2006 WL 1805729, at * (M.D. Ga. June 29, 2006) (citation omitted). "While [the UDTPA] expressly does not preclude other actions based on common law or other statutory authority, the sole remedy provided under [the UDTPA] is injunctive relief." *Lauria v. Ford Mtr. Co.*, 169 Ga. App. 203, 206 (1983). *See also Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc.*, Civil Action File No. 1:04-CV-1082-TWT, 2006 WL 1663357, at *4 n.2 (N.D. Ga. June 14, 2006) ("[U]nder the Georgia [UDTPA], injunctive relief is the only remedy available for such a violation."). Civil damages, therefore, are never available under the UDTPA. *Boynton v. State Farm Mut. Auto. Ins. Co.*, 207 Ga. App. 756, 757 n.1 (1993). "To have standing to seek injunctive relief under the UDTPA, a plaintiff must show ... that [it] is likely to be damaged in the future by some deceptive trade practice of the defendant." *Bolinger v. First Multiple Listing Serv., Inc.*, 838 F.Supp.2d 1340, 1364 (N.D. Ga. 2012) (internal quotations omitted).

Here, Bosch GmbH contends that Plaintiffs have not met their burden because they have at most alleged a past harm, in that Plaintiffs overpaid for their vehicles. Such a harm, they say, cannot be the subject of a UDTPA injunctive claim. (DE 239-1 at 33)

I disagree. Plaintiffs have sufficiently alleged at the motion to dismiss stage that there is a risk of future harm. To the extent these vehicles are still

being driven and are on the roads, for example, it is plausible that they would continue to emit high levels of NOx. (*See, e.g.*, 5CAC ¶ 645)

Bosch GmbH's motion to dismiss Plaintiffs' Georgia UDTPA claim is therefore **denied**.

### c. Fraudulent Concealment

Finally, Bosch GmbH challenges Plaintiffs' fraudulent concealment claims.[9] As Judge Linares outlined, and taking New Jersey as an example,

> To state a claim for fraudulent concealment under New Jersey law, a plaintiff must establish: (1) a material misrepresentation or omission of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity or knowing the omission to be material; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Delaney v. Am. Express Co.*, No. 06-51 34, 2007 WL 1420766, at *5 (D.N.J. May11, 2007); *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997). Rule 9(b) applies to fraudulent concealment claims, *GKE Enters., LLC v. Ford Motor Credit Co. LLC USA*, No. 09-4656, 2010 WL 2179094, at *4 (D.N.J. May 26, 2010); however, as mentioned above, Plaintiffs are not required to plead fraud by omissions claims as precisely as affirmative misrepresentation claims, *Feldman*, 2012 WL 6596830. at * 10, so long as the complaint places "the defendant on notice of the precise misconduct with which it is charged," *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 443 (D.N.J. 2012) (quoting *Frederico*, 507 F.3d at 200).
> . . .
> Under New Jersey law, "courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a specia1 relationship." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). The categories of relationships that give rise to a duty to disclose are: "(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied: and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." *Id.* Here, Plaintiffs do

---

[9]	Specifically, Plaintiffs have asserted claims under the laws of Alabama, California, Colorado, Connecticut, Georgia, Idaho, Illinois, Indiana, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin.

not assert that they fall into one of the special relationship categories with Defendants. As such, the Court will only focus on the parties' arguments challenging whether or not a duty to disclose existed to make a previous statement true.

(DE 161 (Judge Linares Opinion) at 41, 44) The parties do not suggest that there are material differences between New Jersey's fraudulent concealment statute and those of the other states at issue. Nor do the parties meaningfully discuss the majority of the elements of a fraudulent concealment claim. Instead, Bosch GmbH asserts that these claims must be dismissed solely because Plaintiffs have not established that Bosch GmbH had a duty to disclose. (DE 239-1 at 34, n.12 (citing cases under each state establishing the requirement of a duty to disclose requirement.))

As to the duty to disclose, I again find Judge Linares's prior opinion instructive:

Plaintiffs set forth numerous examples of Mercedes' nationwide marketing efforts to promote its BlueTEC clean diesel vehicles. (FAC ¶¶ 323–27). In none of those examples does Mercedes disclose that the purported benefits of the B1LICTEC engine could only be achieved through or were completely obscured by the use of a defeat device. These allegations are sufficient to establish partial disclosures that Mercedes had an obligation to make true. *See Timing Chain*, 2017 WL 1902160. at *20 (finding that the plaintiffs plead a partial disclosure after which the defendant had a duty to disclose "any and all information regarding the Timing Chain System" to plaintiffs, where the plaintiffs alleged that the defendant "represent[ed] in the maintenance schedules that the timing belt, which performs the same function as the Timing Chain System, will need service after a certain time but makes no representation that the Timing Chain System will need maintenance"); *Strawn v. Canuso*, 271 N.J. Super. 88, 104 (App. Div. 1994) (establishing a duty on buyers and brokers of real estate to disclose the existence of off-site conditions that were unknown to the buyer but that were known or should have been known to the seller and that would reasonably and foreseeably affect the value or desirability of the property), *aff'd* 140 N.J. 43 (1995). In fact, in *Strawn*, the New Jersey Supreme Court adopted the interpretation of the Restatement (Second) of Torts which imposes a "duty upon a party to disclose to another 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake . . . and the other, because of the relationship

between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts," where the nondisclosure of those facts amounts to taking advantage of the plaintiffs ignorance, such that it would be "shocking to the ethical sense of the community, and [would be] so extreme and unfair, as to amount to a form of swindling." *United Jersey Bank v. Kensev.* 306 N.J. Super. 540. 554 (App. Div. 1997) (citations omitted). It is this Court's opinion that Mercedes and Bosch's active concealment of the existence of the defeat device amounts to such a situation. (*Cf. FCA*, 295 F. Supp. 3d at 1009 (finding that allegations of defendants' active concealment of the defeat devices was sufficient to establish a duty to disclose under New Jersey law); *Counts,* 237 F. Supp. 3d at 600 (noting that the defendant's alleged active concealment of the defeat device was sufficient to establish a duty to disclose in some states)."

(DE 161 at 44–45) With respect to Bosch LLC specifically, Judge Linares stated "for the same reasons that Plaintiffs need not establish direct reliance on Mercedes' representations, they need not establish direct reliance on Bosch's: they allege that Bosch intentionally withheld the existence of the defeat device while simultaneously promoting clean diesel technology around tile country." (*Id.* ¶ at 43)

Throughout the 5CAC, Plaintiffs allege that Bosch LLC and Bosch GmbH acted as one in that they collaborated and shared employees that worked on developing, manufacturing, supplying, writing the code that supported the EDC 17 units, and testing those units with Mercedes. (5CAC ¶¶ 84, 86, 91, 259, 263, 274) Bosch GmbH is the entity alleged to control the programing and software underlying the EDC 17 units. (*Id.* ¶ 262) Bosch GmbH is therefore alleged to have actively worked to develop these "defeat devices."

Accepting the allegations as true, as I must, it is plausible that, when it came to marketing the units and promoting "clean diesel," it was in Bosch GmbH's interest to conceal the true nature of these devices. The 5CAC sufficiently asserts facts suggesting that the Bosch entities collectively were actively involved in promoting the alleged misrepresentations:

- "Bosch, Bosch GmbH, and Bosch LLC not only kept Volkswagen's, and all the other diesel manufacturers' dirty secrets safe, it went a

step further and actively lobbied lawmakers to push "Clean Diesel" in the U.S., including making Polluting Vehicles diesel vehicles available for regulators to drive." (*Id.* ¶ 289)

- "In 2012 Audi, BMW, Bosch, Daimler, Porsche and VW joined to form The Clearly Better Diesel initiative. The initiative was announced in Berlin by the German Association of the Automotive Industry. Its stated goal was to promote the sale of clean diesel vehicles in the U.S. The initiative's slogan was 'Clean Diesel. Clearly Better.'" (*Id.* ¶¶ at 296, 322 (citing https://www.dieselforum.org/news/clean-diesel-clearly-better-campaign-for-clean-diesel-cars-welcomed which states that "The new promotional diesel campaign was announced today in Berlin by the German Association of the Automotive Industry (VDA) and member companies – Audi, BMW, Bosch, Daimler, Porsche and Volkswagen."[10])

These allegations are sufficient at the motion to dismiss stage to support a finding that Bosch GmbH, like Bosch LLC, had a duty to disclose to make previous statements concerning its efforts to drive the "cleanliness" of diesel vehicles true. Accordingly, Bosch GmbH's motion to dismiss Plaintiffs' fraudulent concealment claims is **denied**.

---

[10]     While I do not rely on it, VDA's website states that the Bosch referred to here is Bosch GmbH. *See* https://www.vda.de/en/association/members/manufacturer-group-III.html.

## V. CONCLUSION

For the reasons stated above, Defendant's motion (DE 239) to dismiss the 5CAC is **DENIED**. An appropriate Order accompanies this Opinion.

Dated: March 25, 2020

/s/ Kevin McNulty
_____
**Kevin McNulty**
**United States District Judge**